PAUL J. BEARD II (State Bar No. 210563)
FISHERBROYLES LLP
4470 W. Sunset Blvd., Suite 93165
Los Angeles, CA 90027
Telephone: (818) 216-3988
Facsimile: (213) 402-5034
E-mail: paul.beard@fisherbroyles.com

Attorneys for Plaintiff
SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION,<br><br>    Plaintiff<br><br>    v.<br><br>COUNTY OF SAN DIEGO, BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO, and DOES 1 through 20, inclusive,<br><br>    Defendants. | Case No.: **'21CV0912 DMS DEB**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES** |

COMPLAINT

**INTRODUCTION**

1. On May 4, 2021, Defendant Board of Supervisors of the County of San Diego voted to pass an Ordinance that indefinitely bans evictions within both the incorporated and unincorporated areas of the County. The Ordinance passed by a narrow 3-2 vote, after four hours of testimony from members of the public. Out of 835 written comments to the Board, 88% were opposed to the Ordinance. Moreover, 70% of speakers at the hearing testified against the Ordinance. The reason for the robust opposition to the Ordinance, including by two Supervisors, is obvious: The Ordinance threatens the lives and livelihoods of thousands of property owners in the County who provide tenants with housing.

2. The Ordinance bars owners—many of them small, "mom and pop" landlords—from moving themselves and/or their families back into their units, due to financial hardship, housing displacement, or other extenuating circumstances. It bars owners from evicting nonpaying tenants, with no mechanism for compensating owners. It bars owners from evicting tenants who harass or threaten owners, their agents, third parties (repair or service workers, delivery workers, etc.). And, it bars owners from evicting tenants who use their units for illegal purposes or create nuisances that impair the peace, comfort, and quiet enjoyment of those who live in, or work at, rental properties, but which may not rise to the level of a "hazard" to health and safety.

3. In short, the Ordinance strips owners of their federal constitutional rights to use and control their properties, as well as their right to exclude, as protected by the Fifth and Fourteenth Amendments to the United States Constitution. Further, the Ordinance rewrites existing rental agreements that provide owners with eviction rights and remedies for breaches and unlawful conduct, in violation of the Contracts Clause of the United States Constitution. Finally, though the California Constitution strictly limits the reach of County laws to unincorporated areas within its borders, the Ordinance flouts that constitutional limitation and purports to apply to owners with properties in *cities* within the County (i.e., in *incorporated* areas).

4. The Ordinance seemingly creates a limited exception to the eviction ban—the only "just cause" for tenant removal. "Just cause" exists to evict a tenant if and only if the owner can prove that the tenant presents a "hazard to the health or safety of other tenants or occupants of the same

property." But even *that* exception to the ban is subject to substantial and vague limitations. Moreover, removing even a "hazard[ous]" tenant exposes the owner to costly litigation by the tenant over "strict compliance" with the Ordinance's numerous requirements, including over whether a tenant's conduct rose to the level of a "hazard"—a term that the Ordinance leaves undefined. The Ordinance creates a cause of action for the tenant to pursue damages against the owner, including for the tenant's "mental or emotional distress." Given the significant risks and costs associated with invoking even the vague and narrow exception to the eviction ban, the exception is toothless.

5.  Plaintiff Southern California Rental Housing Association is an association of rental housing owners, many of whom own units in the County and are subject to, and injured by, the Ordinance's eviction moratorium. The Ordinance violates their federal constitutional rights, as described herein. For those members with rental housing units in cities within the County, the Ordinance unconstitutionally purports to apply to those properties, as well. Plaintiff brings this challenge to the Ordinance on behalf of itself and its members to vindicate their civil rights under 42 U.S.C. § 1983, and seeks equitable relief and damages.

## JURISDICTION AND VENUE

6.  This action is brought pursuant to 42 U.S.C. § 1983, based on Defendants' deprivation of the constitutional rights of Plaintiff and its members under the Fifth and Fourteenth Amendments to the United States Constitution, as well as under Article I, Section 10, Clause 1 of the United States Constitution. Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the state-law claim pursuant to 28 U.S.C. § 1367(a). This Court has authority to grant the requested declaratory and injunctive relief, and damages, pursuant to 28 U.S.C. § 2201, 28 U.S.C. § 1343(a), and 42 U.S.C. § 1983, and to award attorneys' fees and costs pursuant to, *inter alia*, 42 U.S.C. § 1988.

