PAUL J. BEARD II (State Bar No. 210563)
FISHERBROYLES LLP
4470 W. Sunset Blvd., Suite 93165
Los Angeles, CA 90027
Telephone: (818) 216-3988
Facsimile: (213) 402-5034
E-mail: paul.beard@fisherbroyles.com

Attorneys for Plaintiff
SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION,<br><br>      Plaintiff<br><br>   v.<br><br>COUNTY OF SAN DIEGO, BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO, and DOES 1 through 20, inclusive,<br><br>      Defendants. | Case No.:  3:21-cv-00912-L-DEB<br><br>Judge:      Judge M. James Lorenz<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**[No Oral Argument Pursuant to Local Rules]**<br><br>Date:    June 21, 2021<br>Time:   10:00 a.m.<br>Room:  5B<br><br><br>Complaint Filed:   May 13, 2021<br>Trial Date:       None set |

TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on June 21, 2021, at 10:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 5B of the above-entitled Court located at Edward J. Schwartz United States Courthouse, 221 West Broadway, San Diego, CA 92101, San Diego, CA, Plaintiff Southern California Rental Housing Association ("SCRHA") will and hereby does move the Court for a preliminary injunction enjoining Defendants County of San Diego and Board of Supervisors of the County of San Diego (collectively, "County") from enforcing, during the pendency of this proceeding and up through entry of final judgment, newly adopted Ordinance 10724. Specifically, SCRA moves for an injunction preliminarily enjoining enforcement of (1) the eviction moratorium imposed and enforced in sections 3 and 7 of said Ordinance, respectively, or (2) in the alternative and at a minimum, said eviction moratorium outside the unincorporated areas of the County of San Diego.

This Motion is brought under Rule 65(a)(1) of the Federal Rules of Civil Procedure and is made on the grounds that the Ordinance violates: the Contract Clause embodied in Article I, section 10, clause 1, of the United States Constitution; the Takings Clause of the Fifth Amendment to the United States Constitution (as applied against local governments via the Fourteenth Amendment); and Article XI, section 7, of the California Constitution, which limits the County's jurisdiction to unincorporated areas of the same.

This Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith; the Request for Judicial Notice filed herewith; the Declarations of April Solis, Larry Gale, Irma Pintor, Alan Pentico, Molly Kirkland and Wayne Templin filed herewith; all pleadings, papers, documents and records on file herein; and such oral and other documentary evidence and argument as may be presented prior to the time of the hearing.

DATED: May 24, 2021

/s/ Paul Beard II

PAUL BEARD II
Attorney for Plaintiff SOUTHERN CALIFORNIA
RENTAL HOUSING ASSOCIATION

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................. 9

II.   FACTUAL BACKGROUND ............................................................... 11

      A.    Ordinance 10724's Eviction Moratorium ................................. 11

      B.    The Ordinance's Impacts on Plaintiff and Its Members ........... 13

III.  LEGAL STANDARD ........................................................................ 16

IV.   ARGUMENT ...................................................................................... 17

      A.    Plaintiff Has Standing .............................................................. 17

      B.    Plaintiff Is Likely To Succeed on the Merits—or, at a Minimum, Plaintiff Raises "Serious Questions" About the Moratorium's Constitutionality ....................................................................... 18

            1.    The Moratorium Substantially Impairs Contracts ......... 19

            2.    The Moratorium Effects an Unconstitutional Taking ..... 23

            3.    The Moratorium Unconstitutionally Applies Outside the County's Jurisdiction ..................................................... 26

      C.    PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE COURT DENIES RELIEF ...................................................... 27

      D.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN PLAINTIFF'S FAVOR ........................ 29

V.    CONCLUSION .................................................................................. 31

# TABLE OF AUTHORITIES

Page(s)

<u>CASES</u>

*Alliance for the Wild Rockies v. Cottrell*
  632 F.3d 1127 (9th Cir. 2011) .................................................................. 17

*Allied Structural Steel Co. v. Spannaus*
  438 U.S. 234 (1978) ............................................................................... 19

*Arizona Dream Act Coalition v. Brewer*
  757 F.3d 1053 (9th Cir. 2014) ....................................................... 17, 28-30

*Armstrong v. United States*
  364 U.S. 40 (1960) ........................................................................... 23, 26

*Bounds v. Superior Ct.*
  229 Cal. App. 4th 468 (2014) .................................................................. 24

*Brown v. Legal Foundation of Washington*
  538 U.S. 216 (2003) ............................................................................... 23

*Brown v. United States Forest Serv.*
  465 F. Supp. 3d 1119 (D. Or. 2020) ......................................................... 17

*Calder v. Bull*
  3 U.S. 386 (1798) .................................................................................. 24

*Chalk v. U.S. Dist. Ct. (Orange Cty. Superin. of Schs.)*
  840 F.2d 701 (9th Cir. 1998) ............................................................. 16, 29

*Cienega Gardens v. United States*
  331 F.3d 1319 (Fed. Cir. 2003) ............................................................... 25

*City & County of San Francisco v. U.S. Cizienship & Imm. Servs.*
  944 F.3d 773 (9th Cir. 2019) .................................................................. 29

*City of Dublin v. County of Alameda*
  14 Cal. App. 4th 264 (1993) ................................................................... 26

*County Sanitation Dist. No. 2 v. County of Kern*
  127 Cal.App.4th 1544 (2005) .................................................................. 26

*Elrod v. Burns*
  427 U.S. 347 (1976) ............................................................................... 28

MOTION FOR PRELIMINARY INJUNCTION

*Energy Reserves Group , Inc. v. Kansas Power & Light Co.*
  459 U.S. 400 (1983)................................................................................... 19

*Fox Broad. Co. v. Dish Network L.L.C.*
  747 F.3d 1060 (9th Cir. 2014) ................................................................. 17

*Gordon v. Holder*
  721 F.3d 638 (D.C. Cir. 2013)................................................................. 30

*Hunt v. Wash. State Apple Adver. Comm'n*
  432 U.S. 333 (1977)..............................................................................17-18

