PAUL J. BEARD II (State Bar No. 210563)
FISHERBROYLES LLP
4470 W. Sunset Blvd., Suite 93165
Los Angeles, CA 90027
Telephone: (818) 216-3988
Facsimile: (213) 402-5034
E-mail: paul.beard@fisherbroyles.com

Attorneys for Plaintiff
SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION,<br><br>       Plaintiff<br><br>    v.<br><br>COUNTY OF SAN DIEGO, BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO, and DOES 1 through 20, inclusive,<br><br>       Defendants. | Case No.:  3:21-cv-00912-L-DEB<br><br>Judge:    Judge M. James Lorenz<br><br>**PLAINTIFF'S *EX PARTE* APPLICATION FOR (1) ORDER SHORTENING TIME TO BRIEF AND HEAR MOTION FOR PRELIMINARY INJUNCTION AND (2) TEMPORARY RESTRAINING ORDER**<br><br>Complaint Filed:  May 13, 2021<br>Trial Date:      None set |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................. 7

II. FACTUAL BACKGROUND ............................................................... 9

    A. Ordinance 10724's Eviction Moratorium ................................... 9

    B. The Ordinance's Impacts on Plaintiff and Its Members .......... 11

III. LEGAL STANDARD ........................................................................ 14

IV. ARGUMENT...................................................................................... 15

    A. Plaintiff Has Standing ............................................................... 15

    B. An Order Shortening Time on the Preliminary Injunction Motion Is Appropriate............................................................................... 16

    C. A Temporary Restraining Order Is Appropriate ...................... 17

        1. Plaintiff Is Likely To Succeed on the Merits—or, at a Minimum, Plaintiff Raises "Serious Questions" About the Moratorium's Constitutionality ....................................... 17

        2. Plaintiff Will Suffer Irreparable Harm if the Court Denies Relief........................................................................ 26

        3. The Balance of the Equities and the Public Interest Tip Sharply in Plaintiff's Favor ........................................... 28

        4. The Court Should Dispense with Any Bond Requirement .......... 31

V. CONCLUSION .................................................................................. 31

PL.'S EX PARTE APP. FOR ORDER TO SHORTEN TIME AND FOR TRO

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Alliance for the Wild Rockies v. Cottrell*
  632 F.3d 1127 (9th Cir. 2011) .................................................... 15

*Allied Structural Steel Co. v. Spannaus*
  438 U.S. 234 (1978) .................................................................. 18

*Arizona Dream Act Coalition v. Brewer*
  757 F.3d 1053 (9th Cir. 2014) ............................................. 26, 29

*Armstrong v. United States*
  364 U.S. 40 (1960) ............................................................... 22, 24

*Bible Club v. Placentia-Yorba Linda School Dist.*
  573 F. Supp. 2d 1291 (C.D. Cal. 2008) .................................... 31

*Bounds v. Superior Ct.*
  229 Cal. App. 4th 468 (2014) .................................................... 23

*Brown v. Legal Foundation of Washington*
  538 U.S. 216 (2003) .................................................................. 31

*Chalk v. U.S. Dist. Ct. (Orange Cty. Superin. of Schs.)*
  840 F.2d 701 (9th Cir. 1998) ................................................. 26-27

*Cienega Gardens v. United States*
  331 F.3d 1319 (Fed. Cir. 2003) ................................................ 24

*City & County of San Francisco v. U.S. Cizienship & Imm. Servs.*
  944 F.3d 773 (9th Cir. 2019) .................................................... 29

*City of Dublin v. County of Alameda*
  14 Cal. App. 4th 264 (1993) .................................................. 24-25

*County Sanitation Dist. No. 2 v. County of Kern*
  127 Cal.App.4th 1544 (2005) .................................................... 24

*D.H. v. Poway Unified Sch. Dist.*
  2013 U.S. Dist. LEXIS 179116 (S.D. Cal. 2013) ..................... 8, 26-27

*Doctor John's, Inc. v. Sioux City*
  305 F. Supp. 2d 1022 (N.D. Iowa 2004); .................................. 31

*E. Bay Sanctuary Covenant v. Trump*
   932 F.3d 742, 2018 U.S. App. LEXIS 37150 (9th Cir. 2018) ......................... 14, 17

*Elrod v. Burns*
   427 U.S. 347 (1976)..................................................................................... 26

*Energy Reserves Group , Inc. v. Kansas Power & Light Co.*
   459 U.S. 400 (1983)..................................................................................... 18

*Flynt Distrib. Co. v. Harvey*
   734 F.2d 1389 (9th Cir. 1984). ................................................................... 15

*Gordon v. Holder*
   721 F.3d 638 (D.C. Cir. 2013)................................................................29-30

*Hunt v. Wash. State Apple Adver. Comm'n*
   432 U.S. 333 (1977)................................................................................15-16

*Index Newspapers LLC v. U.S. Marshals Serv.*
   977 F.3d 817 (9th Cir. 2020) ...................................................................... 29

*Jorgensen v. Cassiday*
   320 F.3d 906 (9th Cir. 2003) ...................................................................... 31

*Kelo v. City of New London*
   545 U.S. 469 (2005)............................................................................... 22, 24

*Lingle v. Chevron U.S.A. Inc.*
   544 U.S. 528 (2005).................................................................................... 22

*Loretto v. Teleprompter Manattan Catv Corp.*
   458 U.S. 419 (1982)................................................................................22-23

*Lucas v. South Carolina Coastal Council*
   505 U.S. 1003 (1992) .................................................................................. 23

*Melendres v. Arpaio*
   695 F.3d 990 (9th Cir. 2012) ................................................................26-27, 29

*Nichols v. Deutsche Bank Nat'l Trust Co.*
   2007 U.S. Dist. LEXIS 86223 (S.D. Cal. 2007)......................................... 26

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*
   676 F.3d 829 (9th Cir. 2012) ...................................................................15-16

*Pac. Rollforming, LLC v. Trakloc Int'l, LLC*
  2007 U.S. Dist. LEXIS 86211 (S.D. Cal. 2007).......................................31

*Penn Central Transp. Co. v. New York City*
  438 U.S. 104 (1978)..................................................................23

*Republic of the Philippines v. Marcos*
  862 F.2d 1355 (9th Cir. 1988) ......................................................15

*Rodde v. Bonta*
  357 F.3d 988 (9th Cir. 2004) .......................................................29

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*
  749 F.2d 124 (2d Cir. 1984) ........................................................27

*Southern Calif. Gas Co. v. City of Santa Ana*
  336 F.3d 885 (9th Cir. 2003) .......................................................18

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
  240 F.3d 832 (9th Cir. 2001). ......................................................14

