JOHN P. COOLEY, Senior Deputy (SBN 162955)
JEFFREY P. MICHALOWSKI, Senior Deputy (SBN 248073)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531- 4892; Fax: (619) 531-6005
E-mail: john.cooley@sdcounty.ca.gov

Attorneys for COUNTY OF SAN DIEGO (erroneously sued under the additional name "Board of Supervisors of the County of San Diego")

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO, and DOES 1 through 20 inclusive,<br><br>Defendants. | No. 21-cv-0912-L-DEB<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF COUNTY OF SAN DIEGO'S MOTION TO DISMISS [FRCP 12(b)(6)]<br><br>Date:            July 19, 2021<br>Time:            10:00 a.m.<br>Judge:          M. James Lorenz<br>Dept.:           5B<br>Magistrate Judge:  Daniel E. Butcher<br><br>Action Filed: May 13, 2021 |

# TABLE OF CONTENTS

I. INTRODUCTION .............................................................................................. 1

II. STATEMENT OF FACTS ............................................................................... 1

   A. COVID HAS CAUSED SIGNIFICANT ECONOMIC HARDSHIP FOR THE COUNTY. ..... 1

   B. ALL LEVELS OF GOVERNMENT HAVE PROHIBITED EVICTIONS TO COMBAT COVID-19 ............................................................................................... 2

   C. THE COUNTY'S EVICTION ORDINANCE. ................................................. 3

III. ARGUMENT .................................................................................................... 5

   A. THE FIRST CAUSE OF ACTION SHOULD BE DISMISSED BECAUSE THE EVICTION ORDINANCE DOES NOT VIOLATE THE CONTRACTS CLAUSE. ................................ 5

      1. THE ORDINANCE DOES NOT SUBSTANTIALLY IMPAIR CONTRACTS. ................. 7

      2. THE COUNTY HAS A SIGNIFICANT AND LEGITIMATE PUBLIC PURPOSE IN ENACTING THE EVICTION ORDINANCE. .......................................................... 10

      3. THE ORDINANCE IS REASONABLE AND APPROPRIATE TO THE PUBLIC PURPOSE JUSTIFYING THE LEGISLATION'S ADOPTION. .................................................... 10

   B. THE TAKINGS CAUSE OF ACTION DOES NOT SUPPORT A PRELIMINARY INJUNCTION AND PLAINTIFF LACK STANDING TO SEEK TAKINGS COMPENSATION OR DAMAGES. ..................................................................................... 13

   C. THE COUNTY HAD AUTHORITY TO ENACT A COUNTYWIDE ORDINANCE AND THUS DID NOT VIOLATE THE CALIFORNIA CONSTITUTION .......................................... 17

      1. THE CALIFORNIA EMERGENCY ACT AUTHORIZES COUNTYWIDE REGULATION, INCLUDING WITHIN CITIES. ........................................................................ 17

   D. THE ORDINANCE IS CONSISTENT WITH THE CALIFORNIA CONSTITUTION............ 21

CONCLUSION .................................................................................................... 22

21cv0912

TABLE OF AUTHORITIES

CASES

*Ala. Ass'n of Realtors v. United States HHS*,
  2021 U.S. Dist. LEXIS 92104 (D.D.C. May 14, 2021)...................................................3

*Alaska Fish & Wildlife Fed'n v. Dunkle*,
  829 F.2d 933 (9th Cir. 1987) ........................................................................16

*Apt. Ass'n of L.A. Cty. v. City of L.A.*,
  2020 U.S. Dist. LEXIS 212769 (C.D. Cal. 2020) ..............................................passim

*Ass'n of Christian Sch. Int'l v. Stearns*,
  678 F.Supp.2d 980 (C.D. Cal 2008 ................................................................17

*Auracle Homes, L.L.C. v. Lamont*,
  478 F. Supp. 3d 199 (D. Conn. 2020)............................................................passim

*Baptiste v. Kennealy*,
  490 F. Supp. 3d 353 (D. Mass. 2020)..............................................................passim

*Cal. Ass'n of Psych. Providers v. Rank*,
  51 Cal.3d 1 (1990) ......................................................................................19

*City of Dublin v. County of Alameda*,
  14 Cal. App. 4th 264, (1993) ........................................................................21

*City of Los Angeles, Calif v. Patel*,
  576 U.S. 409, 418-19 (2015) ..........................................................................9

*City of Monterey v. Del Monte Dunes*,
  526 U.S. 687 (1999)....................................................................................13

*Cnty. of Butler v. Wolf*,
  2020 U.S. Dist. LEXIS 93484 (W.D. Pa. May 28, 2020) ...............................14

*Cnty. Sanitation Dist. No 2 v. County of Kern*,
  127 Cal. App. 4th 1544 (2005) ........................................................................21

*El Papel L.L.C. v. Inslee*,
  2020 U.S. Dist. LEXIS 246971 (W.D. Wash. Dec. 2, 2020) ..........................5, 9, 10

*Elmsford Apt. Assocs., LLC v. Cuomo*,
  469 F. Supp. 3d 148 (S.D.N.Y. 2020) ...........................................................passim

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*,
  459 U.S. 400 (1983)....................................................................................6, 10, 11

*HAPCO v. City of Philadelphia*,
  482 F. Supp. 3d 337 (E.D. Pa. 2020)............................................................passim

*Heights Apts., L.L.C. v. Walz*,
  2020 U.S. Dist. LEXIS 245190 (D. Minn. Dec. 31, 2020) .............................5, 6, 7, 10

*Home Bldg. & Loan Ass'n v. Blaisdell*,
  290 U.S. 398 (1934)......................................................................................6

*Huggins v. Isenbarger*,
  798 F.2d 203 (7th Cir. 1986) .................................................................. 20

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977) ............................................................................... 16

*Hurley v. Kincaid*,
  285 U.S. 95 (1932) ................................................................................. 13

*In re Knight*,
  55 Cal. App. 511 (1921) ......................................................................... 22

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905) ................................................................................... 6

*Kelo v. City of New London*,
  545 U.S. 469 (2005) ............................................................................... 14

*Knick v. Twp. of Scott*,
  139 S.Ct. 2162 (2019) ....................................................................... 13, 14

*Penn Cent. Transp. Co. v. New York City*,
  438 U.S. 104 (1978) ............................................................................... 15

*Rent Stabilization Ass'n v. Dinkins*,
  5 F.3d 591 (2d Cir. 1993) ...................................................................... 17

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,
  560 U.S. 702 (2010) ............................................................................... 13

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*,
  535 U.S. 302 (2002) ............................................................................... 15

*United Food & Commer. Workers Union Local 751 v. Brown Group*,
  517 U.S. 544 (1996) ............................................................................... 16

