JOHN P. COOLEY, Senior Deputy (SBN 162955)
JEFFREY P. MICHALOWSKI, Senior Deputy (SBN 248073)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531- 4892; Fax: (619) 531-6005
E-mail: john.cooley@sdcounty.ca.gov

Attorneys for COUNTY OF SAN DIEGO (erroneously sued under the additional name "Board of Supervisors of the County of San Diego")

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION,<br><br>   Plaintiff,<br><br> v.<br><br>COUNTY OF SAN DIEGO, BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO, and DOES 1 through 20 inclusive,<br><br>   Defendants. | No. 21-cv-0912-L-DEB<br><br>COUNTY OF SAN DIEGO'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br>Judge:    M. James Lorenz<br><br>Date:    June 21, 2021<br>Time:    10:00 a.m.<br>Dept.:    5B<br>Magistrate Judge: Daniel E. Butcher<br><br>Action Filed: May 13, 2021 |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................. 1

II. STATEMENT OF FACTS ................................................................... 1

    A. COVID HAS CAUSED SIGNIFICANT ECONOMIC HARDSHIP FOR COUNTY RESIDENTS. ................................................................................ 1

    B. ALL LEVELS OF GOVERNMENT HAVE PROHIBITED EVICTIONS TO COMBAT COVID-19. ................................................................................... 2

    C. THE COUNTY'S EVICTION ORDINANCE. ...................................... 3

III. ARGUMENT ...................................................................................... 4

    A. A PLAINTIFF CANNOT SHOW IT WILL LIKELY SUCCEED ON THE MERITS. ........... 5

        1. THE EVICTION ORDINANCE DOES NOT VIOLATE THE CONTRACTS CLAUSE. .... 5

            a. *THE ORDINANCE DOES NOT SUBSTANTIALLY IMPAIR CONTRACTS.* ............... 6

            b. *THE COUNTY HAS A SIGNIFICANT AND LEGITIMATE PUBLIC PURPOSE IN ENACTING THE EVICTION ORDINANCE.* .......................... 9

            c. *THE ORDINANCE IS REASONABLE AND APPROPRIATE TO THE PUBLIC PURPOSE JUSTIFYING THE LEGISLATION'S ADOPTION* ................... 10

        2. THE TAKINGS CAUSE OF ACTION DOES NOT SUPPORT A PRELIMINARY INJUNCTION. ......................................................... 12

        3. THE COUNTY HAD AUTHORITY TO ENACT A COUNTYWIDE ORDINANCE AND THUS DID NOT VIOLATE THE CALIFORNIA CONSTITUTION. ........................... 16

            a. *THE CALIFORNIA EMERGENCY SERVICES ACT AUTHORIZES COUNTYWIDE REGULATION, INCLUDING WITHIN CITIES.* .................... 16

            b. *THE ORDINANCE IS CONSISTENT WITH THE CALIFORNIA CONSTITUTION.* ...... 19

    B. PLAINTIFF FAILS TO SHOW IRREPARABLE HARM. ................................. 21

    C. PLAINTIFF FAILS TO SHOW THE BALANCE OF EQUITIES WEIGHS IN ITS FAVOR AND AN INJUNCTION IS IN THE PUBLIC INTEREST. .............................. 23

IV. CONCLUSION ................................................................................... 25

21cv0912

## TABLE OF CONTENTS

**Cases**

*Ala. Ass'n of Realtors v. United States HHS*,
    2021 U.S. Dist. LEXIS 92104 (D.D.C. May 14, 2021) ....................................................3

*Amwest Sur Ins. Co. v. Reno*,
    52 F.3d 332 (9th Cir. 1995) .....................................................22

*Apt. Ass'n of L.A. Cty. v. City of L.A.*,
    2020 U.S. Dist. LEXIS 212769 (C.D. Cal. 2020) ...........................................passim

*Auracle Homes, L.L.C. v. Lamont*,
    478 F. Supp. 3d 199 (D. Conn. 2020) ............................................passim

*Baptiste v. Kennealy*,
    490 F. Supp. 3d 353 (D. Mass. 2020) ..............................................passim

*Cal. Ass'n of Psych. Providers v. Rank*,
    51 Cal.3d 1 (1990) ...............................................18

*City of Dublin v. County of Alameda*,
    14 Cal. App. 4th 264 (1993) .......................................20

*City of Monterey v. Del Monte Dunes*,
    526 U.S. 687 (1999) ..............................................13

*Cnty. of Butler v. Wolf*,
    2020 U.S. Dist. LEXIS 93484 (W.D. Pa. May 28, 2020) ................................14

*Cnty. Sanitation Dist. No 2 v. County of Kern*,
    127 Cal. App. 4th 1544 (2005) ....................................20

*de Jesus Ortega Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .....................................21

*El Papel L.L.C. v. Inslee*,
    2020 U.S. Dist. LEXIS 246971 (W.D. Wash. Dec. 2, 2020) ...........................5, 9

*Elmsford Apt. Assocs., LLC v. Cuomo*,
    469 F. Supp. 3d 148 (S.D.N.Y. 2020) .................................5, 8, 11, 16

*Elrod v. Burns*,
    427 U.S. 347 (1976) .............................................22

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*,
    459 U.S. 400 (1983) ............................................passim

*HAPCO v. City of Philadephia*,
    482 F. Supp. 3d 337 (E.D. Pa. 2020) ...............................passim

*Heights Apts., L.L.C. v. Walz*,
    2020 U.S. Dist. LEXIS 245190 (D. Minn. Dec. 31, 2020) ..........................5, 6, 7, 9

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934) ..............................................6

21cv0912

*Huggins v. Isenbarger,*
  798 F.2d 203 (7th Cir. 1986) ................................................................18

*Hurley v. Kincaid,*
  285 U.S. 95 (1932) .............................................................................13

*In re Knight,*
  55 Cal. App. 511 (1921) .......................................................................20

*Jacobson v. Massachusetts,*
  197 U.S. 11 (1905) ..............................................................................6

*Kelo v. City of New London,*
  545 U.S. 469 (2005) ...........................................................................14

*Knick v. Twp. of Scott,*
  139 S.Ct. 2162 (2019) ........................................................................14

*Padilla v. Immigration & Customs Enf't,*
  953 F.3d 1134 (9th Cir. 2020) .............................................................23

*Penn Cent. Transp. Co. v. New York City,*
  438 U.S. 104 (1978) .....................................................................15, 16

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,*
  944 F.2d 597 (9th Cir. 1991) ...............................................................22

*Roso-Lino Bev. Distribs,*
  749 F.2d 124 (2nd Cir. 1984) ..............................................................23

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.,*
  560 U.S. 702 (2010) ...........................................................................13

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency,*
  535 U.S. 302 (2002) ...........................................................................15

*Ventura v. City of San Jose,*
  151 Cal. App. 3d 1076 (1984) .............................................................18

*Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Balt.,*
  2020 U.S. Dist. LEXIS 117931 (D. Md. July 6, 2020) ...........................13

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) .......................................................................5, 21, 23

*Yazzie v. Hobbs,*
  977 F.3d 964 (9th Cir. 2020) ...............................................................21

**Statutes**

42 U.S.C. § 3604 ....................................................................................8

Cal Civ. Code § 1942.4 ...........................................................................8

Cal. Civ. Proc. Code § 1179.05 .............................................................14

Cal. Civ. Proc. Code § 1179.05(b) ........................................................24

Cal. Civ. Proc. Code § 1179.05(e) ........................................................20

21cv0912

Cal. Gov't Code § 25123(d).................................................................3, 11, 19
Cal. Gov't Code § 8550.................................................................................17
Cal. Gov't Code § 8558.................................................................................17
Cal. Gov't Code § 8634.................................................................................16

**Other Authorities**

62 Ops. Cal. Att'y Gen. 701, 1979 Cal. AG LEXIS 24 (1979)............................17, 18, 20

Cal Const., art. XI § (1)(a)..........................................................................21

## I. INTRODUCTION

In early 2020, the United States began experiencing the COVID-19 pandemic. All levels of government – federal, state and local – enacted laws designed to slow the spread of the virus and reduce the numbers of serious infections and deaths. Critical to this effort were laws aimed at keeping people in their own residences which allowed them to social distance and self-quarantine to prevent the spread of the coronavirus. To that end, the San Diego County Board of Supervisors enacted a temporary Eviction Ordinance prohibiting most residential tenant evictions. The ordinance will be short-lived – only 72 days. It went into effect on June 3 and will expire on August 14.

