PAUL J. BEARD II (State Bar No. 210563)
FISHERBROYLES LLP
4470 W. Sunset Blvd., Suite 93165
Los Angeles, CA 90027
Telephone: (818) 216-3988
Facsimile: (213) 402-5034
E-mail: paul.beard@fisherbroyles.com

Attorneys for Plaintiff
SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION,<br><br>    Plaintiff<br><br>    v.<br><br>COUNTY OF SAN DIEGO, BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO, and DOES 1 through 20, inclusive,<br><br>    Defendants. | Case No.:  3:21-cv-00912-L-DEB<br><br>Judge:      Judge M. James Lorenz<br><br>**PLAINTIFF'S CONSOLIDATED REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    June 21, 2021<br>Time:   10:00 a.m.<br>Room:  5B<br><br>Complaint Filed:   May 13, 2021<br>Trial Date:         None set |

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................... 6

II.   LEGAL STANDARD ......................................................................... 7

III.  ARGUMENT ..................................................................................... 7

    A.    Plaintiff Shows a Likelihood of Success or, at a Minimum, Raises "Serious Questions" About the Moratorium's Constitutionality ............... 7

        1.    The Moratorium Likely Violates the Contracts Clause ................... 7

        2.    The Moratorium Likely Effects an Unconstitutional Taking ........ 14

        3.    The Moratorium Unconstitutionally Applies Outside the County's Jurisdiction ...................................................................... 18

    B.    PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE COURT DENIES RELIEF ...................................................................... 20

    C.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN PLAINTIFF'S FAVOR ......................... 24

IV.  CONCLUSION ............................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Alliance for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) ............................................................... 17

*Allied Structural Steel Co. v. Spannaus*
438 U.S. 234 (1978) ............................................................................. 19

*Arizona Dream Act Coalition v. Brewer*
757 F.3d 1053 (9th Cir. 2014) ..................................................... 17, 28-30

*Armstrong v. United States*
364 U.S. 40 (1960) .......................................................................... 23, 26

*Bounds v. Superior Ct.*
229 Cal. App. 4th 468 (2014) ............................................................... 24

*Brown v. Legal Foundation of Washington*
538 U.S. 216 (2003) ............................................................................ 23

*Brown v. United States Forest Serv.*
465 F. Supp. 3d 1119 (D. Or. 2020) ...................................................... 17

*Calder v. Bull*
3 U.S. 386 (1798) ................................................................................ 24

*Chalk v. U.S. Dist. Ct. (Orange Cty. Superin. of Schs.)*
840 F.2d 701 (9th Cir. 1998) ........................................................... 16, 29

*Cienega Gardens v. United States*
331 F.3d 1319 (Fed. Cir. 2003) ............................................................ 25

*City & County of San Francisco v. U.S. Cizienship & Imm. Servs.*
944 F.3d 773 (9th Cir. 2019) ................................................................ 29

*City of Dublin v. County of Alameda*
14 Cal. App. 4th 264 (1993) ................................................................ 26

*County Sanitation Dist. No. 2 v. County of Kern*
127 Cal.App.4th 1544 (2005) ............................................................... 26

*Elrod v. Burns*
427 U.S. 347 (1976) ............................................................................ 28

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

*Energy Reserves Group , Inc. v. Kansas Power & Light Co.*
    459 U.S. 400 (1983)................................................................................ 19

*Fox Broad. Co. v. Dish Network L.L.C.*
    747 F.3d 1060 (9th Cir. 2014) ............................................................. 17

*Gordon v. Holder*
    721 F.3d 638 (D.C. Cir. 2013)............................................................. 30

*Hunt v. Wash. State Apple Adver. Comm'n*
    432 U.S. 333 (1977)..........................................................................17-18

*Index Newspapers LLC v. U.S. Marshals Serv.*
    977 F.3d 817 (9th Cir. 2020) ............................................................29-30

*Kelo v. City of New London*
    545 U.S. 469 (2005).........................................................................24-25

*Lingle v. Chevron U.S.A. Inc.*
    544 U.S. 528 (2005)............................................................................. 23

*Loretto v. Teleprompter Manattan Catv Corp.*
    458 U.S. 419 (1982)............................................................................. 24

*Lucas v. South Carolina Coastal Council*
    505 U.S. 1003 (1992) ......................................................................24-25

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012) ......................................................... 28, 30

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*
    676 F.3d 829 (9th Cir. 2012) ...........................................................17-18

*Penn Central Transp. Co. v. New York City*
    438 U.S. 104 (1978)............................................................................. 25

*Rodde v. Bonta*
    357 F.3d 988 (9th Cir. 2004) ............................................................... 29

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*
    749 F.2d 124 (2d Cir. 1984) ................................................................ 28

*Southern Calif. Gas Co. v. City of Santa Ana*
    336 F.3d 885 (9th Cir. 2003) ............................................................... 19

*Sveen v. Melin*
    138 S. Ct. 1815 (2018)................................................................................19

*Valle del Sol Inc. v. Whiting*
    732 F.3d 1006 (9th Cir. 2013) ...............................................................30

*Warth v. Seldin*
    422 U.S. 490 (1975).................................................................................18

*Winter v. National Res. Defense Council, Inc.*
    555 U.S. 7 (2008).....................................................................................17

## CONSTITUTIONAL PROVISIONS

Cal. Const., art. XI, § 7 .....................................................................................26

U.S. Const., Art. I § 10, cl. 1 ............................................................................19

U.S. Const. amend. V .......................................................................................23

U.S. Const. amend. XIV ...................................................................................23

