PAUL J. BEARD II (State Bar No. 210563)
FISHERBROYLES LLP
4470 W. Sunset Blvd., Suite 93165
Los Angeles, CA 90027
Telephone: (818) 216-3988
Facsimile: (213) 402-5034
E-mail: paul.beard@fisherbroyles.com

Attorneys for Plaintiff
SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION,

       Plaintiff

    v.

COUNTY OF SAN DIEGO, BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO, and DOES 1 through 20, inclusive,

       Defendants.

Case No.: 3:21-cv-00912-L-DEB

Judge: Judge M. James Lorenz

**PLAINTIFF'S OPPOSITION TO DEFENDANT COUNTY OF SAN DIEGO'S MOTION TO DISMISS**

Date: July 19, 2021
Time: 10:00 a.m.
Room: 5B

Complaint Filed: May 13, 2021
Trial Date: None set

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................. 7

II. FACTUAL BACKGROUND ................................................................ 8

III. LEGAL STANDARD ........................................................................ 10

IV. ARGUMENT.................................................................................... 11

    A. The Moratorium Violates the Contracts Clause...................... 11

        1. The Moratorium Substantially Impairs Contracts ......... 11

        2. The Ordinance Is Not Drawn in an Appropriate and Reasonable Way To Advance a Significant and Legitimate Public Purpose ................................................................ 15

    B. The Moratorium Violates the Takings Clause ......................... 18

    C. The Moratorium Unconstitutionally Applies Outside the Unincorporated Areas of the County ....................................... 22

V. CONCLUSION ................................................................................. 24

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Structural Steel Co. v. Spannaus*
    438 U.S. 234 (1978)......................................................................................16-17

*Apt. Ass'n of L.A. Cty., Inc. v. City of L.A.*
    2020 U.S. Dist. LEXIS 212769 (C.D. Cal. 2020) ....................................... 12

*Arkansas Game & Fish Commission v. United States*
    568 U.S. 23 (2012).......................................................................................... 22

*Ass'n of Equip. Mfrs. v. Burgum*
    932 F.3d 727, 734 (8th Cir. 2019) ...........................................................15-16

*Auracle Homes, LLC v. Lamont*
    478 F. Supp. 3d 199 (D. Conn. 2020) ......................................................... 14

*Baptiste v. Kennealy*
    490 F. Supp. 3d 353 (D. Mass. 2020)........................................................... 13

*Calder v. Bull*
    3 U.S. 386 (1798)............................................................................................ 22

*Cedar Point Nursery v. Shiroma.*
    2021 U.S. LEXIS 3394 (U.S.S.C. 2021) ................................................. 17, 22

*Citizens Assn. of Sunset Beach v. Orange County Local Agency
    Formation Com.*
    209 Cal. App. 4th 1182 (2012) ..................................................................... 24

*City of Dublin v. County of Alameda*
    14 Cal. App. 4th 264 (1993) ......................................................................... 23

*Cortinas v. State of Nevada Hous.*
    2011 U.S. Dist. LEXIS 150131 (D. Nev. 2011)........................................19-20

*County Sanitation Dist. No. 2 v. County of Kern*
    127 Cal. App. 4th 1544 (2005) ..................................................................... 23

*Elmsford Apt. Assocs., LLC v. Cuomo*
    469 F. Supp. 3d 148 (S.D.N.Y. 2020) .......................................................... 14

*Energy Reserves Group , Inc. v. Kansas Power & Light Co.*
    459 U.S. 400 (1983) ................................................................................. 15, 17

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Ex parte Pfirrmann*
    134 Cal. 143 (1901) .................................................................................. 23

*Ex parte Roach*
    104 Cal. 272 (1894) .................................................................................. 23

*Equip. Mfrs. Inst. v. Janklow*
    300 F.3d 842 (8th Cir. 2002) .................................................................. 15

*Farmers Ins. Exchange v. California*
    175 Cal. App. 3d 494 (1985). ................................................................. 20

*HAPCO v. City of Philadelphia*
    482 F. Supp. 3d 337 (E.D. Penn. 2020)................................................. 14

*Haw. Hous. Auth. v. Midkiff*
    467 U.S. 229 (1984) ................................................................................ 18

*Heights Apts., LLC v. Walz*
    2020 U.S. Dist. LEXIS 245190 (D. Minn. 2020)...............................14-16

*Home Bldg. & Loan Ass. v. Blaisdell*
    290 U.S. 398, 430 (1934) ....................................................................... 13

*Kelo v. City of New London*
    545 U.S. 469 (2005)........................................................................... 18, 22

*Knick v. Twp. of Scott*
    139 S. Ct. 2162 (2019) ............................................................................ 19

*Lingle v. Chevron U.S.A. Inc.*
    544 U.S. 528 (2005)............................................................................19-20

