JOHN P. COOLEY, Senior Deputy (SBN 162955)
JEFFREY P. MICHALOWSKI, Senior Deputy (SBN 248073)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531- 4892; Fax: (619) 531-6005
E-mail: john.cooley@sdcounty.ca.gov

Attorneys for COUNTY OF SAN DIEGO (erroneously sued under the additional name "Board of Supervisors of the County of San Diego")

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTHERN CALIFORNIA RENTAL HOUSING ASSOCIATION,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>COUNTY OF SAN DIEGO, BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO, and DOES 1 through 20 inclusive,<br><br>　　　　　Defendants. | No. 21-cv-0912-L-DEB<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>**NO ORAL ARGUMENT**<br><br>Date:　　　July 19, 2021<br>Time　　　10:00 a.m.<br><br>Dept.:　　　5B<br>Judge:　　　M. James Lorenz<br><br>Action Filed: May 13, 2021 |

# TABLE OF CONTENTS

I.  THE EVICTION ORDINANCE DOES NOT VIOLATE THE CONTRACTS CLAUSE. .... 1

    A.  THE EVICTION ORDINANCE IS NOT A SUBSTANTIAL IMPAIRMENT OF CONTRACT ................................................................................................ 1

    B.  THE COUNTY HAS A SIGNIFICANT AND LEGITIMATE PUBLIC PURPOSE IN ENACTING THE EVICTION ORDINANCE. ..................................................... 3

    C.  THE EVICTION ORDINANCE IS REASONABLE AND APPROPRIATE TO THE PUBLIC PURPOSE JUSTIFYING THE LEGISLATION'S ADOPTION ..................... 4

II.  PLAINTIFF'S TAKINGS CLAUSE CLAIM MUST BE DISMISSED ........................... 6

III. THE COUNTY HAD AUTHORITY DURING THE COVID-19 EMERGENCY TO ENACT ITS EVICTION ORDINANCE COUNTYWIDE .............................................. 9

IV.  CONCLUSION ................................................................................................ 11

## TABLE OF AUTHORITIES

**Cases**

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978) ........................................................................................ 5

*Apt. Ass'n of L.A. Cnty., Inc. v. City of L.A.*,
    500 F. Supp. 3d (C.D. Cal. 2020) ................................................................ 3, 7

*Auracle Homes, L.L.C. v. Lamont*,
    478 F. Supp. 3d (D. Conn. 2020) ................................................................. 2, 6

*Baptiste v. Kennealy*,
    490 F. Supp. 3d (D. Mass. Sept. 25, 2020) ..................................................... 6

*Cedar Point Nursery v. Hassid*,
    2021 U.S. LEXIS 3394, 141 S. Ct. (2021) ...................................................... 8

*Chrysafis v. Marks*,
    2021 U.S. Dist. LEXIS 110405 (E.D. N.Y. June 11, 2021) .......................... 1, 7

*City of Dublin v. County of Alameda*,
    14 Cal. App. 4th 264 (1993) ............................................................................ 9

*City of Oroville v. Superior Court*,
    7 Cal. 5th 1091 (2019) .................................................................................... 8

*Cnty. Sanitation Dist. No. 2 v. County of Kern*,
    127 Cal. App. 4th 1544 (2005) ....................................................................... 9

*Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency*
    365 F. Supp. 2d 1146 (D.Nev. 2005) .............................................................. 8

*Elmsford Apt. Assocs., L.L.C. v. Cuomo*,
    469 F. Supp. 3d 148 (S.D.N.Y. 2020) ..................................................... 2, 3, 6

*Equip. Mfrs. Inst. V. Janklow*,
    300 F. 3d 842 (8th Cir. 2002) ......................................................................... 5

*Exxon Corp. v. Eagerton*,
    462 U.S. 176 (1983) ........................................................................................ 5

*HAPCO v. City of Philadelphia*,
    482 F. Supp. 3d 337 (E.D. Pa. 2020) .............................................................. 2

*Heights Apts, L.L.C. v. Walz*,
    No. 20-CV-2051 (NEB/BRT), 2020 U.S. Dist. LEXIS 245190
    (D. Minn. Dec. 31, 2020) ...................................................................... 2, 3, 4, 6

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 333 (1977) ........................................................................................ 8

*In re Knight*,
    55 Cal. App. 511 (1921) ................................................................................ 10

*Knick v. Twp. of Scott*,
    139 S. Ct. 2162 (2019) .................................................................................... 7

