1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

10  SOUTHERN CALIFORNIA
    RENTAL HOUSING
11  ASSOCIATION,
12              Plaintiff,
13       v.
14  COUNTY OF SAN DIEGO, BOARD
15  OF SUPERVISORS OF THE
    COUNTY OF SAN DIEGO,
16
17              Defendant.
18
19

Case No. 3:21cv912-L-DEB

**ORDER:**
**(1) DENYING PLAINTIFF'S**
**MOTION FOR PRELIMINARY**
**INJUNCTION [ECF NO. 7],**

**(2) GRANTING REQUEST FOR**
**JUDICIAL NOTICE, and**

**(3) DENYING MOTION TO**
**EXPEDITE AS MOOT**
**[ECF NO. 31.]**

20
21       Pending before the Court is Plaintiff's Motion for Preliminary Injunction. [ECF
22  No. 7, ("Mot.").] On June 7, 2021, Defendants filed an Opposition, and Intervenors
23  Alliance of Californians for Community Empowerment Action also filed an
24  Opposition. [ECF Nos. 18, 19.] On June 14, 2021, Plaintiff filed a consolidated Reply.
25  [ECF No. 24.] The Court has reviewed the motion, opposition, reply, exhibits and
26  declarations, and for the reasons stated below, denies Plaintiff's Motion on the papers
27  submitted.
28

1
2
3

## I.    Factual Background

4

5
Plaintiff Southern California Rental Housing Association ("SCRHA" or

6
"Plaintiff") challenges the eviction moratorium imposed by Ordinance 10724 which

7
was enacted by County Defendants ("County") on May 4, with an effective date of

8
June 3.   Plaintiff SCRHA is a membership-based trade association located in

9
Southern California that serves to protect and advocate for the rights of rental housing

10
owners.   (Mot at 11).   Prior to the Ordinance's enactment, SCRHA provided

11
comments to the San Diego County Board of Supervisors recommending the Board

12
reject adoption of the moratorium.   (*Id*. at 12).   SCRHA asserts that individual

13
members including Michael and April Solis, and Irma Pintor, among others, are

14
"suffering mental and emotional anguish because of the moratorium, as they face

15
problematic tenants who are damaging property, creating nuisances, and disturbing

the peace and quiet enjoyment that good tenants are entitled to." (*Id*. at 14).

16
17
The worldwide outbreak of the novel coronavirus respiratory disease,

18
abbreviated as COVID-19, began in early 2020. Governments quickly realized that

19
it was incumbent on them to enact laws to slow the spread of this highly contagious

20
and deadly virus.  On January 30, 2020, the World Health Organization ("WHO")

21
declared a Public Health Emergency of International Concern due to the COVID-19

22
virus. *See* WHO Director-General's Statement on IHR Emergency Committee on

23
Novel Coronavirus (2019-nCoV), World Health Organization (Jan. 30, 2020),

24
https://www.who.int/dg/speeches/detail/who-director-general-s-statement-on-ihr-

25
emergency-committee-on-novel-coronavirus-(2019-ncov).  On January 31, 2020,

26
Health and Human Services (HHS) declared a Public Health Emergency due to the

27
COVID-19 outbreak. *See* Secretary Azar Declares Public Health Emergency for

28
United States for 2019 Novel Coronavirus, U.S. Department of Health and Human

Services (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

On February 14, 2020, the San Diego County Health Officer announced a Local Health Emergency due to COVID-19.  On March 4, 2020, California Governor Gavin Newsom declared a State of Emergency.   See https://www.gov.ca.gov/2020/03/04. On March 13, 2020, the President of the United States issued a declaration of a national emergency.   Pres. Proc. No. 9994, 85 FR 15337, 2020 WL 1272563 (Mar. 13, 2020).

Regulations were put in place by federal, state, and local governments to slow the spread of the disease by requiring limited social contact, and self-quarantining citizens at home. On March 18, 2020, the Federal Housing Administration ("FHA") enacted a 60-day moratorium on foreclosures and evictions for single family homes with FHA insured mortgages.   See https://www.hud.gov/sites/dfiles/OCHCO/documents/20-04hsgml.pdf.

On March 4, 2020, Governor Newsom issued Executive Order N-28-20, which allowed local jurisdictions to exercise their police powers to limit residential evictions.   See https://www.gov.ca.gov/wp-content/uploads/2020/03/3.16.20-Executive-Order.pdf. On March 19, 2020, the Governor signed Executive Order N-33-20, "stay-at-home" orders directing all Californians to stay home except to travel to shop for essential needs, or to go to what was defined an "essential" job.  *Id*. The stay-at-home orders were continued in December. Due to the restrictions on employment, many San Diegans lost their jobs, and suffered economic instability, including the inability to pay rent.   The County of San Diego was already experiencing a severe affordable housing crisis, and almost 46% of the housing units are occupied by renters.  Cal.Hous. Partnership, San Diego County 2021 Affordable

Housing Needs Report 1 (2021) https://chpc.net/resources/san-diego-county-housing-need-report-2021/.