7.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), because Defendants are located within this district and a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## PARTIES

8.  Plaintiff SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION

3
COMPLAINT

("SCRHA") is a California not-for-profit corporation authorized to do business in the State of California. SCRHA is one of Southern California's leading trade associations, serving the needs of the rental housing industry in San Diego, Imperial, and southern Riverside Counties. The mission of SCRHA is to protect rental housing and educate the industry. SCRHA has 2,200 dues-paying members, many of whom are owners of rental housing within the County of San Diego. Members control the direction of the SCRHA, in part by annually voting for its officers.

9.  Some SCRHA members own rental units within the unincorporated areas of the County of San Diego and are subject to the ordinance challenged herein. Some SCRHA members own rental units within *incorporated* areas of the County (i.e., cities within the County), against whom the Ordinance purports to apply as well. These SCRHA members are "Landlords" as that term is defined in the Ordinance and would have standing to challenge the Ordinance in their own right. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

10. SCRHA members include small, "mom and pop" owners in the County who want and are prepared to repossess their units on grounds barred by the Ordinance, including without limitation: (1) to move themselves and/or their immediate family members into the units; (2) to remove tenants who harass and threaten owners, their agents, or third parties (e.g., repair or delivery persons); (3) to remove tenants who have been damaging units; (4) to remove tenants who have not paid rent.

11. For example, Michael and April Solis are husband and wife, and members of SCRHA. They own a single-family, fully furnished home in the City of San Diego. That was their first home and the one their children were born in. They have been renting the home to an individual, whose tenancy is set to expire on July 12, 2021. The tenant is from out-of-state and is very wealthy; he has a home in Northern California, as well as several income properties. The tenant has not been financially impacted by COVID-19. Since moving in, the tenant has unlawfully and without the Solis' permission moved in another family. Further, the tenant has regularly harassed and sent threatening messages to the Solis family. He threatened the entire family—including the children—with bodily harm, saying that he knew where the family lived. He has threatened bogus slip-and-fall lawsuits and has damaged the property, including the pool equipment, slider and window screens, and fencing. Further, he has harassed and threatened third parties engaged by the Solis family to maintain and service the property,

including a pool repair worker, a San Diego Gas & Electric employee, and a handyman. Given the tenant's gross misconduct and the threat he presents to the Solis family, the family recently sent him a 60-day that they did not wish to extend his tenancy beyond July 12. However, citing the recently enacted Ordinance, the tenant boasted that he would stay in the house, and that the Solis family could not remove him. While the tenant is wealthy and is living comfortably in the Solis' house with no repercussions for his conduct, the Solis family has suffered severe financial and emotional distress. Ms. Solis lost her job during the first few months of the pandemic. Mr. Solis has owned a business in San Diego for 25 years, but the pandemic has impacted his business and income. Their dire financial circumstances are such that they and their children must move back into their home. Although they want and are prepared to pursue removal of this problematic tenant, in part so that they can move their family back in, they are barred from doing so because of the Ordinance. The Ordinance has caused, and continues to cause, significant financial and emotional harm and distress to the Solis family.

12.     Larry Gale is also a member of SCRHA. He owns a single-family home in Casa de Oro, in an unincorporated area of the County. The house has been rented on a month-to-month basis to a family for several years. The tenants have breached their obligations under the agreement to maintain and preserve the property in good condition. The yards have become weed-infested. The home itself has been substantially damaged by the tenants. Mr. Gale is elderly and has been regularly mistreated by the tenants. They do not allow him access to or in the property, including simply to maintain the yards. They have changed the locks without permission. At present, Mr. Gale wishes to move his daughter into his home. As a restaurant worker, she has been financially impacted by COVID-19. However, the Ordinance prevents him from exercising his rights to repossess the property even to house his own daughter. The Ordinance has caused, and continues to cause, significant financial and emotional harm and distress to Mr. Gale.