*Index Newspapers LLC v. U.S. Marshals Serv.*
  977 F.3d 817 (9th Cir. 2020) ...............................................................29-30

*Kelo v. City of New London*
  545 U.S. 469 (2005)..............................................................................24-25

*Lingle v. Chevron U.S.A. Inc.*
  544 U.S. 528 (2005)................................................................................. 23

*Loretto v. Teleprompter Manattan Catv Corp.*
  458 U.S. 419 (1982)................................................................................. 24

*Lucas v. South Carolina Coastal Council*
  505 U.S. 1003 (1992) ............................................................................24-25

*Melendres v. Arpaio*
  695 F.3d 990 (9th Cir. 2012) ............................................................ 28, 30

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*
  676 F.3d 829 (9th Cir. 2012) ...............................................................17-18

*Penn Central Transp. Co. v. New York City*
  438 U.S. 104 (1978)................................................................................. 25

*Rodde v. Bonta*
  357 F.3d 988 (9th Cir. 2004) ................................................................. 29

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*
  749 F.2d 124 (2d Cir. 1984) ................................................................... 28

*Southern Calif. Gas Co. v. City of Santa Ana*
  336 F.3d 885 (9th Cir. 2003) ................................................................. 19

*Sveen v. Melin*
    138 S. Ct. 1815 (2018) .................................................................................. 19

*Valle del Sol Inc. v. Whiting*
    732 F.3d 1006 (9th Cir. 2013) ...................................................................... 30

*Warth v. Seldin*
    422 U.S. 490 (1975) ...................................................................................... 18

*Winter v. National Res. Defense Council, Inc.*
    555 U.S. 7 (2008) .......................................................................................... 17

## CONSTITUTIONAL PROVISIONS

Cal. Const., art. XI, § 7 ........................................................................................ 26

U.S. Const., Art. I § 10, cl. 1 ............................................................................... 19

U.S. Const. amend. V .......................................................................................... 23

U.S. Const. amend. XIV ...................................................................................... 23

## FEDERAL STATUTES

42 U.S.C. § 1983 ................................................................................................. 19

## STATE STATUTES

Cal. Civ. Code § 1946.2(a) ................................................................................. 30

Cal. Civ. Proc. Code § 1179.04 .......................................................................... 30

Cal. Gov. Code § 8634 .................................................................................... 26-27

Cal. Gov. Code § 24123(d) ................................................................................. 22

Cal. Health & Safety Code § 50897, *et seq.* ..................................................... 31

## CODES & ORDINANCES

Ordinance 10724 ........................................................................................ *passim*

# I.  **INTRODUCTION**

On May 4, 2021, Defendant County of San Diego enacted Ordinance 10724. The Ordinance indefinitely bans evictions within both the incorporated and unincorporated areas of the County. The Ordinance passed by a narrow 3-2 vote and faced substantial opposition, especially from rental housing owners who rightly fear the ban's consequences for their lives, those of their employees and third parties, and their rental properties. The law is set to take effect on June 3, 2021, but rental housing owners already are suffering the law's deterrent effects.

The Ordinance bars owners—many of them "mom and pop" landlords—from moving themselves or their families back into their units, due to financial hardship, housing displacement, or other extenuating circumstances. It bars owners from removing tenants who do not pay rent that is owed after June 30. It bars owners from removing tenants who harass or threaten them, their employees, or third parties (e.g., repair or service workers, delivery workers, etc.). And it bars owners from evicting tenants who use the property for an illegal purpose or otherwise create a nuisance to the extent it doesn't rise to the level of an "imminent health or safety threat" to "other tenants or occupants"—an exception that is ill-defined and only invites costly lawsuits by tenants against owners intrepid enough to invoke that exception.

In short, the Ordinance re-writes existing rental agreements, which provide owners with important rights and remedies necessary to respond to serious breaches of those agreements, in violation of the Contracts Clause of the United States Constitution. Also, the Ordinance strips owners of their federal constitutional rights to repossess rental units, and to exclude threatening and law-breaking tenants, as protected by the Fifth and Fourteenth Amendments to the United States Constitution. Finally, the Ordinance purports to apply to rental properties in *cities* within the County, even though the California Constitution limits a county's jurisdiction to unincorporated areas.

The County explicitly passed the Ordinance on a *non-urgency* basis because the County knows that no emergency justifies the law. Rather, the County passed the

Ordinance purportedly to prevent economically vulnerable tenants from becoming homeless, particularly during the pandemic. However, the Ordinance applies indiscriminately to keep even the wealthiest and most privileged of tenants housed at the expense of the smallest mom-and-pop owners. Further, as the spread and effects of COVID-19 wane in the County and in the State, the County is hard-pressed to use the pandemic as an excuse to indefinitely suspend owners' constitutional rights.

Plaintiff Southern California Rental Housing Association is an association of rental housing owners, many of whom own units in both the incorporated and unincorporated areas of the County, and are irreparably harmed by the Ordinance's eviction moratorium. Given that the Ordinance goes into effect on June 3, Plaintiff hereby requests preliminary relief to preserve the *status quo*.

As explained in detail below, Plaintiff easily satisfies the four factors for a preliminary injunction: (1) given just how far this Ordinance goes in depriving owners of their most fundamental rights, Plaintiff is likely to succeed on the merits of their claims or, at a minimum, demonstrates "serious questions" surrounding the moratorium's constitutionality; (2) many of Plaintiff's members will be irreparably harmed absent an injunction, including because they are forbidden from moving into their properties, or from removing tenants who harass or present an immediate risk of harm to them, their families, their employees, and their properties; (3) the balance of hardships tips sharply in Plaintiff's favor, especially since Plaintiff seeks only to preserve—not alter—the *status quo*; and (4) an injunction is in the public interest, because all citizens have a stake in upholding the California and Federal Constitutions, and tenants have substantial procedural and substantive protections under existing state law even without the Ordinance. Finally, Plaintiff seeks to preliminarily enjoin only the Ordinance's eviction moratorium, leaving in place the Ordinance's other key provision imposing rent control. Thus, the requested injunction is limited and reasonable.