*Sundance Land Corp. v. Community First Federal Sav. & Loan Ass'n*
  840 F.2d 653 (9th Cir. 1988) .......................................................26

*Sveen v. Melin*
  138 S. Ct. 1815 (2018)..............................................................18

*Valle del Sol Inc. v. Whiting*
  732 F.3d 1006 (9th Cir. 2013) ......................................................29

*Warth v. Seldin*
  422 U.S. 490 (1975).................................................................16

*Winter v. National Res. Defense Council, Inc.*
  555 U.S. 7 (2008)...................................................................14

## CONSTITUTIONAL PROVISIONS

Cal. Const., art. XI, § 7 ...............................................................24

U.S. Const., Art. I § 10, cl. 1 ..........................................................17

U.S. Const. amend. V ...................................................................22

U.S. Const. amend. XIV ................................................................22

**FEDERAL STATUTES AND RULES**

42 U.S.C. § 1983 ...................................................................................17-18

Federal Rule of Civil Procedure 65 ...................................................... 14, 17

**STATE STATUTES**

Cal. Civ. Code § 1946.2(a) ........................................................................ 30

Cal. Civ. Proc. Code § 1179.04 ................................................................. 30

Cal. Gov. Code § 8634 ............................................................................... 25

Cal. Gov. Code § 24123(d) ........................................................................ 21

Cal. Health & Safety Code § 50897, *et seq.* .............................................. 30

**CODES & ORDINANCES**

Ordinance 10724 ................................................................................*passim*

PL.'S EX PARTE APP. FOR ORDER TO SHORTEN TIME AND FOR TRO

# I. **INTRODUCTION**

Plaintiff Southern California Rental Housing Association challenges the eviction moratorium imposed by Ordinance 10724. County Defendants ("County") enacted the law on May 4, and it will become effective on June 3. Following a series of recusals and reassignments which culminated in Judge M. James Lorenz being assigned to this case on May 26, Plaintiff was able to obtain a hearing date and time for its motion for preliminary injunction, which SRCHA promptly filed that same day. But the hearing date for the motion is June 21—almost three weeks after the Ordinance goes into effect.

Therefore, Plaintiff applies *ex parte* for (1) an order shortening the time in which to brief and hold a hearing on its motion, and (2) a temporary restraining order ("TRO"), as a stop gap to preserve the *status quo* between June 3 and resolution of the motion.[1]

Absent such relief, the moratorium will go into effect on June 3 and continue to cause irreparable harm to thousands of rental housing owners in the County of San Diego. Effective June 3, the moratorium bans practically **all evictions** in the County, forcing owners to indefinitely house those tenants who, among other things: harass or threaten owners, their families, and third parties authorized to be on the property; damage or destroy property; create nuisances that disturb other tenants' quiet enjoyment of their rental units; and engage in other offenses that are normally cause for eviction, but do not rise to the level of an "imminent health or safety threat" to "other tenants or occupants of the same property" (as vaguely set forth in the Ordinance).

Further, the moratorium bars owners from moving themselves or their families into their own properties, including because of financial difficulties. No legal remedy can compensate owners for the sudden and indefinite loss of their rights in their properties, including use and enjoyment of their properties as their own homes.

In addition, the indefinite suspension of owners' basic rights is causing owners

---

[1] Due to an oral argument in another case set for June 14, at 9:00 a.m. and lasting all morning, Plaintiff's counsel requests that, if the Court shortens time, it set a hearing for any time other than the morning of June 14. Declaration of Paul Beard, ¶ 12).

to suffer immediate emotional and psychological injury. How can they adequately protect their homes and investments against damage and deterioration, when destructive or uncooperative tenants cannot be removed? How can they adequately protect good tenants from those who disturb their peace and quiet? Further, owners with financial difficulties, who wish to move back into their homes, are under substantial stress. Owners' mental and emotional anguish over these new realities created by the moratorium is irreparable.

Plaintiff has submitted a number of declarations establishing the immediate and psychological injury that the eviction moratorium is causing owners, as they labor under the sheer helplessness and angst of not being able to adequately protect themselves, their families, other tenants, and third parties from problematic tenants who are engaged in illegal, nuisance, and/or other offensive conduct. *See, e.g.*, Declaration of April Solis, ¶¶ 4-10 (describing "significant . . . emotional harm and distress" to husband, wife, and children (owners) caused by inability to remove harassing and destructive tenant); Declaration of Irma Pintor, ¶¶ 4-8 (describing ""emotional harm and distress" to senior owner of one duplex from not being able to remove harassing tenant); Declaration of Mark Feinberg, ¶¶ 3(a)-(g) (describing rental housing owners who are suffering enormous mental and emotional harm as they adjust to the demands of the moratorium); Declaration of Molly Kirkland, ¶¶ 3-7 (same). Such immediate and psychological injury is irreparable. *D.H. v. Poway Unified Sch. Dist.*, 2013 U.S. Dist. LEXIS 179116, *15 (S.D. Cal. 2013).

Having established irreparable harm, Plaintiff easily satisfies the other criteria for a TRO. There are "serious questions" surrounding the moratorium's constitutionality, as it indefinitely: (a) destroys the obligations and rights in existing contracts (rental agreements); (2) suspends the right to lawfully control, use, and regain possession of property; and (3) purports to reach even properties in *incorporated* areas of the County, which are beyond the County's jurisdiction. Further, the balance of hardships tips sharply in Plaintiff's favor, especially since Plaintiff seeks only to preserve—and not

alter—the *status quo*. And, temporary relief is in the public interest, because all citizens have a stake in upholding constitutionally protected rights, and because tenants have substantial protections under existing state law even absent the moratorium.

Plaintiff tried to obtain a stipulation from the County to avoid this *ex parte* application. While the County is open to advancing the hearing date on the motion for preliminary injunction by no more than one week or so, it will not stipulate to a TRO as a stop-gap measure to preserve the *status quo* between June 3 and resolution of that motion. This exposes rental housing owners, including Plaintiff's members, to irreparable harm each day the moratorium is in effect.

For these reasons, the Court should shorten the time for briefing and hearing on the preliminary injunction motion and issue a TRO to preserve the *status quo* until the Court decides the motion.