*Ventura v. City of San Jose*,
  151 Cal. App. 3d 1076 (1984) ............................................................... 19

*Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Balt.*,
  2020 U.S. Dist. LEXIS 117931 (D. Md. July 6, 2020) ......................... 14

STATUTES

42 U.S.C. § 3604 ............................................................................................... 8

Cal Civ. Code § 1942.4 ..................................................................................... 8

Cal. Civ. Proc. Code § 1179.05 ...................................................................... 15

Cal. Civ. Proc. Code § 1179.05(b) ............................................................. 3, 20

Cal. Civ. Proc. Code § 1179.05(e) .................................................................. 22

Cal. Gov't Code § 25123(d)..................................................................3, 11, 20

Cal. Gov't Code § 8550 ...............................................................................19

Cal. Gov't Code § 8558 ...............................................................................19

Cal. Gov't Code § 8634 ...............................................................................18

Other Authorities

62 Ops. Cal. Att'y Gen. 701, 1979 Cal. AG LEXIS 24, at *1-2 (1979).....................18, 19

Cal Const., art. XI § (1)(a) .........................................................................18, 21

## I.   INTRODUCTION

In early 2020, the County of San Diego ("County") began experiencing the worldwide COVID-19 pandemic.  All levels of government – federal, state and local – enacted laws designed to slow the spread of the virus and reduce the numbers of serious infections and deaths.  Critical to this effort were laws aimed at keeping people in their own residences allowing them to social distance and self-quarantine to prevent the spread of the coronavirus.  To that end, the San Diego County Board of Supervisors enacted a temporary Eviction Ordinance prohibiting residential tenant evictions unless the tenant is a hazard to the health or safety of other tenants or occupants.  The ordinance is short-lived, scheduled to expire on August 14 - only 72 days after it becomes effective.

Plaintiff, an association of landlords, seeks an injunction enjoining the County's Eviction Ordinance as well as damages.  The Complaint must be dismissed with prejudice because all causes of action in the Complaint lack merit.

## II.   STATEMENT OF FACTS

The entire world is in the midst of a once-in-a-lifetime pandemic.  On February 14, 2020, the County declared a public health emergency in response to COVID-19.  (Ex. 1, § 1(c).)  Two weeks later, Governor Newsom declared a similar state-wide emergency (Ex. 2).  President Trump declared a national emergency on March 13, 2020.  (Ex. 3).

### A. COVID HAS CAUSED SIGNIFICANT ECONOMIC HARDSHIP FOR THE COUNTY.

The pandemic has hit the County hard.  As of May 30, 2021, 280,150 County residents have been infected with COVID-19; 3,756 residents have died. (Ex. 4.)  And County residents are still dying from the virus on almost a daily basis.

At the pandemic's height in 2020, the County's unemployment rate reached 15.9%.  Although, the rate has since dropped to 6.9%, that rate is still more than double the unemployment rate that existed before the pandemic hit.  And, significantly, the unemployment rate is much higher in some of the less affluent areas of the County.  For example, the current unemployment rate in Logan Heights is 11.2%, the rate in San Ysidro is 10%, and the rate in City Heights is 9.2%.  (Ex. 5.)

In October 2020, SANDAG summarized the overall economic loss to the County due to the pandemic as follows:

- $12.4 billion in expected loss for Gross Regional Product in 2020.
- 4.9 billion in estimated wages lost in the first six months of the pandemic
- 176,000 workers unemployed due to COVID-19.

(Ex. 6.)

### B. ALL LEVELS OF GOVERNMENT HAVE PROHIBITED EVICTIONS TO COMBAT COVID-19.

After fourteen months of the pandemic, it has become generally accepted that "social distancing," including self-quarantining and working from home, are critical to combating the pandemic. Social distancing requires housing security; people cannot stay at home if they have no home. During the pandemic, all levels of government have passed laws limiting evictions to keep people housed and off the streets. To that end, on March 4, 2020, Governor Newsom issued Executive Order N-28-20 (Ex. 7) allowing local jurisdictions such as the County to exercise its police powers to limit residential evictions. That Order expressly noted the importance of preserving housing security to allow social distancing for public health:

> WHEREAS many Californians are experiencing substantial losses of income as a result of business closures, the loss of hours or wages, or layoffs related to COVID-19, hindering their ability to keep up with their rents, mortgages, and utility bills; and [....]

> WHEREAS because homelessness can exacerbate vulnerability to COVID-19, **California must take measures to preserve and increase housing security for Californians to protect public health**. [. . . .]

> WHEREAS in addition to these public health benefits, state and local policies **to promote social distancing, self-quarantine, self-isolation** require that people be able to access basic utilities – including water, gas, electricity, and telecommunications-at their homes, so that Californians can work from home, receive public health information, and otherwise adhere to policies of social distancing, self-quarantine, and self-isolation, if needed.

(Ex. 7 [emphasis added.)

///

///

2

21cv0912

1    Similar eviction prohibitions were enacted by order of the United States Centers

2    for Disease Control and Prevention ("CDC").[1]   The CDC likewise noted the importance

3    of housing security to combat COVID-19:

4         In the context of a pandemic, **eviction moratoria – like quarantine,
      **isolation, and social distancing – can be an effective public health**

5         **measure** utilized to prevent the spread of communicable disease.  Eviction
      moratoria facilitate self-isolation by people who become ill or who are at

6         risk for severe illness from COVID-19 due to an underlying medical
      condition.  **They also allow state and local authorities to more easily**

7         **implement, as needed, stay-at-home and social distancing directives to**
      **mitigate the community spread of COVID-19**.

8

9     (Ex. 8; Ex. 1, §1(g).)

10    California also passed an eviction moratorium, AB 3088, to address the economic

11    impact of the pandemic.  The legislature declared: "There are strong indications that large

12    numbers of California tenants will soon face eviction from their homes based on an

13    inability to pay the rent or other financial obligations:  (AB 3088, Section 2(d).)  (Ex. 9.)

14    AB 3088 was later extended by SB 91 until June 30, 2021.  (Ex. 10.)  The Judicial

15    Council also enacted rules that effectively prohibited the filing of unlawful detainer

16    actions except for those necessary to protect public health and safety.  Emergency Rule 1,

17    Appendix I, California Rules of Court.

18    Furthermore, according to Plaintiff's own website, at least 12 cities in the County

19    passed ordinances imposing eviction moratoriums during COVID-19.  (Ex. 11.)

20    **C. THE COUNTY'S EVICTION ORDINANCE.**

21    At an April 6, 2020 meeting, the County Board of Supervisors considered a motion

22    to enact the Eviction Ordinance placing restrictions on rental evictions.  (ECF 1, ¶ 18.)