Plaintiff, an association of landlords, seeks a preliminary injunction ending the Eviction Ordinance. Plaintiff's motion should be denied because it fails to show a likelihood of succeed on the merits, irreparable harm in the absence of preliminary relief, the balance of equities is in its favor, and the requested injunction is in the public interest.

## II. STATEMENT OF FACTS

On February 14, 2020, the County of San Diego ("County") declared a public health emergency in response to COVID-19. (Ex. A, § 1(c).) Two weeks later, Governor Newsom declared a similar state-wide emergency (Ex. 2). President Trump then declared a national emergency on March 13, 2020. (Ex. 3.)

### A. COVID HAS CAUSED SIGNIFICANT ECONOMIC HARDSHIP FOR COUNTY RESIDENTS.

The pandemic has hit the County hard. As of June 4, 2021, 280,675 County residents have been infected with COVID-19; 3,764 residents have died. (Ex. 4.) And County residents are still dying from the virus on almost a daily basis.

At the pandemic's height in 2020, the County's unemployment rate reached 15.9%. Although the rate has since dropped to 6.9%, that rate (as of March, 2021) is still more than double the unemployment rate that existed before the pandemic hit. And, significantly, the unemployment rate is much higher in some of the less affluent areas of the County. For example, the current unemployment rate in Logan Heights is 11.2%, the rate in San Ysidro is 10%, and the rate in City Heights is 9.2%. (Ex. 5.)

21cv0912

In October 2020, SANDAG summarized the overall economic loss to the County due to the pandemic as follows:

- $12.4 billion in expected loss for Gross Regional Product in 2020.
- 4.8 billion in estimated wages lost in the first six months of the pandemic.
- 176,000 workers unemployed due to COVID-19. (Ex. 6, p. 27.)

## B. ALL LEVELS OF GOVERNMENT HAVE PROHIBITED EVICTIONS TO COMBAT COVID-19.

After fourteen months of the pandemic, it has become generally accepted that "social distancing," including self-quarantining and working from home, are critical to combating the pandemic. (See, Declaration of Dr. Wooten at ¶ 2,) Social distancing requires housing security; people cannot stay at home if they have no home. During the pandemic, all levels of government have passed laws limiting evictions to keep people housed and off the streets. To that end, on March 4, 2020, Governor Newsom issued Executive Order N-28-20 (Ex. 7) allowing local jurisdictions such as the County to exercise its police powers to limit residential evictions. That Order expressly noted the importance of preserving housing security to allow social distancing for public health:

> WHEREAS many Californians are experiencing substantial losses of income as a result of business closures, the loss of hours or wages, or layoffs related to COVID-19, hindering their ability to keep up with their rents, mortgages, and utility bills; and [….]
>
> WHEREAS because homelessness can exacerbate vulnerability to COVID-19, **California must take measures to preserve and increase housing security for Californians to protect public health**. [. . . .]
>
> WHEREAS in addition to these public health benefits, state and local policies **to promote social distancing, self-quarantine, self-isolation** require that people be able to access basic utilities – including water, gas, electricity, and telecommunications-at their homes, so that Californians can work from home, receive public health information, and otherwise adhere to policies of social distancing, self-quarantine, and self-isolation, if needed.

(Ex. 7, p. 36 [emphasis added.])

Similar eviction prohibitions were enacted by order of the United States Centers for Disease Control and Prevention ("CDC").[1] The CDC likewise noted the importance

---

[1] Some courts have ruled the CDC lacked authority to pass a nationwide eviction

of housing security to combat COVID-19:

> In the context of a pandemic, **eviction moratoria – like quarantine, isolation, and social distancing – can be an effective public health measure** utilized to prevent the spread of communicable disease. Eviction moratoria facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19 due to an underlying medical condition. **They also allow state and local authorities to more easily implement, as needed, stay-at-home and social distancing directives to mitigate the community spread of COVID-19.** (Ex. 8, p. 45; Ex. 1, §1(g).)

California also passed an eviction moratorium, AB 3088, to address the economic impact of the pandemic. The legislature declared: "There are strong indications that large numbers of California tenants will soon face eviction from their homes based on an inability to pay the rent or other financial obligations. (Ex. 9, Sec. 2(d), p. 62.) AB 3088 was later extended by SB 91 until June 30, 2021. (Ex. 10, p. 64.) The Judicial Council also enacted rules that effectively prohibited the filing of unlawful detainer actions except for those necessary to protect public health and safety. Emergency Rule 1, Appendix I, California Rules of Court.

Furthermore, according to Plaintiff's own website, at least 12 cities in the County passed ordinances imposing eviction moratoriums during COVID-19. (Ex. 11.)

## C. THE COUNTY'S EVICTION ORDINANCE.

At an April 6, 2020 meeting, the County Board of Supervisors considered a motion to enact the Eviction Ordinance placing restrictions on rental evictions. (ECF 1, ¶ 18.) State law expressly permitted a county to provide eviction protections in addition to what State law already provided. Cal. Civ. Proc. Code § 1179.05(b). The County's motion was presented as an "urgency" motion pursuant to Government Code § 25123(d), meaning that if it passed with a 4/5 supermajority vote, the ordinance became effective immediately. The motion, however, garnered only a simple majority. A second motion to enact the Eviction Ordinance on a non-urgency basis passed with a majority vote.

The statutorily required second reading of the Eviction Ordinance occurred on May 4, 2021 and was then enacted by the Board of Supervisors. (See, ECF 1, ¶ 19.) The

---

moratorium. Those ruling have been suspended pending appeal. *See, e.g., Ala. Ass'n of Realtors v. United States HHS*, 2021 U.S. Dist. LEXIS 92104 (D.D.C. May 14, 2021).

Eviction Ordinance became effective on June 3, 2021.  (Ex. 1, ¶ 10(a), p. 10.)

The Eviction Ordinance will be short-lived, expiring "60 days after the Governor lifts all COVID-19-related stay-at-home and work-at-home orders." (Ex. 1, Section 10(b), p. 10.)  The 60-day clock will begin to run June 15 as confirmed by the California Department of Health's recent announcement that California's Blueprint for a Safer Economy will end on June 15 at which time all business sectors may return to usual operations.  (Ex. 12.)  As of that date, there will no longer be any stay-at-home and work-at-home orders related to COVID-19 in effect.  (Id.; Dr. Wooten Decl. ¶ 6.)  As a result, the County's Eviction Ordinance will have a total lifespan of 72 days – ending on August 14, 2021.