## FEDERAL STATUTES

42 U.S.C. § 1983 ..............................................................................................19

## STATE STATUTES

Cal. Civ. Code § 1946.2(a) ...............................................................................30

Cal. Civ. Proc. Code § 1179.04 ........................................................................30

Cal. Gov. Code § 8634.................................................................................26-27

Cal. Gov. Code § 24123(d) ...............................................................................22

Cal. Health & Safety Code § 50897, *et seq.* ...................................................31

## CODES & ORDINANCES

Ordinance 10724....................................................................................*passim*

# I.   **INTRODUCTION**

Plaintiff satisfies the test for preliminary relief against the moratorium enacted by Defendant County of San Diego, which became effective on June 3. Plaintiff raises "serious questions" about the moratorium's constitutionality under the Contracts and Takings Clauses of the U.S. Constitution, as well as the jurisdictional limits on counties contained in the California Constitution. Plaintiff's members—and all rental housing owners—will suffer irreparable harm if the moratorium persists, including because it violates their constitutional rights. And the balance of the equities and the public interest weigh sharply in favor of a preliminary injunction, particularly as Plaintiff's constitutional rights are seriously implicated.

The opposition briefs of the County and Defendant-Intervenors falls short in disproving the need and propriety for a preliminary injunction.[1] Much of their briefs misconstrues the constitutional issues. The remainder minimizes, if not dismisses, the serious harm that the moratorium has visited on owners. While the County—and Intervenors—may benefit from a policy that crudely favors one constituency (tenants) over another (rental housing owners), policy does not trump basic constitutional norms and rights. In any event, the pandemic undisputedly winding down, the County recently moving into the lowest "yellow tier" of COVID-19 severity on June 9, and the statewide stay-at-home order being lifted; thus, the initial justification for this draconian moratorium is hanging by a thread.[2]

The Court should grant the motion and issue a preliminary injunction prohibiting

---

[1] Defendant County of San Diego and Defendant-Intervenors have submitted separate oppositions to Plaintiff Southern California Rental Housing Association's Motion for Preliminary Injunction. For the convenience of the Court and the parties, Plaintiff hereby submits this consolidated reply brief, addressing both oppositions in a single brief. Unless stated otherwise, Plaintiff refers to both the County and Intervenors collectively as "County."

[2] *See* https://www.countynewscenter.com/county-moves-to-yellow-tier-full-reopening-on-june-15/ (County announcement of "reopening" and movement into "yellow tier" of under Blueprint for a Safer Economy); https://www.gov.ca.gov/2021/06/11/as-california-fully-reopens-governor-newsom-announces-plans-to-lift-pandemic-executive-orders/ (Governor's announcement of plan to lift stay-at-home order, as well as plan to retire the Blueprint for a Safer Economy).

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

enforcement of the moratorium. At a minimum, it should prohibit the County from enforcing it outside the unincorporated areas.

## II. LEGAL STANDARD

A preliminary injunction is justified if the plaintiff "is likely to succeed on the merits," (2) the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [the plaintiff's] favor," and (4) "an injunction is in the public interest." *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). However, as Intervenors acknowledge, the Ninth Circuit adopts a "sliding scale" approach to those factors, whereby "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

Thus, for example, if the Court concludes the "balance of hardships strongly favors the plaintiff," then Plaintiff need only establish "serious questions going to the merits—a lesser showing than a likelihood of success on the merits" (as long as the other two *Winter* elements also are met). *Cascadia Wildlands v. Scott Timber Co.*, 715 Fed. Appx. 621, 623-24 (9th Cir. 2017) (internal citation and quotation marks omitted). By the same token, if the Plaintiff establishes a likelihood of success on the merits of one or more of its claims, it need not make as strong a showing on the balance of hardships.

## III. ARGUMENT

### A. Plaintiff Shows a Likelihood of Success or, at a Minimum, Raises "Serious Questions" About the Moratorium's Constitutionality

#### 1. The Moratorium Likely Violates the Contracts Clause

##### a. The Moratorium Substantially Impairs Contracts

Among COVID-19 related eviction laws across the country, the County's eviction moratorium is unmatched in the violence it does to existing contractual relations between landlord in tenant. For all practical intents and purposes, it

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

indefinitely bars ***all evictions*** in the County and thereby eliminates contract rights contained in rental agreements. An owner is indefinitely barred from moving himself or his family into his property. He must indefinitely suffer breaches of the rental agreement, including a tenant's harassing, disruptive, and nuisance-creating conduct. And, while the moratorium purportedly allows eviction of a tenant posing a "hazard to the health and safety of other tenants or occupants," the term "hazard" is undefined. Worse, even a "hazardous" tenant (however defined) is protected against eviction if, among other things, his eviction would "risk . . . potential spread of coronavirus." That's a scientific call that the owner must make before deciding whether to evict a dangerous tenant. Since most rental housing owners are not epidemiologists with the requisite qualifications to assess the risk of disease transmission associated with an eviction, and given the enormous criminal and civil liability that owners face for making the *wrong* call, the moratorium is functionally a total ban on evictions.