*Loretto v. Teleprompter Manattan Catv Corp.*
    458 U.S. 419 (1982)........................................................................19, 21-22

*Lucas v. South Carolina Coastal Council*
    505 U.S. 1003 (1992) .............................................................................. 21

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012) .................................................................. 19

*Penn Central Transp. Co. v. New York City*
    438 U.S. 104 (1978)................................................................................. 21

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*
    467 U.S. 717 (1984)...................................................................................16

*Sveen v. Melin*
    138 S. Ct. 1815 (2018)......................................................................11-12, 15

*United States Trust Co. of N. Y. v. New Jersey*
    431 U.S. 1 (1977)...................................................................................16

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**Constitutional Provisions**

U.S. Const., Art. I, § 10, cl. 1 ........................................................ 11

Cal. Const., art. XI, § 7 .............................................................. 23

**Federal Statutes**

28 U.S.C. § 2201(a) ................................................................. 19

**Statutes and Ordinances**

San Diego County Ordinance No. 10724 .......................................... *passim*

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# I.    **INTRODUCTION**

On May 4, 2021, Defendant County of San Diego enacted Ordinance 10724, which went into effect on June 3, 2021. The Ordinance indefinitely bans evictions within both the incorporated and unincorporated areas of the County. The Ordinance passed by a narrow 3-2 vote and faced substantial opposition, especially from rental housing owners who rightly fear the ban's consequences for their lives, those of their employees and third parties, and their rental properties.

The Ordinance bars owners—many of them "mom and pop" landlords struggling to make ends meet—from moving themselves or their families back into their units, due to financial hardship, housing displacement, or other extenuating circumstances. It bars them from removing tenants who do not pay rent. It bars them from removing tenants who harass or threaten them, their employees, or third parties (e.g., repair or service workers, delivery workers, etc.). And it bars them from evicting tenants who use the property for an illegal purpose or otherwise create a nuisance to the extent it doesn't rise to the level of an "imminent health or safety threat" to "other tenants or occupants"—an exception that is ill-defined and only invites costly lawsuits by tenants against owners intrepid enough to invoke that exception.

In short, the Ordinance re-writes existing rental agreements, which provide owners with important remedies badly needed to respond to serious breaches of those agreements, in violation of the Contracts Clause of the United States Constitution. Also, the Ordinance strips owners of their federal constitutional rights to repossess rental units, and to exclude threatening and law-breaking tenants, as protected by the Fifth and Fourteenth Amendments to the United States Constitution. Finally, the Ordinance purports to apply to rental properties in *cities* within the County, even though the California Constitution limits a county's jurisdiction to unincorporated areas.

The County explicitly passed the Ordinance on a *non-urgency* basis because the County knows that no emergency justifies the law. Rather, the County passed the Ordinance purportedly to prevent economically vulnerable tenants from becoming

homeless, particularly during the pandemic. However, the Ordinance applies indiscriminately to keep even the wealthiest and most privileged of tenants housed at the expense of the smallest mom-and-pop owners. Further, as the spread and effects of COVID-19 have dramatically waned in the County and in the State, the County is hard-pressed to use the pandemic as an excuse to indefinitely suspend owners' constitutional rights.

Plaintiff Southern California Rental Housing Association, whose member-owners are being devastated by this Ordinance, easily states claims for violation of the Contracts Clause, the Takings Clause, and the California Constitution's limits on county jurisdiction. The Court should deny the County's[1] Motion to Dismiss.

## II. <u>FACTUAL BACKGROUND</u>

On May 4, 2021, Defendants enacted the Ordinance. The Ordinance states, in relevant part, that no owner may "lawfully terminate a residential tenancy" without "just cause." Except for "just cause," owners are prohibited from the following actions to recover possession of their property:

- "Serve a notice of termination of tenancy";
- "File or serve an unlawful detainer lawsuit, ejectment action, or other action to recover possession of a residential unit";
- "Evict a tenant or require a Tenant to vacate a residential unit," including enforcing final court judgments authorizing repossession of said unit;
- "Take any other action in reliance on a notice of termination of tenancy that expired during the Local Emergency [defined as "any period of local emergency declared by the County of San Diego in response to the COVID-19 pandemic"] or attempt to induce a tenant to vacate based on such notice";
- "Represent to a Tenant that the Tenant is required to move out of their unit by law."

---

[1] Defendant-Intervenor has filed a joinder to the County's Motion. Thus, all references to the County's motion to dismiss are intended to encompass the motions of both parties.

Complaint ¶ 20 (quoting Ordinance § 3(c)).