*Loretto  v. Teleprompter Manhattan Catv Corp.*,
    458 U.S. 419 (1982) ........................................................................................ 6

**Other Authorities**

62 Ops. Cal. Att'y Gen. 701, 1979 Cal. AG LEXIS 24 (1979) ......................................... 10

**I.    THE EVICTION ORDINANCE DOES NOT VIOLATE THE CONTRACTS CLAUSE.**

   A.  <u>THE EVICTION ORDINANCE IS NOT A SUBSTANTIAL IMPAIRMENT OF CONTRACT.</u>

Seventeen is the number of times Plaintiff, in its Opposition, falsely described the lifespan of the County's Eviction Ordinance as "indefinite." In fact, the Ordinance is quite finite; it will terminate on August 10, 2021 after being in effect for only 68 days.

By its express terms, the Eviction Ordinance became effective on June 3, 2021, and expires "60 days after the Governor lifts all COVID-19 related stay-at-home and work-at-home orders." (Ex. 1, Sections 10(a) and 10(b).) On June 11, 2021, Governor Newsom issued Executive Order N-07-21 which rescinded all stay-at-home and work-at-home orders. (Ex. 15.) As a result, the Eviction Ordinance will terminate after 68 days - on August 10, 2021.[1]

Significantly, eviction ordinances of much longer duration have been deemed by federal courts to not violate the Contracts Clause. *See, Chrysafis v. Marks*, 2021 U.S. Dist. LEXIS 110405, *26-28 (E.D. N.Y. June 11, 2021) (discussing cases). The district court in *Chrysafis* found a 16-month eviction and foreclosure moratorium, including an extension, to be reasonable. *Id*. 28. The court noted:

> Plaintiffs bitterly object to this [eviction moratorium] extension, the catalyst for this lawsuit. But the Legislature- and the world- remains in the midst of a struggle against the most deadly pandemic in a century. And while progress has been made, as noted by the Legislature in approving the extension, substantial data supported its determination. Although plaintiffs argue that the extension's implementation was less than ideal, this Court neither can nor should second-guess such determinations. Courts are equipped with microscopes, while other branches of government have binoculars. Hence, broad public policy decisions are best left to those institutions. *Id.* at *27-28 [citations omitted].

The Opposition also claims the Eviction Moratorium bars all evictions in the County. (Opp. 11:27-28.) This is simply not true. Under the Ordinance's express terms, all tenants who constitute "a hazard to the health or safety of other tenants or occupants

---

[1] In its motion, the County stated the Eviction Ordinance would terminate on August 14 based on the State's announcement that the stay/work-at-home orders would end on June 15, 2021. (ECF 16-1, p 7:14.) However, Governor Newsom unexpectedly rescinded those orders four days early – on June 11. As a result, the Eviction Ordinance will have a lifespan four days shorter than the County originally represented.

1

of the same property" can be evicted as long as virus spread and public health risks caused by the eviction are taken into account. (Ex. 1, Sec. 3(b).)

Plaintiff implies that only "epidemiologists" are qualified to determine whether a tenant is a hazard. (Opp. 12:9.) However, the language of the Eviction Ordinance is quite clear and uses no medical or scientific terms. The word "hazard" is not difficult to comprehend. Indeed, a LEXIS search for the word "hazard" in the text of California statutes reveals that word is used more than 1,800 times.

Furthermore, a district court reviewing a similar Minnesota ordinance permitting "termination of a lease or eviction not only when a tenant endangers the safety of another resident, but also when a tenant seriously endangers the safety of a non-resident on the premises," determined the statute did not violate the Contracts Clause. *Heights Apts, L.L.C. v. Walz*, No. 20-CV-2051 (NEB/BRT), 2020 U.S. Dist. LEXIS 245190, at *6 (D. Minn. Dec. 31, 2020). Contrary to Plaintiff's argument here, the *Heights Apts.* court did not believe the ordinance constituted a complete bar on evictions:

> To completely prohibit evictions would *not* reasonably advance the state's interest in protecting public health. But [the eviction ordinance] is a far cry from a total prohibition on evictions; landlords are permitted to evict tenants in instances where tenants pose the greatest risk, such as to other residents or by engaging in dangerous criminal activity. *Id.* at *31-32.

Like the ordinance in *Heights Apts.*, the County's Eviction Ordinance "is a far cry from a total prohibition on evictions" because landlords are permitted to evict tenants in instances where tenants are a hazard to the health or safety of other tenants or occupants of the same property – i.e., "pose the greatest risk."