Recognizing that eviction and homelessness would leave residents more vulnerable to COVID-19 due to living in close quarters in shelters, or on the street, the State Legislature enacted eviction protections in Assembly Bill 3088 and Senate Bill 91.  On May 4, 2021, the San Diego County Board of Supervisors passed Ordinance 10724, the Ordinance in question here.  ("Ordinance") The Ordinance is a short-term moratorium on specific residential evictions that was set to begin June 3, 2021, and end "60 days after the Governor lifts all COVID-19 related stay-at-home and work-at-home orders."  (Mot. Exhibit A at 9) The stay-at-home and work-at-home orders expired on June 15, 2021, making the Ordinance's tentative expiration date August 14, 2021.

The Ordinance[1] sets forth the background of the COVID-19 emergency in Section 1, and explains that its purpose is to

> require[] just cause for termination of a residential tenancy and provide[] additional tenant protections that are not prohibited by any other provision of law, and … serve justice and promote racial equity for renters in the County of San Diego and serve[] to preserve the public health and safety which is threatened by COVID-19 and. . . keep the residents of the County of San Diego housed.

Ordinance §3 (ff)

---

[1] Plaintiff requests the court take judicial notice of Ordinance 10724; the County of San Diego "Daily Status Update" regarding Covid-19; draft "urgency" ordinance considered at April 6, 2021 Board of Supervisors meeting; and Minute Order No. 19 from the April 6, 2021 Board of Supervisors meeting.  (Plaintiffs Req. Judicial Notice [ECF No. 7-1.]) Federal Rules of Evidence 201(b)(2) states that judicial notice is appropriate where Exhibits "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Civ.Pro. 201(b)(2). The Court grants Plaintiff's request, finding that public records which include "records and reports of administrative bodies" such as the County of San Diego Board of Supervisors are appropriate for judicial notice. *See United States v. Ritchie*, 342 F.3d 903, 907-09 (9th Cir. 2003).

"Just cause" requires "a showing that the Tenant is an imminent health or safety threat." Ordinance § 3(b). "Imminent health or safety threat" is defined as: "a hazard to the health or safety of other tenants or occupants of the same property, taking into account (1) the risk of potential spread of coronavirus caused by the eviction, in case of a Local Emergency due to COVID-19, (2) any public health or safety risk caused by the eviction, and (3) all other remedies available to the landlord and other occupants of the property, against the nature and degree of health and safety risk posed by the tenant's activity."  Ordinance § 2(b).

To facilitate the purpose of the Ordinance, Owners are prohibited from the following actions to recover possession of their property:

> 1) "Serve a notice of termination of tenancy"; 2) "File or serve an unlawful detainer lawsuit, ejectment action, or other action to recover possession of a residential unit"; 3) "Evict a tenant or require a Tenant to vacate a residential unit," including enforcing final court judgments authorizing repossession of said unit; 4) "Take any other action in reliance on a notice of termination of tenancy that expired during the Local Emergency [defined as "any period of local emergency declared by the County of San Diego in response to the COVID-19 pandemic"] or attempt to induce a tenant to vacate based on such notice"; 5) "Represent to a Tenant that [he] is required to move out of their unit by law."

Ordinance § 3(c).

The Ordinance specifically notes that "[n]othing in this ordinance shall relieve a Tenant of the obligations to pay rent, nor restrict a Landlord's ability to recover rent due." § 3(k). Under the remedies section of the Ordinance, Landlords are prohibited from recovering "possession of a rental unit or prevail[ing] in an unlawful detainer action, ejectment action, or other action to recover possession of a residential unit unless the Landlord is able to prove strict compliance with any applicable provision of the Ordinance.  §7(a)

Plaintiffs seek to enjoin the Ordinance's enforcement in whole, or at a minimum, enjoin its application outside the unincorporated areas of the County, arguing that it is unconstitutional because it violates the Contracts Clause and the

Takings Clause of the United States Constitution, and violates the California Constitution.  (Motion at 9).

## II.    Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). A preliminary injunction may only be granted if the moving party made a "clear showing" of entitlement to relief.  *Id.* at 22.  The requirement for substantial proof in support of a preliminary injunction is "much higher" than the proof necessary to overcome a summary judgment motion.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

> [T]he elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits. [The Ninth] circuit has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor. That test was described in this circuit as one alternative on a continuum.

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

"In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief'."  *Winter*, 555 U.S. at 24. "[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction."  *Cottrell*, 632 F.3d at 1135. "[A] preliminary injunction will not be issued simply to prevent the *possibility* of some remote future injury."  *Winter*, 555 U.S. at 22 (emphasis added)(internal citations omitted).

The public interests implicated by the motion for preliminary injunction are weighed. *Cottrell*, 632 F.3d at 1138. A preliminary injunction cannot be granted unless the public interests in favor of issuing preliminary injunctive relief outweigh the interests against it. *Id.* "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

## III.   Discussion

Plaintiff seeks to enjoin two sections of the Eviction Ordinance: Section 3 ("Moratorium Prohibiting Residential Evictions Without Just Cause") and Section 7 ("Remedies"); or in the alternative, enjoining these two sections from applying outside of the unincorporated areas of the County of San Diego. [ECF No. 7.]