13.     Irma Pintor is also a member of SCRHA. She owns a duplex in the City of San Diego. She is a senior citizen and does not speak English. She used to live in one side of the duplex, while the other side was rented out to a tenant (Tenant 1). But Tenant 1 stopped paying rent. To make ends meet, Ms. Pintor was forced to move out of her duplex and temporarily sleep in her garage, so that she could bring in a paying tenant (Tenant 2). Tenant 1 has repeatedly harassed Ms. Pintor, to the point

where Ms. Pintor must now move out of her garage and into her son's residence. Tenant 1 also has repeatedly harassed third parties, including individuals sent to her unit to make requested repairs. Ms. Pintor understands that Tenant 1 is unable to make rent, and does not want to evict the tenant for that reason. However, Tenant 1's pattern and practice of gross misconduct vis-à-vis Ms. Pintor and third parties authorized to make repairs on the premises require Tenant 1's removal. While she is prepared to take all lawful steps to remove Tenant 1, she cannot do so because of the Ordinance. The dire situation with Tenant 1—and the Ordinance, which purports to strip Ms. Pintor of all her rights and remedies to deal with that situation—have caused, and continues to cause, significant financial and emotional harm and distress to Ms. Pintor.

14. Defendant COUNTY OF SAN DIEGO is a subdivision of the State of California, and has the power to sue and be sued. The County has the power to "make and enforce within its limits all local, police, sanitary and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7.

15. Defendant BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO is the legislative and executive authority of the County. The Board enacted the Ordinance challenged herein.

16. Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 20 and therefore sues Defendants by such fictitious names. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is in some manner responsible or liable for the events and happenings referred to herein, and that each such fictitiously named Defendant caused injury and damage to Plaintiff as alleged in this Complaint. Plaintiff will amend or seek leave of court to amend this Complaint to allege the true names and capacities of such fictitiously named Defendants when the same are ascertained.

17. Plaintiff is informed and believes, and thereon alleges, that at all relevant times, each of the Defendants was the agent of each of the remaining Defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency or employment.

**FACTUAL ALLEGATIONS**

18. On April 6, 2021, the Board considered an "urgency" version of the Ordinance. That version contained Finding (gg), which stated that the Ordinance was "necessary for the immediate

preservation of the public peace, health, and safety." An urgency ordinance goes into effect immediately upon enactment, after only one reading by the Board, and requires an affirmative vote of 4 out of 5 Supervisors. Ultimately, the Board did not support the "urgency" version of the Ordinance and deleted Finding (gg) contained in that draft. The Board therefore concluded there was no urgency in passing the Ordinance.

19. On May 4, 2021, the Board considered the current version of the Ordinance. Not being an urgency ordinance, the Ordinance—if enacted—would take effect 30 days after final passage. As a non-urgency Ordinance, it required the affirmative vote of only a bare majority (3 of 5 Supervisors). After 4 hours of testimony from members of the public, the vast majority of whom were opposed to the Ordinance, the Board narrowly voted to approve the Ordinance by a 3-2 vote with little to no substantive deliberation concerning the issues raised by opponents of the Ordinance.

20. The Ordinance states that, "[i]n the absence of just cause, no Landlord may lawfully terminate a residential tenancy and are [sic] therefore prohibited from engaging in any of the following behaviors with respect to a Tenant of a residential unit: (1) Serve a notice of termination of tenancy; (2) File or serve an unlawful detainer lawsuit, ejection action, or other action to recover possession of a residential unit; (3) Evict a Tenant or require a Tenant to vacate a residential unit, including by seeking the entry of an eviction judgment or by causing or permitting a writ of possession to be executed, including in the case of judgments entered prior to the date of this ordinance; (4) Take any other action in reliance on a notice of termination of tenancy that expired during the Local Emergency or attempt to induce a tenant to vacate based on such a notice. Any notice of termination of tenancy served or expiring during the Local Emergency or within sixty (60) days afterward shall be deemed invalid and insufficient to support an action in unlawful detainer during the Local Emergency or at any time afterward; or (5) Represent to a Tenant that the Tenant is required to move out of their unit by law." Ordinance, § 3(c).