For all these reasons, the Court should preliminarily enjoin enforcement of the Ordinance's eviction ban altogether—or, at a minimum, its implementation outside the

unincorporated areas of the County.

## II. FACTUAL BACKGROUND

### A. Ordinance 10724's Eviction Moratorium

On May 4, 2021, Defendants enacted the Ordinance. A true and correct copy of the Ordinance is attached as Exhibit A to the Request for Judicial Notice ("RJN") filed concurrently with this motion.

The Ordinance states, in relevant part, that no owner may "lawfully terminate a residential tenancy" without "just cause." Except for "just cause," owners are prohibited from the following actions to recover possession of their property:

- "Serve a notice of termination of tenancy";
- "File or serve an unlawful detainer lawsuit, ejectment action, or other action to recover possession of a residential unit";
- "Evict a tenant or require a Tenant to vacate a residential unit," including enforcing final court judgments authorizing repossession of said unit;
- "Take any other action in reliance on a notice of termination of tenancy that expired during the Local Emergency [defined as "any period of local emergency declared by the County of San Diego in response to the COVID-19 pandemic"] or attempt to induce a tenant to vacate based on such notice";
- "Represent to a Tenant that the Tenant is required to move out of their unit by law."

Ordinance § 3(c).

"Just cause" is ill-defined. "Just cause" requires "a showing that the Tenant is an imminent health or safety threat." Ordinance § 3(b). "Imminent health or safety threat" is, in turn, defined as:

> "a hazard to the health or safety of other tenants or occupants of the same property, taking into account (1) the risk of potential spread of coronavirus caused by the eviction, in case of a Local Emergency due to COVID-19, (2) any public health or safety risk caused by the eviction, and (3) all other remedies available to the landlord and other occupants of the property, against the nature and degree of health and safety risk posed by the tenant's activity."

Ordinance § 2(b).

The Ordinance applies to *all* tenants, *all* rental housing owners, and *all* rental units (including single-family homes) in the County. Ordinance § 2. Significantly, the eviction moratorium protects all tenants regardless of their wealth, income, or COVID-19-related financial distress. Thus, by its own terms, the moratorium is concerned, not with protecting the most vulnerable tenants at risk of financial hardship or homelessness, but with benefitting tenants as a group at the expense of owners.

The Ordinance does not define what rises to the level of a "hazard to the health or safety" of a "tenant or occupant." Further, the vague "hazard" exception does not cover threats to owners, their families, their employees, or third parties lawfully on the premises, such as repair- or delivery-persons. It does not cover damage or destruction to property. In other words, a tenant-created "hazard" to anyone besides tenants and occupants is not "just cause" for removing the problematic tenant. Owners are obligated, by law, to house such "hazard[ous]" tenants.

Finally, the Ordinance confers on tenants a new cause of action against owners who repossess their properties, including for "just cause." A tenant "may institute a civil proceeding," including for "mental or emotional distress" damages and treble damages, against an owner who "attempts to recover possession or recovers possession of a residential real property" if (in the tenant's eyes) the owner did not achieve "strict compliance" with all provisions of the Ordinance, including "all notice requirements." Ordinance §§ 7(a), 7(c). Given how ill-defined the "hazard" exception is, and the "strict compliance" requirement, an owner faces a high risk of costly and time-consuming litigation if she tries to remove a tenant even for "just cause" under the "hazard" exception. Thus, the Ordinance deters owners from invoking even the "hazard" exception to the eviction moratorium.

While the Ordinance purports not to "relieve Tenant of the obligation to pay rent, nor restrict a Landlord's ability to recover rent due," the Ordinance does just that.

Ordinance § 3(k). Eviction for nonpayment of rent owed after June 30, 2021 is barred.[1] As long as the Ordinance remains in effect, tenants are excused from paying rent because the Ordinance leaves owners with no legal remedy. Thus, the Ordinance has the legal and practical effect of relieving tenants of their obligation to pay rent and blocks rental housing owners' ability to recover rent due after June 30.

The eviction moratorium applies to all residential rental properties in the County. Ordinance § 2(c). Further, the moratorium applies, not just to unincorporated areas, but to "cities within the County," as well. *Id.* § 8(a). Indeed, it supplants conflicting city laws, to the extent that those city laws are less beneficial to tenants. *Id.* § 8(c).

The Ordinance goes into effect on June 3, 2021, and expires "60 days after the Governor lifts all COVID-19-related stay-at-home and work-at-home orders." *Id.* § 3(a). Since nobody knows for certain when the Governor will lift those orders, the Ordinance's expiration date is also unknown. Thus, the moratorium on evictions will be in effect for an indefinite period of time.

The Board enacted the Ordinance by a narrow 3-2 vote, following over four hours of public testimony. Declaration of Molly Kirkland, ¶¶ 4-5. Given the eviction moratorium's unprecedented reach and severe impacts on rental housing owners, the vast majority of public comment was in opposition to the Ordinance. *Id.*, ¶ 4.

### B. The Ordinance's Impacts on Plaintiff and Its Members

Plaintiff Southern California Rental Housing Association ("SCRHA") is one of Southern California's leading trade associations, and is a membership-based organization that serves the needs of the rental housing industry in San Diego, Imperial, and southern Riverside Counties. SCRHA's purpose is to protect and advocate for the rights of rental housing owners, through educational programs, advocacy before public agencies, and, when necessary, litigation. Declaration of Alan Pentico, ¶¶ 3-4. SCRHA has 2,200 dues-paying members, many of whom are owners of rental housing within

---

[1] State law preemptively governs evictions for nonpayment of rent owed before July 1, 2021. *See* Cal. Civ. Proc. Code § 1179.5(b).

the County of San Diego who are subject to the County's eviction moratorium. *Id.* ¶ 4. SCRHA provided written and oral comments to the Board of Supervisors prior to the Ordinance's enactment, urging the Board to vote against adoption of the moratorium. *Id.* ¶ 5.