## II.    FACTUAL BACKGROUND

### A.    Ordinance 10724's Eviction Moratorium

On May 4, 2021, Defendants enacted the Ordinance. Request for Judicial Notice ("RJN"), Exh. A. The Ordinance states, in relevant part, that no owner may "lawfully terminate a residential tenancy" without "just cause." Except for "just cause," owners are prohibited from the following actions to recover possession of their property:

- "Serve a notice of termination of tenancy";
- "File or serve an unlawful detainer lawsuit, ejectment action, or other action to recover possession of a residential unit";
- "Evict a tenant or require a Tenant to vacate a residential unit," including enforcing final court judgments authorizing repossession of said unit;
- "Take any other action in reliance on a notice of termination of tenancy that expired during the Local Emergency [defined as "any period of local emergency declared by the County of San Diego in response to the COVID-19 pandemic"] or attempt to induce a tenant to vacate based on such notice";
- "Represent to a Tenant that [he] is required to move out of their unit by law."

Ordinance § 3(c).

"Just cause" requires "a showing that the Tenant is an imminent health or safety threat." Ordinance § 3(b). "Imminent health or safety threat" is vaguely defined as:

> "a hazard to the health or safety of other tenants or occupants of the same property, taking into account (1) the risk of potential spread of coronavirus caused by the eviction, in case of a Local Emergency due to COVID-19, (2) any public health or safety risk caused by the eviction, and (3) all other remedies available to the landlord and other occupants of the property, against the nature and degree of health and safety risk posed by the tenant's activity."

Ordinance § 2(b).

The Ordinance applies to *all* tenants, *all* rental housing owners, and *all* rental units—including single-family homes—in the County. Ordinance § 2. Significantly, the eviction moratorium protects all tenants regardless of their wealth, income, or COVID-19-related financial distress. Thus, by its own terms, the moratorium is concerned, not with protecting the most vulnerable tenants at risk of financial hardship or homelessness, but with benefitting tenants as a group at the expense of owners.

The vague "hazard" exception does not cover threats to owners, their families, their employees, or third parties lawfully on the premises, such as repair- or delivery-persons. It does not cover damage or destruction to property. In other words, a tenant-created "hazard" to anyone besides tenants and occupants is not "just cause" for removing the problematic tenant.

Finally, the Ordinance confers on tenants a new cause of action against owners who repossess their properties, including for "just cause." A tenant "may institute a civil proceeding," including for "mental or emotional distress" damages and treble damages, against an owner who "attempts to recover possession or recovers possession of a residential real property" if (in the tenant's eyes) the owner did not achieve "strict compliance" with all provisions of the Ordinance, including "all notice requirements." Ordinance §§ 7(a), 7(c). Given how ill-defined the "hazard" exception is, and the "strict compliance" requirement, an owner faces a high risk of costly and time-consuming litigation if she tries to remove a tenant even for "just cause" under the "hazard"

exception. Thus, the Ordinance deters owners from invoking even the narrow and vaguely defined "hazard" exception to the moratorium.

While the moratorium purports not to "relieve Tenant of the obligation to pay rent, nor restrict a Landlord's ability to recover rent due," it does just that. Ordinance § 3(k). Eviction for nonpayment of rent owed after June 30, 2021 is barred.[2] As long as the Ordinance remains in effect, tenants are excused from paying rent because the Ordinance leaves owners with no legal remedy. Thus, the moratorium has the effect of relieving tenants of their obligation to pay rent and blocks rental housing owners' ability to recover rent due after June 30.

The moratorium applies to all residential rental properties in the County. Ordinance § 2(c). Further, the moratorium applies, not just to unincorporated areas, but to "cities within the County," as well. *Id.* § 8(a).

Finally, the Ordinance becomes effective on June 3 and expires "60 days after the Governor lifts all COVID-19-related stay-at-home and work-at-home orders." *Id.* § 3(a). Since nobody knows when the Governor will lift those orders, the Ordinance's expiration date is also unknown. Thus, the moratorium will be in effect indefinitely.

### B.   The Ordinance's Impacts on Plaintiff and Its Members

Plaintiff  Southern California Rental Housing Association  is one of Southern California's leading trade associations, and is a membership-based organization that serves the needs of the rental housing industry in San Diego, Imperial, and southern Riverside Counties. Plaintiff's purpose is to protect and advocate for the rights of rental housing owners, through educational programs, advocacy before public  agencies, and, when necessary, litigation. Declaration of Alan Pentico, ¶¶ 3-4. The association has 2,200 dues-paying members, many of whom are owners of rental housing within the County of San Diego who are subject to the County's eviction moratorium. *Id.* ¶ 4. Plaintiff provided comments to the Board of Supervisors prior to the Ordinance's

---

[2] State law preemptively governs evictions for nonpayment of rent owed before July 1, 2021. *See* Cal. Civ. Proc. Code § 1179.5(b).

enactment, urging the Board to vote against adoption of the moratorium. *Id.* ¶ 5.

Among Plaintiff's members are husband and wife, Michael and April Solis. Solis Decl., ¶ 2. They own a single-family, fully furnished home in the City of San Diego. *Id*. That was their first home and the one their children were born in. *Id*. They have been renting the home to an individual pursuant to a rental agreement, and the tenancy is set to expire on July 12, 2021. *Id.* ¶ 3. Because they performed income and credit checks prior to renting the property to the tenant, they know that the tenant is from out-of-state and very wealthy. *Id.* He has a home in Northern California, as well as several income properties. *Id.* COVID-19 has not financially impacted the tenant. *Id.*

Since moving in, the Solises' tenant has unlawfully and without their permission moved in another family and an unauthorized pet. *Id.* ¶ 4. Further, the tenant has regularly harassed and sent threatening messages to the Solises. *Id*. He threatened the entire family—including the children—with bodily harm, saying that he knew where the family lived. *Id*. He has threatened bogus slip-and-fall lawsuits and has damaged the property, including the pool equipment, slider and window screens, and fencing. *Id*. Further, he has harassed and threatened third parties engaged by the Solis family to maintain and service the property, including a pool repair worker, a San Diego Gas & Electric employee, and a handyman. *Id*. All these offenses violate the terms of the rental agreement and are legitimate cause for eviction. *Id*.

Given the tenant's gross misconduct and the threat he presents to the Solis family, Mrs. Solis obtained a TRO against him. *Id.* ¶ 5. Further, on May 3, the Solises served on him a 60-day notice to vacate. *Id.* ¶ 6. However, citing the recently enacted Ordinance, the tenant boasted that he would stay in the house, and that the Solises could not remove him. *Id*. Given his multiple breaches of the rental agreement, the Solises are entitled to serve him a 3-day notice to quit. *Id.* ¶ 7. However, the tenant has repeatedly stated he, his family, and pets will not move out of the property. *Id.* In light of this the Solises would need to initiate eviction proceedings, obtain a judgment and writ of possession, then have a Sheriff execute on that writ in order to force him out. *Id.* Yet

none of that would occur before June 3, the date when the Ordinance becomes effective. *Id.*; Declaration of Wayne Templin, ¶¶ 9-14 (describing extraordinary time it takes from service of notice to execution of writ).