23    State law expressly permitted a county to provide eviction protections in addition to what

24    State law already provided.  Cal. Civ. Proc. Code § 1179.05(b).  The County's motion

25    was presented as an "urgency" motion pursuant to Government Code § 25123(d),

26    meaning that if it passed with a 4/5 supermajority vote, the ordinance became effective

27

28    _____

     [1] Some courts have ruled the CDC lacked authority to pass a nationwide eviction
     moratorium.  Those ruling have been suspended pending appeal. *See, e.g.*, *Ala. Ass'n of
     Realtors v. United States HHS*, 2021 U.S. Dist. LEXIS 92104 (D.D.C. May 14, 2021).

immediately.  The motion, however, garnered only a simple majority.  (See, ECF 1, ¶ 18.)  A second motion to enact the Eviction Ordinance on a non-urgency basis passed with a majority vote.

The statutorily required second reading of the Eviction Ordinance occurred on May 4, 2021 and it was thereafter enacted by the Board of Supervisors.  (See, ECF 1, ¶ 19.)  The Eviction Ordinance became effective on June 3, 2021.  (Ex. 1, ¶ 10(a).)

The Eviction Ordinance will be short-lived, expiring "60 days after the Governor lifts all COVID-19-related stay-at-home and work-at-home orders." (Ex. 1, Section 10(b).)  The 60-day clock will begin to run June 15 as confirmed by the California Department of Health's recent announcement that California's Blueprint for a Safer Economy will end on June 15 at which time all business sectors may return to usual operations.  (Ex. 12.)  On that date, all stay-at-home and work-at-home orders will be over.  (See, Ex. 12.[2])  As a result, the County's Eviction Ordinance is scheduled to have a total lifespan of 72 days – ending on August 14, 2021.

In brief, the Eviction Ordinance prohibits residential evictions unless the tenant is a hazard to the health or safety of other tenants or occupants of the same property.[3]  (Ex. 1, Section 3.)  The Findings set forth in the Ordinance clearly state its purpose is to provide housing security to the residents of the County to prevent the spread of COVID-19:

> (m)  Many County of San Diego residents are experiencing substantial losses of income as a result of business closures, the loss of Hours or wages, or layoffs related to COVID-19, hindering their ability to keep up with rent payments.

> (n)  Those residents financially impacted due to COVID-19 may not be able to make timely rent payments or may be forced to choose between making rent payments and having sufficient funds for food, medical care or other necessities for themselves and their families. [….]

---

[2] This fact is also confirmed by the declaration of the County's Public Health Officer, Dr. Wooten, which was recently filed in a similar lawsuit challenging the Eviction Ordinance.  (Ex. 13, ¶ 6 ("[t]here will no longer be any State-issued stay-at-home or work-at-home orders related to COVID-19 in effect, as of June 15, 2021").)

[3] The Ordinance also limits rent increases.  But those provisions are not challenged in the Complaint.

1
2
3

      (r)  Because experiencing homelessness can exacerbate vulnerability to COVID-19, it is necessary to take measures to preserve and increase housing security for San Diego County residents; and to protect public health and prevent transmission of COVID-19, it is essential to avoid unnecessary displacement and homelessness.

4

(Ex. 1; pp. 2-3.)

5
6

      To be clear, the Ordinance expressly <u>does not</u> "relieve a Tenant of the obligation to pay rent, nor restrict a Landlord's ability to recover rent due."  (Ex. 1, Section 3(k).)

7

## III.   ARGUMENT

8
9
10
11

      Plaintiff's Complaint contains three causes of action: Violation of the Contracts Clause of the United States Constitution; Violation of the Takings Clause of the United States Constitution; and Violation of Article XI, Section 7 of the California Constitution. All three lack merit.

12
13

### A.  THE FIRST CAUSE OF ACTION SHOULD BE DISMISSED BECAUSE THE EVICTION ORDINANCE DOES NOT VIOLATE THE CONTRACTS CLAUSE.

14
15
16
17
18
19
20
21
22
23
24
25
26

      Plaintiff first cause of action alleges a violation of the Contracts Clause of the United States Constitution.  Significantly, within the last 12 months, at least **<u>seven</u>** district court decisions scattered across the country have addressed that same argument in relation to COVID-19 related eviction laws.  Each court held there was no Contracts Clause violation.  *See*, *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 171-72 (S.D.N.Y. 2020); *Auracle Homes, L.L.C. v. Lamont*, 478 F. Supp. 3d 199, 223-26 (D. Conn. 2020); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 349-56 (E.D. Pa. 2020); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 382-87 (D. Mass. 2020); *Apt. Ass'n of L.A. Cty. v. City of L.A.*, 2020 U.S. Dist. LEXIS 212769, *8-20 (C.D. Cal. 2020)[4]; *El Papel L.L.C. v. Inslee*, 2020 U.S. Dist. LEXIS 246971, *16-33 (W.D. Wash. Dec. 2, 2020); *Heights Apts., L.L.C. v. Walz*, 2020 U.S. Dist. LEXIS 245190, *29-33 (D. Minn. Dec. 31, 2020).  The County is unaware of any court reaching a contrary conclusion. See, *El Papel L.L.C.*, 2020 U.S. Dist. LEXIS 246971, at *21 ("to date, there has not been

27
28

---

[4] The plaintiff in *Apt. Ass'n* appealed the denial of its motion for preliminary injunction.  Oral argument was recently held before the Ninth Circuit which can be viewed here:  https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000019325

21cv0912

1    a single court in the country that has found such moratoria to be unconstitutional during

2    this [COVID-19] public emergency.")

3          The Contracts Clause states: "No State shall . . . pass any . . . Law impairing the

4    Obligation of Contracts."  U.S. Const. art. I, Sec. 10.  Although the language "is facially

5    absolute, its prohibition must be accommodated to the inherent police power of the State

6    to safeguard the vital interests of its people."  *Apt. Ass'n of L.A. Cty.*, 2020 U.S. Dist.

7    LEXIS 212769, at *8 (hereinafter, "Apt. Ass'n") (quoting *Energy Reserves Grp., Inc. v.*

8    *Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983)).  The constitutional question

9    presented in the light of the COVID-19 emergency is "whether the power possessed

10   embraces the particular exercise of it in response to particular conditions."  *Apt. Ass'n* at

11   *8 (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934).

12         A Contracts Clause analysis of the Eviction Ordinance is subject to a rational basis

13   review.  *Baptiste*, 2020 U.S. Dist. LEXIS 176264, at *11; *Heights Apts.,* 2020 U.S. Dist.

14   LEXIS 245190, *32.  And decisions of a legislature are given great deference during a

15   crisis such as this pandemic.  *Jacobson v. Massachusetts*, 197 U.S. 11, 29, 31 (1905).