In brief, the Eviction Ordinance prohibits residential evictions unless the tenant is a hazard to the health or safety of other tenants or occupants of the same property.[2]  (Ex. 1, Sec. 3, pp. 6-8.)  The Findings set forth in the Ordinance clearly states its purpose is to provide housing security to the residents of the County to prevent the spread of COVID:

> (m) Many County of San Diego residents are experiencing substantial losses of income as a result of business closures, the loss of Hours or wages, or layoffs related to COVID-19, hindering their ability to keep up with rent payments.
>
> (n) Those residents financially impacted due to COVID-19 may not be able to make timely rent payments or may be forced to choose between making rent payments and having sufficient funds for food, medical care or other necessities for themselves and their families. [….]
>
> (r) Because experiencing homelessness can exacerbate vulnerability to COVID-19, it is necessary to take measures to preserve and increase housing security for San Diego County residents; and to protect public health and prevent transmission of COVID-19, it is essential to avoid unnecessary displacement and homelessness. (Ex. 1; pp. 3-4.)

To be clear, the Ordinance expressly does not "relieve a Tenant of the obligation to pay rent, nor restrict a Landlord's ability to recover rent due."  (Ex. 1, Section 3(k), p. 8.)

## III.  ARGUMENT

Plaintiff seeks to enjoin two specific sections of the Eviction Ordinance: Section 3 ("Moratorium Prohibiting Residential Evictions Without Just Cause") and Section 7

---

[2] The Ordinance also limits rent increases.  But those provisions are not challenged by Plaintiff. (See, ECF 7, 10:24-26.)

21cv0912

("Remedies"); or, alternatively, enjoin those two sections from applying outside of the unincorporated areas of the County of San Diego. (ECF 7, 2:10-13.) To prevail, Plaintiff has the burden of establishing "[it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Plaintiff cannot meet its burden of clearly establishing any of the above elements and, therefore, this District Court would not abuse its discretion by denying the motion.

## A. PLAINTIFF CANNOT SHOW IT WILL LIKELY SUCCEED ON THE MERITS.

### 1. THE EVICTION ORDINANCE DOES NOT VIOLATE THE CONTRACTS CLAUSE.

Plaintiff first argues the County's Ordinance violates the Contracts Clause of the United States Constitution. Significantly, within the last 12 months, at least **seven** district court decisions across the country have addressed that same argument in relation to COVID-19 related eviction laws. Each court held there was no Contracts Clause violation. *See*, *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 171-72 (S.D.N.Y. 2020); *Auracle Homes, L.L.C. v. Lamont*, 478 F. Supp. 3d 199, 223-26 (D. Conn. 2020); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 349-56 (E.D. Pa. 2020); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 382-87 (D. Mass. 2020); *Apt. Ass'n of L.A. Cty. v. City of L.A.*, 2020 U.S. Dist. LEXIS 212769, *8-20 (C.D. Cal. 2020)[3]; *El Papel L.L.C. v. Inslee*, 2020 U.S. Dist. LEXIS 246971, *16-33 (W.D. Wash. Dec. 2, 2020); *Heights Apts., L.L.C. v. Walz*, 2020 U.S. Dist. LEXIS 245190, *29-33 (D. Minn. Dec. 31, 2020). The County is unaware of any court reaching a contrary conclusion. See, *El Papel L.L.C.*, 2020 U.S. Dist. LEXIS 246971, at *21 ("to date, there has not been a single court in the country that has found such moratoria to be unconstitutional during

---

[3] The plaintiff in *Apt. Ass'n* appealed the denial of its motion for preliminary injunction. Oral argument was recently held before the Ninth Circuit which can be viewed here: https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000019325

this public emergency.")  Plaintiff does not reference any of the above cases.

The Contracts Clause states: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, Sec. 10.  Although the language "is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people."  *Apt. Ass'n of L.A. Cty.*, 2020 U.S. Dist. LEXIS 212769, at *8 (hereinafter, "*Apt. Ass'n*") (quoting *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983)).  The constitutional question presented in the light of the COVID-19 emergency is "whether the power possessed embraces the particular exercise of it in response to particular conditions."  *Apt. Ass'n* at *8 (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934).

A Contracts Clause analysis of the Eviction Ordinance is subject to a rational basis review.  *Baptiste*, 2020 U.S. Dist. LEXIS 176264, at *11; *Heights Apts.,* 2020 U.S. Dist. LEXIS 245190, *32.  And decisions of a legislature are given great deference during a crisis such as this pandemic.  *Jacobson v. Massachusetts*, 197 U.S. 11, 29, 31 (1905).

To determine whether restrictions violate the Contracts Clause, the court examines:

(1) whether the law operates as a substantial impairment of a contractual relationship,

(2) whether the [County] has a significant and legitimate public purpose in enacting the moratorium, and

(3) whether the adjustment of the rights of the contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.

*Apt. Ass'n* at *8-9 [quotations omitted] (citing *Energy Reserves*, 459 U.S. at 411-12).

As discussed below, the Eviction Ordinance (1) does not substantially impair the relationship between tenant and landlord; (2) has a significant and legitimate public purpose; and (3) is a reasonable adjustment of the contracting parties' rights and appropriate to the public purpose.

### a. THE ORDINANCE DOES NOT SUBSTANTIALLY IMPAIR CONTRACTS.

In its motion, Plaintiff argues the Eviction Ordinance substantially impairs the contractual relationship between rental housing owners and their tenants for several

reasons: it places a moratorium on all evictions within the County except for reasons of health and safety (ECF 7, 20:1-5); landlords will be unfairly forced to make "scientific and public-health" decisions before evicting tenants (ECF 7, 20:11-16); the Ordinance potentially subjects landlords to lawsuits if tenants are evicted (ECF 7, 20:17-23); and the Ordinance significantly interferes with rental housing owners' reasonable expectations because they could not have "foreseen or expected" the pandemic or Eviction Ordinance (ECF 7, 21:21-27). Case law analyzing similar eviction restrictions enacted to address COVID-19, however, makes it clear that none of these arguments support the finding of a "substantial impairment" because the fundamental nature of the contracts – the payment of rent in return for housing – is not affected. Furthermore the restrictions were foreseeable given the highly regulated nature of residential rentals.

At least four district courts have reviewed similar COVID-19 related eviction ordinances and determined there was no substantial impairment of contract. In *Heights Apts.*, the court noted "the fundamental nature of a lease of a residential unit is that the landlord provides the tenant a place to live; the tenant, in turn, pays the landlord rent. The landlord's end of the contractual bargain is receiving rent payments." *Heights Apts L.L.C.*, 2020 U.S. Dist. LEXIS 245190, *30. The court ruled there was no contract impairment because the eviction moratoria did not interfere with the landlord's right to receive rent. *Id*. Nothing in the moratoria prevented the collection of rents, or prevented the landlord from suing for back rents. It was only the eviction that was prohibited. *Id*.

The *Elmsford Apt.* court applied a similar rationale to uphold an eviction moratorium: "The eviction moratorium does not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants. The tenants are still bound to their contracts, and the landlord may obtain a judgment for unpaid rent if the tenants fail to honor their obligations." *Elmsford Apt.*, 469 F.Supp.3d at 172.

Like the moratoria in *Heights Apts*., and *Elmsford Apt.,* the County's Eviction Ordinance preserves the fundamental nature of tenant/landlord contracts. Landlords still

have the right to collect rent from tenants, and seek back rents once the Eviction Ordinance expires.  Furthermore, landlords still retain their non-contractual remedies. They have the right to sue for damages to rental property and seek restraining orders against their tenants who threaten violence.  And, of course, landlords still have the right to call law enforcement officers to address violence or threats from tenants.