The moratorium indefinitely suspends various contract rights, including owners' rights to manage, repossess, and protect the integrity of their properties, and owners remain helpless under the Ordinance to safeguard those rights for an indefinite period of time.[3] Significantly, no owner could have guessed those rights would be suspended at 14 months after the start of the pandemic, as conditions are dramatically improving, and just days before the state stay-at-home order is lifted. If the County's moratorium does not completely "undermine[] the contractual bargain, interfere[] with a party's reasonable expectations, and prevent[] the party from safeguarding or reinstating his rights," it is difficult to imagine what law would. *Sveen*, 138 S. Ct. at 1822. At a

---

[3] Intervenors bemoan the fact that Plaintiff has not presented specific rental agreements to establish contract rights, including the conditions under which breaches would justify eviction. However, the various declarations submitted with the Motion, as well as supplemental declarations submitted with this reply brief, establish that owners' rental agreements have been breached by problematic tenants who cannot be evicted due to the moratorium. *See, e.g.*, Decl. of April Solis in Support of Motion, ¶ 4; Decl. of Larry Gale in Support of Motion, ¶¶ 4-5; Supp. Decl. of Mary Anne Wesson, ¶ 19. That is sufficient to establish the moratorium's impairment of contracts.

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

minimum, the total ban interferes with owners' "reasonable expectations," for "no amount of prior regulation" of the landlord-tenant relationship before COVID-19 "could have led landlords to expect anything like the blanket Moratorium" the County enacted. *Apt. Ass'n of L.A. Cty., Inc. v. City of L.A.*, 2020 U.S. Dist. LEXIS 212769, *12 (C.D. Cal. 2020).

Indeed, that is precisely what Judge Pregerson of the Central District held late last year in an apartment association's challenge to a City of Los Angeles eviction moratorium enacted *at the start* of the pandemic. The city law "prohibits evictions of residential and commercial tenants for failure to pay rent due to COVID-19, and prohibits evictions of residential tenants during the emergency for no-fault reasons, for unauthorized occupants or pets, and for nuisances related to COVID-19." *Id.* at * 6 (internal citation and quotation marks omitted). Further, "[l]andlords may continue to seek to evict tenants for other reasons, and do not run afoul of the Moratorium at all if they seek to evict a tenant on the basis of a good faith belief that the tenant does not qualify for the Moratorium's protections." *Id.* at *6-7. By comparison to the County moratorium, Los Angeles' law is eminently reasonable. But Judge Pregerson held that "it would be difficult to conclude that the [city's] Moratorium does not, at a minimum, significantly interfere with landlords' reasonable expectations." *Id.* at *11. Judge Pregerson could not "ignore the possibility that some landlords may face, at the very least, the prospects of reduced cash flow and time value of missed rent payments and increased wear and tear on rental properties, and that these effects were, at least in terms of degree, unforeseeable." *Id.* *12. As a result, Judge Pregerson concluded that the association "is likely to succeed in showing a substantial impairment of its contractual rights." *Id.* at *12-13; *see also Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 384 (Mass. 2020) (finding no "reasonable landlord would … have anticipated a virtually unprecedented event such as the COVID-19 pandemic that would generate a ban on even initiating eviction actions against tenants who do not pay rent and on replacing them with tenants who do pay rent"). So, too, here.

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

The County and Intervenors cite district court decisions taht have upheld COVID-19 related eviction moratoria against Contracts Clause challenges. But, even if they were binding on this Court, those decisions would not save the County's moratorium. In Contracts Clause cases, "[e]very case must be determined upon its own circumstances." *Home Bldg. & Loan Ass. v. Blaisdell*, 290 U.S. 398, 430 (1934). What the County conveniently omits about the cited district court cases is that they involved comparatively modest eviction moratoria. None of the moratoria indefinitely banned ***all*** evictions, like the County's ordinance does. And none of them came into effect a shocking 15 months into the pandemic, as it winds down. *See, e.g.*, *Heights Apts., LLC v. Walz*, 2020 U.S. Dist. LEXIS 245190, *4 (Minn. 2020) (Minnesota Governor's executive orders[4]--issued between March and July 2020—allowing eviction of (a) tenants seriously endangering safety of anyone on the premises, not just tenants; (b) tenants refusing to relinquish unit to allow owner or owner's family to move in; (c) tenants engaged in unlawful conduct (even if not endangering anyone's safety); and (d) tenants who damage property); *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 159 (S.D.N.Y. 2020) (challenge to New York Governor order issued in May 2020 temporarily disallowing only evictions for nonpayment of rent, with court stressing that the order "did nothing to impede the commencement of holdover proceedings brought when a tenant fails to cure a violation of the terms of the lease"); *HAPCO v. City of Philadephia*, 482 F. Supp. 3d 337, 345-47 (E.D. Penn. 2020) (challenge to city moratorium—enacted in July 2020—barring only evictions of tenants with COVID-19 financial hardship); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 209-11 (Conn. 2020) (same).

Finally, the County claims that an owner has other remedies to deal with

---

[4] The orders are Emergency Executive Orders 20-14, 20-73, and 20-79, available at the following web addresses maintained by the Minnesota Legislature: https://www.leg.mn.gov/archive/execorders/20-14.pdf., https://www.leg.mn.gov/archive/execorders/20-73.pdf and https://www.leg.mn.gov/archive/execorders/20-79.pdf, respectively.

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

problematic tenants—namely, obtain a restraining order or call law enforcement. See, e.g., Intervenors' Opp. Br. at 23. But the question is whether the moratorium has substantially impaired the contractual relationship between landlord and tenant, via the indefinite[5] suspension of contract rights; the question is not whether there are other ways—outside that contract—to address problematic tenants. In any event, restraining orders and police calls are no substitute for the contract right of eviction when repossession of one's property is necessary for reasons other than harassment or violence (e.g., to substitute a nonpaying tenant with a paying one, to move oneself or one's family into the property, etc.).