"Just cause" is ill-defined. "Just cause" requires "a showing that the Tenant is an imminent health or safety threat." Complaint ¶ 21 (quoting Ordinance § 3(b)). "Imminent health or safety threat" is, in turn, defined as:

> "a hazard to the health or safety of other tenants or occupants of the same property, taking into account (1) the risk of potential spread of coronavirus caused by the eviction, in case of a Local Emergency due to COVID-19, (2) any public health or safety risk caused by the eviction, and (3) all other remedies available to the landlord and other occupants of the property, against the nature and degree of health and safety risk posed by the tenant's activity."

Complaint ¶ 21 (quoting Ordinance § 2(b)).

The Ordinance applies to *all* tenants, *all* rental housing owners, and *all* rental units (including single-family homes) in the County. Complaint ¶ 24 (citing Ordinance § 2). Significantly, the eviction moratorium protects all tenants regardless of their wealth, income, or COVID-19-related financial distress. *E.g.*, Complaint ¶ 11. Thus, by its own terms, the moratorium is concerned, not with protecting the most vulnerable tenants at risk of financial hardship or homelessness, but with benefitting tenants as a group at the expense of owners.

The Ordinance does not define what rises to the level of a "hazard to the health or safety" of a "tenant or occupant." Further, the vague "hazard" exception does not cover threats to owners, their families, their employees, or third parties lawfully on the premises, such as repair- or delivery-persons. Complaint ¶ 21. It does not cover damage or destruction to property. *Id.* In other words, a tenant-created "hazard" to anyone besides tenants and occupants is not "just cause" for removing the problematic tenant. Owners are obligated, by law, to house such "hazard[ous]" tenants. *Id.*

Finally, the Ordinance confers on tenants a new cause of action against owners who repossess their properties, including for "just cause." Complaint ¶ 22. A tenant "may institute a civil proceeding," including for "mental or emotional distress" damages and treble damages, against an owner who "attempts to recover possession or recovers possession of a residential real property" if (in the tenant's eyes) the owner did not

achieve "strict compliance" with all provisions of the Ordinance, including "all notice requirements." Complaint ¶¶ 4, 22 (citing Ordinance §§ 7(a), 7(c)). Given how ill-defined the "hazard" exception is, and the "strict compliance" requirement, an owner faces a high risk of costly and time-consuming litigation if she tries to remove a tenant even for "just cause" under the "hazard" exception. *Id.* Thus, the Ordinance deters owners from invoking even the "hazard" exception to the eviction moratorium.

While the Ordinance purports not to "relieve Tenant of the obligation to pay rent, nor restrict a Landlord's ability to recover rent due," the Ordinance does just that. Complaint ¶ 23 (citing Ordinance § 3(k)). Eviction for nonpayment of rent is barred. *Id.* As long as the Ordinance remains in effect, tenants are excused from paying rent because the Ordinance leaves owners with no legal remedy. Thus, the Ordinance has the legal and practical effect of relieving tenants of their obligation to pay rent and blocks rental housing owners' ability to recover rent due after June 30.

The eviction moratorium applies to all residential rental properties in the County. Complaint ¶ 24 (citing Ordinance § 2(c)). Further, the moratorium applies, not just to unincorporated areas, but to "cities within the County," as well. *Id.* ¶ 24 (citing Ordinance § 8(a)). Indeed, it supplants conflicting city laws, to the extent that those city laws are less beneficial to tenants. *Id.*=.

The Ordinance went into effect on June 3, 2021, and purportedly expires "60 days after the Governor lifts all COVID-19-related stay-at-home and work-at-home orders." Complaint ¶ 26 (citing Ordinance § 3(a)).

The Board enacted the Ordinance by a narrow 3-2 vote, following over four hours of public testimony. Complaint ¶ 1. Given the eviction moratorium's unprecedented reach and severe impacts on rental housing owners, the vast majority of public comment was in opposition to the Ordinance. *Id.*

## III.   LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The

court must assume the truth of all factual allegations and construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). Dismissal of an action is appropriate only where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1482 (9th Cir. 1991).

## IV.   ARGUMENT

### A.   The Moratorium Violates the Contracts Clause

The Contracts Clause of the United States Constitution provides that "[n]o state shall . . . pass . . . any . . . Law impairing the Obligation of Contracts." U.S. Const., Art. I, § 10, cl. 1. Thus, the Clause "restricts the power of States to disrupt contractual arrangements" of "any kind." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). The Court employs a "two-step test" to determine if a law "crosses the constitutional line" under the Contracts Clause. *Id.* at 1821.

"The threshold issue is whether the state law has operated as a substantial impairment of a contractual relationship. *Id.* at 1821-22 (internal citation and quotation marks omitted). "In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822. "If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation. In particular,  the Court has asked whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (internal quotation marks omitted).

Here, the moratorium violates both factors.