The Opposition completely ignores the cases finding that because the tenant/landlord relationship is already heavily regulated, eviction moratoriums were foreseeable and thus did not act as impairments of contracts. See, Motion at 8:8-22 - discussing *Elmsford Apt. Assocs., L.L.C. v. Cuomo*, 469 F. Supp. 3d 148, 169 (S.D.N.Y. 2020), *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 351 (E.D. Pa. 2020) and *Auracle Homes, L.L.C. v. Lamont*, 478 F. Supp. 3d 199, 224 (D. Conn. 2020). The one

2

21cv0912

contrary case - *Apt. Ass'n of L.A. Cnty., Inc. v. City of L.A.*, 500 F. Supp. 3d 1088 (C.D. Cal. 2020) - is easily distinguishable. Judge Pregerson in *Apt. Ass'n of L.A. Cty* noted that prior rental regulations could not "have led landlords to expect anything like the blanket [eviction] Moratorium." *Id*. at 1096. However, that moratorium's lifespan was 12-28 months as compared to the County's 68-day Eviction Ordinance. *See Id*. at 1096, n. 25.

Furthermore, Judge Pregerson also noted that, as a result of Los Angeles's eviction moratorium, "some landlords may face . . . the prospects of reduced cash flow." *Id*. at 1096. That "prospect" no longer exists because Governor Newsom and the California legislature passed Assembly Bill 832 which "increases the value of the reimbursement the state's emergency rental assistance program provides to now cover 100 percent of past-due and prospective rent payments." (Ex. 16; AB 832, sec. 22(c)(1)(A) and (B)[2].) Therefore, not only do landlords retain the right to recover all rent due from tenants under the County's Eviction Ordinance, but landlords are virtually guaranteed to recover past and future rent from tenants unable to make their payments.

As noted by the district courts in *Heights Apts.*, *L.L.C.* 2020 U.S. Dist. LEXIS 245190, *30 and *Elmsford Apt. Assocs.*, 469 F. Supp. 3d at 172, the eviction moratoriums at issue did not violate the Contracts Clause because the tenants were still bound by their rental contracts. Those moratoriums only postponed the date by which the landlord could exercise remedies. The same is true for the County's Ordinance. (See, Ex. 1, Section 4(k) ("Nothing in this ordinance shall relieve a Tenant of the obligation to pay rent, nor restrict a Landlord's ability to recover rent due.").)

B. THE COUNTY HAS A SIGNIFICANT AND LEGITIMATE PUBLIC PURPOSE IN ENACTING THE EVICTION ORDINANCE.

Plaintiff's Complaint alleges the County does not have a significant and legitimate purpose in enacting the Eviction Ordinance. (ECF 1, ¶ 35-36.) In a nutshell, the Complaint claims COVID-19 is over and, therefore, the Ordinance is not justified or

---

[2] https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202120220AB832

necessary. (Id.) But nothing stated in the Opposition supports that conclusory statement. The undisputed findings in the Eviction Ordinance all support the County's "significant and legitimate purpose" to protect the health, safety and welfare of San Diego County residents. (Ex. 1, Section 1 subsections (a)-(gg)).

Moreover, housing security has become even more important due to the recent rise of the highly contagious Delta Variant of COVID-19 which is now the dominant strain in California.[3] As of July 1, COVID-19 cases in California had risen 17 percent in the previous two weeks.[4] Evictions are the antithesis of housing security. It cannot be said with a straight face that the County did not have a significant and legitimate purpose when it passed the Eviction Ordinance to protect the health, safety and welfare of its residents. *See, Heights Apts., L.L.C. v. Walz*, 2020 U.S. Dist. LEXIS 245190, at *31 ("The [emergency orders] advance an important and legitimate state interest – preventing the spread of COVID-19.")

C. THE EVICTION ORDINANCE IS REASONABLE AND APPROPRIATE TO THE PUBLIC PURPOSE JUSTIFYING THE LEGISLATION'S ADOPTION.

The Opposition argues the Eviction Ordinance is not reasonable and appropriate to the public purpose. This argument, however, is based on three false allegations.

First, the Eviction Ordinance is not "indefinite" as claimed. It ends on August 10.

Second, the pandemic is not over, or even almost over. Residents who have not fully vaccinated (which includes almost all children under age 12 and 22% of the population over age 12[5]) are still at significant risk for getting the virus, especially the more virulent Delta Variant which is the dominant strain in California.