### A. Likelihood of Success on the Merits

#### 1.  Contracts Clause

Article I, Section 10 of the U.S. Constitution prohibits the States from passing any law "impairing the Obligation of Contracts." U.S. Const. Art. I § 10, cl. 1. While the wording suggests that it "is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people. *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 410 (1983).  In order to determine whether a Plaintiff is likely to succeed on the merits of a claim that an ordinance violates the Contracts Clause, the Court must determine whether (1) the law "operate[s] as a substantial impairment of a contractual relationship," (2) whether the County "has a significant or legitimate public purpose" in establishing the moratorium, and (3) whether the adjustment to the rights of the contracting parties is "based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislations adoption." *Energy Reserves*, 459 U.S. at 411-12.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a. Substantial Impairment

SCRHA argues that the Ordinance "indefinitely excuses tenants from their contractual obligations under their rental agreements, and indefinitely bars Plaintiff's members from pursuing their contractual right to remove tenants who breach their agreements or violate the law." (Motion at 21).  In addition, Plaintiff argues that the Ordinance interferes with the rental housing owners' reasonable expectations, contending that no owners could have foreseen the COVID-19 pandemic or the extent to which governments would use the circumstances to curtail their rights under the rental agreements and the Constitution.  (*Id*.)

In response, Defendant contends that nothing in the Ordinance substantially impairs the fundamental nature of the landlord-tenant contracts,  which is the payment of rent in return for housing. (Oppo. at 7).  In addition, the landlord-tenant relationship is subject to considerable regulation, therefore, it was not unforeseeable that additional regulation in response to the unprecedented COVID-19 pandemic would be enacted.  (*Id*. at 8).   Moreover, the Ordinance is not a substantial impairment of the contracts because it will be short-lived, expiring on August 14, 2021.  (*Id*. at 9).

To determine whether a state law substantially impairs the Contract Clause, the Court considers "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S.Ct 1815, 1822 (2018). Pertinent to this inquiry is whether the parties were operating in a regulated industry. *Energy Reserves,* 459 U.S. at 411. "If the industry has been heavily regulated, then the impairment is less severe." *Campanelli v. Allstate Life Ins. Co.,* 322 F.3d 1086, 1098 (9th Cir. 2003). "If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation." *Sveen,* 138 S.Ct. at 1822.

The Ordinance impacts the landlord-tenant relationship by ceasing all evictions except those for "just cause" for the duration of the regulation. The parties do not dispute that San Diego County landlords operate in a highly regulated industry, with state and federal law governing multiple aspects of the landlord-tenant relationship, such as disclosure about hazards like lead-based paint and prohibitions against discriminatory rental practices. However, Plaintiff contends that no property owners would "have guessed that their rights would be suspended fourteen months after the start of the pandemic, just before the stay-at-home order is lifted. (Reply at 8).

The nature and scope of the global pandemic and governmental responses to ensure the safety of citizens are unprecedented. The regulations that halted evictions which were passed during the early days of the pandemic could not have been predicted by landlords, however, the Ordinance at issue followed the issuance of many similar regulations. As such, it was foreseeable to the extent the industry intersects with the health and safety of citizens. *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F.Supp 3d 148, 171-72 (S.D.N.Y. 2020) ("Because past regulation puts industry participants on notice that they may face further government intervention in the future, a later in time regulation is less likely to violate the contracts clause where it 'covers the same topic [as the prior regulation] and shares the same overt legislative intent to protect [the parties protected by the prior regulation'.")(internal citations omitted).

Even if portions of the Ordinance impair existing landlord-tenant agreements, this is not fatal to the law. *See Sveen*, 138 S.Ct. at 1822 (Where court finds substantial impairment, "the inquiry turns to the means and ends of the legislation.") This Court is guided by the reasoning of the Supreme Court's seminal decision in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934), which found that a similar measure was constitutional. In *Blaisdell*, an emergency ordinance was passed in

9

Minnesota in response to the economic crisis of the Great Depression which prohibited a property owner from repossession for two years, from May 1933 to May 1935, as long as rent payments of a specific amount were paid. *Blaisdell*, 290 U.S. at 420.

The *Blaisdell* Court analyzed five factors in holding that, although the statute minimally interfered with the expectations of purchasers of property at foreclosure sales by extending the time that borrowers could repay their obligations, the statute did not violate the Contracts Clause. The Court considered five factors and concluded (1) "An emergency existed in Minnesota which furnished a proper occasion for the exercise of the reserved power of the state to protect the vital interests of the community;" (2) "[t]he legislation was addressed to a legitimate end; that is, the legislation was not for the mere advantage of particular individuals but for the protection of a basic interest of society;" (3) "the relief afforded and justified by the emergency, in order not to contravene the constitutional provision, could only be of a character appropriate to that emergency, and could be granted only upon reasonable conditions;" (4) "[t]he conditions upon which the period of redemption is extended do not appear to be unreasonable;" and (5) "[t]he legislation is temporary in operation." 290 U.S. at 444-47.