21. Under the Ordinance, "'just cause' requires a showing that the Tenant is an imminent health or safety threat, as defined in Section 2." Ordinance, § 3(b). Section 2 of the Ordinance defines "imminent health or safety threat" as "a hazard to the health or safety of other tenants or occupants of the same property, taking into account (1) the risk of potential spread of coronavirus caused by the

eviction, in case of a Local Emergency due to COVID-19, (2) any public health or safety risk caused by the eviction, and (3) all other remedies available to the landlord and other occupants of the property, against the nature and degree of health and safety risk posed by the tenant's activity." The Ordinance specifically excludes from the definition of "imminent health or safety threat" "the Resident's COVID-19 illness or exposure to COVID-19, whether actual or suspected." Ordinance, § 2. The Ordinance does not define the term "hazard."

22. The Ordinance ensures that the "just cause" exception to the eviction moratorium will rarely (if ever) be invoked by rental housing owners. That is because invoking the exception—even successfully—exposes an owner to the risk of costly and time-consuming litigation by the tenant. The Ordinance provides that, if an owner "attempts to recover possession or recovers possession of a residential real property in violation of this ordinance," the "aggrieved Tenant may institute a civil proceeding for injunctive relief, money damages (including for mental or emotional distress . . . ), and all other relief the court deems appropriate." Ordinance, § 7(c). Thus, for example, a tenant who receives a notice to terminate based on an owner's good-faith belief that he presents an "imminent health or safety threat" can sue the owner over whether the (vaguely defined) "imminent health and safety" criterion was satisfied. Few, if any, owners will want to invite that kind of litigation risk.

23. While the Ordinance purports not to "relieve Tenant of the obligation to pay rent, nor restrict a Landlord's ability to recover rent due," Ordinance, § 3(k), the Ordinance does just that. Under the Ordinance, nonpayment of rent is not "just cause" for eviction, so a rental housing owner may not evict a tenant for failure to pay rent. The natural consequence is that, as long as the Ordinance is in effect, tenants are excused from paying rent because owners are without legal remedy. Thus, the Ordinance has the legal and practical effect of relieving tenants of their obligation to pay rent and blocks rental housing owners' ability to recover rent due.

24. The Ordinance applies to *all* rental housing owners and *all* tenants in the County. Specifically, the Ordinance applies against "owners, lessors, or sublessors (of any level) of either residential rental property, and the agent, representative, or successor of any of the foregoing." Ordinance, § 2(c). Further, the Ordinance applies in favor of any "tenant, subtenant, lessee, sublessee (of any level), or any other person entitled to use or occupancy of residential property, including

8
COMPLAINT

occupants who are holding over after the expiration of the term of a written or oral lease and current occupants who occupied the property with the current or prior consent of the property's landlord or a prior owner," including "a prior homeowner residing in a residential unit post-foreclosure." Ordinance, § 2(f).

25.     Further, the Ordinance applies, not just to unincorporated areas, but to "cities within the County" as well. Ordinance, § 8(a). It further supplants conflicting city laws, to the extent that they are less beneficial to tenants within the County. *Id.*, § 8(c).

26.     Having been passed on May 4, the Ordinance goes into effect on June 3, 2021. The Ordinance's moratorium expires "60 days after the Governor lifts all COVID-19-related stay-at-home and work-at-home orders." Ordinance § 3(a). Since it is unknown when the Governor will lift those orders, the Ordinance's expiration date is also unknown. Thus, the Ordinance will be in effect for an indefinite period of time.

27.     Plaintiff and its members objected to passage of the Ordinance at both the April 6 and May 4, 2021, hearings by the Board. They were joined by hundreds of speakers who opposed and continue to oppose this draconian law. Nevertheless, as described above and by a close 3-2 vote, the Board enacted the Ordinance.

## FIRST CLAIM

**Violation of the Contracts Clause of the United States Constitution**

**(U.S. Const. Art. I, § 10, cl. 1; 42 U.S.C. § 1983)**

*By Plaintiff Against All Defendants*

28.     Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

29.     The Contracts Clause of the United States Constitution prohibits local governments from passing "any . . . Law impairing the Obligation of Contracts." U.S. Const., Art. I, §10, cl. 1. Contracts Clause violations are actionable under 42 U.S.C. § 1983. *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) ("The right of a party not to have a State, or a political subdivision thereof, impair its obligations of contract is a right secured by the first article of the United States Constitution. A deprivation of that right may therefore give rise to a cause of action

under section 1983.").