Among SCRHA's members are husband and wife, Michael and April Solis. Declaration of April Solis, ¶ 2. They own a single-family, fully furnished home in the City of San Diego. *Id*. That was their first home and the one their children were born in. *Id*. They have been renting the home to an individual pursuant to a rental agreement, and the tenancy is set to expire on July 12, 2021. *Id.* ¶ 3. Because they performed income and credit checks prior to renting the property to the tenant, they know that the tenant is from out-of-state and very wealthy. *Id.* He has a home in Northern California, as well as several income properties. *Id.* The tenant has not been financially impacted by COVID-19. *Id.*

Since moving in, the Solises' tenant has unlawfully and without their permission moved in another family. *Id.* ¶ 4. Further, the tenant has regularly harassed and sent threatening messages to the Solises. *Id*. He threatened the entire family—including the children—with bodily harm, saying that he knew where the family lived. *Id*. He has threatened bogus slip-and-fall lawsuits and has damaged the property, including the pool equipment, slider and window screens, and fencing. *Id*. Further, he has harassed and threatened third parties engaged by the Solis family to maintain and service the property, including a pool repair worker, a San Diego Gas & Electric employee, and a handyman. *Id*. All these offenses violate the terms of the rental agreement and are legitimate cause for eviction. *Id*.

Given the tenant's gross misconduct and the threat he presents to the Solis family, the family recently sent him a 60-day that they did not wish to extend his tenancy beyond July 12. *Id.* ¶ 5. However, citing the recently enacted Ordinance, the tenant boasted that he would stay in the house, and that the Solises could not remove him. *Id*. While the tenant is wealthy and is living comfortably in the Solises' house with no

repercussions for his conduct, they have suffered severe financial and emotional distress. Ms. Solis lost her job during the first few months of the pandemic. *Id.* ¶ 6. Mr. Solis has owned a business in San Diego for 25 years, but the pandemic has impacted his business and income. *Id*. Their dire financial circumstances are such that they and their children must move back into their home. *Id*. Although they want and are prepared to pursue removal of this problematic tenant, in part so that they can move their family back in, they are barred from doing so because of the Ordinance. *Id*. The Ordinance has caused, and continues to cause, significant financial and emotional harm and distress to the Solises. *Id.* ¶ 7.

Larry Gale is also a member of SCRHA. (Declaration of Larry Gale, ¶ 2). He owns a single-family home in Casa de Oro, in an unincorporated area of the County. *Id.* ¶ 3. The house has been rented on a month-to-month basis to a family for several years, pursuant to a rental agreement. *Id*. The tenants have breached their obligations under the agreement to maintain and preserve the property in good condition. *Id.* ¶ 4. The yards have become weed-infested. *Id*. The home itself has been substantially damaged by the tenants. *Id*. Mr. Gale is elderly and has been regularly mistreated by the tenants. *Id*. They do not allow him access to or in the property, including simply to maintain the yards. *Id*. They have changed the locks without permission. At present, Mr. Gale wishes to move his daughter into his home. *Id*. As a restaurant worker, she has been financially impacted by COVID-19. *Id*.

The rental agreement with the tenant easily provides grounds for Mr. Gale's repossession of the property, including because of the breaches described above. *Id*. ¶ 5. However, the Ordinance prevents him from exercising his rights to repossess the property. *Id.* The Ordinance has caused, and continues to cause, significant financial and emotional harm and distress to Mr. Gale. *Id.*

Irma Pintor is also a member of SCRHA. Declaration of Irma Pintor, ¶ 2. She owns a duplex in the City of San Diego. *Id.* ¶ 4. She is a senior citizen and does not speak English. *Id.* ¶ 3. She used to live in one side of the duplex, while the other side

was rented out to a tenant (Tenant 1). *Id.* ¶ 4. But Tenant 1 stopped paying rent. *Id.* To make ends meet, Ms. Pintor was forced to move out of her duplex and temporarily sleep in her garage, so that she could bring in a paying tenant (Tenant 2). *Id.*

Tenant 1 has repeatedly harassed Ms. Pintor, to the point where Ms. Pintor must now move out of her garage and into her son's home. *Id.* ¶ 5. Tenant 1 also has repeatedly harassed third parties, including individuals sent to her unit to make requested repairs. *Id.* Ms. Pintor understands that Tenant 1 is unable to make rent, and does not want to evict the tenant for that reason. *Id.* However, Tenant 1's pattern and practice of gross misconduct vis-à-vis Ms. Pintor and third parties authorized to make repairs on the premises require Tenant 1's removal. *Id.* While she is prepared to take all lawful steps to remove Tenant 1, she is deterred and prohibited from doing so, because of the Ordinance's moratorium. *Id.* The dire situation with Tenant 1—and the Ordinance, which will strip Ms. Pintor of all her rights and remedies to deal with that situation—have caused, and continues to cause, significant financial and emotional harm and distress to Ms. Pintor. *Id.* ¶ 6.

Never in their wildest imaginations could members like the Solises, Mr. Gale, and Ms. Pintor have foreseen the pandemic and the burdensome regulations against rental housing owners that would follow in its wake. Never could they have imagined a law, like the County's Ordinance, that eliminates important protections and remedies contained in their rental agreements, and strips them of their property rights. Solis Decl., ¶ 8; Gale Decl., ¶ 6; Pintor Decl., ¶ 7. Never before have they faced the prospect of being compelled to indefinitely house tenants, including without payment of rent. Solis Decl., ¶ 8; Gale Decl., ¶ 6; Pintor Decl., ¶ 7.

## III. **LEGAL STANDARD**

"The purpose of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits." *Chalk v. U.S. District Court (Orange Cty. Superin. of Schs.)*, 840 F.2d 701, 704 (9th Cir. 1998). Generally, to obtain a preliminary injunction, the moving party must establish four factors—namely, that (1) he "is likely

to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit employs a "sliding scale" approach to weighing the preliminary injunction factors. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* "For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Id.*

Finally, when the plaintiff seeks a prohibitory[2] injunction (versus a mandatory one), the test is laxer. A preliminary prohibitory injunction should issue if the plaintiff shows "serious questions going to the merits," the "balance of hardships tips sharply towards the plaintiff," and the other two factors are met. *Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1066 (9th Cir. 2014); *but see Brown v. United States Forest Serv.*, 465 F. Supp. 3d 1119, 1128 n.3 (D. Or. 2020) ("[W]here . . . plaintiffs seek a mandatory injunction, courts decline to apply the 'serious questions' test.").