The Solises are suffering severe financial and emotional distress. Ms. Solis lost her job during the first few months of the pandemic. Solis Decl., ¶ 8. Mr. Solis has owned a business in for 25 years, but the pandemic has impacted his business and income. *Id*. Their dire financial circumstances are such that they and their children must move back into their home. *Id*. Although they want and are prepared to pursue removal of this problematic tenant, in part so that they can move their family back in, they are barred from doing so because of the Ordinance. *Id*. The Ordinance has caused, and continues to cause, significant financial and emotional harm and distress to the Solises. *Id.* ¶ 9.

Irma Pintor is also a member of Plaintiff. Pintor Decl., ¶ 2. She owns a duplex in the City of San Diego. *Id.* ¶ 4. She is a senior citizen and does not speak English. *Id.* ¶ 3. She used to live in one side of the duplex, while the other side was rented out to a tenant (Tenant 1). *Id.* ¶ 4. But Tenant 1 stopped paying rent. *Id.* To make ends meet, Ms. Pintor was forced to move out of her duplex and temporarily sleep in her garage, so that she could bring in a paying tenant (Tenant 2). *Id.*

Tenant 1 has repeatedly harassed Ms. Pintor, to the point where Ms. Pintor must now move out of her garage and into her son's home. *Id.* ¶ 5. Tenant 1 also has repeatedly harassed third parties, including individuals sent to her unit to make requested repairs. *Id.* Ms. Pintor understands that Tenant 1 is unable to make rent, and does not want to evict the tenant for that reason. *Id.* However, Tenant 1's pattern and practice of gross misconduct vis-à-vis Ms. Pintor and third parties authorized to make repairs on the premises require Tenant 1's removal. *Id.* While she is prepared to take all lawful steps to remove Tenant 1, she is deterred and prohibited from doing so, because of the Ordinance's moratorium. *Id.* The dire situation with Tenant 1—and the Ordinance, which will strip Ms. Pintor of all her rights and remedies to deal with that

situation—have caused, and continues to cause, significant financial and emotional harm and distress to Ms. Pintor. *Id.* ¶ 6.

Many other owners are suffering mental and emotional anguish because of the moratorium, as they face problematic tenants who are damaging property, creating nuisances, and disturbing the peace and quiet enjoyment that good tenants are entitled to. Kirkland Decl., ¶¶ 2-8; Feinberg Decl., ¶ 2. Temporary and preliminary relief is the *only* way to remedy those irreparable injuries.

## III.  LEGAL STANDARD

Civil Rule 7.1(e)(5) authorizes *ex parte* applications for orders shortening time, following a "meet and confer" between the parties pursuant to the Court's Standing Order.

Rule 65 of the Federal Rules of Civil Procedure authorizes TROs. A TRO's "underlying purpose [is to] preserv[e] the status quo and prevent[ ] irreparable harm" until a preliminary injunction hearing can be held. *Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). A TRO "expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension." Fed. R. Civ. Proc. 65(b)(2); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 2018 U.S. App. LEXIS 37150, **29-30, 69  (9th Cir. 2018) (upholding district court's 30-day TRO).

The standards for a TRO and preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Generally, to obtain a TRO, the moving party must establish that: (1) he "is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). However, under the Ninth Circuit's "sliding scale" approach, the first and third elements are balanced so that "serious questions" going to the merits and a balance

of hardships that "tips sharply" in favor of the movant are sufficient for relief so long as the other two elements are also met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). "Serious questions are substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quotations and citation omitted). Finally, in reviewing a TRO application, the Court "may give even inadmissible evidence [even hearsay] some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

## IV. **ARGUMENT**

### A. **Plaintiff Has Standing**

An associational plaintiff may bring suit on its members' behalf when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 839 (9th Cir. 2012) (same). Plaintiff easily meets the requirements for associational standing.

First, Plaintiff's members would have standing to sue in their own right. Members like the Solises and Ms. Pintor are rental housing owners in the County who are subject to the challenged Ordinance's eviction moratorium. Unless enjoined, the Ordinance will bar them from exercising their right to repossess their properties on otherwise lawful grounds, including to remove tenants who are threatening and harassing them and their families. Solis Decl., ¶¶ 4-6; Pintor Decl., ¶¶ 4-6. Although it takes effect on June 3, the moratorium ensures that even *present* efforts to commence eviction proceedings on otherwise lawful grounds will be futile. Given the time it takes from notice to vacate to the Sheriff's execution of a writ of possession, no eviction could be completed prior to June 3. (Templin Decl., ¶¶ 9-14). Thus, Plaintiff's members have suffered and continue

to suffer "immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Hunt*, 432 U.S. at 342.

Second, Plaintiff's action seeks to vindicate members' rights, as protected by the Federal Constitution. Vindicating the rights of its members is not only "germane" to Plaintiff's purpose; it is *the* purpose of the association. Pentico Decl., ¶ 4.

Third, the temporary injunctive relief that Plaintiff seeks here does not require that individual members participate in this action. "If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975); *Oklevueha*, 676 F.3d at 839 (same).

**B.** **An Order Shortening Time on the Preliminary Injunction Motion Is Appropriate**

Consistent with Civil Rule 7.1.(e)(5), Plaintiff makes its request for an order shortening time by way of an *ex parte* application, and it has served the application on the County. Further, Plaintiff has complied with the "meet and confer" requirements of the Court's Standing Order. Given the chronology of events in this case and Plaintiff's diligence, an order shortening time on the preliminary injunction motion is justified.

The Ordinance was enacted on May 4. On May 13, Plaintiff filed its Complaint challenging the Ordinance's eviction moratorium. Plaintiff immediately began work on its motion for preliminary injunction and all supporting documents. Beard Decl., ¶ 6. Per the Local Rules, no motion may be filed without first obtaining a hearing date and time from the assigned Judge's Clerk. Local Rules 7.1(b), 7.1(e)(1).

Between May 21 and May 24, the case was reassigned a number of times. Beard Decl., ¶¶ 7-8. Finally, it was assigned to Judge Lorenz. His clerk provided a hearing date and time for the motion, and the motion was filed and served on May 24. *Id.*

Over the next couple of days, Plaintiff's counsel tried, in vain, to secure a

stipulation from the County that would obviate the need for this application. After multiple attempts to reach out to the County, with no response back, the County finally responded on the afternoon of May 26. The County declined to stipulate to any TRO. Further, the County would not agree to any shortening of time resulting in the hearing date being advanced by more than one week or so. Beard Decl., ¶¶ 9-10.