16         To determine whether restrictions violate the Contracts Clause, the court examines:

17   (1) whether the law operates as a substantial impairment of a contractual
           relationship,
18
19   (2)  Whether the [County] has a significant and legitimate public purpose in
           enacting the moratorium, and
20
     (3) Whether the adjustment of the rights of the contracting parties is based upon
21         reasonable conditions and is of a character appropriate to the public purpose
           justifying the legislation's adoption.
22   *Apt. Ass'n* at *8-9 [quotations omitted] (citing *Energy Reserves*, 459 U.S. at 411-12).

23         As discussed below, the Eviction Ordinance (1) does not substantially impair the

24   relationship between, tenant and landlord; (2) has a significant and legitimate public

25   purpose; and (3) is a reasonable adjustment of the contracting parties' rights and

26   appropriate to the public purpose.

27   / / /

28   / / /

1

### 1. THE ORDINANCE DOES NOT SUBSTANTIALLY IMPAIR CONTRACTS.

2    The Complaint alleges that the Eviction Ordinance substantially impairs the

3    contractual relationship between rental housing owners and their tenants because it places

4    a moratorium on all evictions within the County except for reasons of health and safety,

5    and significantly interferes with rental housing owners' reasonable expectations because

6    they could not have "foreseen or expected" the pandemic or Eviction Ordinance.  (ECF 1,

7    ¶ 31-34).  Case law analyzing similar eviction restrictions due to COVID makes it clear

8    that there is no "substantial impairment" because the fundamental nature of the contracts

9    – the payment of rent in return for housing – is not affected.  Furthermore the restrictions

10   were foreseeable given the highly regulated nature of residential rentals.

11   At least four district courts have reviewed similar COVID-19 related eviction

12   ordinances and determined there was no substantial impairment of contract.  In *Heights*

13   *Apts.*, the court noted "the fundamental nature of a lease of a residential unit is that the

14   landlord provides the tenant a place to live; the tenant, in turn, pays the landlord rent. The

15   landlord's end of the contractual bargain is receiving rent payments." *Heights Apts*

16   *L.L.C.*, 2020 U.S. Dist. LEXIS 245190, at *30.  The court ruled there was no contract

17   impairment because the eviction moratoriums did not interfere with the landlord's right to

18   receive rent.  *Id*.  Nothing in the ordinances prevented the collection of rents, or

19   prevented the landlord for suing for back rents.  It was only the eviction that was

20   prohibited.  *Id*.

21   The *Elmsford Apt.* court applied similar rationale to uphold an eviction

22   moratorium: "The eviction moratorium does not eliminate the suite of contractual

23   remedies available to the Plaintiffs; it merely postpones the date on which landlords may

24   commence summary proceedings against their tenants.  The tenants are still bound to

25   their contracts, and the landlord may obtain a judgment for unpaid rent if the tenants fail

26   to honor their obligations." *Elmsford Apt.*, 469 F.Supp.3d at 172.

27   / / /

28   / / /

Like the moratoriums in *Heights Apts*., and *Elmsford Apt.,* the County's Eviction Ordinance preserves the fundamental nature of tenant/landlord contracts.  Landlords still have the right to collect rent from tenants, and seek back rents once the Eviction Ordinance expires.  Furthermore, landlords still retain their non-contractual remedies.  They have the right to sue for damages to rental property and seek restraining orders against their tenants who threaten violence.  And, of course, landlords still have the right to call law enforcement officers to address violence or threats from tenants.

The Complaint alleges the Eviction Moratorium undermines the landlords' reasonable expectations relating to tenant/landlord relationship because the tenants did not foresee COVID-19 or the Ordinance.  (See, ECF 1, ¶ 24.)  However, the "unforseeability of COVID" argument advanced by Plaintiff has also been rejected by the district courts.  Three of the district court cases ruled that the eviction restrictions at issue did not act as a substantial impairment to contract because residential leases are already heavily regulated and thus, additional restrictions were foreseeable.  "[A] long line of cases teaches that the foreseeability of an impairment on contractual rights, and therefore the extent to which such impairment qualifies as substantial, is affected by whether the relevant party operates in a heavily regulated industry." *Elmsford* at 169.  "When a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable." *HAPCO* at 351.  "[T]he expected costs of foreseeable future regulation are already presumed to be priced into the contracts formed under the prior regulation." *Auracle Homes* at 224.

There can be no dispute that in the County – like in Los Angles - "the landlord-tenant relationship has long been subject to extensive regulation." *Apt. Ass'n* at *11 (citing 42 U.S.C. § 3604 and Cal Civ. Code § 1942.4 as examples of regulation of the landlord-tenant relationship.  Therefore, as a result of that extensive regulation, it was entirely foreseeable that additional regulations – such as those contained in the Eviction Ordinance – would be enacted.  Indeed, the Eviction Ordinance is not the first one

21cv0912

affecting County residential leases.  In addition to federal and state eviction moratoriums, the cities of San Diego, Carlsbad, Chula Vista, Encinitas, Escondido, Imperial Beach, La Mesa, National City, Oceanside, San Marco and Santee have all had similar ordinances in place during the pandemic as shown by Plaintiff's own website. (Ex. 11.)

Although a few district court cases either assumed without deciding an eviction moratorium constituted substantial impairment,[5] or found it unnecessary to decide that issue,[6] only one case expressly held an eviction moratorium constituted a substantial impairment.  That case is distinguishable because its moratorium was scheduled to last more than one year.  In *Apt. Ass'n*, the district court reviewed the City of Los Angeles's eviction moratorium ordinance enacted during the pandemic.  Although the court ultimately ruled there was no violation of the Contracts Clause, the court concluded that the plaintiff would likely succeed in showing a substantial impairment of its contractual rights, in part because "the Moratorium's limitation on evictions will persist for at least one year from today, and likely until March 2022."  *Id*. at *13 and n. 25.  Similar facts are not present here.  The lifespan of the Eviction Ordinance will be only 72 days, ending on August 14, 2021.  (See section II(C) above.)  As a result, the Eviction Ordinance is not a substantial impairment of contract.

Furthermore, Plaintiff appears to assert a facial challenge to the Eviction Ordinance.  (See, ECF 1, ¶ 31.)  As a result, Plaintiff must allege all applications of the Eviction Ordinance unconstitutionally impair existing contractual rights.  *See*, *City of Los Angeles, Calif v. Patel*, 576 U.S. 409, 418-19 (2015).  However, there is no such allegation, and it is axiomatic that not all tenants will violate their agreements and be otherwise subject to eviction but for the Ordinance.  Further, any agreements signed after the May 4 enactment date were entered into subject to the Eviction Ordinance.

/ / /

/ / /

/ / /

---

[5] *El Papel L.L.C.*, 2020 U.S. Dist. LEXIS 246971, at *17
[6] *Baptiste*, 2020 U.S. Dist. LEXIS 176264, at *46.