The "unforseeability of COVID-19" argument advanced by Plaintiff has also been rejected by the district courts.  Three of the district court cases ruled that the eviction restrictions at issue did not act as a substantial impairment to contract because housing contracts are already heavily regulated, and thus additional restrictions were foreseeable. "[A] long line of cases teaches that the foreseeability of an impairment on contractual rights, and therefore the extent to which such impairment qualifies as substantial, is affected by whether the relevant party operates in a heavily regulated industry." *Elmsford* at 169.  "When a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable."  *HAPCO* at 351. "[T]he expected costs of foreseeable future regulation are already presumed to be priced into the contracts formed under the prior regulation." *Auracle Homes* at 224.

There can be no dispute that in the County – like in Los Angeles - "the landlord-tenant relationship has long been subject to extensive regulation."  *Apt. Ass'n* at *11 (citing 42 U.S.C. § 3604 and Cal Civ. Code § 1942.4 as examples of regulation of the landlord-tenant relationship).  Therefore, as a result of that extensive regulation, it was entirely foreseeable that additional regulations – such as those contained in the Eviction Ordinance – would be enacted.  Indeed, the Eviction Ordinance is not the first one affecting County residential leases.  In addition to federal and state eviction moratoriums, the cities of San Diego, Carlsbad, Chula Vista, Encinitas, Escondido, Imperial Beach, La Mesa, National City, Oceanside, San Marcos and Santee have all had similar ordinances in place during the pandemic as shown by Plaintiff's own website. (Ex. 11.)

/ / /

Although a few district court cases either assumed without deciding that an eviction moratorium constituted substantial impairment,[4] or found it unnecessary to decide that issue,[5] only one case expressly held an eviction moratorium constituted a substantial impairment. That case is distinguishable because its moratorium was scheduled to last more than one year. In *Apt. Ass'n*, the district court reviewed the City of Los Angeles's eviction moratorium ordinance enacted during the pandemic. Although the court ultimately ruled there was no violation of the Contracts Clause, the court concluded that the plaintiff would likely succeed in showing a substantial impairment of its contractual rights, in part because "the Moratorium's limitation on evictions will persist for at least one year from today, and likely until March 2022." *Id*. at *13 and n. 25. Similar facts are not present here. The lifespan of the Eviction Ordinance will be only 72 days, ending on August 14, 2021. (See section II(C) above.) As a result, the Eviction Ordinance is not a substantial impairment of contract.

### b. THE COUNTY HAS A SIGNIFICANT AND LEGITIMATE PUBLIC PURPOSE IN ENACTING THE EVICTION ORDINANCE.

To determine whether the Eviction Ordinance violates the Contracts Clause, this Court must next examine whether the County has a significant and legitimate public purpose in enacting the Ordinance. *Apt. Ass'n at* *8-9 (citing *Energy Reserves*, 459 U.S. at 411-12). Here, there should be no dispute that the Eviction Ordinance is motivated by a legitimate public purpose. Indeed, in every opinion reviewing the issue for purposes of COVID-19 eviction moratoriums, the district court held the restrictions had a significant and legitimate public purpose, or the plaintiff conceded that point. *See*, *Auracle Homes L.L.C.,* 478 F. Supp. 3d at 225; *HAPCO*, 482 F. Supp. 3d at 354; *Baptiste*, 2020 U.S. Dist. LEXIS 176264, at *47; *Apt. Ass'n* at *9; *El Papel L.L.C.*, 2020 U.S. Dist. LEXIS 246971, at *26; *Heights Apts L.L.C.,* 2020 U.S. Dist. LEXIS 245190, at *31.

"A legitimate public purpose is one aimed at remedying an important general social or economic problem rather than providing a benefit to special interests." *Auracle*

---

[4] *El Papel L.L.C.*, 2020 U.S. Dist. LEXIS 246971, at *17
[5] *Baptiste*, 2020 U.S. Dist. LEXIS 176264, at *46.

21cv0912

*Homes*, 478 F. Supp. 3d at 225; *see also*, *Energy Reserves*, 459 U.S. at 411-12. The "public purpose need not be addressed to an emergency." Id. at 412.

Remarkably, Plaintiff facially claims there is no legitimate public purpose supporting the Eviction Ordinance. (ECF 7, 23:9-10.) The motion's lack of evidence and argument on this point is, in effect, a concession that there is a legitimate public purpose. Regardless, the lengthy findings set forth in Section 1, subsections (a)-(gg) of the Eviction Ordinance clearly identifies a proper public purpose – the health, safety and welfare of San Diego County residents – in detail. And there is no language in the Ordinance suggesting that by passing the Ordinance, the County engaged in self-dealing or that the beneficiaries of the Ordinance are a special interest group. The legitimate public purpose of the Ordinance is established,

### c. THE ORDINANCE IS REASONABLE AND APPROPRIATE TO THE PUBLIC PURPOSE JUSTIFYING THE LEGISLATION'S ADOPTION.

Lastly, this Court must examine whether the Ordinance is reasonable and appropriate to the public purpose justifying the Ordinance's enactment. *Apt. Ass'n* at *8 (citing *Energy Reserves*, 459 U.S. at 412). Plaintiff's statement that the County has the burden of establishing that the Eviction Ordinance "is necessary" is not a correct statement of law. (*See*, ECF 7, 22:16-18.) Supreme Court authority requires "justification" for the adoption of the ordinance – not "necessity." *Energy Reserves*, 459 U.S. at 412; *see also Apt. Ass'n* at *8. Significantly, "[w]hen, as in this case, the challenged law only impairs private contracts, and not those to which the [county] is a party, courts 'must accord substantial deference to the [county's] conclusion that its approach reasonably promotes the public purpose for which it was enacted." *Elmsford,* 469 F. Supp. 3d at 169; *Apt. Ass'n* at *13 (citing *Energy Reserves*, 459 U.S. at 412-13).

Plaintiff first argues no emergency justifies the Eviction Ordinance. (ECF 7, 22:8-18.) However, an emergency is not required to justify the public purpose behind a regulation that acts as a significant impairment on a contract. *Energy Reserves*, 459 U.S. at 412. And Plaintiff cites no contrary authority. Furthermore, Plaintiff is simply

incorrect – the Ordinance is justified by the COVID-19 emergency. Both California and the County declared Public Health Emergencies due to COVID-19. (Ex. 2; Ex. 1, § 1(c), p. 2.) Those emergency declarations are still in effect. (Dr. Wooten Decl.; ¶ 2.)

Plaintiff's argument based on the County Board of Supervisors' urgency motion failing to garner a supermajority vote is a red herring. (See ECF 7, 22:8-18.) An urgency motion is simply a procedural vehicle to enact an ordinance faster. Gov't Code § 25123(d). An urgency vote has no relation to whether an ordinance is constitutional. And, again, the Supreme Court has stated an emergency is not required to justify the public purpose behind a regulation that acts as a significant impairment on a contract. *Energy Reserves*, 459 U.S. at 412.