**b.** **The County Fails To Establish the Moratorium Reasonably and Appropriately Advances a Significant and Legitimate Public Purpose**

The County cannot escape the reality that its moratorium works a severe impairment on contracts. Nor has the County met its burden of establishing that the moratorium is "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822 (internal citation and quotation marks omitted). Notwithstanding the County's claim to the contrary (County Opp. at 10:3-11), it is the *County*'s burden to show a "significant and legitimate public purpose," not the Plaintiff's to show the absence of such a purpose. *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 734 (8th Cir. 2019) ("The State bears the burden of proof in showing a significant and legitimate public purpose underlying the Act.") (quoting *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 859 (8th Cir. 2002) and *Energy Reserves*, 459 U.S. at 411-12).

As the district court in *Heights Apts.* observed, "[t]o completely prohibit evictions would *not* reasonably advance the state's interest in protecting public health." *Heights*

---

[5] While the County insists the moratorium will end on August 14, the Intervenors are (rightfully) more suspicious that a definitive expiration exists. Intervenors' Opp. Br. at 6 (saying it will only "likely" expire on August 14).

*Apts.*, 2020 U.S. Dist. LEXIS 245190, *31. Further, when impairment of the contract relationship is "severe"—as here, where the moratorium has effectively rewritten rental agreements to indefinitely eliminate contract rights and remedies—the Court must engage in "a careful examination of the nature and purpose of the state legislation." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978). The alleged "public health" justification for pandemic-related moratoria becomes increasingly suspect, "[a]s time goes on. *Heights Apts.*, 2020 U.S. Dist. LEXIS at *26. Here, the moratorium prohibits all evictions, with a vague exception that the County drafted in such a way as to be utterly unfeasible and prohibitively risky for owners to invoke. And it comes 15 months into the pandemic, as COVID-19 transmission began to dramatically recede, and the County and State move to fully re-open society.

Moreover, the Supreme Court's precedents make clear that a substantial impairment is unreasonable when "an evident and more moderate course would serve [the government's] purposes equally well.*" United States Trust Co. of N. Y. v. New Jersey*, 431 U.S. 1, 31 (1977); s*ee also Allied Structural*, 438 U.S. at 247 (analyzing whether an impairment of private contracts "was necessary to meet an important general social problem"[6]). The County's stated purpose for the moratorium is "to provide housing security" to County residents "to prevent the spread of COVID" associated with "homelessness." County Opp. at 4:13-22. In particular, "unvaccinated" residents must "stay home" and therefore require "housing security." County Opp. at 12.

Yet, as the County admits (County Opp. at 11), the moratorium indiscriminately

---

[6] Contrary to the County's argument, the Court must consider the reasonableness and necessity of the law in light of the purported objective, especially when the impairment is, as here, severe. *Allied Structural*, 438 U.S. at 247 ("[T]here is no showing in the record before us that this severe disruption of contractual expectations was necessary to meet an important general social problem. The presumption favoring legislative judgment as to the necessity and reasonableness of a particular measure, simply cannot stand in this case." (internal citation and quotation marks omitted)). Moreover, the Supreme Court "has made clear that the Contract Clause provides greater protection for contractual rights than the 'less searching' rational basis standard applied under the Due Process Clauses." *Ass'n of Equip. Mfrs.*, 932 F.3d at 734 (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984)).

requires owners to house *all* tenants for an indefinite period of time, regardless whether such tenants are suffering a financial hardship, are at risk of homelessness, or are vaccinated or otherwise vulnerable to COVID transmission. Instead of taking a bulldozer to owners' contract rights, the County could have served its alleged purpose equally well by providing rental assistance for economically vulnerable tenants requiring new housing following otherwise-lawful evictions,[7] or at a minimum suspend evictions only for economically vulnerable tenants *who can establish financial hardship*.

Given how sweeping the moratorium is, with no regard for its stated objective, the moratorium can "hardly be characterized . . . as one enacted to protect a broad societal interest rather than a narrow class" (here, tenants). *Allied Structural*, 438 U.S. at 248-49. Indeed, the moratorium is the quintessential "special interest legislation," as evidenced by the fact that it passed by a bare majority against near-unanimous opposition among rental housing owners and two Supervisors, and was designed, not to address a "broad and general social or economic problem," but to benefit a discrete class of persons by directly "adjust[ing] the rights and responsibilities of contracting parties." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 192 (1983); *see also Energy Reserves Group v. Kan. Power & Light Co.*, 459 U.S. 400, 407 & n.6 (1983) (discussing the features of "special interest" legislation, including the breadth and strength of support among interest groups and political representatives). "[S]uch special interest legislation runs afoul of the Contract Clause when it impairs pre-existing contracts." *Janklow*, 300 F.3d at 861. If this law were reasonably addressing a broad and general social or economic problem, one would have seen broad support across diverse stakeholders in the County. *Energy Reserves*, 459 U.S. 40 at 407 n.6 (holding law was not special interest legislation, given it found support among diverse interests, and was enacted by

---

[7] See the County of San Diego's website describing the robust "rental assistance" programs for vulnerable residents in and out of the unincorporated areas of the County: https://www.sandiegocounty.gov/content/sdc/sdhcd/rental-assistance/overview.html

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

"substantial margins" in both houses).

In sum, the County has not shown—and cannot show—that its moratorium is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

## 2. The Moratorium Likely Effects an Unconstitutional Taking

The County makes four arguments against the Takings Clause claim, but none of them has merit.