### 1.   The Moratorium Substantially Impairs Contracts

Among COVID-19 related eviction laws across the country, the County's eviction moratorium is unmatched in the violence it does to existing contractual relations between landlord in tenant. For all practical intents and purposes, it indefinitely bars ***all evictions*** in the County and thereby eliminates contract rights

contained in rental agreements. An owner is indefinitely barred from moving himself or his family into his property. He must indefinitely suffer breaches of the rental agreement, including a tenant's harassing, disruptive, and nuisance-creating conduct. And, while the moratorium purportedly allows eviction of a tenant posing a "hazard to the health and safety of other tenants or occupants," the term "hazard" is undefined. Worse, even a "hazardous" tenant (however defined) is protected against eviction if, among other things, his eviction would "risk . . . potential spread of coronavirus." That's a scientific call that the owner must make before deciding whether to evict a dangerous tenant. Since most rental housing owners are not epidemiologists with the requisite qualifications to assess the risk of disease transmission associated with an eviction, and given the enormous criminal and civil liability that owners face for making the *wrong* call, the moratorium is functionally a total ban on evictions.

The moratorium indefinitely suspends various contract rights, including owners' rights to manage, repossess, and protect the integrity of their properties, and owners remain helpless under the Ordinance to safeguard those rights for an indefinite period of time. Significantly, no owner could have guessed those rights would be suspended at 14 months after the start of the pandemic, as conditions are dramatically improving, and just days before the state stay-at-home order is lifted. If the County's moratorium does not completely "undermine[] the contractual bargain, interfere[] with a party's reasonable expectations, and prevent[] the party from safeguarding or reinstating his rights," it is difficult to imagine what law would. *Sveen*, 138 S. Ct. at 1822. At a minimum, the total ban interferes with owners' "reasonable expectations," for "no amount of prior regulation" of the landlord-tenant relationship before COVID-19 "could have led landlords to expect anything like the blanket Moratorium" the County enacted. *Apt. Ass'n of L.A. Cty., Inc. v. City of L.A.*, 2020 U.S. Dist. LEXIS 212769, *12 (C.D. Cal. 2020).

Indeed, that is precisely what Judge Pregerson of the Central District held late last year in an apartment association's challenge to a City of Los Angeles eviction

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

moratorium enacted *at the start* of the pandemic. The city law "prohibits evictions of residential and commercial tenants for failure to pay rent due to COVID-19, and prohibits evictions of residential tenants during the emergency for no-fault reasons, for unauthorized occupants or pets, and for nuisances related to COVID-19." *Id.* at * 6 (internal citation and quotation marks omitted). Further, "[l]andlords may continue to seek to evict tenants for other reasons, and do not run afoul of the Moratorium at all if they seek to evict a tenant on the basis of a good faith belief that the tenant does not qualify for the Moratorium's protections." *Id.* at *6-7. By comparison to the County moratorium, Los Angeles' law is eminently reasonable. But Judge Pregerson held that "it would be difficult to conclude that the [city's] Moratorium does not, at a minimum, significantly interfere with landlords' reasonable expectations." *Id.* at *11. Judge Pregerson could not "ignore the possibility that some landlords may face, at the very least, the prospects of reduced cash flow and time value of missed rent payments and increased wear and tear on rental properties, and that these effects were, at least in terms of degree, unforeseeable." *Id.* *12. As a result, Judge Pregerson concluded that the association "is likely to succeed in showing a substantial impairment of its contractual rights." *Id.* at *12-13; *see also Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 384 (Mass. 2020) (finding no "reasonable landlord would … have anticipated a virtually unprecedented event such as the COVID-19 pandemic that would generate a ban on even initiating eviction actions against tenants who do not pay rent and on replacing them with tenants who do pay rent"). So, too, here.

The County moves to dismiss largely on the basis that other district court decisions have upheld COVID-19 related eviction moratoria against Contracts Clause challenges. Motion at 5, 7. But, even if those decisions were binding on this Court, they would not save this moratorium.

In Contracts Clause cases, "[e]very case must be determined upon its own circumstances." *Home Bldg. & Loan Ass. v. Blaisdell*, 290 U.S. 398, 430 (1934). What the County conveniently omits about the cited district court cases is that they involved

comparatively modest eviction moratoria. None of the moratoria indefinitely banned **all** evictions, like the County's ordinance does. And none of them came into effect a shocking 15 months into the pandemic, as it was winding down. *See, e.g.*, *Heights Apts., LLC v. Walz*, 2020 U.S. Dist. LEXIS 245190, *4 (Minn. 2020) (Minnesota Governor's executive orders[2]--issued between March and July 2020—allowing eviction of (a) tenants seriously endangering safety of anyone on the premises, not just tenants; (b) tenants refusing to relinquish unit to allow owner or owner's family to move in; (c) tenants engaged in unlawful conduct (even if not endangering anyone's safety); and (d) tenants who damage property); *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 159 (S.D.N.Y. 2020) (challenge to New York Governor order issued in May 2020 temporarily disallowing only evictions for nonpayment of rent, with court stressing that the order "did nothing to impede the commencement of holdover proceedings brought when a tenant fails to cure a violation of the terms of the lease"); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 345-47 (E.D. Penn. 2020) (challenge to city moratorium—enacted in July 2020—barring only evictions of tenants with COVID-19 financial hardship); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 209-11 (Conn. 2020) (same).