/ / /

/ / /

---

[3] https://www.latimes.com/california/story/2021-07-04/delta-variant-spreads-rapidly-now-california-most-dominant-strain-coronavirus-covid-19; https://www.sacbee.com/news/coronavirus/article252606053.html (last visited 7/8/21).
[4] https://www.sandiegouniontribune.com/news/california/story/2021-06-30/california-virus-cases-rising-as-delta-variant-spreads (last visited 7/8/21).
[5] https://sdcounty.maps.arcgis.com/apps/dashboards/c0f4b16356b840478dfdd50d1630ff2a (webpage last visited 7/8/21)

Third, the Eviction Ordinance does not prohibit all evictions. A landlord may evict a tenant if that tenant is a "hazard to the health or safety of other tenants or occupants of the same property." (Ex. 1, Sec 3(b) and 2(b).)

Plaintiff argues the Eviction Ordinance "is the quintessential 'special interest legislation,' . . . and was designed, not to address a 'broad and general social or economic problem,' but to benefit a discrete class of persons . . . ." (Opp. 17:12-16.) This is incorrect and the cases cited by Plaintiff addressing "special interest" legislation violating the Contracts Clause have nothing in common with the County's Eviction Moratorium enacted for the health and welfare of County residents. (See Opp. p. 17:9-25.)

For example, in *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 248-49 (1978) the law at issue made companies subject to a pension funding charge if the company was an employer with at least 100 employees, at least one of whom works in Minnesota, with a voluntary private pension plans, and that employer closed the Minnesota office or terminated the pension plan. (*Id.*) The case *Exxon Corp. v. Eagerton*, 462 U.S. 176, 192 (1983) discussed contrasting cases where legislation was deemed to address only "special interests," including New York and New Jersey statutes which repealed a covenant with holders of bonds issued by the Port Authorities of each state. *Equip. Mfrs. Inst. V. Janklow*, 300 F.3d 842, 861 (8th Cir. 2002) related to legislation preventing farm equipment dealership terminations which benefitted only "a narrow class of dealers of agricultural machinery." Significantly, none of the numerous cases addressing COVID-19 eviction moratoriums (see, ECF 16-1, 10:18-26) have held that the moratorium was favoring a special interest group.

Plaintiff argues "the County could have served its alleged purpose equally well by providing rental assistance for economically vulnerable tenants . . . or at a minimum suspend evictions only for economically vulnerable tenants." (Opp., 17:4-7.) However, this argument fundamentally misunderstands the County's goal. The purpose of the County's Eviction Moratorium is to provide housing security to all tenants, not just those experiencing financial hardship. COVID-19 cares not whether a tenant is rich or poor;

tenants of all financial means can spread and catch the disease. Evicted tenants cannot isolate and quarantine at home. They must go out into society and interact with people in order to secure new housing arrangements.

## II.   PLAINTIFF'S TAKINGS CLAUSE CLAIM MUST BE DISMISSED.

Plaintiff's Opposition argues the Eviction Ordinance violates the Takings Clause because (1) the alleged taking is not for the "public use"; and (2) the Ordinance "indefinitely" destroys owners' property rights and "provides no means of securing compensation prior to or at the time of such taking." Both arguments fail.

First and foremost, as discussed in the County's moving papers, the Eviction Ordinance does not violate the Takings Clause. (See, Motion, 15:6-16:4.) The Opposition focuses on a "*Loretto*" form of taking by alleging the Eviction Ordinance "requires an owner to indefinitely suffer a 'physical occupation without his consent." (ECF 28 21:6-8 – citing *Loretto v. Teleprompter Manhattan Catv Corp.*, 458 U.S. 419 (1982).) This argument fails. First, of course, the Ordinance is not "indefinite." The Ordinance ends on August 10, 2021. Further, there is not physical occupation of the any landlord's property because - as almost every court that has reviewed COVID-related eviction moratoriums has found - the landlords invited each of their tenants onto the landlord's property. *See*, *Heights Apt., L.L.C.,* 2020 U.S. Dist. LEXIS 245190, at *37(holding COVID-19 eviction moratorium did not violate the Takings Clause); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 388 (D. Mass. Sept. 25, 2020) (same); *Auracle Homes, L.L.C.,* 478 F. Supp. 3d at 220 (same); *Elmsford Apt. Assocs., L.L.C.,* 469 F. Supp. 3d at 162-64 ("the Order is one more example of 'government regulation of the rental relationship [that] does not constitute a physical taking.").