Applying those factors to the Ordinance at issue here the Court finds that the COVID-19 pandemic created a global health emergency which the Ordinance outlines as the impetus for the regulation; the Ordinance was drafted to protect the health and safety of all San Diego County residents, not any group of particular individuals; tenants continue to be obligated to pay rent and otherwise comply with rental agreements, and landlords may evict tenants that pose an imminent threat to health and safety, making it a reasonably tailored rule; and the Ordinance is set to expire 60 days after the COVID-19 stay-and-work-at-home orders are lifted, making it of limited duration.  As multiple other courts have held, a temporary delay of an

eviction remedy does not constitute a substantial impairment. *See Elmsford Apt.*, 469 F.Supp 3d at171-72; *Apt. Ass'n of L.A. Cty. V. City of L.A.*, 500 F.Supp. 3d 1088 (C.D. Cal. 2020); *HAPCO*, 482 F.Supp. 3d 337 (E.D. Penn. 2020); *Auracle Homes LLC v. Lamont*, 478 F,Supp. 3d 199,  223-26 (D. Conn. 2020).  For the foregoing reasons, the Court finds that the Ordinance does not substantially impair property owners' contract rights.

b) Public Purpose

The Court must next determine whether the County had a significant and legitimate public purpose in enacting the Ordinance.  *Energy Reserves*, 459 U.S. at 411-12.  A legitimate public purpose is one whose goal is to alleviate important general social or economic problems, as opposed to providing a benefit to a specific individual or group. *Id.*  Plaintiff contends that there is no legitimate public purpose supporting the Ordinance.  However, the Ordinance goes into detail to describe the current global COVID-19 pandemic threat to the health and safety of all San Diego County citizens and emphasizes the importance of keeping residents in their homes to limit and stop the spread of this highly contagious disease.  Ordinance § 1(a)-(gg). The Ordinance states:

> (r) Because experiencing homelessness can exacerbate vulnerability to COVID-19, it is necessary to take measures to preserve and increase housing security for San Diego County residents; and to protect public health and prevent transmission of COVID-19, it is essential to avoid unnecessary displacement and homelessness.
>
> (s) An urgency ordinance that requires just case for termination of a residential tenancy during the COVID-19 crises would help ensure that residents stay safely housed during the pandemic and would therefore reduce opportunities for transmission of the virus.

Ordinance §1 (r)-(s).

There is nothing in the Ordinance which suggests that it was enacted to benefit a special interest group. Instead, the Court concludes that the Ordinance has a

legitimate public purpose: protecting the health and safety of San Diego County residents from the threat of the COVID-19 virus.

c) Reasonable and Appropriate

Finally, the Court must determine whether the Ordinance is reasonable and appropriate to the public purpose that justifies its enactment. See *Energy Reserves*, 459 U.S. at 412. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Id*. Plaintiff argues that there is no emergency justifying the Ordinance's enactment, pointing to the fact that the urgency motion failed to receive a supermajority vote. (Motion [ECF No. 7.]) However, "since *Blaisdell*, the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation," therefore this argument fails. *Energy Reserves*, 459 U.S. at 412.

Next, Plaintiff contends that the Ordinance "purports to be designed to protect economically vulnerable tenants, including from homelessness… [b]ut that the Ordinance casts a far wider net and applies to all tenants, including the financially well-to-do who require no special protections." (Mot. at 22). Plaintiff argues that the County could have served its alleged purpose equally well by providing rental assistance for economically vulnerable tenants requiring new housing following otherwise lawful evictions, or at a minimum suspend evictions only for economically vulnerable tenants who can establish financial hardship." (Reply at 13).

The terms of the Ordinance do not reference "economically vulnerable" tenants, but instead state that those infected with COVID-19 may be unable to work due to illness and may face "potential loss of income, health care and medical coverage, and ability to pay for housing and basic needs." Ordinance §1 (l)-(n). Although the Ordinance describes the high rates of COVID-19 infection and unemployment in zip codes with large Black and Hispanic populations, it does not

limit its scope to economically disadvantaged residents. Ordinance §1 (z)- (cc). Instead, its stated purpose is to "serve justice and promote racial equity for renters in the County of San Diego and serve[] to preserve the public health and safety which is threatened by COVID-19 and to keep the residents of the County of San Diego housed." Ordinance § 1(ff). Because the economic impact of the COVID-19 pandemic are far ranging, the Ordinance aims to ensure County of San Diego residents, whatever their socio-economic status, remain housed for their own safety and the safety of the community at large.

Plaintiff also argues that the Ordinance "creates many more problems and threats that it purports to resolve" including that the moratorium on evictions will allow "on-site threats to life, limb, and property" to go unaddressed. (Mot. at 22-23). The moratorium does not prevent landlords from calling law enforcement if an imminent threat exists due to a tenant, and it allows evictions where the standard for "just cause" is met, that is, where a tenant poses "a hazard to the health or safety of other tenants or occupants of the same property" other than infection or exposure to COVID-19. Ordinance §2 (b). The Ordinance is reasonable and appropriate to the public purpose underlying its enactment.