30. Whether a law substantially impairs a contractual relationship depends upon "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). First, the court will determine whether the law "operate[s] as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). "In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. Second, the court considers "whether the [challenged] law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822 (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412 (1983)).

31. Here, the Ordinance substantially impairs the contractual relationship between rental housing owners and their tenants. Specifically, the Ordinance places a moratorium on *all* evictions within the County, except insofar as the rental housing owner can prove that a tenant's conduct rises to the level of being a "hazard to the health or safety of other tenants or occupants of the same property." Ordinance, § 3(c), 2(a). Even when a tenant presents such a "hazard"—the only "just cause" for eviction—a rental housing owner may be barred from evicting him in light of "the risk of potential spread of coronavirus caused by the eviction, in case of a Local Emergency due to COVID-19, (2) any public health or safety risk caused by the eviction, and (3) all other remedies available to the landlord and other occupants of the property, against the nature and degree of health and safety risk posed by the tenant's activity." There is an additional restriction on evictions even for "hazard[ous]" tenants: "An imminent health or safety threat cannot be the Resident's COVID-19 illness or exposure to COVID-19, whether actual or suspected." In other words, a tenant with COVID-19, who intentionally or negligently fails to take adequate precautions to avoid transmission to other tenants or occupants of the premises cannot be evicted, even though he clearly presents a "hazard" to them. The term "hazard" is undefined, as are the various purported limitations on a "hazard"-based eviction. Further, an owner who invokes this "just cause" provision for eviction exposes herself to a substantial risk of litigation

by the tenant—including over whether the tenant's conduct rose to the level of a "hazard." The "just cause" exception to the eviction mortarium is, for all intents and purposes, is ineffective.

32. Apart from that "exception," <u>all evictions are prohibited</u>, including for the following tenant conduct:

    a. harassing, threatening, or endangering the health or safety of the rental housing owner; her employees and agents; invited guests of other tenants; and third parties authorized to conduct business on the property (e.g., repair persons, utility service providers, delivery persons, etc.);

    b. damaging or destroying the rental unit or common areas of the rental housing premises;

    c. creating a disturbance or nuisance inside a rental unit or in common areas, including in a way that affects others' peace, comfort, and quiet enjoyment of property through the generation of noise, odors, and other offensive conduct;

    d. using the rental unit for unlawful purposes in a manner that may not clearly rise to the level of constituting a "hazard to the health or safety of other tenants or occupants of the same property" (e.g., housing occupants not listed in the rental agreement; keeping unauthorized pets, whose nature or number risks property damage and destruction; illegal drug cultivation, dealing, or use; prostitution; etc.);

    e. failure to pay rent;

    f. refusal to vacate unit, following otherwise-lawful notice, to allow the rental housing owner and/or her family to move into said unit, out of financial necessity or other extenuating circumstance.

33. In sum, the Ordinance indefinitely excuses tenants from their contractual obligations under their rental agreements, and indefinitely bars Plaintiff's members from pursuing their contractual right to remove tenants who breach those agreements or violate the law. Thus, the Ordinance undermines the contractual bargain that is the hallmark of all rental agreements, including the agreements of Plaintiff's members, interferes with rental housing owners' reasonable expectations, and deprives them of their contract remedies so that they cannot safeguard their rights.

34. In addition, the Ordinance significantly interferes with rental housing owners' reasonable expectations. No rental housing owner, including Plaintiff's members, could ever have foreseen or expected the COVID-19 pandemic (the County's purported justification for the Ordinance) and or the extent to which governments (like the County) would use those extraordinary circumstances to justify crippling restrictions on their livelihoods as owners, and violations of their rights under existing rental agreements and the United States Constitution. Never before have rental housing owners faced the prospect of being compelled by law to indefinitely house tenants irrespective of their "non-hazardous" misconduct, breaches, and law-violation.