## IV.   ARGUMENT

### A.   Plaintiff Has Standing

An associational plaintiff may bring suit on its members' behalf when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 839 (9th Cir.

---

[2] *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (An "injunction[]that prohibit[s] enforcement of a new law or policy," and does not "order[] a responsible party to take action," "is prohibitory.").

2012) (same). Plaintiff easily meets the requirements for associational standing.

First, Plaintiff's members would have standing to sue in their own right. Members like the Solises, Mr. Gale, and Ms. Pintor are rental housing owners in the County who are subject to the challenged Ordinance's eviction moratorium. Unless enjoined, the Ordinance will bar them from exercising their right to repossess their properties on otherwise lawful grounds, including to remove tenants who are threatening or harassing them and their families. Solis Decl., ¶¶ 4-6; Gale Decl., ¶¶ 4-5; Pintor Decl., ¶¶ 4-6. Although it takes effect on June 3, the moratorium ensures that even *present* efforts to commence eviction proceedings on otherwise lawful grounds will be futile. Given the amount of time it takes from service of a notice to vacate to execution of a writ of possession by the Sheriff, no eviction proceeding could be completed—and a writ of possession executed—prior to June 3. (Declaration of Wayne Templin, ¶¶ 9-14). Thus, Plaintiff's members have suffered and continue to suffer "immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Hunt*, 432 U.S. at 342.

Second, Plaintiff's action seeks to vindicate members' contractual and property rights, as protected by the Federal Constitution. Vindicating the rights of its members is not only "germane" to Plaintiff's purpose; it is *the* purpose of the association. Pentico Decl., ¶ 4.

Third, the preliminary prospective relief that Plaintiff seeks here does not require that individual members participate in this action. "If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975); *Oklevueha*, 676 F.3d at 839 (same).

**B.**   **Plaintiff Is Likely To Succeed on the Merits—or, at a Minimum, Plaintiff Raises "Serious Questions" About the Moratorium's Constitutionality**

Plaintiff claims that the Ordinance's eviction moratorium violates the Contracts and Takings Clauses of the U.S. Constitution, and exceeds the County's authority under the California Constitution, insofar as it applies outside the County's unincorporated areas. (Complaint, pp. 9, 14, 17). As detailed below, Plaintiff is likely to succeed on one or more of these constitutional claims. At a minimum, Plaintiff raises serious questions about the moratorium's constitutionality on one or more grounds stated in the Complaint, including its effectiveness outside the County's unincorporated areas.

### 1. The Moratorium Substantially Impairs Contracts

The Contracts Clause of the United States Constitution prohibits local governments from passing "any . . . Law impairing the Obligation of Contracts." U.S. Const., Art. I, §10, cl. 1. Contracts Clause violations are actionable under 42 U.S.C. § 1983. *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) ("The right of a party not to have a State, or a political subdivision thereof, impair its obligations of contract is a right secured by the first article of the United States Constitution. A deprivation of that right may therefore give rise to a cause of action under section 1983."). Whether a law substantially impairs a contractual relationship depends upon "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018).

First, the court will determine whether the law "operate[s] as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). "In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. Second, the court considers "whether the [challenged] law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822 (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412 (1983)).

Here, the Ordinance substantially impairs the contractual relationship between rental housing owners and their tenants. Specifically, the Ordinance places a moratorium on *all* evictions within the County, except insofar as the owner can prove that a tenant's conduct rises to the level of being a "hazard to the health or safety of other tenants or occupants of the same property." Ordinance § 3(c), 2(a). Even when a tenant presents such a "hazard"—the only "just cause" for eviction—a rental housing owner may be barred from evicting him in light of "(1) the risk of potential spread of coronavirus caused by the eviction, in case of a Local Emergency due to COVID-19, (2) any public health or safety risk caused by the eviction, and (3) all other remedies available to the landlord and other occupants of the property, against the nature and degree of health and safety risk posed by the tenant's activity." There is an additional restriction on evictions even for "hazard[ous]" tenants: "An imminent health or safety threat cannot be the Resident's COVID-19 illness or exposure to COVID-19, whether actual or suspected." Thus, the "hazards" exception is itself subject to a number of amorphous exceptions requiring an owner to make difficult calls about scientific and public-health matters.

To make matters worse, an owner who takes actinon to repossess her unit exposes herself to a substantial risk of litigation by the tenant, including over whether the tenant's conduct rose to the level of a "hazard." Ordinance § 7(c). Given the ill-defined terms in the Ordinance's "just cause" provisions, the burden on owners to justify their entitlement to a "just cause" eviction, and the litigation that those issues invite, few owners can be expected to invoke the "hazard" exception.

Apart from the nebulous "hazard" exception, all evictions are prohibited, including for the following tenant conduct:

- harassing, threatening, or endangering the health or safety of the rental housing owner; her employees and agents; invited guests of other tenants; and third parties authorized to conduct business on the property (e.g., repair persons, utility service providers, delivery persons, etc.);

- damaging or destroying the rental unit or common areas of the rental housing premises;

- creating a disturbance or nuisance inside a rental unit or in common areas, including in a way that affects others' peace, comfort, and quiet enjoyment of property through the generation of noise, odors, and other offensive conduct;

- using the rental unit for unlawful purposes in a manner that may not clearly rise to the level of constituting a "hazard to the health or safety of other tenants or occupants of the same property" (e.g., housing occupants not listed in the rental agreement; keeping unauthorized pets, whose nature or number risks property damage and destruction; illegal drug cultivation, dealing, or use; prostitution; etc.);

- failure to pay rent owed after June 30, 2021; and

- refusal to vacate unit, following otherwise-lawful notice, to allow the rental housing owner and/or her family to move into said unit, out of financial necessity or other extenuating circumstance.