Plaintiff requests that the Court issue: (1) an order shortening time so that the hearing date is advanced to at least <u>June 17</u>, and (2) a TRO barring enforcement of the moratorium until resolution of the motion. Advancing the preliminary injunction hearing to June 17 (if not earlier) allows for a TRO that lasts no longer than 14 days, as prescribed by Rule 65 (i.e., June 3-17). The County does not appear to oppose a shortening of time resulting in advancement of the hearing date by 4 days.

If the Court is disinclined to shorten time to accommodate a 14-day TRO, then the Court still has ample discretion to issue a TRO of longer duration, including up to the current date set for the preliminary injunction motion (June 21). Fed. R. Civ. Proc. 65(b)(2); *see also E. Bay Sanctuary*, 932 F.3d 742, 2018 U.S. App. LEXIS 37150, \*\*29-30, 69 (upholding district court's 30-day TRO). Good cause exists for a TRO lasting more than 14 days, given the extent of irreparable harm, including emotional and mental distress, that owners are suffering and will continue to suffer every day the moratorium is in effect. Solis Decl., ¶ 9; Pintor Decl., ¶ 6; Kirkland Decl., ¶¶ 2-8; Feinberg Decl., ¶ 3(a)-(g).

**C.**     <u>**A Temporary Restraining Order Is Appropriate**</u>

        **1.**     <u>**Plaintiff Is Likely To Succeed on the Merits—or, at a Minimum, Plaintiff Raises "Serious Questions" About the Moratorium's Constitutionality**</u>

                **a.**     <u>**The Moratorium Substantially Impairs Contracts**</u>

The Contracts Clause of the United States Constitution prohibits local governments from passing "any . . . Law impairing the Obligation of Contracts." U.S. Const., Art. I, §10, cl. 1. Contracts Clause violations are actionable under 42 U.S.C. §

1983. *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) ("The right of a party not to have a State, or a political subdivision thereof, impair its obligations of contract is a right secured by the first article of the United States Constitution. A deprivation of that right may therefore give rise to a cause of action under section 1983."). Whether a law substantially impairs a contractual relationship depends upon "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018).

First, the court will determine whether the law "operate[s] as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). "In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. Second, the court considers "whether the [challenged] law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822 (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412 (1983)).

Here, the Ordinance substantially impairs the contractual relationship between rental housing owners and their tenants. Specifically, the Ordinance places a moratorium on *all* evictions within the County, except insofar as the owner can prove that a tenant's conduct rises to the extraordinary level of being a "hazard to the health or safety of other tenants or occupants of the same property." Ordinance § 3(c), 2(a). Even when a tenant presents such a "hazard"—the only "just cause" for eviction—a rental housing owner may be barred from evicting him in light of "(1) the risk of potential spread of coronavirus caused by the eviction, in case of a Local Emergency due to COVID-19, (2) any public health or safety risk caused by the eviction, and (3) all other remedies available to the landlord and other occupants of the property, against the nature and degree of health and safety risk posed by the tenant's activity." There is

an additional restriction on evictions even for "hazard[ous]" tenants: "An imminent health or safety threat cannot be the Resident's COVID-19 illness or exposure to COVID-19, whether actual or suspected." Thus, the "hazards" exception is itself subject to a number of amorphous exceptions requiring an owner to make difficult calls about scientific and public-health matters.

To make matters worse, an owner who takes action to repossess her unit exposes herself to a substantial risk of litigation by the tenant, including over whether the tenant's conduct rose to the level of a "hazard." Ordinance § 7(c). Given the ill-defined terms in the Ordinance's "just cause" provisions, the burden on owners to justify their entitlement to a "just cause" eviction, and the litigation that those issues invite, few owners can be expected to invoke the "hazard" exception.

Apart from the nebulous "hazard" exception, all evictions are prohibited, including for the following tenant conduct:

- harassing, threatening, or endangering the health or safety of the rental housing owner; her employees and agents; invited guests of other tenants; and third parties authorized to conduct business on the property (e.g., repair persons, utility service providers, delivery persons, etc.);

- damaging or destroying the rental unit or common areas of the rental housing premises;

- creating a disturbance or nuisance inside a rental unit or in common areas, including in a way that affects others' peace, comfort, and quiet enjoyment of property through the generation of noise, odors, and other offensive conduct;

- using the rental unit for unlawful purposes in a manner that may not clearly rise to the level of constituting a "hazard to the health or safety of other tenants or occupants of the same property" (e.g., housing occupants not listed in the rental agreement; keeping unauthorized pets, whose nature or number risks property damage and destruction; illegal drug cultivation, dealing, or use; prostitution; etc.);

- failure to pay rent owed after June 30, 2021; and

- refusal to vacate unit, following otherwise-lawful notice, to allow the rental housing owner and/or her family to move into said unit, out of financial necessity or other extenuating circumstance.

This is not just a list of hypotheticals. Owners are *now* dealing with these very problems and cannot remedy them because of the impending moratorium. Solis Decl., ¶¶ 4-10; Pintor Decl., ¶¶ 4-8; Feinberg Decl., ¶¶ 3(a)-(g); Kirkland Decl., ¶¶ 3-8.

In sum, the Ordinance indefinitely excuses tenants from their contractual obligations under their rental agreements, and indefinitely bars Plaintiff's members from pursuing their contractual right to remove tenants who breach their agreements or violate the law. Thus, the Ordinance undermines the contractual bargain that is the hallmark of all rental agreements.

In addition, the Ordinance significantly interferes with owners' reasonable expectations. No rental housing owner, including Plaintiff's members, could ever have foreseen or expected the COVID-19 pandemic (the County's purported justification for the Ordinance), or the extent to which governments (like the County) would use those extraordinary circumstances to justify crippling restrictions on their livelihoods as owners, and violations of their rights under existing rental agreements and the United States Constitution. Solis Decl., ¶ 10; Pintor Decl., ¶ 7. Never before have rental housing owners faced the prospect of being compelled by law to indefinitely house tenants irrespective of their "non-hazardous" misconduct. Solis Decl., ¶ 10; Pintor Decl., ¶ 7.

Because the Ordinance substantially impairs contracts, the County bears the burden of showing that the impairment is both reasonable and necessary. The County cannot meet that burden. The Ordinance cites the COVID-19 pandemic as its primary justification. But the County reports that COVID-19 conditions have been improving. RJN, Exh. B.