21cv0912

**2.** **THE COUNTY HAS A SIGNIFICANT AND LEGITIMATE PUBLIC PURPOSE IN ENACTING THE EVICTION ORDINANCE.**

To determine whether the Eviction Ordinance violates the Contracts Clause, this Court must next examine whether the County has a significant and legitimate public purpose in enacting the eviction restrictions. *Apt. Ass'n at* \*8-9 (citing *Energy Reserves*, 459 U.S. at 411-12). Here, there should be no dispute that the Eviction Ordinance is motivated by a legitimate public purpose. Indeed, in every opinion reviewing the issue for purposes of COVID-19 eviction moratoriums, the district court held the restrictions had a significant and legitimate public purpose, or the plaintiff conceded that point. *See*, *Auracle Homes L.L.C.,* 478 F. Supp. 3d at 225; *HAPCO*, 482 F. Supp. 3d at 354; *Baptiste*, 2020 U.S. Dist. LEXIS 176264, at \*47; *Apt. Ass'n* at \*9; *El Papel L.L.C.*, 2020 U.S. Dist. LEXIS 246971, at \*26; *Heights Apts L.L.C.,* 2020 U.S. Dist. LEXIS 245190, at \*31.

"A legitimate public purpose is one aimed at remedying an important general social or economic problem rather than providing a benefit to special interests." *Auracle Homes*, 478 F. Supp. 3d at 225; *see also*, *Energy Reserves*, 459 U.S. at 411-12. The "public purpose need not be addressed to an emergency." Id. at 412.

The lengthy findings set forth in Section 1, subsections (a)-(gg) of the Eviction Ordinance clearly identifies a proper public purpose – the health, safety and welfare of San Diego County residents – in detail. And there is no language in the Ordinance suggesting that by passing the Ordinance, the County is engaged in self-dealing or that the beneficiaries of the Ordinance are a special interest group. The legitimate public purpose of the Ordinance is established,

**3.** **THE ORDINANCE IS REASONABLE AND APPROPRIATE TO THE PUBLIC PURPOSE JUSTIFYING THE LEGISLATION'S ADOPTION.**

Lastly, this Court must examine whether the Ordinance is reasonable and appropriate to the public purpose justifying the Ordinance's enactment. *Apt. Ass'n* at \*8 (citing *Energy Reserves*, 459 U.S. at 412). Significantly, "[w]hen, as in this case, the

challenged law only impairs private contracts, and not those to which the [county] is a party, courts 'must accord substantial deference to the [county's] conclusion that its approach reasonably promotes the public purpose for which it was enacted." *Elmsford,* 469 F. Supp. 3d at 169; *Apt. Ass'n* at *13 (citing *Energy Reserves*, 459 U.S. at 412-13).

An emergency is not required to justify the public purpose behind a regulation that acts as a significant impairment on a contract. *Energy Reserves*, 459 U.S. at 412. Regardless, the Eviction Ordinance is justified by the COVID-19 emergency.  The County declared a Public Health Emergency on February 14, 2020 due to COVID-19. (Ex. A, § 1(c).)  California also declared an emergency. (Ex. 2.)  Those declarations have never been lifted.

Plaintiff's allegation in its Complaint that the Board of Supervisors "conceded that no emergency justifies the Ordinance" because the Board's urgency motion failed to garner a supermajority vote is a red herring.  (See ECF 1, ¶ 36.)  An urgency motion is simply a procedural vehicle to enact an ordinance faster. Government Code § 25123(d). An urgency vote has no relation to whether an ordinance is constitutional.  And, again, the Supreme Court has stated an emergency is not required to justify the public purpose behind a regulation that acts as a significant impairment on a contract. *Energy Reserves*, 459 U.S. at 412.

The Eviction Ordinance protects all tenants in the County.  The County's economy has taken a significant blow, and unemployment rates are twice as high (as of May, 2021) than before COVID-19 hit.  (Exs. 5-6.)  Job loss is a risk faced by tenants of all economic means.  Given the high cost of rent in San Diego County, many residents, not just low income, are but one or two payroll checks away from not being able to afford rent.  (See Ex. 1, Section 1(p) and (q) (noting County's severe housing affordability crisis.)  The Ordinance seeks to protect those tenants from taking actions - like bringing in roommates or moving in with their family members – that result in virus spread.

/ / /

/ / /

1      While low income residents will likely be the demographic that benefits most, the

2   language used in the Eviction Ordinance applies to all County residents.  (See, Ex. 1,

3   Sections (m) and (n).)  Tenants of all economic means are susceptible to getting COVID-

4   19.    The coronavirus is still prevalent in the County and about 38% of residents aged 12

5   and older are still not completely vaccinated;[7] residents under age 12 are not yet eligible

6   to receive the vaccine.  (Ex. 14.)  Variants of the virus that are more resistant to the

7   COVID-19 vaccine could spread in the County.  For this reason, unvaccinated residents

8   must continue to self-quarantine at home when infected, stay away from social

9   gatherings, and continue to social distance a minimum of six feet when not at home, and

10   continue to wear masks when not at home.  The common denominator for each of the

11   social distancing requirements for unvaccinated residents is the word "home."  If a

12   resident does not have a home, they cannot self-quarantine at home, cannot get closer

13   than six feet to anyone, and must always wear a mask.  Therefore, it is good public health

14   policy to provide residents with housing security. To that end, the Board of Supervisors

15   enacted the Ordinance as a short-term measure.

16      Plaintiff alleges that the "Ordinance creates many more problems and threats than

17   it purports to resolve." (ECF 1, ¶ 37.)  However, Plaintiff's broad generalization does not

18   overcome the County-wide public health benefits resulting from the Eviction Ordinance.

19   The district court in *Apt Ass'n* had no difficulty finding the eviction moratorium in Los

20   Angeles was reasonable:

21          [T]he court joins at least four other courts that have found eviction moratoria
            reasonable in light of the COVID-19 pandemic at the preliminary injunction
22          stage, notwithstanding the lack of any provision for partial rent payments.
            [Citations]  Notably, here, as in Blaisdell, the Moratorium is addressed to
23          protect a basic societal need, is temporary in nature, does not disturb
            landlords' ability to obtain a judgment for contract damages, does not
24          absolve tenants of any obligation to pay any amount of rent, does not appear
            to impact landlords' ability to obtain housing, and was implemented in the
25          context of a state of emergency.

26   *Apt. Ass'n* at *18.  This finding is equally applicable to the County's Eviction Ordinance.

27   / / /

28
    ───────────────
         [7] Significantly, the number of vaccinated residents was much lower when the
    Eviction Ordinance was enacted.