Plaintiff next argues the Eviction Ordinance sweeps too broadly because it protects both rich and poor tenants but was "designed to protect economically vulnerable tenants, including from homelessness." (ECF 7, 22:19-23.) This argument is not correct. There is no language in the Ordinance limiting its protection to the "economically vulnerable." The County's economy has taken a significant blow, and unemployment rates remain twice as high as before COVID-19 hit. (Exs. 5-6.) Job loss is a risk faced by tenants of all economic means. Given the high cost of rent in San Diego County, many residents, not just low income, are but one or two paychecks away from not being able to afford rent. (See Ex. 1, Sec. 1(p) and (q), p. 4 (noting County's severe housing affordability crisis.) The Ordinance seeks to protect those tenants from taking actions - like bringing in roommates or moving in with family members – that result in virus spread.

While low income residents will likely be the demographic that benefits most, the language used in the Eviction Ordinance applies to all County residents. (See, Ex. 1, Sections (m) and (n), p. 3.) Tenants of all economic means are susceptible to getting COVID-19. The coronavirus is still prevalent in the County. As of June 1, 2021, only 54.8% of County residents aged 12 and older are fully vaccinated; 69.6% have received at least one vaccine dosage. (Dr. Wooten Decl. ¶ 8.) Residents under age 12 are not yet eligible to receive the vaccine. (Id.) Variants of the virus that are more resistant to the

21cv0912

COVID-19 vaccine could spread in the County. (Id.) For this reason, the County's Public Health Officer believes unvaccinated residents must continue to self-quarantine at home when infected, stay away from social gatherings, and continue to social distance a minimum of six feet when not at home, and continue to wear masks when not at home. (Dr. Wooten Decl. ¶ 9.) The common denominator for each of the social distancing requirements for unvaccinated residents is the word "home." If a resident does not have a home, they cannot self-quarantine at home, cannot get closer than six feet to anyone, and must always wear a mask. And being forced out of one's home increases health risks. (See, Dr. Wooten Decl., ¶¶ 10-11.) Therefore, it is good public health policy to provide residents with housing security. To that end, the Board of Supervisors enacted the Ordinance as a short-term measure.

Plaintiff argues that the "Ordinance creates many more problems and threats than it purports to resolve." (ECF 7, 22:23-25.) However, to support that broad generalization, Plaintiff offers only a few self-serving declarations that do not overcome the County-wide public health benefits resulting from the Eviction Ordinance.

The district court in *Apt Ass'n* had no difficulty finding the eviction moratorium in Los Angeles was reasonable:

> [T]he court joins at least four other courts that have found eviction moratoria reasonable in light of the COVID-19 pandemic at the preliminary injunction stage, notwithstanding the lack of any provision for partial rent payments. [Citations] Notably, here, as in <u>Blaisdell</u>, the Moratorium is addressed to protect a basic societal need, is temporary in nature, does not disturb landlords' ability to obtain a judgment for contract damages, does not absolve tenants of any obligation to pay any amount of rent, does not appear to impact landlords' ability to obtain housing, and was implemented in the context of a state of emergency.

*Apt. Ass'n* at *18. This finding is equally applicable to the County's Eviction Ordinance.

### 2. THE TAKINGS CAUSE OF ACTION DOES NOT SUPPORT A PRELIMINARY INJUNCTION.

Plaintiff's request for injunctive relief based on the Takings Clause fails for three reasons. *First*, it rests on a basic misunderstanding of the Fifth Amendment. The Takings Clause is not a wholesale bar on government takings. Rather, it bars only

21cv0912

takings ***without just compensation***.  *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 714-15 (1999) ("[T]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation.").  *Consider also Hurley v. Kincaid*, 285 U.S. 95, 104 (1932) ("The Fifth Amendment does not entitle [the landowner] to be paid in advance of the taking.").

The remedy for any takings associated with the Eviction Ordinance, then, is not an injunction.  Rather, the aggrieved party may sue for money damages in federal court. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 741 (2010) (Kennedy, J., concurring) ("It makes perfect sense that the remedy for a Takings Clause violation is only damages, as the Clause does not proscribe the taking of property; it proscribes taking without just compensation.").

Indeed, the Supreme Court recently addressed the remedies appropriate for a Takings claim, and reiterated that the proper relief is compensation, not an injunction:

> Governments need not fear that our holding will lead federal courts to invalidate their regulations as unconstitutional. As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed. *Knick v. Twp. of Scott,* 139 S.Ct. 2162, 2179 (2019).

In light of *Knick*, *even meritorious Takings causes of action* will not support claims for injunctive relief, because that is not the appropriate remedy.  In a case challenging a similar regulation—a 60-day moratorium on evictions and foreclosures—a district court denied plaintiff's request for injunctive relief under the Takings clause.  It noted that, under *Knick*, "whether Plaintiff's claim has a likelihood of success is irrelevant at this stage."  *HAPCO*, 482 F. Supp. 3d at 358.  *See also Baptiste*, 490 F. Supp. 3d 353, 388 (D. Mass. 2020) ("[A]n injunction would be unjustified even if . . . plaintiff were likely to prove the [Eviction] Moratorium constitute a taking of their property.").

In numerous other cases addressing pandemic-related restrictions on evictions and rent increases, courts have held that Takings causes of action do not support claims for injunctive relief.  *See Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Balt.*, 2020 U.S. Dist. LEXIS 117931, at *10 (D. Md. July 6, 2020) (TRO challenging

ban on rent increases denied – the "proper remedy for a Takings violation is not injunctive relief, but rather monetary damages."). Requests to enjoin shutdown orders under the Takings Clause have likewise failed. *Cnty. of Butler v. Wolf*, 2020 U.S. Dist. LEXIS 93484, *11 (W.D. Pa. May 28, 2020) (shutdown order – request for declaratory relief denied as declaratory judgment would be "functional equivalent of injunctive relief"; "*Knick* forecloses such relief"). Plaintiff does not cite any case in which a court enjoined rental- or eviction-related restrictions under the Takings clause. Indeed, they do not cite *any* case in which a court issued an injunction under the Takings Clause.

*Second*, and relatedly, Plaintiff will not be irreparably harmed if the Court does not grant injunctive relief. "[I]t is black letter law that a Takings Clause violation does not constitute irreparable harm for purposes of obtaining injunctive relief because monetary damages is the proper remedy for such a violation." *See HAPCO*, 482 F. Supp. 3d at 361 n.131 (citing *Knick*, 139 S. Ct. at 2176-66).

*Third*, Plaintiff's Takings cause of action is unlikely to succeed on the merits. As an initial matter, Plaintiff's claim that the purported taking is "not for a public use or purpose" (ECF 7, 24:19-22) lacks merit. The Ordinance aims to protect not only economically vulnerable populations—a valid regulatory goal that itself qualifies as a "public use"[6]—but also the population as a whole, which remains at risk from a once-in-a-century pandemic. *See* Ordinance § 1(r) ("to protect public health and prevent transmission of COVID-19, it is essential to avoid unnecessary displacement and homelessness"); § 1(s) ("An urgency ordinance that requires just cause for termination . . . would help ensure that residents stay safely housed during the pandemic and would therefore reduce opportunities for transmission of the virus."). *Consider also* Cal. Civ. Proc. Code § 1179.05 (noting Legislature's intent "to protect individuals negatively

---

[6] Plaintiff suggests that protection of tenants is not a "public" benefit. *See* ECF 24:18-22, citing *Kelo v. City of New London*, 545 U.S. 469 (2005). But *Kelo* undermines plaintiff's position, and teaches that courts should "afford[] legislatures broad latitude in determining what public needs justify the use of the takings power." *Id.* at 283. Consistent with that deference, the *Kelo* court found that the city's use of its eminent domain power to support private development satisfied the "public use" requirement.

impacted by the COVID-19 pandemic").