*First*, the County argues that the Takings Clause "bars only takings *without just compensation*." County Opp. at 12-13; Intervenors' Opp. at 14. Therefore, the County reasons, Plaintiff's only remedy is just compensation in the form of money damages, and equitable relief is unavailable. *Id.* at 13. The argument reflects a basic misunderstanding of Plaintiff's takings claim and of takings law generally.

Plaintiff challenges the moratorium on the grounds that it violates two separate requirements of the Takings Clause—(1) that the taking be for a "public use," and (2) if the taking is for a public use, that the plaintiff be awarded "just compensation." U.S. Const. amend. V (Takings Clause); *see also* Complaint, ¶¶ 48-49. As to the first requirement, a taking for a *private* use is void, and therefore subject to declaratory and injunctive relief. *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."); *Kelo v. City of New London*, 545 U.S. 469, 477 (""[I]t has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, *even though A is paid just compensation*" (emphasis added)); *id.* at 490 (Kennedy, J., concurring) ("Transfers [of property rights] intended to confer benefits on particular, favored private entities, and with only incidental or pretextual public benefits, are *forbidden* by the Public Use Clause." (emphasis added)). As the United States Supreme Court has made clear, "[i]f a government action is found to be impermissible . . . because it fails to meet the 'public use' requirement . . . that is the end of the inquiry, and '[n]o

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

amount of compensation can authorize such action.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) (internal citation and quotation marks omitted); see also 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").

Plaintiff's alternative ground for an unlawful taking presupposes the moratorium indefinitely destroys owners' property rights for a "public use," and argues that the moratorium provides no means of securing compensation prior to or at the time of such taking. The Declaratory Judgment Act easily authorizes the Court to "declare the rights and other legal relations" of owners vis-à-vis the County, including whether the moratorium effects an uncompensated taking for public use. 28 U.S.C. § 2201(a). Declaratory relief is proper, "whether or not further relief" (such as just compensation) "could be sought." *Id.*; *see also Loretto v. Teleprompter Manhattan Catv Corp.*, 458 U.S. 419, 426 (1982) (declaring statute authorizing cable company to install cable box on private property effected "a permanent physical occupation" that was "taking" requiring compensation).

The same holds for takings claims for injunctive relief, when the plaintiff claims irreparable harm—or, if he claims damages, the challenged law or action lacks the government's "pledge of reasonably prompt ascertainment and payment" of compensation. *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2185 (Kagan, J., dissenting) (internal citation and quotation marks omitted); *id.* at 2177 (holding "there is no basis to enjoin the government's action effecting a taking" *only if* "adequate provision for obtaining just compensation" does not "exist"). Here, rental housing owners have suffered irreparable harm associated with the complete loss—however temporary—of their constitutional property rights in their units, so that injunctive relief is available. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'");

see also *Cortinas v. State of Nevada Hous.*, 2011 U.S. Dist. LEXIS 150131, *4 ("Losing one's home and property to foreclosure may undoubtedly constitute irreparable harm," "because the attributes of real property are unique" (internal citation and quotation marks omitted)). Further, even if owners sought just compensation for their loss, the moratorium lacks any mechanism whatsoever for "prompt ascertainment and payment" of such compensation. Indeed, in California, "[t]he state's police power, exercised in an emergency to protect the public interest, provides a cloak of absolute immunity from liability" against compensation claims for takings. *See, e.g., Farmers Ins. Exchange v. California*, 175 Cal. App. 3d 494, 503 (1985). Under these circumstances, there is no bar to Plaintiff's taking claim for injunctive relief. *See also Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 526 (2019) (adjudicating similar takings claim for declaratory and injunctive relief, in  challenge to state regulation authorizing union organizers to regularly access agricultural employees at employer worksites).[8]

*Second*, citing one district court opinion out of Pennsylvania, the County claims Plaintiff will not be irreparably harmed if the Court does not grant injunctive relief. The Plaintiff has explained—at great length—the irreparable harm that has accompanied the moratorium's destruction of owners' property rights. Regardless, declaratory relief can appropriately remedy violations of the Public Use and Just Compensation Clauses, and an injunction is appropriate to remedy the moratorium's violation of the Public Use Clause, as described above. *Lingle*, 544 U.S. at 543.

*Third*, the County claims Plaintiff is unlikely to succeed on the merits for two reasons: (1) there is no taking under the Supreme Court's decisions in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), or *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), and (2) if there is a taking, it's for a "public use." The County fails on both counts.

---

[8] The County's and Intervenors' reliance on various district court decisions barring injunctive relief claims under the Takings Clause are misplaced. Those out-of-state courts do not take into account the irreparable harm associated with some takings (as here), as well as the absence of a prompt and adequate remedy for challenges like this one in California.

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

Notably, the County ignores the principal theory on which Plaintiff claims a taking: The moratorium effects a *per se* taking under *Loretto*, because it requires an owner to indefinitely suffer a "physical occupation" without his consent. *Loretto*, 458 U.S. at 426; *see also* Complaint ¶ 46. Indeed, under the moratorium, the owner indefinitely loses **all rights** to control, manage, or repossess the entire rented property under the moratorium.[9] It is far more severe than New York law in *Loretto*, which required landlords to suffer the presence of cable boxes on their properties. On this ground alone, the Court should reject the County's claim that Plaintiff is unlikely to succeed on the takings claim; Plaintiff will—or at least has raised serious questions about the moratorium's constitutionality under *Loretto*.