The County argues that the "fundamental nature of tenant/landlord contracts" is preserved, because owners "have the right to collect rent from tenants, and seek back rents once the Eviction Ordinance expires." Motion at 8. But that betrays a basic misunderstanding of the depth and breadth of landlord-tenant contracts. The deferred right to collect rents does nothing for the owner who cannot exercise his contract right to repossess his home to move himself or his family back in; or his contract right to expel a nuisance tenant wreaking havoc on neighbors and third parties; or his contract

---

[2] The orders are Emergency Executive Orders 20-14, 20-73, and 20-79, available at the following web addresses maintained by the Minnesota Legislature: https://www.leg.mn.gov/archive/execorders/20-14.pdf., https://www.leg.mn.gov/archive/execorders/20-73.pdf, and https://www.leg.mn.gov/archive/execorders/20-79.pdf, respectively.

right to protect his rental against damage. The owner-tenant contract is about much more than timely payment of rent; as to those other non-rent terms, the moratorium simply *suspends* them.

Next, the County claims that an owner has other remedies to deal with problematic tenants, such as obtaining a restraining order or calling law enforcement. Motion at 8. But the question is whether the moratorium has substantially impaired the contractual relationship between landlord and tenant, via the indefinite suspension of contract rights; the question is not whether there are other ways—outside that contract—to address problematic tenants. In any event, restraining orders and police calls are no substitute for the contract right of eviction when repossession of one's property is necessary for reasons other than harassment or violence (e.g., to substitute a nonpaying tenant with a paying one, to move oneself or one's family into the property, etc.).

## 2. <u>The Ordinance Is Not Drawn in an Appropriate and Reasonable Way To Advance a Significant and Legitimate Public Purpose</u>

The County cannot escape the reality that its moratorium works a severe impairment on contracts. Nor has the County met its burden of establishing that the moratorium is "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822 (internal citation and quotation marks omitted). It is the *County*'s burden to show a "significant and legitimate public purpose," not the Plaintiff's to show the absence of such a purpose. *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 734 (8th Cir. 2019) ("The State bears the burden of proof in showing a significant and legitimate public purpose underlying the Act." (quoting *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 859 (8th Cir. 2002) and *Energy Reserves Group , Inc. v. Kansas Power & Light Co.*, 459 U.S. at 400, 411-12 (1983)

As the district court in *Heights Apts.* observed, "[t]o completely prohibit evictions would *not* reasonably advance the state's interest in protecting public health." *Heights Apts.*, 2020 U.S. Dist. LEXIS 245190, *31. Further, when impairment of the contract

relationship is "severe"—as here, where the moratorium has effectively rewritten rental agreements to indefinitely eliminate contract rights and remedies—the Court must engage in "a careful examination of the nature and purpose of the state legislation." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978). The alleged "public health" justification for pandemic-related moratoria becomes increasingly suspect, "[a]s time goes on." *Heights Apts.*, 2020 U.S. Dist. LEXIS at *26. Here, the moratorium prohibits all evictions, with a vague exception that the County drafted in such a way as to be utterly unfeasible and prohibitively risky for owners to invoke. And it comes 15 months into the pandemic, as COVID-19 transmission began to dramatically recede, and the County and State move to fully re-open society.

Moreover, the Supreme Court's precedents make clear that a substantial impairment is unreasonable when "an evident and more moderate course would serve [the government's] purposes equally well.*" United States Trust Co. of N. Y. v. New Jersey*, 431 U.S. 1, 31 (1977); s*ee also Allied Structural*, 438 U.S. at 247 (analyzing whether an impairment of private contracts "was necessary to meet an important general social problem"[3]). The County's stated purpose for the moratorium is "to provide housing security" to County residents "to prevent the spread of COVID" associated with "homelessness." Motion at 4. In particular, "unvaccinated" residents must "stay home" and therefore require "housing security." Motion at 12.