Plaintiff's argument that the Eviction Moratorium was not enacted for the public good is baseless. (See, ECF 28, 22:2-20.) The "Findings" set forth in the County's Eviction Ordinance more than adequately show the Ordinance is for the common good – the health and safety of all San Diego County residents. (See, Ex. 1, Sec. 1(a)-(gg).) Notably, it is not for Plaintiff to decide what is for the public good – that decision is

reserved for elected officials. *See*, *Apt. Ass'n of L.A. Cnty., Inc.*, 500 F. Supp. 3d at 1103 ("This Court will defer to the judgment of local authorities, who have the unenviable tasks of weighing all of the relevant considerations and choosing the least of all possible evils."); *Chrysafis*, 2021 U.S. Dist. LEXIS 110405, at *26-28.

Understandably, landlords within the County believe they are being harmed by the Eviction Moratorium. However, landlords and tenants alike are victims of the virus, both literally and economically." *Apt. Ass'n of L.A. Cnty., Inc.*, 500 F. Supp. 3d at 1103. The Eviction Moratorium seeks to benefit both landlords and tenants, and homeowners and homeless, to prevent the spread of COVID-19 by providing tenants with housing security.

As an alternative argument, Plaintiff argues its claim for declaratory relief should not be dismissed because "the moratorium provides no means of securing compensation prior to or at the time of such taking." (ECF 28, 19:6-19.) In making that argument, Plaintiff relies upon a misreading of the Supreme Court's decision in *Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019).

In *Knick*, the Supreme Court held that a court cannot enjoin a taking if there is a procedure in place to compensate the Plaintiff:

> A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it. That does not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities. *Knick* at 2167-68.

Historically, equitable relief may have been available because there was no direct means for a plaintiff to seek compensation for a taking. *Id*. at 2175-76. However, "[t]oday, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Id*. at 2176.

/ / /

/ / /

7

There can be no dispute that California has an "adequate provision for obtaining just compensation." It is set forth at article I, section 19 of the California Constitution. *See, City of Oroville v. Superior Court*, 7 Cal. 5th 1091, 1102 (2019) ("Under article I, section 19 of the California Constitution (article I, section 19), a public entity must pay the owner just compensation when it takes or damages private property for public use.") Therefore, individual landlords have a right to sue the County for inverse condemnation – but they may not seek equitable relief to stop any taking.[6]

Plaintiff assumes it has associational standing on behalf of its member landlords to seek declaratory relief based on taking cause of action. However, case law makes it clear that an association cannot sidestep the standing requirement by seeking only equitable relief based on a takings claim. This is because a takings claim "requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). Moreover, the association must have standing to assert both the legal claim and the relief requested. *Id*.

In *Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency ("Lake Tahoe")*, a homeowners association challenged a land use regulation requiring homes along Lake Tahoe to meet certain objective aesthetic requirements to obtain a building permit. *Lake Tahoe*, 365 F. Supp. 2d 1146, 1150 (D. Nev. 2005). The plaintiff association asserted a regulatory takings claim, seeing declaratory and injunctive relief only. *Id*. at 1161-62. The district court held that standing was lacking because the takings claim required individual participation of the homeowners:

> The Committee tries to overcome this prudential hurdle [standing] by seeking solely equitable (declaratory and injunctive) relief. However, despite the Committee's argument to the contrary, seeking equitable relief does not *per se* overcome the prudential prong of associational standing.

---

[6] *Cedar Point Nursery v. Hassid*, 2021 U.S. LEXIS 3394, 141 S. Ct. 2063 (2021), reaches no contrary conclusion. The Supreme Court held only that a law requiring agriculture employers to allow union organizers access to their property constituted a "*per se* physical taking." *Id*. at *33. The Court remanded the case back to the district court without addressing whether plaintiff was entitled to equitable relief. *Id*. at *34.

8

> While the Committee might be correct that the equitable relief that it requested does not require the participation of its members, it must also demonstrate that the claim itself does not require the participation of its members. However, under the fact-specific legal test applied in this instance, it is clear that the claim itself will require the participation of the Committee's members. Thus, we find that the prudential concerns presented by the Committee's takings claim are real and substantial, and they advise against finding associational standing in this instance.

*Id* at 1163-64 (citations omitted).  In summary, Plaintiff lacks standing here to seek declaratory relief on behalf of its members.