For the foregoing reasons, the Court finds that Plaintiff is not likely to succeed on the merits of its claim that the Ordinance violates the Contracts Clause.

### 2. *Takings Clause*

The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the government from taking private property unless it is for a "public use" and "just compensation" is paid to the owner. U.S. Const. amend. V, XIV (applying Takings Clause to state and local governments). Two categories of takings exist: physical takings and regulatory takings. *Yee v. City of Escondido, Cal.,* 503 U.S. 519 (1992). In a physical taking, the government "authorizes a physical occupation of

property" and is required to afford just compensation to the property owner. *Id*. at 522. A regulatory taking may be either categorical, where "no productive or economically beneficial use of land is permitted," or non-categorical, which is "[a]nything less than a complete elimination of value, or a total loss." *Tahoe Sierra Pres. Council Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 330-31 (2002).

In a non-categorical taking, the government regulates the use of the property, and compensation is only required where "the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee,* 503 U.S. at 523 (citing *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 123-125 (1978). In analyzing a regulatory taking, a court considers the three *Penn Central* factors: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with investment-backed expectations; and (3) the character of the governmental taking. *Penn. Central*, 438 U.S. at 124 (internal citations omitted).

Plaintiff contends that the Ordinance constitutes an unconstitutional *per se* taking under *Loretto v. Teleprompter Manhattan Catv Corp*., 458 U.S. 419, 426 (1982), because it imposes an indefinite moratorium on evictions, and suspends the owners' right to possess the property, or exclude others from the property, without compensating landlords. (Mot. at 24). According to Plaintiff, owners have suffered a complete loss of their constitutional property rights, even though it may be temporary, which constitutes an irreparable injury. (Reply at 15). Plaintiff argues that the Ordinance transfers property rights from owners to renters, and that any public benefit is only incidental. (*Id*. at 17-18).

As a primary matter, injunctive relief is generally barred for claims under the Fifth Amendment takings clause "[a]s long as just compensation remedies are

available - - as they have been for nearly 150 years." *Knick v. Township of Scott, Pennsylvania*, 139 S.Ct. 2162, 2179 (2019). If the Ordinance results in takings, the remedy is money damages, not an injunction. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 741)(2010)(Kennedy, J., concurring)("It makes perfect sense that the remedy for a Takings Clause violation is only damages, as the Clause does not proscribe the taking of property; it proscribes taking without just compensation").

Alternatively, the Court finds that injunctive relief is not warranted here. First, there is no *per se* physical taking effectuated by the Ordinance because it is expressly time-limited, set to expire 60 days after the stay-at-home and work-from-home orders are lifted, making any alleged invasion of property rights temporary. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005)(a physical taking "requires an owner suffer a permanent physical invasion of her property.") Unlike an invasion of property by an uninvited guest, the landlords here have solicited tenants to rent their properties, and the Ordinance simply regulates landlords' relationship with tenants. *Yee v. City of Escondido*, 503 U.S. at 531 ("Because they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals.)

Plaintiff filed a Notice of Supplemental Authority citing the recently decided Takings Clause case *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063 (2021), in support.  In *Cedar Point*, the Court held that "a California regulation that granted labor organizations a 'right to take access' to agricultural property in order to solicit support for unionization" violated the 5th and 14th Amendments Takings Clause. *Id*. at 2066. The regulation permitted access up to three hours a day for 120 days a year, which constituted a physical, or *per se* taking, because it was a physical appropriation of property and impaired the owners' right to exclude.  *Id*. at 2080. In reaching this

conclusion, the Court focused on "physical invasions" which constituted takings, even if only for a limited time pursuant to an access regulation. *Id*. at 2073.

Plaintiff contends that the Ordinance at issue here is a *per se* physical taking, and presumably by providing the Court with *Cedar Point* in support, believes that the cases are on all fours. However, *Cedar Point* is distinguishable from the facts before this Court. Unlike the landowners in *Cedar Point* who were forced to allow unionizing activity on their property for a specified amount of time, the landowners here invited the renters to inhabit their rental units, make them their homes, and abide by the rental agreements. No "physical invasion" has occurred here. Although renters cannot be evicted during the temporary duration of the Ordinance, landlords have not lost their right to exclude as did the owners in *Cedar Point*.

The Court turns next to determine whether the Ordinance constitutes a non-categorical regulatory taking by analyzing the *Penn* factors. First, Plaintiff argues that the economic impact on rental housing owners is "devastating" because it nearly eliminates their right to lawfully repossess and use their property, even for nonpayment of rent. (Motion at 25.) In response, Defendant contends that landlords may still collect rent during the term of the Ordinance and may still evict tenants if they default on obligations, but must wait 72 days before beginning eviction proceedings, per the Ordinance. (Oppo at 15.) In addition, the Intervenors note that property owners may receive emergency rental assistance funds while the Ordinance is in effect. (Intervenor's Opposition at 18).