35. Because the Ordinance substantially impairs contracts, Defendants bear the burden of showing that the impairment is both reasonable and necessary. Defendants cannot meet that burden. The Ordinance cites the COVID-19 pandemic as its justification. But, as the County knows, the spread and effects of COVID-19 in the County and the State as a whole are dramatically waning. The Governor of California himself claims that if the State remains on the current trajectory, the State will "fully reopen on June 15,"[1] just days after this Ordinance goes into effect. Below are graphs showing cases and deaths in the County, since March 19, 2020 through to May 10, 2021:



---
[1] https://www.gov.ca.gov/2021/04/06/governor-newsom-outlines-the-states-next-step-in-the-covid-19-pandemic-recovery-moving-beyond-the-blueprint/ (last visited on May 11, 2021).



36. The Board of Supervisors itself conceded that no emergency justifies the Ordinance. At its first reading of the Ordinance on April 6, the Board voted to eliminate a finding contained in the draft ordinance, which stated that the eviction moratorium "is necessary for the immediate preservation of the public peace, health, and safety." There being no public-health or other emergency, the County cannot meet its burden of establishing that the substantial impairment of housing owners' rental agreements is necessary.

37. Nor can the County establish that the impairment of owners' rental agreements is reasonable. By barring evictions, the Ordinance creates many more problems and threats than it purports to resolve. Under the Ordinance, rental housing owners, their agents, and other persons authorized to be on rental housing premises must now contend with tenants who are, among other things, harassing and dangerous to them, and destructive of property. Innocent tenants must suffer "nonhazardous" disturbances, nuisances, unlawful uses of property, and other misconduct that cannot be eliminated by removal of the offending tenant. The consequence of the eviction moratorium is that on-site threats to life, limb, and property, as well as to the peaceful and quiet enjoyment of rental units

by innocent tenants, will go unaddressed and even grow.

38. In sum, the Ordinance unilaterally rewrites all rental agreements within the County to eliminate tenant obligations, without any attempt to tie such wholesale revisions to the COVID-19 pandemic. Even if there were a legitimate purpose behind the County's Ordinances, which there is not, the complete obliteration of the contract rights of Plaintiff's members is not a reasonable or necessary means of achieving that purpose. Accordingly, the contractual impairments effectuated by the Ordinance violate the Contracts Clause and are unconstitutional.

39. In applying the Ordinance to Plaintiff's members and other rental housing owners, the County is acting under color of law. The County's conduct in adopting and enforcing the Ordinance has deprived and, unless enjoined, will continue to deprive owners of their rights, privileges, and immunities secured by the United States Constitution and/or laws of the United States to which owners are entitled.

40. Unless the County is enjoined and restrained from enforcing or threatening to enforce the Ordinance, Plaintiff's members and other owners will be irreparably injured. They will be deprived of rights guaranteed under the United States Constitution. Further, Plaintiff's members are entitled to nominal and compensatory damages for violation of their constitutional rights under 42 U.S.C. § 1983.

## SECOND CLAIM

**Violation of the Takings Clause of the United States Constitution**

**(U.S. Const. amends. V, XIV; 42 U.S.C. § 1983)**

*By Plaintiff Against All Defendants*

41. Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

42. The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the government from taking private property unless (a) it is for a "public use" and (b) "just compensation" is paid to the rental housing owner. U.S. Const. amend. V, XIV (making Takings Clause applicable to state and local governments); *see also Brown v. Legal Foundation of Washington*, 538 U.S. 216, 231-32 (2003) (underscoring the Takings Clause's two separate requirements). The Takings Clause was enshrined in the Constitution so that the government would not "force some

people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

43. If the government "fails to meet the 'public use' requirement," then "that is the end of the inquiry," and "[n]o amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). A government taking of property for a private use or purpose is barred. As the United States Supreme Court has explained: "it has long been accepted that the sovereign" (i.e., the government) "may not take the property of A for the sole purpose of transferring it to B." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005); *Calder v. Bull*, 3 U.S. 386 (1798). (holding that "[i]t is against all reason and justice" to presume that the legislature has been entrusted with the power to enact "a law that takes property from A and gives it to B")).