In sum, the Ordinance indefinitely excuses tenants from their contractual obligations under their rental agreements, and indefinitely bars Plaintiff's members from pursuing their contractual right to remove tenants who breach their agreements or violate the law. Thus, the Ordinance undermines the contractual bargain that is the hallmark of all rental agreements.

In addition, the Ordinance significantly interferes with rental housing owners' reasonable expectations. No rental housing owner, including Plaintiff's members, could ever have foreseen or expected the COVID-19 pandemic (the County's purported justification for the Ordinance), or the extent to which governments (like the County) would use those extraordinary circumstances to justify crippling restrictions on their livelihoods as owners, and violations of their rights under existing rental agreements and the United States Constitution. Solis Decl., ¶ 8; Gale Decl., ¶ 6; Pintor Decl., ¶ 7. Never before have rental housing owners faced the prospect of being compelled by law

1  to indefinitely house tenants irrespective of their "non-hazardous" misconduct or
2  breaches. Solis Decl., ¶ 8; Gale Decl., ¶ 6; Pintor Decl., ¶ 7.

3      Because the Ordinance substantially impairs contracts, the County bears the
4  burden of showing that the impairment is both reasonable and necessary. The County
5  cannot meet that burden. The Ordinance cites the COVID-19 pandemic as its primary
6  justification. But the County reports that COVID-19 conditions have been improving.
7  RJN, Exh. B.

8      The Board of Supervisors itself has conceded that no emergency justifies the
9  Ordinance. At its first reading of the Ordinance on April 6, the Board considered the
10  law as an "urgency" ordinance. RJN, Exh. C. That draft contained special findings to
11  the effect that an emergency justified the eviction moratorium and other provisions. *Id.*,
12  pp. 4, 9. An "urgency" ordinance takes effect immediately upon its passage. Cal. Gov.
13  Code § 24123(d). But at the April 6 hearing, the Board eliminated those "urgency"
14  findings and converted the proposal into a regular, non-"urgency" ordinance—to be
15  read a second time on May 4 and, if approved, to take effect 30 days after passage, on
16  June 3. RJN, Exh. D (minutes of April 6 meeting). There being no urgency, the County
17  cannot meet its burden of establishing that the substantial impairment of housing
18  owners' rental agreements is necessary.

19      Nor can the County establish that the impairment of owners' rental agreements
20  is reasonable. The moratorium purports to be designed to protect economically
21  vulnerable tenants, including from homelessness. Ordinance § 1(o), (r). But the
22  Ordinance casts a far wider net and applies to *all* tenants, including the financially well-
23  to-do who require no special protections. *E.g.*, Solis Decl., ¶ 3. Further, by barring
24  evictions, the Ordinance creates many more problems and threats than it purports to
25  resolve. Under the Ordinance, rental housing owners, their agents, and other persons
26  authorized to be on rental housing premises must now contend with tenants who are,
27  among other things, harassing and dangerous to them, and destructive of property. Solis
28  Decl., ¶¶ 4-6; Gale Decl., ¶¶ 4-5; Pintor Decl., ¶¶ 4-6. Innocent tenants must suffer

"nonhazardous" disturbances, nuisances, unlawful uses of property, and other misconduct that cannot be eliminated by removal of the offending tenant. Solis Decl., ¶¶ 4-6; Gale Decl., ¶¶ 4-5; Pintor Decl., ¶¶ 4-6. The consequence of the eviction moratorium is that on-site threats to life, limb, and property, as well as to the peaceful and quiet enjoyment of rental units by innocent tenants, will go unaddressed and even grow.

In sum, the Ordinance unilaterally rewrites all rental agreements within the County to eliminate tenant obligations, without any attempt to tie such wholesale revisions to the COVID-19 pandemic or even homelessness. Even if there were a legitimate purpose behind the County's Ordinances, which there is not, the complete obliteration of the contract rights of Plaintiff's members is not a reasonable or necessary means of achieving that purpose. Accordingly, the contractual impairments made by the Ordinance violate the Contracts Clause—or, at a minimum, raise "serious questions" under that constitutional provision.

### 2.    The Moratorium Effects an Unconstitutional Taking

The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the government from taking private property unless (a) it is for a "public use" and (b) "just compensation" is paid to the rental housing owner. U.S. Const. amend. V, XIV (making Takings Clause applicable to state and local governments); *see also Brown v. Legal Foundation of Washington*, 538 U.S. 216, 231-32 (2003) (underscoring the Takings Clause's two separate requirements). The Takings Clause was enshrined in the Constitution so that the government would not "force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

If the government "fails to meet the 'public use' requirement," then "that is the end of the inquiry," and "[n]o amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). A government taking of property for a private use or purpose is barred. As the United States Supreme Court has

explained: "it has long been accepted that the sovereign" (i.e., the government) "may not take the property of A for the sole purpose of transferring it to B." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005); *Calder v. Bull*, 3 U.S. 386 (1798). (holding that "[i]t is against all reason and justice" to presume that the legislature has been entrusted with the power to enact "a law that takes property from A and gives it to B")).

"Nor would the [government] be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." *Kelo*, 545 U.S. at 478. If a taking is designed simply "to benefit a particular class of identifiable individuals," then the taking is not for a "public use" consistent with the Public Use Clause, and is therefore unconstitutional. *Id.* Significantly, takings with only an "incidental" public benefit "are forbidden by the Public Use Clause." *Id.* at 490 (Kennedy, J., concurring); *see also Loretto v. Teleprompter Manhattan Catv Corp.,* 458 U.S. 419 (1982) (holding that a "taking" under the Takings Clause occurs even when, under the authority of law, "a stranger directly invades and occupies the owner's property" and does not pass to or through the government's hands).