The Board of Supervisors itself has conceded that no emergency justifies the Ordinance. At its first reading of the Ordinance on April 6, the Board considered the

law as an "urgency" ordinance. RJN, Exh. C. That draft contained special findings to the effect that an emergency justified the eviction moratorium and other provisions. *Id.*, pp. 4, 9. An "urgency" ordinance takes effect immediately upon its passage. Cal. Gov. Code § 24123(d). But at the April 6 hearing, the Board eliminated those "urgency" findings and converted the proposal into a regular, non-"urgency" ordinance—to be read a second time on May 4 and, if approved, to take effect 30 days after passage, on June 3. RJN, Exh. D (minutes of April 6 meeting). There being no urgency, the County cannot meet its burden of establishing that the substantial impairment of housing owners' rental agreements is necessary.

Nor can the County establish that the impairment of owners' rental agreements is reasonable. The moratorium purports to be designed to protect economically vulnerable tenants, including from homelessness. Ordinance § 1(o), (r). But the Ordinance casts a far wider net and applies to *all* tenants, including the financially well-to-do who require no special protections. *E.g.*, Solis Decl., ¶ 3. Further, by barring evictions, the Ordinance creates many more problems and threats than it purports to resolve. Under the Ordinance, rental housing owners, their agents, and other persons authorized to be on rental housing premises must now contend with tenants who are, among other things, harassing and dangerous to them, and destructive of property. Solis Decl., ¶¶ 4-6; Pintor Decl., ¶¶ 4-6. Innocent tenants must suffer "nonhazardous" disturbances, nuisances, unlawful uses of property, and other misconduct that cannot be eliminated by removal of the offending tenant. Solis Decl., ¶¶ 4-6; Pintor Decl., ¶¶ 4-6. The consequence of the eviction moratorium is that on-site threats to life, limb, and property, as well as to the peaceful and quiet enjoyment of rental units by innocent tenants, will go unaddressed and even grow.

In sum, the Ordinance unilaterally rewrites rental agreements within the County to eliminate tenant obligations, without any attempt to tie such wholesale revisions to the pandemic or even homelessness. Even if there were a legitimate purpose behind the County's Ordinances, which there is not, the complete obliteration of the contract rights

of Plaintiff's members is not a reasonable or necessary means of achieving that purpose

For these reasons, the eviction moratorium in the Ordinance likely violates the Contracts Clause. At a minimum, Plaintiff has raised "serious questions" concerning the moratorium's constitutionality under the Contracts Clause.

### b.     The Moratorium Effects an Unconstitutional Taking

The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the government from taking private property unless (a) it is for a "public use" and (b) "just compensation" is paid to the rental housing owner. U.S. Const. amend. V, XIV (making Takings Clause applicable to state and local governments); *see also Brown v. Legal Foundation of Washington*, 538 U.S. 216, 231-32 (2003) (underscoring the Takings Clause's two separate requirements). The Takings Clause was enshrined in the Constitution so that the government would not "force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

If the government "fails to meet the 'public use' requirement," then "that is the end of the inquiry," and "[n]o amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). A government taking of property for a private use or purpose is barred. As the United States Supreme Court has explained: "it has long been accepted that the sovereign" (i.e., the government) "may not take the property of A for the sole purpose of transferring it to B." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005).

"Nor would the [government] be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." *Kelo*, 545 U.S. at 478. If a taking is designed simply "to benefit a particular class of identifiable individuals," then the taking is not for a "public use" consistent with the Public Use Clause, and is therefore unconstitutional. *Id.* Significantly, takings with only an "incidental" public benefit "are forbidden by the Public Use Clause." *Id.* at 490 (Kennedy, J., concurring); *see also Loretto v. Teleprompter Manhattan Catv Corp.*, 458

U.S. 419 (1982) (holding that a "taking" under the Takings Clause occurs even when, under the authority of law, "a stranger directly invades and occupies the owner's property" and does not pass to or through the government's hands).

The Ordinance imposes an indefinite moratorium on evictions, except when an owner can prove that a problematic tenant meets the vague definition of being a "hazard" to other tenants. Under the moratorium, rental housing owners cannot remove a tenant for any other kind of threat or misconduct, and cannot even move themselves and/or their families into their own properties. Owners' "rights to possess the property, to use the property" or "to exclude others from the property" are, for all practical intents and purposes, indefinitely suspended. *Bounds v. Superior Court*, 229 Cal. App. 4th 468, 479 (2014) (describing the "bundle of rights" possessed by a property owner in his private property). The Ordinance thereby effects a *per se* taking. *See, e.g., Loretto*, 458 U.S. 419, 434–35 (1982) (law requiring owner to allow cable company to install cable facilities on his property without said owner's consent effected a *per se* taking).

The moratorium alternatively effects a regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). It eliminates, for an indefinite period of time, owners' right to make economically beneficial or valuable use of their properties by depriving them of the only legal remedy they have to guarantee a reasonable return on their investment: the right to terminate a tenancy and evict for nonpayment of rent owed after June 30. The moratorium also effects a regulatory taking under the takings test set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123 (1978). First, the moratorium's "economic impact" on rental housing owners is devastating, given the near-total elimination of their right to lawfully repossess and use their properties, including for nonpayment of rent owed after June 30. Second, the moratorium substantially interferes with distinct investment-backed expectations, given the rights and remedies otherwise provided to owners by law and by existing rental agreements. Finally, the character of the governmental action is that of a taking of a property interest because the moratorium "authorize[s] the continuing physical

occupation of particular [owners'] properties," in part to address alleged societal problems, and is "not an example of government regulation under common law nuisance or other similar doctrines." *Cienega Gardens v. United States*, 331 F.3d 1319, 1338 (Fed. Cir. 2003).

The taking effected by the moratorium is unconstitutional under the Fifth Amendment, for two reasons. First, the taking is not for a public use or purpose. The moratorium's express purpose and effect are to benefit "a particular class of identifiable individuals"—*i.e.*, tenants, rich or poor. *Kelo*, 545 U.S. at 478. As such, the moratorium violates the Public Use requirement of the Takings Clause.

Second, the Ordinance provides no mechanism for compensating rental housing owners for the loss of their property rights. The moratorium eliminates owners' full rights to possess, use, and exclude, pursuant to their existing rental agreements and the Constitution. Yet the Ordinance provides no compensation for the taking of those property interests. The Ordinance is at total cross-purposes with the Takings Clause, which is intended to ensure that government does not "force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49.

For these reasons, the moratorium imposed by the Ordinance likely violates the Takings Clause. At a minimum, Plaintiff has raised "serious questions" concerning the moratorium's constitutionality under that clause.

### c. The Moratorium Unconstitutionally Applies Outside the County's Jurisdiction

"A county or city may make and enforce ***within its limits*** all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7 (emphasis added). Thus, the County's authority extends only to unincorporated areas within its borders and does not extend to cities within the County. *County Sanitation Dist. No. 2 v. County of Kern*, 127 Cal.App.4th 1544, 1612 (2005) (holding that only unincorporated area of a county is "within its limits"); *City of Dublin*

*v. County of Alameda*, 14 Cal. App. 4th 264, 274–275 (1993) (same).