**B. THE TAKINGS CAUSE OF ACTION DOES NOT SUPPORT A PRELIMINARY INJUNCTION AND PLAINTIFF LACK STANDING TO SEEK TAKINGS COMPENSATION OR DAMAGES.**

Plaintiff's request for injunctive relief based on the Takings Clause fails for numerous reasons. *First*, it rests on a basic misunderstanding of the Fifth Amendment. The Takings Clause is not a wholesale bar on government takings. Rather, it bars only takings ***without just compensation***. *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 714–15 (1999) ("[T]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation."). *Consider also Hurley v. Kincaid*, 285 U.S. 95, 104 (1932) ("The Fifth Amendment does not entitle [the landowner] to be paid in advance of the taking.").

The remedy for any takings associated with the Eviction Ordinance, then, is not an injunction. Rather, an aggrieved party may seek compensation by suing for money damages. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 741 (2010) (Kennedy, J., concurring) ("It makes perfect sense that the remedy for a Takings Clause violation is only damages, as the Clause does not proscribe the taking of property; it proscribes taking without just compensation.").

Indeed, the Supreme Court recently addressed the remedies appropriate for a Takings claim, and reiterated that the proper relief is compensation, not an injunction:

> Governments need not fear that our holding will lead federal courts to invalidate their regulations as unconstitutional. As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed. *Knick v. Twp. of Scott*, 139 S.Ct. 2162, 2179 (2019).

In light of *Knick*, *even meritorious Takings causes of action* will not support claims for injunctive relief, because that is not the appropriate remedy. In a case challenging a similar regulation—a 60-day moratorium on evictions and foreclosures—a district court denied plaintiff's request for injunctive relief under the Takings clause. It noted that, under *Knick*, "whether Plaintiff's claim has a likelihood of success is irrelevant at this stage." *HAPCO*, 482 F. Supp. 3d at 358. *See also Baptiste*, 490 F. Supp. 3d 353, 388 (D.

/ / /

13

21cv0912

Mass. 2020) ("[A]n injunction would be unjustified even if . . . plaintiff were likely to prove the [Eviction] Moratorium constitute a taking of their property.").

In numerous other cases addressing pandemic-related restrictions on evictions and rent increases, courts have held that Takings causes of action do not support claims for injunctive relief.  *See Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Balt.*, 2020 U.S. Dist. LEXIS 117931, at *10 (D. Md. July 6, 2020) (TRO challenging ban on rent increases denied – the "proper remedy for a Takings violation is not injunctive relief, but rather monetary damages.").  Requests to enjoin shutdown orders under the Takings Clause have likewise failed.  *Cnty. of Butler v. Wolf*, 2020 U.S. Dist. LEXIS 93484, *11 (W.D. Pa. May 28, 2020) (shutdown order – request for declaratory relief denied as declaratory judgment would be "functional equivalent of injunctive relief"; "*Knick* forecloses such relief").

*Second*, and relatedly, Plaintiff will not be irreparably harmed if the Court does not grant injunctive relief.  "[I]t is black letter law that a Takings Clause violation does not constitute irreparable harm for purposes of obtaining injunctive relief because monetary damages is the proper remedy for such a violation."  *See HAPCO*, 482 F. Supp. 3d at 361 n.131 (citing *Knick*, 139 S. Ct. at 2176-66). Therefore, an injunction cannot issue.

*Third*, Plaintiff's Takings cause of action lacks substantive merit.  Any claim made by Plaintiff that the purported taking is "not for a public use or purpose" (ECF 7, 24:19-22) is incorrect.  The Ordinance aims to protect not only economically vulnerable populations—a valid regulatory goal that itself qualifies as a "public use"[8]—but also the population as a whole, which remains at risk from a once-in-a-century pandemic.  *See* Ordinance § 1(r) ("to protect public health and prevent transmission of COVID-19, it is essential to avoid unnecessary displacement and homelessness"); § 1(s) ("An urgency

---

[8] Plaintiff suggests that protection of tenants is not a "public" benefit.  *See* ECF 1, ¶ 44, citing *Kelo v. City of New London*, 545 U.S. 469 (2005).  But *Kelo* undermines plaintiff's position, and teaches that courts should "afford[] legislatures broad latitude in determining what public needs justify the use of the takings power."  *Id.* at 283.  Consistent with that deference, the *Kelo* court found that the city's use of its eminent domain power to support private development satisfied the "public use" requirement.

ordinance that requires just cause for termination . . . would help ensure that residents stay safely housed during the pandemic and would therefore reduce opportunities for transmission of the virus."). *Consider also* Cal. Civ. Proc. Code § 1179.05 (noting Legislature's intent "to protect individuals negatively impacted by the COVID-19 pandemic").

When an alleged taking is for public use, as it is here, "anything less than a complete elimination of value, or a total loss," is considered a "non-categorical taking," which is analyzed under *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978). *See Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002). Under *Penn Central*, courts weigh (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with investment-backed expectations; and (3) the character of the governmental action – *i.e.*, whether the government is akin to a "physical invasion," or is instead a "public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124.

Here, each of the *Penn Central* factors confirms there was no taking. With respect to the first two factors, the economic impact is modest, and there is no meaningful impact on investment-backed expectations. Landlords may still rent their properties, they are still entitled to payment, and they may still evict and sue if their tenants default on their obligations. Ordinance § 3(k). The only restriction imposed by the Eviction Ordinance is that landlords must wait 72 days before commencing eviction proceedings. *See Elmsford*, 469 F. Supp. 3d at 168 (eviction moratorium "does nothing more than defer the ability of the landlord to collect (or obtain a judgment for) the full amount of the rent," and thus "does not disrupt the landlord's investment-backed expectations.") The third factor, too, counsels against finding a taking. The Ordinance is far from a "physical invasion." Rather, it defers a landlord's eviction rights for a modest period; it is a short-term public program that "adjust[s] the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124.

21cv0912

District courts that have addressed similar regulations have found no taking.  *See Elmsford*, 469 F. Supp. 3d at 165 (applying *Penn Cent.* factors to eviction moratorium and finding no taking); *Auracle Homes, L.L.C.*, 478 F. Supp. 3d 199, 220 (D. Conn. 2020) (same); *Baptiste*, 490 F. Supp. 3d at 387 (same).

Finally, Plaintiff cannot use its associational standing in this case to seek compensation or damages on behalf of its landlord members.  Under proper circumstances, an organization can have "associational standing" to sue on behalf of its members.  The burden is on the association to meet a three part test:

> An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiff here cannot assert a Takings compensation or damages on behalf of its members because Takings claims are personal to the individual landlords.  To prosecute a Takings claim, each landlord would have to appear and offer evidence as to what was "Taken" and the value of the property allegedly taken:

> *Hunt* held that "individual participation" is not normally necessary when an association seeks prospective or injunctive relief for its members, but indicated that such **participation would be required in an action for damages to an association's members, thus suggesting that an association's action for damages running solely to its members would be barred for want of the association's standing to sue**.