When an alleged taking is for public use, as it is here, "anything less than a complete elimination of value, or a total loss," is considered a "non-categorical taking," which is analyzed under *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978). *See Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002).[7] Under *Penn Central*, courts weigh (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with investment-backed expectations; and (3) the character of the governmental action – *i.e.*, whether the government is akin to a "physical invasion," or is instead a "public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124.

Here, each of the *Penn Central* factors confirms there was no taking. With respect to the first two factors, the economic impact is modest, and there is no meaningful impact on investment-backed expectations. Landlords may still rent their properties, they are still entitled to payment, and they may still evict and sue if their tenants default on their obligations. Ordinance § 3(k). The only restriction imposed by the Eviction Ordinance is that landlords must wait 72 days before commencing eviction proceedings. *See Elmsford*, 469 F. Supp. 3d at 168 (eviction moratorium "does nothing more than defer the ability of the landlord to collect (or obtain a judgment for) the full amount of the rent," and thus "does not disrupt the landlord's investment-backed expectations.") The third factor, too, counsels against finding a taking. The Ordinance is far from a "physical invasion." Rather, it defers a landlord's eviction rights for a modest period; it is a short-

---

[7] Plaintiff ventures a conclusory attempt (*see* ECF 7, 23:28-24:5) to avoid "non-categorical takings" doctrine, and instead shoehorn the case into the rule of *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992). But in *Lucas*, the Court held that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Id.* at 1019 (emphasis in original). But plaintiff does not contend that the Eviction Ordinance deprives owners of *all* beneficial use. Rather, it is undisputed that they are still entitled to rent out their properties, to collect full rent, and to later evict and sue for back rent if necessary. That is not enough. *See Brown v. Legal Found.*, 538 U.S. 216, 233 (2003) ("But a government regulation that merely prohibits landlords from **evicting** tenants unwilling to pay a higher rent… does not constitute a categorical taking."))

term public program that "adjust[s] the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124.

District courts that have addressed similar regulations have found no taking. *See Elmsford*, 469 F. Supp. 3d at 165 (applying *Penn Cent.* factors to eviction moratorium and finding no taking); *Auracle Homes, L.L.C.*, 478 F. Supp. 3d 199, 220 (D. Conn. 2020) (same); *Baptiste*, 490 F. Supp. 3d at 387 (same). Plaintiff identifies no decision to the contrary.

### 3. THE COUNTY HAD AUTHORITY TO ENACT A COUNTYWIDE ORDINANCE AND THUS DID NOT VIOLATE THE CALIFORNIA CONSTITUTION.

#### a. THE CALIFORNIA EMERGENCY SERVICES ACT AUTHORIZES COUNTYWIDE REGULATION, INCLUDING WITHIN CITIES.

There are eighteen cities within the County of San Diego. The county also includes unincorporated areas, which consist largely of the rural eastern portion of the County, in communities such as Borrego Springs, Campo, Fallbrook, Jamul, Julian, Pine Valley, Rainbow, and Ramona. The Ordinance applies to properties in unincorporated areas as well as properties in cities within the County. Ordinance § 8(a)–(b).

In passing the Ordinance, the County relied on the California Emergency Services Act, which authorizes "the governing body of a political subdivision," such as a County, to "promulgate orders and regulations necessary to provide for the protection of life and property." *See* Cal. Gov't Code § 8634. *See also* Ordinance § 8(a)(citing § 8634).

Plaintiff contends the Eviction Ordinance, in part, exceeds the authority granted by section 8634. Specifically, it contends that section 8634 only authorizes county regulation of properties within unincorporated areas of counties. But that is not what section 8634 says. Its authorization contains no geographical limitations. Rather, it says only that counties have the authority to regulate, without geographical limitation, "for the protection of life and property." That is exactly what the County did here.

Plaintiff's interpretation of the statute also conflicts with an Opinion of the California Attorney General addressing the exact questions at issue here. Specifically, in response to a request from the Director of the Office of Emergency Services, the Office

of the Attorney General concluded:

1. Cities within a county are bound by county rules and regulations adopted by the county pursuant to section 8634 of the Government Code during a county proclaimed emergency when the local emergency includes both incorporated and unincorporated territory even if the cities do not independently declare the existence of a local emergency.

2. When the county has declared a local emergency based upon conditions which include both incorporated and unincorporated territory of the county, it is not necessary for the cities to also declare the existence of a local emergency independently.

62 Ops. Cal. Att'y Gen. 701, 1979 Cal. AG LEXIS 24, at *1-2 (1979) (hereinafter, "A.G. Opinion" or "Opinion").

The Opinion noted that the Legislature's overarching goals for the California Emergency Act were to ensure that "adequate preparations are made to deal with emergencies and that all governmental and private efforts to deal with emergencies are coordinated to the end that the most effective use is made of all manpower, resources and facilities for dealing with emergencies." A.G. Opinion at *3 (quoting Cal. Gov't Code § 8550). It further noted that the types of emergencies addressed by the Act—air pollution, fire, flood, storm, epidemic, riot drought, sudden and sever energy shortage, or earthquake (Cal. Gov't Code § 8558) are not confined by political boundaries. Rather, to serve the Act's purpose of providing for the most effective coordinated response to emergencies, the Legislature intended broader, unified responses. It did not intend a patchwork of hyper-local responses, and it certainly did not intend to authorize cities to resist or conflict with counties' responses. A.G. Opinion at *4.

While cities are free to declare their own local emergencies in the absence of county emergencies, counties need not wait for cities to act, and they need not limit their responses to unincorporated areas. The A.G. Opinion did not view the question as close:

[T]he Legislature intended to specifically provide that cities and counties can proclaim local emergencies . . . . However, as to counties, it would, in the words of the Supreme Court [in *Fields v. Eu*, 18 Cal.3d 322 (1976)] 'defy common sense' to conclude that as to matters such as fire, flood, **epidemic** or air pollution, matters which clearly do not respect corporate boundaries, a county's power and jurisdiction ended at such boundaries. Also, to so conclude would conflict with the stated purposes of the Act.

21cv0912

A.G. Opinion at * 134 (underlining in original; bold font added).

The Opinion, although not binding, "is entitled to great weight." *Cal. Ass'n of Psych. Providers v. Rank*, 51 Cal.3d 1, 17 (1990). "In the absence of controlling authority, these opinions are persuasive 'since the Legislature is presumed to be cognizant of that construction of the statute." *Id.* If the Legislature had disagreed with the Attorney General, it was of course free to amend the statute or otherwise say so.

For three reasons, the Opinion is entitled to an especially high level of deference here. *First*, the Opinion has stood for over forty years, with no statutory clarifications nor criticism by the Legislature. *Compare Ventura v. City of San Jose*, 151 Cal. App. 3d 1076, 1080 (1984) ("We can presume that this five-year-old-opinion has come to the attention of the Legislature, and that if it were a misstatement of the legislative intent, some corrective measure would have been adopted.").

*Second*, in the last 15 months, the pandemic response has consumed the attention of the Legislature, the press, watchdogs, and the public. If the Legislature had wished to modify section 8634, there would have been no more opportune time. Instead, the Legislature left section 8634 undisturbed.

*Third*, Plaintiff chose to file in federal court, rather than seeking guidance from the California courts. Comity dictates that it is only in the rarest of circumstances that a federal court should override a state attorney general's interpretation of a state statute:

> Any position that disregarded the [state] executive's views would raise profound questions in a federal system, one in which states rather than the national government establish the meaning of state law. I should think it regrettable if a federal court were to order a state to change its practices on the ground that its Executive Branch does not understand state law . . . .