Assuming *arguendo* the moratorium does not effect a *per se* taking, it certainly at least effects a regulatory taking under *Lucas* or *Penn Central*. Under *Lucas*, the moratorium deprives owners of all "economically beneficial" or "viable" use of their properties because the moratorium strips owners of the only means of securing payment for the leaseholds: eviction. At a minimum, the moratorium results in a *Penn Central*, which requires a balancing of factors, because: (1) the moratorium's "economic impact" on rental housing owners is devastating, given it eliminates owners' right to lawfully repossess property, even for nonpayment of rent or to move themselves and/or their families into a property; (2) the extent to which the Ordinance has interfered with distinct investment-backed expectations, based on existing law and rental agreements, is substantial; and (3) the character of the County's action—enactment of a law that confers no reciprocity of advantage, but rather penalizes owners to the exclusive benefit

---

[9] Intervenors note that the *per se* physical takings paradigm does not apply, because the moratorium does not authorize "permanent" occupancy of rental units. (Intervenors' Opp. at 15-16. While *Loretto* involved a "permanent" physical occupation authorized by the government on private property, later, the United States Supreme Court recognized that even "temporary" invasions are actionable as takings. *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23, 38 (2012) ("We rule today, simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection.").

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

of tenants—weighs decisively in favor of finding a taking.[10]

Finally, the County's self-serving declaration that its taking is for a "public use" finds no support in fact or law. The moratorium nakedly transfers property rights from one group of citizens (owners) another (tenants). Landlords may be title owners of their properties, but they have no right to control, manage, use, repossess, or exclude third parties (including tenants) from those properties. Conversely, tenants have the indefinite right to use and occupy said properties, regardless of their conduct, offenses, or payment of rent. Importantly, they indefinitely enjoy the right to exclude—even the owners. The right to exclude is so fundamental that, when the government "takes" it, it "does not simply take a single 'strand' from the 'bundle' of property rights; it chops through the bundle, taking a slice of every strand." *Loretto*, 458 U.S. at 435. If the moratorium is not "a law that takes property from A and gives it to B" to effect an illegal *private* taking, it's hard to imagine a law that could. *Calder v. Bull*, 3 U.S. 386 (1798); *Kelo*, 545 U.S. at 477 (same). Significantly, takings with only an "incidental" public benefit— like helping to keep economically vulnerable, unvaccinated renters housed—"are forbidden by the Public Use Clause." *Kelo*, 545 U.S. at 490 (Kennedy, J., concurring). Because the taking here is designed simply "to benefit a particular class of identifiable individuals," it is not for a "public use" and is void. *Id.* at 478.

### 3. The Moratorium Unconstitutionally Applies Outside the Unincorporated Areas

The County hangs its hat on a nonbinding 1979 Attorney General's Opinion for the proposition that, under Government Code section 8634, a county's authority may

---

[10] The County's characterization of the moratorium's impacts on owners is disingenuous. "Landlords may still rent their properties" (they are *forced* to); "they are still entitled to payment" (not at present); and "they may still evict and sue if their tenants default on their obligations" (they may not, for an indefinite period of time). County Opp. at 15. They also may not repossess their homes to move in themselves or their families—an impact the County conveniently ignores. While the County may eventually decide to restore some or all of these property rights, even *temporary* takings are actionable. *Ark. Game & Fish*, 568 U.S. at 34 ("[W]e have rejected the argument that government action must be permanent to qualify as a taking.").

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

extend beyond the unincorporated areas within its borders. County Opp. at 16-17. In the process, it casts aside a controlling constitutional provision and case law that say the opposite.

The California Constitution clearly states that "[a] county or city may make and enforce *within its limits* all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7 (emphasis added). The County brushes this off, claiming that, because cities are within its "limits," it can regulate cities. But that's not how the courts have interpreted the constitutional provision. In *County Sanitation Dist. No. 2 v. County of Kern*, 127 Cal.App.4th 1544, (2005), a California Court of Appeal interpreted Article XI, section 7, of the California Constitution as strictly limiting the powers of Kern County (and by extension all counties in the State):

> The incorporated areas of Kern County are necessarily outside the jurisdiction and authority of County; County's authority extends only to the unincorporated areas within its borders.

*Id.* (citing Cal. Const., art. XI, § 7).

The Court of Appeal in *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264 (1993) agreed. There, Alameda County voters passed Measure D, which purported to regulate solid waste in "both the incorporated and unincorporated areas" of the County. *Id.* at 274. The Court held that, to the extent it went beyond the unincorporated areas, the measure was unconstitutional: "the California Constitution specifies that the police power bestowed upon a county may be exercised 'within its limits,' i.e., only in the unincorporated area of the county." *Id.* at 274-75 (quoting Cal. Const., art. XI, § 7); *see also In re Knight*, 55 Cal. App. 511, 513-14 (1921) (county ordinances effective only within county borders); *Ex parte Pfirrmann*, 134 Cal. 143, 145 (1901) (county and city have mutually exclusive jurisdiction); *Ex parte Roach*, 104 Cal. 272, 275 (1894) (city ordinances supersede ordinances of its county upon same subject).

It does not matter, as the County contends, that these cases purportedly involved

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

"local" issues and did not involve Government Code section 8634. Even if section 8634 itself extended a county's jurisdiction beyond the unincorporated areas within its borders (which it does not), it would be unconstitutional. The reason is simple: "Constitutions trump conflicting statutes." *Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.*, 209 Cal. App. 4th 1182, 1189 (2012). The 1979 Attorney General's Opinion does not—and cannot—alter that fact.[11]

Finally, Intervenors' argument that the court should decline to exercise "supplemental jurisdiction" over this "novel or complex issue of State law" fails. Intervenors' Opp. at 18 (quoting 28 U.S.C. 1367(c)(1)). There's nothing novel or complex about this claim: the Constitution, as consistently interpreted by California courts, prohibits counties from acting beyond the unincorporated areas. The Court may adjudicate this claim.