Yet, as the County admits (Motion at 11-12), the moratorium indiscriminately

_____

[3]The Court must consider the reasonableness and necessity of the law in light of the purported objective, especially when the impairment is, as here, severe. *Allied Structural*, 438 U.S. at 247 ("[T]here is no showing in the record before us that this severe disruption of contractual expectations was necessary to meet an important general social problem. The presumption favoring legislative judgment as to the necessity and reasonableness of a particular measure, simply cannot stand in this case." (internal citation and quotation marks omitted)). Moreover, the Supreme Court "has made clear that the Contract Clause provides greater protection for contractual rights than the 'less searching' rational basis standard applied under the Due Process Clauses." *Ass'n of Equip. Mfrs.*, 932 F.3d at 734 (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984)).

requires owners to house *all* tenants for an indefinite period of time, regardless whether such tenants are suffering a financial hardship, are at risk of homelessness, or are vaccinated or otherwise vulnerable to COVID transmission. Instead of taking a bulldozer to owners' contract rights, the County could have served its alleged purpose equally well by providing rental assistance for economically vulnerable tenants requiring new housing following otherwise-lawful evictions,[4] or at a minimum suspend evictions only for economically vulnerable tenants *who can establish financial hardship*.

Given how sweeping the moratorium is, with no regard for its stated objective, the moratorium can "hardly be characterized . . . as one enacted to protect a broad societal interest rather than a narrow class" (here, tenants). *Allied Structural*, 438 U.S. at 248-49. Indeed, the moratorium is the quintessential "special interest legislation," as evidenced by the fact that it passed by a bare majority against near-unanimous opposition among rental housing owners and two Supervisors, and was designed, not to address a "broad and general social or economic problem," but to benefit a discrete class of persons by directly "adjust[ing] the rights and responsibilities of contracting parties." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 192 (1983); *see also Energy Reserves Group v. Kan. Power & Light Co.*, 459 U.S. 400, 407 & n.6 (1983) (discussing the features of "special interest" legislation, including the breadth and strength of support among interest groups and political representatives). "[S]uch special interest legislation runs afoul of the Contract Clause when it impairs pre-existing contracts." *Janklow*, 300 F.3d at 861. If this law were reasonably addressing a broad and general social or economic problem, one would have seen broad support across diverse stakeholders in the County. *Energy Reserves*, 459 U.S. 40 at 407 n.6 (holding law was not special interest legislation, given it found support among diverse interests, and was enacted by

---

[4] See the County of San Diego's website describing the robust "rental assistance" programs for vulnerable residents in and out of the unincorporated areas of the County: https://www.sandiegocounty.gov/content/sdc/sdhcd/rental-assistance/overview.html

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

"substantial margins" in both houses).

In sum, the County has not shown—and cannot show—that its moratorium is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

**B.** **The Moratorium Violates the Takings Clause**

The County makes several arguments against the Takings Clause claim, but none of them has merit. *First*, the County argues that the Takings Clause "bars only takings *without just compensation.*" Motion at 13. Therefore, the County reasons, Plaintiff's only remedy is just compensation in the form of money damages, and equitable relief is unavailable. *Id.* at 13. The argument reflects a basic misunderstanding of Plaintiff's takings claim and of takings law generally.

Plaintiff challenges the moratorium on the grounds that it violates two separate requirements of the Takings Clause—(1) that the taking be for a "public use," and (2) if the taking is for a public use, that the plaintiff be awarded "just compensation." U.S. Const. amend. V (Takings Clause); *see also* Complaint, ¶¶ 48-49. As to the first requirement, a taking for a *private* use is void, and therefore subject to declaratory and injunctive relief. *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."); *Kelo v. City of New London*, 545 U.S. 469, 477 (2005) (""[I]t has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, *even though A is paid just compensation*" (emphasis added)); *id.* at 490 (Kennedy, J., concurring) ("Transfers [of property rights] intended to confer benefits on particular, favored private entities, and with only incidental or pretextual public benefits, are *forbidden* by the Public Use Clause." (emphasis added)). As the United States Supreme Court has made clear, "[i]f a government action is found to be impermissible . . . because it fails to meet the 'public use' requirement . . . that is the end of the inquiry, and '[n]o amount of compensation can authorize such action.'"

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) (internal citation and quotation marks omitted); *see also* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").

Plaintiff's alternative ground for an unlawful taking presupposes the moratorium indefinitely destroys owners' property rights for a "public use," and argues that the moratorium provides no means of securing compensation prior to or at the time of such taking. The Declaratory Judgment Act easily authorizes the Court to "declare the rights and other legal relations" of owners vis-à-vis the County, including whether the moratorium effects an uncompensated taking for public use. 28 U.S.C. § 2201(a). Declaratory relief is proper, "whether or not further relief" (such as just compensation) "could be sought." *Id.*; *see also Loretto v. Teleprompter Manhattan Catv Corp.*, 458 U.S. 419, 426 (1982) (declaring statute authorizing cable company to install cable box on private property effected "a permanent physical occupation" that was "taking" requiring compensation).