### III. THE COUNTY HAD AUTHORITY DURING THE COVID-19 EMERGENCY TO ENACT ITS EVICTION ORDINANCE COUNTYWIDE.

The County expressly enacted its Eviction Ordinance across the entire County based on its emergency declaration and Government Code § 8634. (Ex. 1, section 8(a).)

A formal Attorney General's Opinion ("AG Opinion") confirms that when a local emergency exists, a county may enact countywide orders and regulations:

> [S]ection 8630 permits counties to declare that local emergencies exist both in unincorporated and incorporated territory of the county where the nature of the emergency incudes incorporated territory as well as unincorporated territory of a county. We also conclude as a correlative that section 8634 permits a county to promulgate rules and regulations which apply in both corporate and unincorporated territory." 1979 Cal. AG LEXIS 24, *14-15.

Plaintiff relies on Article XI, § 7 of the California Constitution to argue the AG Opinion reached the wrong conclusion. (ECF 28, pp. 23-24.)  However, the clear language of §7 actually supports the County's authority.  That section states: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal Const, Art. XI § 7. Thus, the County had authority to make and enforce an ordinance within its "limits" or boundaries; it is axiomatic the cities are included within the County's limits.

Plaintiff's complaint relies on two California appellate cases to argue a county's authority does not extend to the incorporated portions of a county. See *Cnty. Sanitation Dist. No. 2 v. County of Kern*, 127 Cal. App. 4th 1544, 1612 (2005) and *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264, 274-75 (1993).  However, neither of the two

9

cases involve Government Code section 8630, and neither involve the declaration of a local emergency. And they certainly didn't involve a world-wide pandemic. Both cases involved a hyperlocal subject – trash.

Plaintiff cites three additional cases in its Opposition, all of which are at least 100 years old: *In re Knight*, 55 Cal. App. 511, 513-14 (1921) (selling liquor in violation of county ordinance and the 18th Amendment of the US Constitution), *Ex parte Pfirrmann*, 134 Cal. 143, 145 (1901) (payment of county liquor license); and *Ex parte Roach*, 104 Cal. 272, 275 (1894) (sale of liquor in violation of county ordinance). All of these cases predate Article XI, section 7 which was enacted in 1970. As a result, the cases do not support Plaintiff's argument.

Furthermore, the AG Opinion expressly noted two of Plaintiff's authorities – Article XI, section 7 and *Ex parte Pfirrmann*. 1979 Cal. AG LEXIS 24,*16-17 and n. 7. Those authorities, however, do not apply because by enacting an ordinance addressing a countywide emergency, the county is acting as an agent of the state:

> In concluding that county rules and regulations apply within cities within the county, we recognize that such conclusion is contrary to the general rule that police powers regulations adopted by a county are not applicable in a city, whether or not the city has adopted any regulations on the particular subject. However, as discussed above, implementation of the Emergency Services Act is a matter of statewide concern. Thus when a count declares a state of emergency, it acts for the state as a subdivision thereof and its regulations may apply in incorporated as well as unincorporated territory. 1979 Cal. AG LEXIS 24, *16 .

Finally, Plaintiff fails to disclose that a superior court judge recently held that the County's Eviction Ordinance does apply to both the incorporated and non-incorporated portions of the County. The court's ruling stated:

> The County further argues that Government Code 8634 specifically authorizes counties to regulate, in these emergency situations, within cities. [Citation.] Fires, earthquakes, things of that sort, the Attorney General says that counties need that broad authority to make a unified response that crosses all the County's geographical area, unincorporated or not, so that it can have a unified response rather than a patchwork quilt of hyperlocal regulations that may differ. So a pandemic is perhaps the clearest example of an emergency that would trigger that need for a broader, more unified approach. **The County isn't barred from acting within incorporated city limits.** (Ex. 17, pp 2-3 [emphasis added].)

10

21cv0912

In summary, the pandemic and resulting declaration of local emergency authorized the County to enact the Eviction Ordinance countywide, thereby avoiding the "patchwork quilt" of separate ordinances in each of the 18 incorporated cities. COVID-19 does not recognize boundaries between cities and counties.

## IV. CONCLUSION

This case should be dismissed with prejudice.

DATED: July 12, 2021              Office of County Counsel

                                  By   s/John P. Cooley
                                       JOHN P. COOLEY, Senior Deputy
                                  Attorneys for COUNTY OF SAN DIEGO