When determining economic impact, courts "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497 (1987). It is difficult to calculate the impact that the Ordinance has on the value of Plaintiff's members' property interests, particularly because Plaintiff has not included any facts related to

a diminution of value of their property. The declarations from a few members of the Plaintiff organization do not make specific allegations about lost revenue. (See Complaint; Declarations [ECF Nos. 7-2-7-5).]) It is not enough to succeed on a facial challenge to the Ordinance under the Takings Clause if only a few tenants are behind on their rent. The Court in *Keystone* noted, "[m]any . . . ordinances place limits on the property owner's right to make profitable use of some segments of his property" but do not run afoul of the Takings Clause. *Keystone*, 480 U.S. at 498. Although the Ordinance restrains landlords' ability to evict tenants during its term, nothing in the Ordinance makes it "commercially impracticable" to continue to receive rents from other tenants or from the rental assistance fund. *See* County Emergency Rent & Utility Assistance, https://www.sandiegocounty.gov/content/dam/sdc/sdhcd/new-docs/Landlord-Flyer.pdf. Landlords may also apply for rental assistance for their tenants in some instances. *See* Housing Stability Assistance Program, https://www.sdhc.org/housing-opportunities/help-with-your-rent/covid-19-rental-assistance/.

The second *Penn* factor directs a court to consider the extent to which the regulation has interfered with investment-backed expectations. Various courts have determined that eviction moratorium regulations enacted in response to COVID-19 do not violate a landlord's investment-backed expectations, finding that the business area of renting residential property is heavily-regulated, therefore landlords could have expected additional ordinances. See *Elmsford*, 469 F.Supp. 3d 166-68; *Auracle Home*, 478 F.Supp.3d at 199. Other courts have noted that although landlords understood they were operating in a highly regulated area, they could not have expected the COVID-19 pandemic and its attendant regulations. See *Baptiste*, 490 F.Supp. 3d 535 (D.Mass. 2020); *Heights Apartments, LLC v. Walz*, 510 F.Supp. 789 (D. Minn. 2020).

As noted above, the business of residential rental housing is highly regulated, and all branches of government quickly enacted regulations to keep citizens housed during the COVID-19 pandemic crisis.  By Plaintiff's own admission, the Ordinance was one of the restrictions passed later in the pandemic, indicating that landlords were on notice for almost a year before the eviction moratorium took effect. Moreover, the Ordinance impacts only the right to evict, and not the owners' right to continue to collect rents. *Andrus v. Allard*, 444 U.S. 51, 65-66 (1979)(Property owners generally "possess a full bundle of property rights, [and] the destruction of one strand of the bundle is not a taking.") Landlords may still rent their properties, may evict and sue if tenants default, but must defer that process until the conclusion of the Ordinance's limited duration. Plaintiff's reasonable investment-backed expectations must yield to a "public program adjusting the benefits and burdens of economic life to promote the common good."  *Penn Central*, 438 U.S. at 124.

Finally, the court must consider the character of the governmental taking. Regulations which originate from public programs designed to promote the common good must balance economic benefits and burdens, and generally do not violate the Takings Clause. *Connolly v. Pension Benefit Guar. Corp*., 475 U.S. 211, 227 (1986). Plaintiff argues that the Ordinance constitutes a taking that is not for a public use or purpose, but instead, its express purpose and effect is to benefit a particular class of individuals, tenants, whether rich or poor.  (Mot. at 25).

The Court does not agree. The Ordinance was enacted with the stated purpose of ensuring that citizens could remain housed during the unprecedented COVID-19 pandemic to limit the spread of a deadly virus.  Section 1 of the Ordinance clearly sets forth the dangers associated with renters being evicted, and potentially forced to move in with family or friends, use community shelters, or become homeless, as the risk of COVID-19 transmission increases with close contact.  The Ordinance acts to create a temporary shift in the burdens and benefits of the landlord-tenant relationship

with the stated purpose of advancing the common good. *See Penn Central*, 438 U.S. at 124.

For the foregoing reasons, the Ordinance does not constitute a violation of the Takings Clause.

### 3. California Constitution

Plaintiff argues that the Ordinance violates the California Constitution because it impermissibly extends its reach beyond the unincorporated areas of the County, and applies to cities within the County. (Mot. at 26.)  The authority upon which the Ordinance rests, section 8634, allows for County officials to promulgate orders and regulations in response to a local emergency, but Plaintiff contends it does not say that a county regulation applies to cities within that county.  In addition, Plaintiff contends that the Board of Supervisors voted to convert the Ordinance from an "urgency" ordinance, to a "non-urgency" ordinance," therefore, the "[o]rdinance is not premised upon an urgent need to protect life and property."  (*Id*. at 27).

Defendant counters that the County had authority to enact the countywide Ordinance pursuant to California Emergency Services Act , section 8634, which does not contain any geographical limitations. (Oppo. at 16).  Indeed, Defendant argues that the purpose behind section 8634 is to create a coordinated response to emergencies, rather than a patchwork of local responses, as the Attorney General of California noted in an Opinion letter.  (*Id*. at 16-17).  Finally, Defendant argues that the "non-urgent" status of the Ordinance has nothing to do with the underlying emergency, but instead is a procedural designation, and that the Ordinance was designed to protect life and property as provided by California Emergency Services Act. (*Id*. at 19).