44. "Nor would the [government] be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." *Kelo*, 545 U.S. at 478. If a taking is designed simply "to benefit a particular class of identifiable individuals," then the taking is not for a "public use" consistent with the Public Use Clause, and is therefore unconstitutional. *Id.* Significantly, takings with only an "incidental" public benefit "are forbidden by the Public Use Clause." *Id.* at 490 (Kennedy, J., concurring); *see also Loretto v. Teleprompter Manhattan Catv Corp.*, 458 U.S. 419 (1982) (holding that a "taking" under the Takings Clause occurs even when, under the authority of law, "a stranger directly invades and occupies the owner's property" and does not pass to or through the government's hands).

45. The Ordinance imposes an indefinite moratorium on evictions for any reason other than in the case of a tenant who presents a "hazard" to other tenants in the same property—a narrow category of "just cause" eviction that is inadequately defined in, and subject to several exceptions under, the Ordinance. For an indefinite period of time, rental housing owners cannot remove a tenant for any other kind of threat or misconduct, and cannot even move themselves and/or their families into their own properties. Under the Ordinance, rental housing owners' "rights to possess the property, to use the property" or "to exclude others from the property" are, for all practical intents and purposes, indefinitely suspended. *Bounds v. Superior Court*, 229 Cal. App. 4th 468, 479 (2014) (describing the "bundle of rights" possessed by a property owner in his private property). Further, the Ordinance

eliminates, for an indefinite period of time, rental housing owners' right to make economically beneficial or valuable use of their properties, because the Ordinance indefinitely deprives owners of the only legal remedy they have to guarantee a reasonable return on their investment: the right to terminate a tenancy and evict for nonpayment of rent.

46. Through its moratorium on evictions, the Ordinance effects a *per se* taking of rental housing owners' properties, because it indefinitely grants tenants near-unqualified access to and use of the properties. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35 (1982) (regulation requiring property owner to allow cable company to install cable facilities on his property effects a per se taking).

47. In the alternative, the Ordinance effects a categorical regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), because the Ordinance deprives owners of all "economically beneficial" or "viable" use of their properties. At a minimum, the Ordinance effects a noncategorical regulatory taking under *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), because: (1) the moratorium's "economic impact" on rental housing owners is devastating, given their right to lawfully repossess their properties, even for nonpayment of rent or to move themselves and/or their families into said properties, is for all practical intents and purposes eliminated; (2) the extent to which the Ordinance has interfered with distinct investment-backed expectations, based on existing law and rental agreements, is substantial; and (3) the character of the County's action—enactment of a law that confers no reciprocity of advantage, but rather penalizes owners to the exclusive benefit of tenants—weighs decisively in favor of finding a taking.

48. The taking effected by the moratorium is unconstitutional under the Fifth Amendment, for two reasons. First, the taking is not for a public use or purpose. The moratorium's express purpose and effect are to benefit "a particular class of identifiable individuals"—namely, tenants. *Kelo*, 545 U.S. at 478. As such, the moratorium violates the Public Use requirement of the Takings Clause.

49. Second, the Ordinance provides no mechanism for compensating owners for the loss of their property rights. The moratorium eliminates housing owners' full rights to possess, use, and exclude, pursuant to their existing rental agreements and the Constitution. Yet the Ordinance provides no compensation for the taking and significant economic impact to rental housing owners. The

Ordinance is at total cross-purposes with the Takings Clause, which is intended to ensure that government does not "force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49.

50. Plaintiff and its members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless the County is immediately enjoined from implementing and enforcing the Ordinance. Further, Plaintiff's members are entitled to nominal and compensatory damages for violation of their constitutional rights under 42 U.S.C. § 1983.

### THIRD CLAIM

### Violation of Article XI, Section 7, of the California Constitution

*By Plaintiff Against All Defendants*

51. Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

52. "A county or city may make and enforce **within its limits** all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7 (emphasis added). Thus, the County's legislative and executive authority extends only to unincorporated areas within its borders and does not extend to cities within the County. *County Sanitation Dist. No. 2 v. County of Kern*, 127 Cal.App.4th 1544, 1612 (2005) (holding that only unincorporated area of a county is "within its limits"); *City of Dublin v. County of Alameda*, 14 Cal.App.4th 264, 274–275 (1993) (same).