The Ordinance imposes an indefinite moratorium on evictions, except when an owner can prove that a problematic tenant meets the vague definition of being a "hazard" to other tenants. Under the moratorium, rental housing owners cannot remove a tenant for any other kind of threat or misconduct, and cannot even move themselves and/or their families into their own properties. Owners' "rights to possess the property, to use the property" or "to exclude others from the property" are, for all practical intents and purposes, indefinitely suspended. *Bounds v. Superior Court*, 229 Cal. App. 4th 468, 479 (2014) (describing the "bundle of rights" possessed by a property owner in his private property). The Ordinance thereby effects a *per se* taking. *See, e.g., Loretto*, 458 U.S. 419, 434–35 (1982) (law requiring property owner to allow cable company to install cable facilities on his property without said owner's consent effected a *per se* taking).

The moratorium alternatively effects a regulatory taking under *Lucas v. South*

MOTION FOR PRELIMINARY INJUNCTION

*Carolina Coastal Council*, 505 U.S. 1003 (1992). It eliminates, for an indefinite period of time, owners' right to make economically beneficial or valuable use of their properties by depriving them of the only legal remedy they have to guarantee a reasonable return on their investment: the right to terminate a tenancy and evict for nonpayment of rent owed after June 30. The moratorium also effects a regulatory taking under the takings test set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123 (1978). First, the moratorium's "economic impact" on rental housing owners is devastating, given the near-total elimination of their right to lawfully repossess and use their properties, including for nonpayment of rent owed after June 30. Second, the moratorium substantially interferes with distinct investment-backed expectations, given the rights and remedies otherwise provided to owners by law and by existing rental agreements. Finally, the character of the governmental action is that of a taking of a property interest because the moratorium "authorize[s] the continuing physical occupation of particular [owners'] properties," in part to address alleged societal problems, and is "not an example of government regulation under common law nuisance or other similar doctrines." *Cienega Gardens v. United States*, 331 F.3d 1319, 1338 (Fed. Cir. 2003).

The taking effected by the moratorium is unconstitutional under the Fifth Amendment, for two reasons. First, the taking is not for a public use or purpose. The moratorium's express purpose and effect are to benefit "a particular class of identifiable individuals"—*i.e.*, tenants, rich or poor. *Kelo*, 545 U.S. at 478. As such, the moratorium violates the Public Use requirement of the Takings Clause.

Second, the Ordinance provides no mechanism for compensating rental housing owners for the loss of their property rights. The moratorium eliminates owners' full rights to possess, use, and exclude, pursuant to their existing rental agreements and the Constitution. Yet the Ordinance provides no compensation for the taking of those property interests. The Ordinance is at total cross-purposes with the Takings Clause, which is intended to ensure that government does not "force some people alone to bear

public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49.

In sum, Plaintiff has established that it is likely to succeed on the merits of its takings claim—or, at a minimum, has raised "serious questions" concerning the moratorium's constitutionality under the Takings Clause.

### 3. The Moratorium Unconstitutionally Applies Outside the County's Jurisdiction

"A county or city may make and enforce *within its limits* all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7 (emphasis added). Thus, the County's legislative and executive authority extends only to unincorporated areas within its borders and does not extend to cities within the County. *County Sanitation Dist. No. 2 v. County of Kern*, 127 Cal.App.4th 1544, 1612 (2005) (holding that only unincorporated area of a county is "within its limits"); *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264, 274–275 (1993) (same).

The Ordinance states that "the regulations in this ordinance shall apply to cities within the County of San Diego," except where "the governing body of a city has enacted an ordinance that has stronger protections for Tenants during the COVID-19 emergency." Ordinance, § 8(a)-(b). The Ordinance further states that "[t]o the extent the city ordinance is not stronger, the county ordinance protecting Tenants shall apply despite contrary provisions or silence on the subject in the city ordinance." *Id.* § 8(c).

As a constitutional matter, the Ordinance has no lawful application outside the unincorporated areas of the County. Plaintiff's members with rental housing properties in cities within the County are immediately harmed, and will continue to be harmed, by enforcement of an Ordinance that constitutionally should not apply to them or their properties. *E.g.*, Gale Decl., ¶ 3 (member with property in incorporated area of County).

The Ordinance cites California Government Code section 8634 as the basis for applying beyond the County's jurisdiction. But section 8634 does not justify the

Ordinance's extra-territorial application to cities.

Section 8634 provides, in relevant part, that "[d]uring a local emergency the governing body of a political subdivision, or officials designated thereby, may promulgate orders and regulations necessary to provide for the protection of life and property, including orders or regulations imposing a curfew within designated boundaries where necessary to preserve the public order and safety." Cal. Gov. Code § 8634. The statute does not say that a county regulation required by a county-declared "emergency" applies to cities within that county. Nor is there case law to support that interpretation of the statute.

Even if section 8634 subjected cities to a county's "emergency" regulations, the County could not invoke the statute to apply its Ordinance outside unincorporated areas. That is because the Ordinance is not premised upon an urgent need to protect life and property. Indeed, at the April 6, 2021 hearing, the Board voted to convert the Ordinance from an "urgency" ordinance (which would take effect immediately upon enactment) into a *non-urgency* ordinance to take effect within 30 days of its enactment. Significantly, the Board voted at the April 6, 2021, hearing to eliminate Finding (gg) of the first draft of the ordinance, which claimed the ordinance was "necessary for the immediate preservation of the public peace, health, and safety." RJN, Exhs. C-D. Thus, by the County's own admission in deleting that finding and abandoning all claims to urgency, the Ordinance is not needed for the protection of life and property. If anything, the Ordinance does just the opposite: It strips the protections that the Constitution affords to rental housing owners and their properties.

Plaintiff has established that it is likely to succeed on the merits of its jurisdictional claim—or, at a minimum, has raised "serious questions" concerning the moratorium's constitutionality under the California Constitution.

## C. <u>PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE COURT DENIES RELIEF</u>

If this Court concludes that Plaintiff is likely to succeed on one or more of its

MOTION FOR PRELIMINARY INJUNCTION

claims—or at least raises "serious questions going to the merits"—the remaining factors follow readily.