Nevertheless, the Ordinance states that "the regulations in this ordinance shall apply to cities within the County of San Diego," except where "the governing body of a city has enacted an ordinance that has stronger protections for Tenants during the COVID-19 emergency." Ordinance, § 8(a)-(b). The Ordinance further states that "[t]o the extent the city ordinance is not stronger, the county ordinance protecting Tenants shall apply despite contrary provisions or silence on the subject in the city ordinance." *Id.* § 8(c). The Ordinance thereby exceeds the County's lawful jurisdiction.

The Ordinance cites, to no avail, California Government Code section 8634. Section 8634 provides, in relevant part, that "[d]uring a local emergency the governing body of a political subdivision, or officials designated thereby, may promulgate orders and regulations necessary to provide for the protection of life and property, including orders or regulations imposing a curfew within designated boundaries where necessary to preserve the public order and safety." Cal. Gov. Code § 8634. The statute does not say that a county regulation required by a county-declared "emergency" applies to cities within that county. Nor is there case law to support that interpretation of the statute.

Even if section 8634 subjected cities to a county's "emergency" regulations, the County could not invoke the statute to apply its Ordinance outside unincorporated areas. That is because the Ordinance is not premised upon an urgent need to protect life and property. Indeed, at the April 6, 2021 hearing, the Board voted to convert the Ordinance from an "urgency" ordinance (which would take effect immediately upon enactment) into a *non-urgency* ordinance to take effect within 30 days of its enactment. Significantly, the Board voted at the April 6, 2021, hearing to eliminate Finding (gg) of the first draft of the ordinance, which claimed the ordinance was "necessary for the immediate preservation of the public peace, health, and safety." RJN, Exhs. C-D. Thus, by the County's own admission in deleting that finding and abandoning all claims to urgency, the Ordinance is not needed for the protection of life and property. If anything, the Ordinance does just the opposite: It strips the protections that the Constitution

affords to rental housing owners and their properties.

In sum, it is likely that the Ordinance exceeds the County's jurisdiction under the California Constitution, insofar as it purports to apply to incorporated areas (e.g., cities). At a minimum, Plaintiff has raised "serious questions" concerning the moratorium's constitutionality under the California Constitution.

### 2. Plaintiff Will Suffer Irreparable Harm if the Court Denies Relief

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act*, 757 F.3d at 1068. "Because intangible injuries generally lack an adequate remedy," they may "qualify as irreparable harm." *Id.* (internal citation and quotation marks omitted). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The indefinite deprivation of one's right to repossess one's real property—which is "unique" to that owner—causes "immediate, irreparable injury," because the "legal remedy—i.e., damages—is inadequate." *Sundance Land Corp. v. Community First Federal Sav. & Loan Ass'n.*, 840 F.2d 653, 661 (9th Cir. 1988); *Nichols v. Deutsche Bank Nat'l Trust Co.*, 2007 U.S. Dist. LEXIS 86223 (S.D. Cal. 2007) (same). Further, a showing of "immediate and psychological injury" establishes irreparable harm. *D.H.*, 2013 U.S. Dist. LEXIS 179116, *15 (citing *Chalk v. U.S. Dist. Court Cent. Dist. California*, 840 F.2d 701, 710 (9th Cir. 1988)).

As explained above, the moratorium likely violates rental housing owners' constitutional rights—or at least raises "serious questions" to that effect. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres*, 695 F.3d at 1002. But the moratorium's irreparable harm extends beyond those constitutional violations.

The moratorium requires owners to indefinitely house tenants who (1) harass and abuse them, their families, employees, third parties who repair or service units, or (2)

are engaged in nuisance or even criminal activities. Solis Decl., ¶ 4; Pintor Decl., ¶ 5; Kirkland Decl., ¶¶ 4, 6, 8; Feinberg Decl., ¶ 3(a)-(g). Others need or want to move themselves or their family members into their units, but are prohibited from doing so because of the moratorium. Solis Decl., ¶ 8. Still others cannot replace nonpaying tenants with paying ones (Kirkland Decl., ¶ 7), threatening "the loss of an ongoing business representing many years of effort and the livelihood of its [owners]." *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (holding that such loss "constitutes irreparable harm," because it "cannot be fully compensated by subsequent monetary damages"). In all those cases, the moratorium illegalizes the only means of remedying the irreparable harm—namely, removal of the tenant and repossession of the property.

Of course, if owners choose to assert their constitutional rights to repossess their properties, they will be in knowing violation of the law. Among other things, they will subject themselves to tenant-initiated litigation resulting in a "trebled" award of damages, including for "mental or emotional distress." Ordinance § 7(a). That is "in addition to any other existing remedies . . . available to the Tenant under local, state or federal law," including "sanctions." *Id.* § 7(c)-(d).

The sudden and indefinite suspension of one's contractual and property rights under the Federal Constitution is irreparable. *Melendres*, 695 F.3d at 1002. But there is also the "immediate and psychological injury" that the moratorium has visited upon rental housing owners. Solis Decl., ¶ 9; Pintor Decl., ¶ 6; Kirkland Decl., ¶¶ 2-7; Feinberg, ¶ 2. A showing of "immediate and psychological injury" establishes irreparable harm. *D.H.*, 2013 U.S. Dist. LEXIS 179116, *15 (a showing of "immediate and psychological injury" establishes irreparable harm ) (citing *Chalk v. U.S. Dist. Court Cent. Dist. California*, 840 F.2d 701, 710 (9th Cir. 1988)).

For example, one elderly woman who owns one single condominium in the County has a tenant who has not paid rent in a year, despite being on disability and not having experienced financial hardship. In the last year alone, the tenant has violated

parking rules enforced by the homeowners' association, causing the owner to receive several violations. The owner would like to move into her condo. Despite the tenant's violations, and the owner's desire to move into her condo, the moratorium indefinitely prohibits her from repossessing the property. This has caused her great distress, and she frequently breaks down in tears in calls with Plaintiff. (Kirkland Decl., ¶ 7).

Another owner is prohibited from removing a tenant who is illegally operating a business out of the rental unit. Also, while smoking is prohibited at the property, neighboring tenants have reported ongoing smoking of marijuana and methamphetamine from the problematic tenant's unit. The good tenants have expressed their intent to terminate their leases, because they lack quiet enjoyment of the property and feel unsafe given the problematic tenant's activities. The problematic tenant's conduct, and the adverse impacts that tenant is having on good tenants, have caused the owner to feel emotionally overwhelmed and helpless. (Kirkland Decl., ¶ 3).