*United Food & Commer. Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 546 (1996) [emphasis added]; *see also, Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933, 938 (9th Cir. 1987) (associational standing allowed because the organization did not seek money damages).

An association does not have standing to represent member landlords seeking compensation or damages due to an alleged regulatory Taking in violation of the Fifth Amendment:

16                                          21cv0912

1
2
3
4
5

> Whether we used the "just and reasonable return" standard or the "economically viable use" standard to determine when a taking has occurred, . . . we would have to engage in an *ad hoc* factual inquiry for *each* landlord who alleges that he has suffered a taking. We would have to determine the landlord's particular return based on a host of individualized financial data, and we would have to investigate the reasons for any failure to obtain an adequate return, because the Constitution certainly cannot be read to guarantee a profit to an inefficient or incompetent landlord.

6

7

8

9

10

*Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993) (denying associational standing for an association representing building owner members alleging New York's rent stabilization scheme violates the Takings Clause of the Fifth Amendment); *see also*, A*ss'n of Christian Sch. Int'l v. Stearns*, 678 F.Supp.2d 980, 986 (C.D. Cal 2008) (citing *Rent Stabilization Ass'n*.)

11

12

13

In summary, Plaintiff's second cause of action for a "Takings" must be dismissed because no injunctive relief is available, there has been no Taking, and Plaintiff does not have standing to assert compensation or damages claims on behalf of its members.

14

15

### C. THE COUNTY HAD AUTHORITY TO ENACT A COUNTYWIDE ORDINANCE AND THUS DID NOT VIOLATE THE CALIFORNIA CONSTITUTION.

16

17

Plaintiff's Third Cause of Action alleges violation of the California Constitution. This claim also lacks merit.

18

19

#### 1. THE CALIFORNIA EMERGENCY ACT AUTHORIZES COUNTYWIDE REGULATION, INCLUDING WITHIN CITIES.

20

21

22

23

24

There are eighteen cities within the County. The County also includes unincorporated areas, which consist largely of the rural eastern portion of the County, in communities such as Borrego Springs, Campo, Fallbrook, Jamul, Julian, Pine Valley, Rainbow, and Ramona. The Ordinance applies to properties in unincorporated areas as well as properties in cities within the County. (Ex. 1§ 8(a)–(b).)

25   / / /

26   / / /

27   / / /

28   / / /

In passing the Ordinance, the County relied on the California Emergency Services Act, which authorizes "the governing body of a political subdivision," such as a County,[9] to "promulgate orders and regulations necessary to provide for the protection of life and property."  *See* Cal. Gov't Code § 8634.  (*See also* Ex. 1 § 8(a)(citing § 8634).)

Plaintiff alleges the Eviction Ordinance, in part, exceeds the authority granted by section 8634.  Specifically, it contends that section 8634 only authorizes county regulation of properties within unincorporated areas of counties.  But that is not what section 8634 says.  Its authorization contains no geographical limitations.  Rather, it says only that counties have the authority to regulate, without geographical limitation, "for the protection of life and property."  That is exactly what the County did here.

Plaintiff's interpretation of the statute also conflicts with an Opinion of the California Attorney General addressing the exact questions at issue here.  Specifically, in response to a request from the Director of the Office of Emergency Services, the Office of the Attorney General concluded:

1. Cities within a county are bound by county rules and regulations adopted by the county pursuant to section 8634 of the Government Code during a county proclaimed emergency when the local emergency includes both incorporated and unincorporated territory even if the cities do not independently declare the existence of a local emergency.

2. When the county has declared a local emergency based upon conditions which include both incorporated and unincorporated territory of the county, it is not necessary for the cities to also declare the existence of a local emergency independently.

62 Ops. Cal. Att'y Gen. 701, 1979 Cal. AG LEXIS 24, at *1-2 (1979) (hereinafter, "A.G. Opinion" or "Opinion").

The Opinion noted that the Legislature's overarching goals for the California Emergency Act were to ensure that "adequate preparations are made to deal with emergencies and that all governmental and private efforts to deal with emergencies are coordinated to the end that the most effective use is made of all manpower, resources and facilities for dealing with emergencies."  A.G. Opinion at *3 (quoting Cal. Gov't Code §

---

[9] A County is a political subdivision of the State.  *See* Cal Const., art. XI § (1)(a).

8550).  It further noted that the types of emergencies addressed by the Act—air pollution, fire, flood, storm, epidemic, riot drought, sudden and sever energy shortage, or earthquake (Cal. Gov't Code § 8558) are not confined by political boundaries.  Rather, to serve the Act's purpose of providing for the most effective coordinated response to emergencies, the Legislature intended broader, unified responses.  It did not intend a patchwork of hyper-local responses, and it certainly did not intend to authorize cities to resist or conflict with counties' responses.  A.G. Opinion at *4.

While cities are free to declare their own local emergencies in the absence of county emergencies, counties need not wait for cities to act, and they need not limit their responses to unincorporated areas.  The A.G. Opinion did not view the question as close:

> [T]he Legislature intended to specifically provide that cities and counties can proclaim local emergencies . . . . However, as to counties, it would, in the words of the Supreme Court [in *Fields v. Eu*, 18 Cal.3d 322 (1976)] 'defy common sense' to conclude that as to matters such as fire, flood, **epidemic** or air pollution, matters which clearly do not respect corporate boundaries, a county's power and jurisdiction ended at such boundaries. Also, to so conclude would conflict with the stated purposes of the Act.

A.G. Opinion at * 134 (underlining in original; bold font added).

The Opinion, although not binding, "is entitled to great weight."  *Cal. Ass'n of Psych. Providers v. Rank*, 51 Cal.3d 1, 17 (1990).  "In the absence of controlling authority, these opinions are persuasive 'since the Legislature is presumed to be cognizant of that construction of the statute."  *Id.*  If the Legislature had disagreed with the Attorney General, it was of course free to amend the statute or otherwise say so.

For three reasons, the Opinion is entitled to an especially high level of deference here.  *First*, the Opinion has stood for over forty years, with no statutory clarifications nor criticism by the Legislature.  *Compare Ventura v. City of San Jose*, 151 Cal. App. 3d 1076, 1080 (1984) ("We can presume that this five-year-old-opinion has come to the attention of the Legislature, and that if it were a misstatement of the legislative intent, some corrective measure would have been adopted.").