*See Huggins v. Isenbarger*, 798 F.2d 203, 210 (7th Cir. 1986) (Easterbrook, J., concurring). Rather than contesting, disputing, or distinguishing the Attorney General's Opinion, however, Plaintiff opts to disregard it entirely.

Plaintiff ventures one additional argument under section 8634. It argues that there is no real emergency here, and the County thus cannot rely on the California Services Emergency Act. (ECF 7, p. 26.) This is a staggering argument, given that San Diegans

continue to die of COVID-19 almost every day.  Indeed, Plaintiff teeters on the edge of frivolousness by arguing that the Ordinance does not aim to protect life and property.  *See* Ordinance § 1(o) (self-evictions lead to homelessness and living in "overcrowded living situations"); § 1(r) ("homelessness can exacerbate vulnerability to COVID-19"); § 1(r) ("to protect public health and prevent transmission of COVID-19, it is essential to avoid unnecessary displacement and homelessness"); § 1(s) ("An urgency ordinance that requires just cause for termination . . . would help ensure that residents stay safely housed during the pandemic and would therefore reduce opportunities for transmission of the virus.").

And in any event, Plaintiff's argument rests not on the language of the statute, but instead on sleight of hand.  Section 8634 confers authority on counties any time there is "a local emergency."  It is undisputed that the County has declared a state of emergency (as has the Governor and the President).  Instead, Plaintiff points out only that the Ordinance was not passed on an "urgency" basis.  But the Emergency Services Act is indifferent to how Ordinances are designated.[8]  What matters under the statute is that there is a "local emergency," and that the Ordinance is designed to protect life and property.  That is sufficient to confer authority under section 8634.

### b.  THE ORDINANCE IS CONSISTENT WITH THE CALIFORNIA CONSTITUTION.

Plaintiff also contends that the Ordinance is constitutionally infirm.  He cites Article XI, section 7, which states: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinance and regulations not in conflict with general laws."  But the Ordinance is consistent with that provision, as the County did nothing more than "make and enforce within its limits" an eviction moratorium.  Both unincorporated areas and cities are within county limits, and are thus within the scope of the constitutional authorization.

To the extent that Plaintiff contends that Article XI, section 7 confers on a city *exclusive* authority to regulate "within its limits," that argument does not pass muster.  As

---

[8] Such "urgency" ordinances pursuant to Cal. Gov't Code § 25123(d)), say nothing about whether there is an underlying emergency.

an initial matter, that is simply not what the provision says. Had the drafters wished to *limit* county authority to unincorporated areas, or had the drafters wished to grant cities *exclusive* authority to regulate within city limits, that would have been easy enough to say. But the provision says no such thing. Moreover, the Attorney General's Opinion again rejects Plaintiff's position:

> In reaching the conclusions herein we are not unaware of the provisions of section 8668, subdivision (b), which provides: '(b) Nothing in this chapter shall be construed to diminish or remove any authority of any city . . . granted by Section 7 Article XI of the California Constitution. This provision, however, clearly does not mean that cities . . . retain <u>all</u> police powers within their jurisdictions . . . [I]nsofar as measures taken be different levels of government with respect to the same emergency conflict, the measures taken by the agency with the more inclusive territorial jurisdiction (*e.g.*, county versus a city) must govern. Opinion at *17-18.

Plaintiff does not address the AG Opinion. Instead, it summarily cites two cases, both of which miss the mark. First, *Cnty. Sanitation Dist. No 2 v. County of Kern*, 127 Cal. App. 4th 1544, 1612 (2005) was a CEQA case involving disposal of "sewage sludge," and the defendant-county had not invoked the special authorization of the California Emergency Act. Second, *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264, 274–75 (1993) dealt with landfill surcharges and garbage incineration bans. The California Emergency Services Act was not at issue in either case.

To be sure, both of Plaintiff's cases found that the defendant-counties had overstepped their authority by regulating within cities. That is hardly surprising – in matters of purely local concern (*e.g.,* sludge disposal and landfill surcharges), it has long been the general rule that county regulations do not apply within the boundaries of incorporated cities. *In re Knight*, 55 Cal. App. 511, 518 (1921). But pandemics are not matters of purely local concern, nor are the other emergencies addressed by the California Emergency Services Act. Rather, as the A.G. Opinion recognizes, "implementation of the Emergency Services Act is a matter of statewide concern." Opinion at *16; *Accord* Cal. Civ. Proc. Code § 1179.05(e) ("The Legislature finds and declares that this section [entitled "Limitations on and effect of municipal response to protect tenants from eviction related to COVID-19 pandemic"] addresses a matter of statewide concern rather than a

municipal affair . . . .").  Accordingly, "when a county declares a state of emergency, it acts for the state as a subdivision thereof **and its regulations may apply in incorporated as well as unincorporated territory**."[9] *Id.* (emphasis supplied).

The Eviction Ordinance does not violate the California Constitution, nor does it exceed the Legislature's authorization under the California Emergency Services Act.  The County acted within its authority.

### B.  PLAINTIFF FAILS TO SHOW IRREPARABLE HARM.

Even assuming, *arguendo*, Plaintiff can show a likelihood of success, Plaintiff must still show it is likely to suffer irreparable harm if the requested injunction is not issued.  *Winter*, 555 U.S. at 22.  That irreparable injury must be "concrete and particularized" and "actual or imminent."  *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020).  Plaintiff has not met that burden.

As an initial matter, Plaintiff does not argue that it, as a business entity, will suffer any harm.  Instead, Plaintiff contends its members will suffer harm.  Because it relies on association standing, Plaintiff must show that "all of its members will be irreparably harmed."  *HAPCO*, 482 F. Supp. 3d at 362 [emphasis added].  However, the handful of declarations submitted by Plaintiff "fail[] to establish a foundation for which the Court could infer that nearly [all of Plaintiff's] members are all in the same situation."  *See*, *Id*. As the court found in *HAPCO,* not all of Plaintiff's members will be harmed by the Eviction Ordinance.  See *Id*.  Many, if not the overwhelming majority of landlords, have tenants who pay their rent and give their landlords no reason to pursue eviction.

In, perhaps, an attempt to avoid offering evidence of actual harm to all its members, Plaintiff states that it is well established that any deprivation of constitutional rights constitutes irreparable harm.  (ECF 7, 28:6-9.)  This is simply not correct.  The only cases cited by Plaintiff involve non-economic individual liberties.  See, *de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) (individuals 4th Amendment right violated by wrongfully detention); *Elrod v. Burns*, 427 U.S. 347, 373 (1976)

---

[9] A County is a political subdivision of the State.  *See* Cal Const., art. XI § (1)(a).

(government employee's First Amendment rights were violated due to discharge based on employee's political affiliation).  Plaintiff does not cite any case holding irreparable harm results from violation of the Contracts Clause or Takings Clause of the Constitution.  That proposition has been rejected by the Ninth Circuit.  *See Apt. Ass'n at* *22 (citing *Amwest Sur Ins. Co. v. Reno*, 52 F.3d 332 (9th Cir. 1995) (unpublished)).  Moreover, "it is black letter law that a Takings Clause violation does not constitute irreparable harm for purposes of obtaining injunctive relief because monetary damages is the proper remedy for such a violation."  *HAPCO*, 482 F. Supp. 3d at 361 n.131 (E.D. Pa. 2020) (citing *Knick*, 139 S. Ct. at 2176-77).