## B.   PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE COURT DENIES RELIEF

The County cites a Pennsylvania district court case for the proposition that Plaintiff must show that *all* of its members will suffer irreparable harm in order to justify a preliminary injunction. But that is not the law in this Circuit. An associational plaintiff can establish irreparable harm if at least one of its members can establish such harm. *See, e.g.*, *Sierra Club v. Trump*, 963 F.3d 874, 902-03 (9th Cir. 2020).

In *Sierra Club*, the national environmental organization sued to stop the Federal Government's funding of the Trump Administration's wall along the southern border of the United States. To establish the "irreparable harm" necessary to justify an injunction, Sierra Club "presented declarations from members who regularly visit the respective project areas." *Id.* at 902 (Collins, J., dissenting); *see also id.* at 884-85

---

[11] The Court should resist the County's and Intervenors' plea to follow the Attorney General opinion, including on the grounds that, if the Legislature disagreed with that opinion, it had over 40 years to change the law but chose not to. That's a red herring. The Legislature is bound by (and cannot modify) Article XI, section 7, of the California Constitution, as consistently interpreted by this State's courts to limit a county's power to the unincorporated areas.

(describing the declarations). "These members described how the construction and the resulting border barriers would interfere with their enjoyment of the surrounding landscape and would impede their ability to fish, to hunt, to monitor and document wildlife and vegetation for educational purposes, and to participate in other activities near the project sites." *Id.* The Court concluded that the members' declarations were sufficient to establish that "Sierra Club would suffer irreparable harm to its recreational and aesthetic interests absent injunction." *Id.* at 895. Significantly, the Court did not require a showing that every member of Sierra Club—a national organization—declare that it has suffered irreparable harm from construction of the wall. See also

As the direct result of the moratorium, Plaintiff has demonstrated that *all* members (and *all* County rental housing owners) are suffering an indefinite loss of their constitutional rights, protected by the Contracts and Takings Clauses. " [I]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres*, 695 F.3d at 1002; *see also Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (A "colorable claim" of a constitutional violation is sufficient to establish irreparable harm at the preliminary injunction stage); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995))). Thus, all owners, including Plaintiff's members, are suffering irreparable harm by virtue of the moratorium's constitutional violations.

The County tries to distinguish these cases by claiming that the rights protected by the Contracts and Takings Clauses—rights that are actually *listed* in the Constitution—lack the same status as other constitutional rights, because they are "economic" in nature. But a constitutional right is a constitutional right. Indeed, more recent Supreme Court cases have rejected the notion that there are tiers of constitutional rights, with some deserving greater respect than others. In *Knick*, for example, the

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

Supreme Court said that "[t]akings claims against local governments should be handled the same as other claims under the Bill of Rights." *Knick*, 139 S. Ct. at 2177 (overruling a precedent that had "relegate[d] the Takings Clause 'to the status of a poor relation' among the provisions of the Bill of Rights" and "restoring takings claims to the full-fledged constitutional status the Framers envisioned when they included the Clause among other protections in the Bill of Rights") (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 392). The rights against the impairment of contracts and against uncompensated takings for private purposes are undisputedly "constitutional rights," and their violation constitutes irreparable harm. This dispels the County's doubts that "irreparable harm" can "result[] from violation of the Contracts Clause or the Takings Clause."[12] County Opp. at 22.

In addition to establishing the moratorium's constitutional violations, Plaintiff submitted declarations from members who own rental properties in the County and are subject to the moratorium. *See* Declarations of April Solis, Larry Gale, and Irma Pintor in Support of Motion. Those members testified to the mental and emotion hardship associated with being stripped of their rights use, control, manage, and repossess their own properties, including one family who can't even move themselves back into their family home. Though these owners feel the emotional and mental strain of losing their rights, the County surprisingly characterizes their declarations as "speculation." County Opp. at 22:25. The declarations are decidedly not speculation, as they are based on declarants' own personal knowledge of their own difficult circumstances trying to live under the moratorium.

---

[12] There actually is nothing peculiar about individuals suffering irreparable harm as the result of Contracts or Takings Clause violations. "The doctrine that an action will lie to enjoin the enforcement of an [invalid] municipal ordinance in cases where such enforcement will cause substantial and irreparable injury to private property or private property rights, and in which there is no adequate remedy in the ordinary course of law, is now too well settled to require discussion." *San Diego Tuberculosis Ass'n v. City of E. San Diego*, 186 Cal. 252, 255 (1921); see also Ebel v. City of Garden Grove, 120 Cal. App. 3d 399, 410 (1981) ("It is well settled that where the enforcement of an ordinance may cause irreparable injury, the injured party may attack its constitutionality by an action to enjoin its enforcement.").

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

To combat the County's criticisms in its Opposition Brief that the irreparable harm suffered by April Solis, Larry Gale, Irma Pintor, and other owners either has nothing to do with the moratorium or is fleeting, Plaintiff is compelled to submit supplemental declarations[13] of Ms. Solis and another owner (and member of Plaintiff), Mary Anne Wesson.

Because of a problematic tenant she cannot evict under the moratorium that is now in force, and the loss of her constitutional rights, Ms. Solis has "endured sleepless nights, illness, and other symptoms of severe mental and emotional distress" for which she has had to take medication. Supp. Decl. of April Solis, ¶ 8. No amount of money can adequately compensate her for this ongoing harm. Id. ¶ 4.