The same holds for takings claims for injunctive relief, when the plaintiff claims irreparable harm—or, if he claims damages, the challenged law or action lacks the government's "pledge of reasonably prompt ascertainment and payment" of compensation. *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2185 (2019) (Kagan, J., dissenting) (internal citation and quotation marks omitted); *id.* at 2177 (holding "there is no basis to enjoin the government's action effecting a taking" *only if* "adequate provision for obtaining just compensation" does not "exist"). Here, rental housing owners have suffered irreparable harm associated with the complete loss—however temporary—of their constitutional property rights in their units, so that injunctive relief is available. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"); *see also Cortinas v. State of Nevada Hous.*, 2011 U.S. Dist. LEXIS

150131, *4 (D. Nev. 2011) ("Losing one's home and property to foreclosure may undoubtedly constitute irreparable harm," "because the attributes of real property are unique" (internal citation and quotation marks omitted)). Further, even if owners sought just compensation for their loss, the moratorium lacks any mechanism whatsoever for "prompt ascertainment and payment" of such compensation. Indeed, in California, "[t]he state's police power, exercised in an emergency to protect the public interest, provides a cloak of absolute immunity from liability" against compensation claims for takings. *See, e.g., Farmers Ins. Exchange v. Calif.*, 175 Cal. App. 3d 494, 503 (1985). Under these circumstances, there is no bar to Plaintiff's taking claim for injunctive relief.[5]

Significantly, just last month, the Supreme Court declared a California statute unconstitutional under the Takings Clause and enjoined its enforcement. *Cedar Point Nursery v. Hassid*, 2021 U.S. LEXIS 3394, *33-34 (U.S.S.C. 2021) (holding, in challenge for equitable relief only, that state law requiring agricultural employers to grant access to their properties to union organizers violated employers' fundamental right to exclude and "constitute[d] a *per se* physical taking); *id*., *58-59 (Breyer, J., dissenting) (Challengers "seek only injunctive and declaratory relief.").

*Second*, citing one district court opinion out of Pennsylvania, the County claims Plaintiff will not be irreparably harmed if the Court does not grant injunctive relief. The Plaintiff has explained—at great length—the irreparable harm that has accompanied the moratorium's destruction of owners' property rights. Regardless, declaratory relief can appropriately remedy violations of the Public Use and Just Compensation Clauses, and an injunction is appropriate to remedy the moratorium's violation of the Public Use Clause, as described above. *Lingle*, 544 U.S. at 543.

---

[5] The County's reliance on various district court decisions barring injunctive relief claims under the Takings Clause is misplaced. Those out-of-state courts do not take into account the irreparable harm associated with some takings (as here), as well as the absence of a prompt and adequate remedy for challenges like this one in California.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Third*, the County claims that (1) there is no taking under the Supreme Court's decisions in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), or *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), and (2) if there is a taking, it's for a "public use." The County fails on both counts.

Notably, the County ignores the principal theory on which Plaintiff claims a taking: The moratorium effects a *per se* taking under *Loretto*, because it requires an owner to indefinitely suffer a "physical occupation" without his consent. *Loretto*, 458 U.S. at 426; *see also* Complaint ¶ 46. Indeed, under the moratorium, the owner indefinitely loses **all rights** to control, manage, or repossess the entire rented property under the moratorium. It is far more severe than New York law in *Loretto*, which required landlords to suffer the presence of cable boxes on their properties. On this ground alone, the Court should reject the County's claim that Plaintiff is unlikely to succeed on the takings claim; Plaintiff will—or at least has raised serious questions about the moratorium's constitutionality under *Loretto*.

Assuming *arguendo* the moratorium does not effect a *per se* taking, it certainly at least effects a regulatory taking under *Lucas* or *Penn Central*. Under *Lucas*, the moratorium deprives owners of all "economically beneficial" or "viable" use of their properties because the moratorium strips owners of the only means of securing payment for the leaseholds: eviction. At a minimum, the moratorium results in a *Penn Central*, which requires a balancing of factors, because: (1) the moratorium's "economic impact" on rental housing owners is devastating, given it eliminates owners' right to lawfully repossess property, even for nonpayment of rent or to move themselves and/or their families into a property; (2) the extent to which the Ordinance has interfered with distinct investment-backed expectations, based on existing law and rental agreements, is substantial; and (3) the character of the County's action—enactment of a law that confers no reciprocity of advantage, but rather penalizes owners to the exclusive benefit

of tenants—weighs decisively in favor of finding a taking.[6]