The argument is rejected based on the California Energy Services Act. "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7. The Ordinance was enacted pursuant to the California Emergency Services Act, § 8634 which states in pertinent part: "[d]uring a local emergency the governing body of a political subdivision, or officials designated thereby, may promulgate orders and regulations necessary to provide for the protection of life and property." Cal. Gov. Code. § 8634. The California Attorney General issued an opinion in response to a request from the Director of the Office of Emergency Services to clarify whether cities within a county were bound by rules and regulations adopted by the county pursuant to section 8634. The Attorney General concluded that "[c]ities within a county are bound by county rules and regulations adopted by the county pursuant to section 8634 of the Government Code during a county proclaimed emergency" irrespective of whether the cities have also declared an emergency. 62 Ops. Cal.Att'y Gen. 701 (Cal. A.G. 1979).

The Ordinance states that "the regulations in this ordinance shall apply to cities within the County of San Diego" except where "the governing body of a city has enacted an ordinance that has stronger protections for Tenants during the COVID-19 emergency." Ordinance § 8 (a)-(b). The stated purpose of the Ordinance is to "serve[] to preserve the public health and safety which is threatened by COVID-19 and [] keep the residents of the County of San Diego housed. Ordinance § 1. The Ordinance was initially presented as an "urgency" motion pursuant to Government Code § 25123(d), meaning that if it passed with a 4/5 supermajority vote, it would become effective immediately. However, the motion garnered a simple majority, and a second motion to enact the Ordinance on a non-urgency basis passed with a majority vote. The statutorily required second reading of the Eviction Ordinance occurred on May 4, 2021, and was enacted by the Board of Supervisors. [ECF No. 1, ¶ 19.)

While not binding on this Court, the Opinion of the Attorney General is entitled to "great weight." *California Bldg. Indus. Ass'n v. State Water Res. Control Bd*., 4 Cal. 5th 1032, 1042 (2018).  The Opinion stated in no uncertain terms, that the Legislature intended to provide that a county's authority to address local emergencies such as "fire, flood, epidemic, or air pollution" was not limited by "corporate boundaries" and that it would "defy common sense" to conclude otherwise.  A.G. Opinion at *134. The Court agrees. The COVID-19 virus does not distinguish between city and county borders. Instead, it spreads through the air. It would "defy common sense" for the Court to hold that the County was not authorized under section 8364 to enact an Ordinance that included cities within the County when the stated aim and purpose to limit the spread of COVID-19 by prohibiting evictions for the duration of the declared emergency.

Plaintiff cites *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264 (1993), and *County Sanitation Dist. Nos.2 v. County of Kern*, 127Cal.App. 4th 1544 (2005), for the proposition that the California Constitution only authorizes a county to exercise its police power within the unincorporated areas of the county.  (Reply at 19).  The California Emergency Services Act was not an issue in either of these cases. Instead, they involved matters of purely local concern, in which the county regulations did not apply within incorporated cities. In *Kern*, the case involved disposal of "sewage sludge" under CEQA.  127 Cal. App. 4th at 1557.  The issue of landfill surcharges and garbage incineration bans were at issue in *Dublin*.  14 Cal. App. 4th at 270.  Neither of these issues concerned the health and safety of residents throughout the county including all of its cities. In addition, the fact that the Ordinance was not passed on the procedural "urgency" basis does not change the fact that it was passed to address a public health emergency.

For the foregoing reasons, the Court finds that the Ordinance does not violate the California Constitution by applying to areas outside the unincorporated areas of the County, including cities within the County.

B. Irreparable Harm

As indicated above, Plaintiff's constitutional claims are not likely to succeed, however even if they arguably have merit, Plaintiff must show its members are likely to suffer irreparable harm if the injunction is denied. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.")

As a primary matter, Plaintiff may assert associational standing on behalf of its members, despite Defendant's claim that Plaintiff cannot show that all of its members will be irreparably harmed. *See Friends of the Earth, Inc., v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 181 (2000)( "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.")

Plaintiff argues that its members have suffered irreparable harm, or harm for which there is no legal remedy such as damages, because they have suffered "the mental and emotional hardship associated with being stripped of their rights to use, control, manage, and repossess their own properties, including one family who can't even move themselves back into their family home." (Reply at 22). In support, Plaintiff provides the declarations of owners with problematic tenants who refuse to pay rent, cause disturbances, and harass the owners. One such owner, Mary Anne Wesson, reportedly suffers from fibromyalgia which she states has been made

significantly worse due to the stress caused by the disruptive tenant who is renting her condominium. (*Id*. at 23)  According to Wesson, her tenant has violated the terms of the rental agreement in multiple ways, has been a disruptive neighbor, and told Wesson that her young son had COVID-19 as an excuse to keep Wesson from giving prospective renters a tour of the condominium, though Wesson doubts the tenant's excuse.  (Wesson Dec. at ¶ 5-12). Wesson has signed a lease to new tenants, and claims she knows the existing tenant "and her children have family to move in with" but due to the Ordinance, she states she cannot evict them. (*Id*. at ¶ 13.)