53. The Ordinance states that "the regulations in this ordinance shall apply to cities within the County of San Diego," except where "the governing body of a city has enacted an ordinance that has stronger protections for Tenants during the COVID-19 emergency." Ordinance, § 8(a)-(b). The Ordinance further states that "[t]o the extent the city ordinance is not stronger, the county ordinance protecting Tenants shall apply despite contrary provisions or silence on the subject in the city ordinance." *Id.* § 8(c).

54. As a constitutional matter, the Ordinance has no lawful application outside the unincorporated areas of the County. Plaintiff's members with rental housing properties in cities within the County are immediately harmed, and will continue to be harmed, by enforcement of an Ordinance

that constitutionally should not apply to them or their properties.

55.     The Ordinance cites California Government Code section 8634 as the basis for applying beyond the County's jurisdiction. But section 8634 does not justify the Ordinance's extra-territorial application to cities.

56.     Section 8634 provides, in relevant part, that "[d]uring a local emergency the governing body of a political subdivision, or officials designated thereby, may promulgate orders and regulations necessary to provide for the protection of life and property, including orders or regulations imposing a curfew within designated boundaries where necessary to preserve the public order and safety." Cal. Gov. Code § 8634. The statute does not say that a county regulation required by a county-declared "emergency" applies to cities within that county. Nor is there case law to support that interpretation of the statute.

57.     Even if section 8634 subjected cities to a county's "emergency" regulations, the County could not invoke the statute to apply its Ordinance outside unincorporated areas. That is because the Ordinance is not premised upon an urgent need to protect life and property. Indeed, at the April 6, 2021 hearing, the Board voted to convert the Ordinance from an "urgency" ordinance (which would take effect immediately upon enactment) into a *non-urgency* ordinance to take effect within 30 days of its enactment. Significantly, the Board voted at the April 6, 2021, hearing to eliminate Finding (gg) of the first draft of the ordinance, which claimed the ordinance was "necessary for the immediate preservation of the public peace, health, and safety." Thus, by the County's own admission in deleting that finding and abandoning all claims to urgency, the Ordinance is not needed for the protection of life and property. If anything, the Ordinance does just the opposite: It strips the protections that the Constitution affords to rental housing owners and their properties.

58.     Plaintiff and its members have no adequate remedy at law and will suffer serious and irreparable harm from the unconstitutional exercise of County jurisdiction over them and their properties, as reflected in the Ordinance.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests relief as follows:

1.      A declaratory judgment that the Ordinance's eviction moratorium is null and void, and

of no effect, because it deprives rental housing owners, including Plaintiff's members, of the rights, privileges, and immunities secured by the United States Constitution, as follows:

    a. The eviction moratorium violates the Contracts Clause of Article I, section 10, of the United States Constitution.

    b. The eviction moratorium effects an unconstitutional taking of private property, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

2. A temporary, preliminary, and permanent injunction enjoining the County, and all those in active concert or participation with the County, from implementing or enforcing the Ordinance's eviction moratorium.

3. Nominal and compensatory damages to Plaintiff's members with properties in the County, for violation of their federal constitutional rights.

4. If the Ordinance's eviction moratorium is upheld, a declaratory judgment that the Ordinance applies only to the unincorporated areas of the County, as mandated by article XI, section 7, of the California Constitution.

5. If the Ordinance's eviction moratorium is upheld, a temporary, preliminary, and permanent injunction enjoining the County, and all those in active concert or participation with the County, from implementing or enforcing the Ordinance outside the County's unincorporated areas.

6. Reasonable attorneys' fees and costs incurred in this action, including fees and costs incurred to challenge the Ordinance at the administrative hearing before the Board of Supervisors prior to its May 4, 2021 adoption thereof, pursuant to, *inter alia*, 42 U.S.C. § 1988.

7. Any and all other relief to Plaintiff as the Court may deem proper and just.

DATED: May 13, 2021        **FISHERBROYLES LLP**

_____
PAUL BEARD II

Attorneys for Plaintiff Southern California Rental Housing Association