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act*, 757 F.3d at 1068. "Because intangible injuries generally lack an adequate remedy," they may "qualify as irreparable harm." *Id.* (internal citation and quotation marks omitted). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

As explained above, the Ordinance raises serious questions about the Ordinance's constitutionality under the Contracts Clause, the Takings Clause, and the California Constitution's separation of powers between cities and counties. But the harms extend far beyond constitutional violations.

Plaintiff's members include owners who, under the moratorium, must house tenants who harass and abuse them, their families, and third parties who repair or service units. Others need or want to move themselves or their family members into their units, but are prohibited from doing so because of the moratorium. Still others cannot replace nonpaying tenants with paying ones, threatening "the loss of an ongoing business representing many years of effort and the livelihood of its [owners]." *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (holding that such loss "constitutes irreparable harm," because it "cannot be fully compensated by subsequent monetary damages"). In all those cases, the moratorium illegalizes the only means of avoiding or mitigating the irreparable harm—namely, removal of the tenant and repossession of the property.

Of course, if owners choose to assert their constitutional rights to repossess their properties, they will be in knowing violation of the law. Among other things, they will subject themselves to tenant-initiated litigation resulting in a "trebled" award of damages, including for "mental or emotional distress." Ordinance § 7(a). That is "in

addition to any other existing remedies . . . available to the Tenant under local, state or federal law," including "sanctions." *Id.* § 7(c)-(d).

Because of the prospect of these irreparable injuries, the need to "preserve the status quo pending a determination of the action on the merits"—the fundamental purpose of a preliminary injunction—is strong. *Chalk*, 840 F.2d at 704.

**D.** **THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN PLAINTIFF'S FAVOR**

The final two factors are the balance of equities and the public interest. "Because the government is a party," courts "consider [those two factors] together." *City & Cty. of San Francisco v. United States Citizenship & Immigration Servs.*, 944 F.3d 773, 806 (9th Cir. 2019) (internal citation and quotation marks omitted).

"To balance the equities, [courts] consider the hardships each party is likely to suffer if the other prevails." *Id.* Plaintiff has discussed the irreparable harm to its members, above. In stark contrast to Plaintiff's harm, the County will suffer no harm from a preliminary injunction that merely preserves the *status quo*. "[B]y establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiff[] [has] established that . . . the balance of equities favor a preliminary injunction." *Ariz. Dream Act*, 757 F.3d at 1069. The balance of equities also favors parties, like Plaintiff in this case, who seek only "to preserve, rather than alter, the status quo while they litigate the merits of th[eir] action." *Rodde v. Bonta*, 357 F.3d 988, 999 n.14 (9th Cir. 2004). The narrow, prohibitory nature of the relief Plaintiff seeks "strengthens [its] position" in the balancing of this factor. *Id.*

The County may argue that the "public interest" compels denial of a preliminary injunction in order to keep tenants housed during the pandemic. But any such interest does not outweigh the Plaintiff's in protecting its members' constitutional rights and avoiding the irreparable harm to themselves, their families, and their businesses. The Court must "balance[] the public interest on the side of the plaintiff[] against the public interest on the side of the government to determine where the public interest lies." *Index*

*Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020). A preliminary injunction here is in the public interest, because "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (internal citation and quotation marks omitted) (emphasis added). Conversely, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). Simply put, "it would not be equitable or in the public's interest to allow the [County] . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Ariz. Dream Act*, 757 F.3d at 1069 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

On the other hand, preliminarily enjoining the moratorium threatens no one's constitutional rights. And while the moratorium may advance the County's policy goal of assisting tenants, "[t]he Constitution does not permit [the County] to prioritize any policy goal over the [Contracts Clause or Takings Clause]." *Gordon*, 721 F.3d at 653. Indeed, even without the Ordinance, tenants enjoy significant substantive and procedural protections against eviction under state law—even for failure to pay rent owed after June 30.

For example, tenants who have continuously and lawfully occupied a rental unit for 12 or more months may be evicted only for "just cause." Cal. Civ. Code § 1946.2(a). And, for a "just cause" eviction that is not the tenant's fault—for example, if the owner simply wants to move back in—the owner must make a "relocation assistance" payment to the tenant in the amount of one month's rent. *Id.* § 1946.2(d)(3).

In addition to the protections codified in section 1946.2, California enacted additional state-law protections in response to the pandemic. Assembly Bill ("AB") 3088, signed into law in August 2020, prohibits residential tenants from being evicted for failure to pay rent because of a COVID-19-related hardship occurring between March 1 and August 31, 2020, as long as the tenant providers the owner with a written declaration of hardship. Cal. Civ. Proc. Code § 1179.04. Residential tenants who

experience a new COVID-19-related hardship between September 1, 2020, and January 31, 2021, are also protected from eviction as long as they pay 25 percent of the rent due by January 31, 2021. *Id.* Senate Bill 91, signed into law in January, extends AB 3088's protections through June 30, 2021 *and* establishes a comprehensive "Emergency Rental Assistance Program" to help economically vulnerable tenants who cannot pay rent. Cal. Health & Safety Code § 50897, *et seq.* Thus, through state law, California has sought to balance the hardships that many tenants are facing against the rights of rental housing owners. The County's indiscriminate moratorium on evictions disturbs that delicate balance, and strips owners of *all* the rights in their properties.

Finally, it bears repeating that the County initially considered the moratorium to be a matter of urgency, but then rejected that characterization. RJN, Exhs. C-D. The upshot is that the County acknowledges that the moratorium is not justified on emergency grounds. Thus, any allegation that the moratorium is necessary to address a public-health or other *emergency* is belied by the County's own actions.

## V.    **CONCLUSION**

For the foregoing reasons, Plaintiff requests that this motion be granted. The Court should issue an injunction prohibiting the eviction moratorium's enforcement pending the proceedings in this Court. Short of that, the Court should, at a minimum, enjoin the moratorium's application outside the unincorporated areas of the County.

DATED: May 24, 2021

/s/ Paul Beard II

_____
PAUL BEARD II
Attorney for Plaintiff SOUTHERN CALIFORNIA
RENTAL HOUSING ASSOCIATION