These are just a few examples of owners suffering emotional and mental distress over their inability to remove tenants who are committing illegal, destructive, or offensive activities in their units or in common areas, but whose conduct does not rise to the level of being an "imminent health or safety threat" to "other tenants or occupants of the same property"—at least as that concept is vaguely defined in the law. Ordinance, § 2(b); see also Kirkland Decl., ¶¶ 4-8 (describing additional examples of owners suffering severe mental and emotional distress because of the moratorium's elimination of their right to remove tenants); Feinberg Decl., ¶ 3(a)-(g) (describing many owners who are under the "mental and emotional burden of the inability to safeguard their properties and their well-behaved residents" because of the moratorium); Solis Decl., ¶ 9 (describing mental and emotional anguish under the moratorium); Pintor Decl., ¶ 6 (same). These harms are irreparable and cry out for a TRO.

### 3. The Balance of the Equities and the Public Interest Tip Sharply in Plaintiff's Favor

The final two factors are the balance of equities and the public interest. "Because

the government is a party," courts "consider [those two factors] together." *City & Cty. of San Francisco v. United States Citizenship & Immigration Servs.*, 944 F.3d 773, 806 (9th Cir. 2019) (internal citation and quotation marks omitted). "To balance the equities, [courts] consider the hardships each party is likely to suffer if the other prevails." *Id.*

Plaintiff has discussed above the irreparable harm caused by the moratorium. By contrast, the County will suffer no harm from a TRO that merely preserves the *status quo* until the preliminary injunction motion is decided. "[B]y establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiff[] [has] established that . . . the balance of equities favor" a TRO. *Ariz. Dream Act*, 757 F.3d at 1069. The balance of equities also favors parties, like Plaintiff, who seek only "to preserve, rather than alter, the status quo while they litigate the merits of th[eir] action." *Rodde v. Bonta*, 357 F.3d 988, 999 n.14 (9th Cir. 2004). The narrow, prohibitory nature of the relief Plaintiff seeks "strengthens [its] position" in the balancing of this factor. *Id.*

The County may argue that the "public interest" compels denial of a TRO. But any such interest does not outweigh the Plaintiff's in protecting its members' constitutional rights and avoiding the irreparable harm described above. The Court must "balance[] the public interest on the side of the plaintiff[] against the public interest on the side of the government to determine where the public interest lies." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020). A TRO is in the public interest, because "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (internal citation and quotation marks omitted) (emphasis added). Conversely, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). Simply put, "it would not be equitable or in the public's interest to allow the [County] . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Ariz. Dream Act*, 757 F.3d at 1069 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

By contrast, temporarily enjoining the moratorium threatens no one's

constitutional rights. And while the moratorium may advance the County's policy goal of assisting tenants, "[t]he Constitution does not permit [the County] to prioritize any policy goal over the [Contracts Clause or Takings Clause]." *Gordon*, 721 F.3d at 653. Indeed, even without the moratorium, tenants enjoy substantive and procedural protections against eviction under state law, even for failure to pay rent.

For example, tenants who have continuously and lawfully occupied a rental unit for 12 or more months may be evicted only for "just cause." Cal. Civ. Code § 1946.2(a). And, for a "just cause" eviction that is not the tenant's fault—for example, if the owner simply wants to move back in—the owner must make a "relocation assistance" payment to the tenant in the amount of one month's rent. *Id.* § 1946.2(d)(3). In addition to the protections codified in section 1946.2, California enacted additional state-law protections in response to the pandemic. Assembly Bill ("AB") 3088, signed into law in August 2020, prohibits residential tenants from being evicted for failure to pay rent because of a COVID-19-related hardship occurring between March 1 and August 31, 2020, as long as the tenant providers the owner with a written declaration of hardship. Cal. Civ. Proc. Code § 1179.04. Residential tenants who experience a new COVID-19-related hardship between September 1, 2020, and January 31, 2021, are also protected from eviction as long as they pay 25 percent of the rent due by January 31, 2021. *Id.* Senate Bill 91, signed into law in January, extends AB 3088's protections through June 30, 2021 *and* establishes a comprehensive "Emergency Rental Assistance Program" to help economically vulnerable tenants who cannot pay rent. Cal. Health & Safety Code § 50897, *et seq.* Thus, through state law, California has sought to balance the hardships that many tenants are facing against the rights of rental housing owners. The County's indiscriminate moratorium on evictions disturbs that delicate balance, and strips owners of *all* the rights in their properties.

Finally, it bears repeating that the County initially considered the moratorium to be a matter of urgency, but then rejected that characterization. RJN, Exhs. C-D. The upshot is that the County acknowledges that the moratorium is not justified on

emergency grounds. Thus, any allegation that the moratorium is necessary to address a public-health or other *emergency* is belied by the County's own actions.

### 4.      The Court Should Dispense with Any Bond Requirement

"Rule 65(c) [of the Federal Rules of Civil Procedure] invests the district court with discretion as to the amount of security required, ***if any***" when granting temporary or preliminary relief. *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003) (emphasis in original) (internal citations and quotation marks omitted). "The bond amount may be set at zero if there is no evidence the party will suffer damages from the injunction," and "[t]he burden is on the party affected by the injunction to present evidence that a bond is needed." *Pac. Rollforming, LLC v. Trakloc Int'l, LLC*, 2007 U.S. Dist. LEXIS 86211, *4 (S.D. Cal. 2007).

The Court should waive any bond requirement, because enjoining the County from unconstitutionally enforcing the moratorium will not cause the County any economic damage. On the other hand, imposing a bond requirement on Plaintiff would be unduly burdensome. "[R]equiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because the rights potentially impinged by the government entity's actions are of such gravity that protection of those rights should not be contingent upon an ability to pay." *Doctor John's, Inc. v. Sioux City*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004); *see also Bible Club v. Placentia-Yorba Linda School Dist.*, 573 F. Supp. 2d 1291 n. 6 (C.D. Cal. 2008) (waiving requirement of student group to post a bond where case involved "the probable violation of [the club's] First Amendment rights" and minimal damage to the government entity of issuing injunction).

## V.      CONCLUSION

For the foregoing reasons, the Court should issue an order shortening the time to brief and hear the motion for preliminary injunction. Further, the Court should issue a TRO to preserve the status quo pending resolution of that motion.

DATED: May 27, 2021        /s/ Paul Beard II

PAUL BEARD II
Attorney for Plaintiff SOUTHERN CALIFORNIA
RENTAL HOUSING ASSOCIATION

PL.'S EX PARTE APP. FOR ORDER TO SHORTEN TIME AND FOR TRO