/ / /

/ / /

*Second*, in the last 15 months, the pandemic response has consumed the attention of the Legislature, the press, watchdogs, and the public.  If the Legislature had wished to modify section 8634, there would have been no more opportune time.  Instead, the Legislature left section 8634 undisturbed.  *Consider* Cal. Civ. Proc. Code § 1179.05(b) (declining to modify county authority "to extend, expand, renew, reenact, or newly adopt an ordinance that requires just cause of termination of a residential tenancy or amend existing ordinances that require just cause for termination of a residential tenancy . . . .").

*Third*, Plaintiff chose to file in federal court, rather than seeking guidance from the California courts.  Comity dictates that it is only in the rarest of circumstances that a federal court should override a state attorney general's interpretation of a state statute:

> Any position that disregarded the [state] executive's views would raise profound questions in a federal system, one in which states rather than the national government establish the meaning of state law.  I should think it regrettable if a federal court were to order a state to change its practices on the ground that its Executive Branch does not understand state law . . . .

*See Huggins v. Isenbarger*, 798 F.2d 203, 210 (7th Cir. 1986) (Easterbrook, J., concurring).

Plaintiff seems to allege in paragraphs 56-57 of the Complaint that the County could not invoke the Emergency Services Act to pass the Eviction Ordinance because there was no emergency. Section 8634 confers authority on counties any time there is "a local emergency."  It is undisputed that the County has declared a state of emergency (as has the Governor and the President).  Instead, Plaintiff points out only that the Ordinance was not passed on an "urgency" basis.  (ECF 1, ¶ 57.)  But the Emergency Services Act is indifferent to how Ordinances are designated.[10]  What matters under the statute is that there is a "local emergency," and that the Ordinance is designed to protect life and property.  That is sufficient to confer authority under section 8634.

/ / /

/ / /

---

[10] As noted above, such "urgency" ordinances pursuant to Cal. Gov't Code § 25123(d)), say nothing about whether there is an underlying emergency.  (See section 2C, supra.)

### D. The Ordinance is Consistent with the California Constitution.

Article XI, section 7 states: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinance and regulations not in conflict with general laws."  The Eviction Ordinance is consistent with that provision, as the County did nothing more than "make and enforce within its limits" an eviction moratorium.  Both unincorporated areas and cities are within county limits, and are thus within the scope of the constitutional authorization.

To the extent that Plaintiff contends that Article XI, section 7 confers on a city *exclusive* authority to regulate "within its limits," that argument does not pass muster.  As an initial matter, that is simply not what the provision says.  Had the drafters wished to *limit* county authority to unincorporated areas, or had the drafters wished to grant cities *exclusive* authority to regulate within city limits, that would have been easy enough to say.  But the provision says no such thing.  Moreover, the Attorney General's Opinion again rejects Plaintiff's position:

> In reaching the conclusions herein we are not unaware of the provisions of section 8668, subdivision (b), which provides: '(b) Nothing in this chapter shall be construed to diminish or remove any authority of any city . . . granted by Section 7 Article XI of the California Constitution.  This provision, however, clearly does not mean that cities . . . retain <u>all</u> police powers within their jurisdictions . . . [I]nsofar as measures taken be different levels of government with respect to the same emergency conflict, the measures taken by the agency with the more inclusive territorial jurisdiction (*e.g.*, county versus a city) must govern.  Opinion at *17-18.

Plaintiff's Complaint does not address the AG Opinion.  Instead, it summarily cites two cases, both of which miss the mark.  First, *Cnty. Sanitation Dist. No 2 v. County of Kern*, 127 Cal. App. 4th 1544, 1612 (2005) was a CEQA case involving disposal of "sewage sludge," and the defendant-county had not invoked the special authorization of the California Emergency Act.  Second, *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264, 274–75 (1993) dealt with landfill surcharges and garbage incineration bans.  The California Emergency Act was not at issue in either case.

/ / /

/ / /

1    To be sure, both of Plaintiff's cases found that the defendant-counties had

2  overstepped their authority by regulating within cities.  That is hardly surprising – in

3  matters of purely local concern (*e.g.,* sludge disposal and landfill surcharges), it has long

4  been the general rule that county regulations do not apply within the boundaries of

5  incorporated cities.  *In re Knight*, 55 Cal. App. 511, 518 (1921).  But pandemics are not

6  matters of purely local concern, nor are the other emergencies addressed by the California

7  Emergency Act.  Rather, as the A.G. Opinion recognizes, "implementation of the

8  Emergency Services Act is a matter of statewide concern."  Opinion at *16; *Accord* Cal.

9  Civ. Proc. Code § 1179.05(e) ("The Legislature finds and declares that this section

10  [entitled "Limitations on and effect of municipal response to protect tenants from eviction

11  related to COVID-19 pandemic"] addresses a matter of statewide concern rather than a

12  municipal affair . . . .").  Accordingly, "when a county declares a state of emergency, it

13  acts for the state as a subdivision thereof **and its regulations may apply in incorporated**

14  **as well as unincorporated territory**."  Opinion at *16. (emphasis supplied).

15    The Eviction Ordinance does not violate the California Constitution, nor does it

16  exceed the Legislature's authorization under the California Emergency Services Act.  The

17  County acted within its authority.

## CONCLUSION

19    The County does not deny that the Eviction Ordinance may present a hardship to

20  some landlords, but the County Board of Supervisors has determined that, on balance, it

21  is more important for the County to provide housing security to its residents to slow the

22  spread of COVID-19.  In this lawsuit, Plaintiff is essentially asking this Court to rule that

23  the Board of Supervisors' determination was incorrect.  However, as the district court

24  stated in *Apartment Association of L.A. County,* difficult balancing tests are best decided

25  by elected officials, not the court:

26  / / /

27  / / /

28  / / /

[T]he COVID-19 crisis is unparalleled in this country's modern history. It is, quite literally, a matter of life and death. The economic damage the pandemic has wrought, if left unmediated by measures such as the City Moratorium, would likely trigger a tidal wave of evictions that would not only inflict misery upon many thousands of displaced residents, but also exacerbate a public health emergency that has already radically altered the daily life of every city resident, and even now threatens to overwhelm community resources. The hardships wrought upon residential landlords as an unintended consequence of the City's efforts are real, and are significant, but must yield precedence to the vital interests of the public as a whole.

This Court will defer to the judgment of local authorities, who have the unenviable task of weighing all of the relevant considerations and choosing the least of all possible evils. It bears repeating, however, that the COVID-19 crisis is national in scope, and demands a national response.
*Apt. Ass'n* at \*28.

The County respectfully asks this Court to dismiss Plaintiff's Complaint with prejudice.


DATED: June 4, 2021              Office of County Counsel

By    s/John P. Cooley
      JOHN P. COOLEY, Senior Deputy
Attorneys for COUNTY OF SAN DIEGO
E-mail:  john.cooley@sdcounty.ca.gov

23                                      21cv0912