Not surprisingly, Plaintiff's declarants do not directly allege harm from loss of rents because economic loss cannot constitute irreparable harm.  *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir. 1991) ("economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award."); *Apt. Ass'n* at *21-22.  Moreover, the Eviction Ordinance does not prohibit the landlords from collecting rent and significant government funds exist to directly pay rent to landlords on behalf of tenants.  (See, https://www.sdhc.org/housing-opportunities/help-with-your-rent/; *see also, Apt. Ass'n* *19-20 (court noted government funds available to Los Angles landlords).

Unable to claim economic damages, Plaintiff argues its members have suffered non-monetary harm because rental owners, their families and third parties are harassed and abused by tenants, and because the owners are prohibited from moving into the rentals themselves.  (ECF 7, 28:14-17.)  This Court already found that Plaintiff's evidence submitted before the Ordinance was in effect, did not demonstrate "that they have suffered emotional harm as a result of the Ordinance."  (ECF 13, 5:18-21.)  While Plaintiff's declarations may speculate that there may be some harm to landlords and others, they do not support a finding of "irreparable harm."  Although Landlords will be, for a short period of time, prohibited from evicting tenants except under certain circumstances, the Eviction Ordinance does not prohibit other remedies available to

landlords such as calling the police, obtaining a civil harassment restraining order pursuant to Code of Civil Procedure § 527.6, and suing for damages.

Plaintiff's declarations from the landlord attorney (Mark Feinberg) and Director of Public Affairs (Molly Kirkland), describe bad actions of tenants (based on hearsay) that can be handled by law enforcement – e.g., dangerous dogs, drugs, public intoxication, loud music, prostitution and illegal massage parlors. Similarly, the declarations from the two landlords (April Solis and Irmir Pintor) describe actions taken by tenants that can be addressed by remedies other than evictions; as a result, Plaintiff has not shown irreparable harm.

Plaintiff also argues that irreparable harm exists because landlords "cannot replace nonpaying tenants with paying ones threatening 'the loss of an ongoing business representing many years of effort and the livelihood of its owners.'" (ECF 7, 27:17-19.) None of Plaintiff's declarations, however, support that argument. And *Roso-Lino Beverage Distributors v. Coca-Cola Bottling Co.,* the case cited by Plaintiff for the proposition that the loss of an ongoing business constitutes irreparable harm, involved facts very different from those present here. *Roso-Lino* involved the complete termination of a husband and wife's small Coca-Cola distributorship after 11 years. *Roso-Lino Bev. Distribs*, 749 F.2d 124 (2nd Cir. 1984). In marked contrast, the County's Eviction Ordinance does not terminate anyone's business. It merely postpones the commencement of eviction proceedings for 72 days.

Plaintiff's final allegation of irreparable harm is that if they violate the Eviction Ordinance, they could find themselves in legal jeopardy. (ECF 7, 28:25-29:2.) While true, facing legal repercussions for violating the law does not constitute irreparable harm.

### C. PLAINTIFF FAILS TO SHOW THE BALANCE OF EQUITIES WEIGHS IN ITS FAVOR AND AN INJUNCTION IS IN THE PUBLIC INTEREST.

Plaintiff's final burden is to show the balance of equities tips in its favor, and that a preliminary injunction is in the public interest. *Winter,* 555 U.S. at 20. Because the government is a party, these two factors merge. *Apt. Ass'n* at *27-28 (citing *Padilla v.*

21cv0912

*Immigration & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020).

Plaintiff first argues "the County will suffer no harm from a preliminary injunction that merely preserves the status quo." (ECF 7, 29:14-15.) In fact, the opposite is true. As an initial matter, Plaintiff is not asking this Court to maintain the status quo. Rather, the Ordinance is already in effect. Plaintiff's motion thus asks the Court to upend the status quo, and to alter the legal rights of the parties, as well as the legal rights of all tenants and landlords across the County. Moreover, if the Eviction Ordinance is enjoined, the health and welfare of County residents will suffer. The County is still in the midst of the COVID-19 pandemic. (Dr. Wooten Decl., ¶¶ 5, 7-9.) Unvaccinated residents must continue to self-quarantine at home when infected, stay away from social gatherings and continue to social distance a minimum of six feet when not at home. (Dr. Wooten Decl., ¶ 9.) This will not be possible for residents evicted from their residence with nowhere else to live or for residents who have to move in with others. Clearly, if the Eviction Ordinance is enjoined, evictions will increase. As a result, the medical needs of County residents will increase (Dr. Wooten Decl, ¶ 11; Ex. 8, pp. 49-50) and the County will likely not continue its COVID-19 downward trajectory towards herd immunity (Dr. Wooten Decl., ¶¶ 8-9.) Infections and deaths from COVID-19 will continue. In short, County residents will be prejudiced by an injunction.

Plaintiff argues that protections enacted by the California legislature adequately protect the interest of tenants in San Diego County. The County's Board of Supervisors disagrees as evidenced by one of its Findings in the Eviction Ordinance:

> (w) AB 3088 and SB 91 leave certain tenants unprotected from eviction, such as tenants who were unable to pay rent before the COVID-19 pandemic and tenants who are facing eviction for certain reasons other than nonpayment of rent. (Ex. 1, Section 1(w), p. 4.)

The State legislature also believed additional protections enacted by local governments could be warranted to reduce the spread of COVID-19. When it passed SB 91, the State legislature expressly permitted local governments to enact additional restrictions on evictions. Cal. Civ. Proc. Code § 1179.05(b).

21cv0912

The Eviction Ordinance provides protections to County tenants not otherwise provided by the State; unlike State's eviction moratorium law, the Eviction Ordinance is not limited to a tenant's non-payment of rent, it applies to rent defaults that occurred prior to AB 3088 and SB 91 being enacted (Ex. 1, sec. 1(u-w) p. 4), and it will apply to rent defaults that occur after the State's law expires on June 30 of this year.

The County does not deny that the Eviction Ordinance may present a hardship to some landlords, but the County Board of Supervisors has determined that, on balance, it is more important for the County to provide housing security to its residents to slow the spread of COVID-19. Essentially, by seeking injunctive relief, Plaintiff is asking this Court to rule that the Board of Supervisors' determination was incorrect. However, as the district court stated in *Apartment Association of L.A. County,* difficult balancing tests are best decided by elected officials, not the court:

> [T]he COVID-19 crisis is unparalleled in this country's modern history. It is, quite literally, a matter of life and death. The economic damage the pandemic has wrought, if left unmediated by measures such as the City Moratorium, would likely trigger a tidal wave of evictions that would not only inflict misery upon many thousands of displaced residents, but also exacerbate a public health emergency that has already radically altered the daily life of every city resident, and even now threatens to overwhelm community resources. The hardships wrought upon residential landlords as an unintended consequence of the City's efforts are real, and are significant, but must yield precedence to the vital interests of the public as a whole.
>
> This Court will defer to the judgment of local authorities, who have the unenviable task of weighing all of the relevant considerations and choosing the least of all possible evils. It bears repeating, however, that the COVID-19 crisis is national in scope, and demands a national response.
> *Apt. Ass'n* at *28.

## IV.  CONCLUSION

The County respectfully asks this Court to deny Plaintiff's motion for a preliminary injunction.

DATED: June 7, 2021         Office of County Counsel

By     s/John P. Cooley
                JOHN P. COOLEY, Senior Deputy
                Attorneys for COUNTY OF SAN DIEGO
                E-mail:  john.cooley@sdcounty.ca.gov

21cv0912