Ms. Wesson owns a condominium in the County, which has been rented out to a problematic tenant as well. That tenant secured the tenancy by fraud, and has consistently breached the terms of her lease, including by creating nuisances at the complex, such as noise and trash. Supp. Decl. of Mary Anne Wesson, ¶¶ 3, 6, 19. She has made life "unbearable" for Ms. Wesson, who under the current moratorium cannot replace her with better tenants (even though her lease is up). *Id.*, ¶¶ 10, 14. Ms. Wesson

---

[13] The Supplemental Declarations are offered to directly rebut points made by the County and Intervenors concerning the irreparable harm caused by the moratorium, and address circumstances that were not in existence at the time the motion was filed on May 24—namely, the coming into effect of the Ordinance on June 3 and the moratorium's impacts since then on owners and tenants. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 56931, *602 n.2 (N.D. Cal. 2017) (allowing "supplemental declarations . . . responding to points made in . . . . opposition" brief). *Travelers Indem. Co. v. Walker & Zanger, Inc.*, 221 F. Supp. 2d 1224, 1228 n.2 (S.D. Cal. 2002) (Judge Lorenz defendant's motion to strike evidence attached to supplemental declaration filed by plaintiff in support of reply brief). In any event, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). This flexibility exists because "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination." *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). A district court therefore "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm." *Id.* In light of these facts and law, the Supplemental Declarations are proper and should be considered. *See, e.g., Nulife Ventures, Inc. v. Avacen, Inc.*, 2020 U.S. Dist. LEXIS 233536, *23-24 (S.D. Cal. 2020) (allowing supplemental declarations in light of flexibility of preliminary injunction proceedings).

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

has become mentally and physically sick from the ordeal created by the moratorium. *Id.*, ¶ 20. She declares:

> My emotional and mental distress has been exacerbated by my sleeplessness over a problematic tenant whom the Ordinance requires me to indefinitely house. My sleeplessness has become worse since realizing I have no legal remedy to remove Ms. Roe because of the Ordinance. I suffer from fibromyalgia, which is made significantly worse by such anguish, stress and poor sleep caused by the Ordinance. My body is actually suffering, not just my emotional health. I have terrible headaches and stomach aches, in addition to debilitating and total body pain—all because of the Ordinance, which eliminates my most basic rights of access, use, control, and repossession of my own condominium; causes me to have to deal indefinitely with HOA and neighbor complaints; causes me to worry about the state of my condominium and the impacts of a bad tenant I must house; and causes me to have to deny good tenants housing in my condominium. Their anguish I find the most distressing.

*Id.*. ¶¶ 20-21.

The plight of these and other owners cannot be denied and cannot be adequately compensated. Supp. Solis Decl., ¶ 4; Supp. Wesson Decl., ¶ 21. And the County's so-called "remedies"—calling the police, obtaining a restraining order, and suing for damages—are not realistic or adequate solutions to the severe difficulties that owners are facing under the moratorium. Restraining orders (like the one obtained by Ms. Solis against her harassing tenant) do not suspend the landlord-tenant relationship: As long as she must house a bad tenant, *someone* must deal with that tenant—in Ms. Solis's case, her husband. Supp. Solis Decl., ¶ 5. Other lease breaches that make life miserable for owners and neighbors are not "crimes" justifying police intervention. The County's tone-deaf dismissal of the real suffering of a segment of the citizens it represents—rental housing providers—falls flat.

## C. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN PLAINTIFF'S FAVOR

"[B]y establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiff[] [has] established that . . . the balance of equities favor a preliminary injunction." *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). The balance of equities also favors parties, like Plaintiff in this case, who

seek only "to preserve, rather than alter, the status quo while they litigate the merits of th[eir] action." *Rodde v. Bonta*, 357 F.3d 988, 999 n.14 (9th Cir. 2004). The "'[s]tatus quo' to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy"—here, the state of affairs before the moratorium came into effect. *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d 2014). Further, the narrow, prohibitory nature of the relief Plaintiff seeks "strengthens [its] position" in the balancing of this factor. *Rodde*, 357 F.3d at 999.

As far as the "public interest" factor is concerned, "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (internal citation and quotation marks omitted) (emphasis added). Conversely, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). Simply put, "it would not be equitable or in the public's interest to allow the [County] . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Ariz. Dream Act*, 757 F.3d at 1069 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

The County does not grapple with these clear-cut authorities and principles, which justify an injunction. Instead, the County points to its policy of providing "housing security" for its most vulnerable and unvaccinated residents as a reason why the balance of equities and the public interest weigh in its favor. County Opp. at 23-25. But "[t]he Constitution does not permit [the County] to prioritize any policy goal over the [Contracts Clause or Takings Clause]." *Gordon*, 721 F.3d at 653. And, significantly, even without the moratorium, the County's economically vulnerable and unvaccinated tenants enjoy significant substantive and procedural protections against eviction under state law. *See* Plaintiff's Motion, pp. 30-31.

## IV. **CONCLUSION**

A preliminary injunction should issue, prohibiting the County from enforcing its moratorium. At a minimum, the moratorium should be enjoined outside the County's

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION

unincorporated areas.

DATED: June 14, 2021

/s/ Paul Beard II

_____
PAUL BEARD II
Attorney for Plaintiff SOUTHERN CALIFORNIA
RENTAL HOUSING ASSOCIATION

PLAINTIFF'S CONSOLIDATED REPLY ISO OF ITS MOT. FOR PRELIM. INJUNCTION