Finally, the County's self-serving declaration that its taking is for a "public use" finds no support in fact or law. The moratorium nakedly transfers property rights from one group of citizens (owners) to another (tenants). Landlords may be title owners of their properties, but they have no right to control, manage, use, repossess, or exclude third parties (including tenants) from those properties. Conversely, tenants have the indefinite right to use and occupy said properties, regardless of their conduct, offenses, or payment of rent. Importantly, they indefinitely enjoy the right to exclude—even the owners. The right to exclude is so fundamental that, when the government "takes" it, it "does not simply take a single 'strand' from the 'bundle' of property rights; it chops through the bundle, taking a slice of every strand." *Loretto*, 458 U.S. at 435; *Cedar Point*, 2021 U.S. LEXIS 3394, *14 ("The right to exclude is "one of the most treasured" rights of property ownership."). If the moratorium is not "a law that takes property from A and gives it to B" to effect an illegal *private* taking, it's hard to imagine a law that could. *Calder v. Bull*, 3 U.S. 386 (1798); *Kelo*, 545 U.S. at 477 (same). Significantly, takings with only an "incidental" public benefit—like helping to keep economically vulnerable, unvaccinated renters housed—"are forbidden by the Public Use Clause." *Kelo*, 545 U.S. at 490 (Kennedy, J., concurring). Because the taking here is designed simply "to benefit a particular class of identifiable individuals," it is not for a "public use" and is void. *Id.* at 478.

## C. The Moratorium Unconstitutionally Applies Outside the Unincorporated

---

[6] The County's characterization of the moratorium's impacts on owners is disingenuous. "Landlords may still rent their properties" (they are *forced* to); "they are still entitled to payment" (not at present); and "they may still evict and sue if their tenants default on their obligations" (they may not, for an indefinite period of time). Motion at 15. They also may not repossess their homes to move in themselves or their families—an impact the County conveniently ignores. While the County may eventually decide to restore some or all of these property rights, even *temporary* takings are actionable. *Arkansas Game & Fish Comm. v. United States*, 568 U.S. 23 (2012) ("[W]e have rejected the argument that government action must be permanent to qualify as a taking.").

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**Areas of the County**

The County hangs its hat on a nonbinding 1979 Attorney General's Opinion for the proposition that, under Government Code section 8634, a county's authority may extend beyond the unincorporated areas within its borders. Motion at 18. In the process, it casts aside a controlling constitutional provision and case law that say the opposite.

The California Constitution clearly states that "[a] county or city may make and enforce *within its limits* all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7 (emphasis added). The County brushes this off, claiming that, because cities are within its "limits," it can regulate cities. But that's not how the courts have interpreted the constitutional provision. In *County Sanitation Dist. No. 2 v. County of Kern*, 127 Cal.App.4th 1544, (2005), a California Court of Appeal interpreted Article XI, section 7, of the California Constitution as strictly limiting the powers of Kern County (and by extension all counties in the State):

> The incorporated areas of Kern County are necessarily outside the jurisdiction and authority of County; County's authority extends only to the unincorporated areas within its borders.

*Id.* (citing Cal. Const., art. XI, § 7).

The Court of Appeal in *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264 (1993) agreed. There, Alameda County voters passed Measure D, which purported to regulate solid waste in "both the incorporated and unincorporated areas" of the County. *Id.* at 274. The Court held that, to the extent it went beyond the unincorporated areas, the measure was unconstitutional: "the California Constitution specifies that the police power bestowed upon a county may be exercised 'within its limits,' i.e., only in the unincorporated area of the county." *Id.* at 274-75 (quoting Cal. Const., art. XI, § 7); *see also In re Knight*, 55 Cal. App. 511, 513-14 (1921) (county ordinances effective only within county borders); *Ex parte Pfirrmann*, 134 Cal. 143, 145 (1901) (county and city have mutually exclusive jurisdiction); *Ex parte Roach*, 104 Cal. 272, 275 (1894)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

(city ordinances supersede ordinances of its county upon same subject).

It does not matter, as the County contends, that these cases purportedly involved "local" issues and did not involve Government Code section 8634. Even if section 8634 itself extended a county's jurisdiction beyond the unincorporated areas within its borders (which it does not), it would be unconstitutional. The reason is simple: "Constitutions trump conflicting statutes." *Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.*, 209 Cal. App. 4th 1182, 1189 (2012). The 1979 Attorney General's Opinion does not—and cannot—alter that fact.[7]

## V. **CONCLUSION**

The County has failed to establish that it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Levine*, 950 F.2d at 1482. Indeed, Plaintiff has established that the moratorium is unconstitutional. For these reasons, the Court should deny the County's motion.

DATED: July 2, 2021

/s/ Paul Beard II

_____
PAUL BEARD II
Attorney for Plaintiff SOUTHERN CALIFORNIA
RENTAL HOUSING ASSOCIATION

---

[7] The Court should resist the County's plea to follow the Attorney General opinion, including on the grounds that, if the Legislature disagreed with that opinion, it had over 40 years to change the law but chose not to. That's a red herring. The Legislature is bound by (and cannot modify) Article XI, section 7, of the California Constitution, as consistently interpreted by this State's courts to limit a county's power to the unincorporated areas.