It is beyond dispute that Wesson, and other owners, are impacted by the eviction moratorium. However, the harm they are suffering in terms of stress and emotional hardship will be short-lived, as the Ordinance is set to expire in the middle of August 2021.  Moreover, preventing the eviction of Wesson's tenant and her children, who might move in with family, is precisely the goal of the moratorium.  COVID-19 spreads easily, and citizens who are "are forced to move out of their housing without adequate replacement housing may move into overcrowded living situations" increasing the spread of the virus. Ordinance § 1(o). Importantly, Plaintiff's members' asserted irreparable harm does not stem from their constitutional contract or takings clause rights, therefore, it is insufficient to show irreparable harm necessary to grant a preliminary injunction.  *See Garcia v. Google, Inc*., 786 F.3d 733, 744-45 (9th Cir. 2015)(assertions of emotional distress are not cognizable irreparable harm for copyright claims because there is no cause of action for emotional distress under the Copyright Act.) For the foregoing reasons, Plaintiff has failed to show its members will suffer irreparable harm in the absence of a preliminary injunction.

C. BALANCE OF EQUITIES AND THE PUBLIC INTEREST

The final two factors require that Plaintiff show the balance of equities tips in its favor, and that a preliminary injunction is in the public's interest. *Winter*, 555 U.S.

at 20. Where, as here, the government is a party, these two factors are considered together. *City & Cty. Of San Francisco v. United States Citizenship & Immigration Servs.*, 944 F.3d 773, 806 (9th Cir. 2019). "To balance the equities, [courts] consider the hardships each party is likely to suffer if the other prevails." *Id.*

Plaintiff contends that the balance of equities favors its members, who seek only "to preserve, rather than alter the status quo while they litigate the merits of th[eir] action" citing *Rodde v. Bonta*, 357 F.3d 988, 999 n.14 (9th Cir. 2004). In addition, Plaintiff argues that the Ordinance violates its members' constitutional rights, and it is always in the public interest to prevent a violation of a party's constitutional rights. (Mot. at 30). Plaintiff claims that enjoining the Ordinance would not violate anyone's constitutional rights, and that tenants have other protections including Assembly Bill 3088 which prevents residential tenants from being evicted for failure to pay rent because of COVID-19 related hardship occurring between March 1 and August 31, 2020 and Senate Bill 91, which extends AB 3088's protections and establishes a comprehensive "Emergency Rental Assistance Program" to help economically vulnerable tenants who cannot pay rent. (*Id.* at 31).

In response, Defendant argues that a preliminary injunction would upend the status quo because the Ordinance is already in effect. (Oppo. at 24). Further, if the Ordinance is enjoined, evictions will increase, and with it the health and safety risks to County residents who will suffer both from housing insecurity and exposure to others during an unprecedented global pandemic. (*Id.*) Although there are tenant protections in place, Defendant contends that the ordinance was justified, as the Board of Supervisors found, because those protections left some tenants unprotected from eviction. (*Id.*) The Intervenors similarly claim that "[e]njoining the Ordinance risks worsening the County's existing housing crisis and increasing the spread of COVID-19." (Intervenors Memo. at 25). They further argue that the balance of

24

hardships weighs sharply against enjoining the Ordinance because "lives and public health are at stake on only one side of the scale." (*Id*.)

If the Ordinance is not enjoined, Plaintiff's members may suffer economic injury, along with frustration and emotional distress from disruptive and harassing tenants. In contrast, if the Ordinance is enjoined, tenants may be evicted from their homes during a global pandemic in a region with a critical housing shortage, and contribute to the spread of a deadly disease. The hardships tip sharply in Defendant's favor. The present motion for preliminary injunction was filed before the Ordinance went into effect, but the motion was not fully briefed and ready for disposition until June 14, 2021, after the Ordinance was in effect. Therefore, a preliminary injunction would disrupt the current *status quo* and endanger the health of all County residents. "The hardships wrought upon residential landlords as an unintended consequence of the [County's] efforts are real, and are significant, but must yield precedence to the vital interests of the public as a whole." *Apartment Association*, 500 F.Supp.3d at 1103.

As to the public interest, it unlikely that Plaintiff can show the Ordinance violates the constitutional rights of its members, therefore this factor does not weigh in favor of a preliminary injunction. *Melendres v. Arpaio*, 695 F.3d 980, 1002 (9th Cir. 2012). Moreover, the Ordinance fills an important gap in the other protections enacted by the California legislature which already prevents some evictions due to the COVID-19 public health emergency. The purpose of the Ordinance is to keep residents sheltered in their homes to slow down the speed of COVID-19. The public interest therefore, weighs heavily against enjoining the Ordinance.

//

//

//

1

## IV.   CONCLUSION

2

3       For the foregoing reasons, Plaintiff's Motion is denied.

4       **IT IS SO ORDERED.**

Dated:  July 26, 2021

5

6

7       Hon. M. James Lorenz
        United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28