1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11   SOUTHERN CALIFORNIA          Case No. 3:21cv912-L-DEB
     RENTAL HOUSING
12   ASSOCIATION,

13                      Plaintiff,      **ORDER GRANTING IN PART AND
                                        DENYING IN PART
14          v.                          DEFENDANT'S MOTION TO
                                        DISMISS [ECF NO. 46.]**
15   COUNTY OF SAN DIEGO, BOARD
16   OF SUPERVISORS OF THE
     COUNTY OF SAN DIEGO,
17
18                      Defendant.
19

20       Pending before the Court is Defendant's Revised Motion to Dismiss. [ECF No.

21   46 ("Mot.").] Plaintiffs filed an Opposition. [ECF No. 48.] Defendant filed a Reply.

22   [ECF No. 52.] The matter is submitted on the briefs without oral argument. *See* Civ.

23   L. R. 7.1(d)(1).  For the reasons stated below, Defendant's Motion is GRANTED in

24   part and DENIED in part.

25   //

26   //

27   //

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      Factual Background[1]

Plaintiff Southern California Rental Housing Association ("SCRHA") challenges the eviction moratorium imposed by Ordinance 10724 ("Ordinance") which was enacted by County Defendants on May 4, 2021, with an effective date of June 3, 2021.  Plaintiff SCRHA is a membership-based trade association located in Southern California that serves to protect and advocate for the rights of rental housing owners.  Prior to the Ordinance's enactment, SCRHA provided comments to the San Diego County Board of Supervisors recommending the Board reject adoption of the moratorium.   SCRHA asserts that individual members including Michael and April Solis, and Irma Pintor, among others, are "suffering mental and emotional anguish because of the moratorium, as they face problematic tenants who are damaging property, creating nuisances, and disturbing the peace and quiet enjoyment that good tenants are entitled to." (*Id*. at 14).

The worldwide outbreak of the novel coronavirus respiratory disease, abbreviated as COVID-19, began in early 2020 and Governments quickly realized that it was incumbent on them to enact laws to slow the spread of this highly contagious and deadly virus.  On January 30, 2020, the World Health Organization ("WHO") declared a Public Health Emergency of International Concern due to the COVID-19 virus. *See* WHO Director-General's Statement on IHR Emergency Committee on Novel Coronavirus (2019-nCoV), World Health Organization (Jan. 30, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-statement-on-ihr-emergency-committee-on-novel-coronavirus-(2019-ncov). On January 31, 2020, Health and Human Services (HHS) declared a Public Health

---

[1] The majority of the facts are taken from the Complaint and for purposes of ruling on the Defendant's Motion to Dismiss, the Court assumes the truth of all plausible non-conclusory allegations in the Complaint. *Grabowski v. Ariz. Bd. Of Regents*, 69 F.4th 1110 (9th Cir. 2023).

2

Emergency due to the COVID-19 outbreak. *See* Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus, U.S. Department of Health and Human Services (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

On February 14, 2020, the San Diego County Health Officer announced a Local Health Emergency due to COVID-19.  On March 4, 2020, California Governor Gavin Newsom declared a State of Emergency.  See https://www.gov.ca.gov/2020/03/04. On March 13, 2020, the President of the United States issued a declaration of a national emergency.   Pres. Proc. No. 9994, 85 FR 15337, 2020 WL 1272563 (Mar. 13, 2020).

Regulations were put in place by federal, state, and local governments to slow the spread of the disease by requiring limited social contact, and self-quarantining citizens at home. On March 18, 2020, the Federal Housing Administration ("FHA") enacted a 60-day moratorium on foreclosures and evictions for single family homes with FHA insured mortgages. See https://www.hud.gov/sites/dfiles/OCHCO/documents/20-04hsgml.pdf.

On March 4, 2020, Governor Newsom issued Executive Order N-28-20, which allowed local jurisdictions to exercise their police powers to limit residential evictions.     See     https://www.gov.ca.gov/wp-content/uploads/2020/03/3.16.20-Executive-Order.pdf. On March 19, 2020, the Governor signed Executive Order N-33-20, "stay-at-home" orders directing all Californians to stay home except to travel to shop for essential needs, or to go to what was defined an "essential" job. *Id*. The stay-at-home orders were continued in December, 2020. Due to the restrictions on employment, many San Diegans lost their jobs and suffered economic instability, including the inability to pay rent.

Recognizing that eviction and homelessness would leave residents more vulnerable to COVID-19 due to seeking new housing, living in close quarters in shelters, or on the street, the State Legislature enacted eviction protections in Assembly Bill 3088 and Senate Bill 91.  On May 4, 2021, the San Diego County Board of Supervisors passed Ordinance 10724, the Ordinance in question here. The Ordinance is a short-term moratorium on specific residential evictions that was set to begin June 3, 2021, and end "60 days after the Governor lifts all COVID-19 related stay-at-home and work-at-home orders."  The stay-at-home and work-at-home orders expired on June 15, 2021, and the Ordinance expired on August 14, 2021.

The Ordinance sets forth the background of the COVID-19 emergency in Section 1, and explains that its purpose is to

> require[] just cause for termination of a residential tenancy and provide[] additional tenant protections that are not prohibited by any other provision of law, and … serve justice and promote racial equity for renters in the County of San Diego and serve[] to preserve the public health and safety which is threatened by COVID-19 and. . . keep the residents of the County of San Diego housed.

> Ordinance §3 (ff)

"Just cause" requires "a showing that the Tenant is an imminent health or safety threat." Ordinance § 3(b). "Imminent health or safety threat" is defined as: "a hazard to the health or safety of other tenants or occupants of the same property, taking into account (1) the risk of potential spread of coronavirus caused by the eviction, in case of a Local Emergency due to COVID-19, (2) any public health or safety risk caused by the eviction, and (3) all other remedies available to the landlord and other occupants of the property, against the nature and degree of health and safety risk posed by the tenant's activity."  Ordinance § 2(b).

To facilitate the purpose of the Ordinance, Owners are prohibited from the following actions to recover possession of their property:

> 1) "Serve a notice of termination of tenancy"; 2) "File or serve an unlawful detainer lawsuit, ejectment action, or other action to recover possession of a

residential unit"; 3) "Evict a tenant or require a Tenant to vacate a residential unit," including enforcing final court judgments authorizing repossession of said unit; 4) "Take any other action in reliance on a notice of termination of tenancy that expired during the Local Emergency [defined as "any period of local emergency declared by the County of San Diego in response to the COVID-19 pandemic"] or attempt to induce a tenant to vacate based on such notice"; 5) "Represent to a Tenant that [he] is required to move out of their unit by law."

Ordinance § 3(c).

The Ordinance states that "[n]othing in this ordinance shall relieve a Tenant of the obligations to pay rent, nor restrict a Landlord's ability to recover rent due." § 3(k). Under the remedies section of the Ordinance, Landlords are prohibited from recovering "possession of a rental unit or prevail[ing] in an unlawful detainer action, ejectment action, or other action to recover possession of a residential unit unless the Landlord is able to prove strict compliance with any applicable provision of the Ordinance. §7(a).

## II.   Relevant Procedural Background

On May 13, 2021, Plaintiff filed the Complaint challenging Ordinance 10724 raising three causes of action: (1) Violation of the Contracts Clause of the United States Constitution pursuant to Article 1 § 10 and 42 U.S.C. § 1983; (2) Violation of the Takings Clause of the United States Constitution pursuant to Amendments V, XIV and 42 U.S.C. § 1983; and (3) Violation of Article XI, Section 7, of the California Constitution. [ECF No. 1.]

On May 24, 2021, Plaintiffs filed a Motion for Preliminary Injunction which was denied on July 26, 2021. [ECF Nos. 7, 32.]

On June 4, 2021, Defendant filed a Motion to Dismiss. [ECF No. 16.] On July 27, 2021, Plaintiff filed a Notice of Appeal to the Ninth Circuit Court of Appeals. [ECF No. 33.] On November 9, 2022, the Ninth Circuit issued a Memorandum decision noting that the Ordinance expired on August 10, 2021, and was in effect only 68 days,

therefore the appeal was dismissed as moot. [ECF No. 40.] On December 5, 2022, this Court denied the pending Motion to Dismiss as moot and granted leave to re-file to the extent there were remaining issues to decide. [ECF 42.]

On January 16, 2023, Defendants filed the present Revised Motion to Dismiss Plaintiff's Complaint. [ECF No. 46.] On February 13, 2023, Plaintiff filed a Response in Opposition. [ECF No. 48.] On February 27, 2023, Defendants filed a Reply. [ECF No. 52.]

### III.   Legal Standard

The court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n.*, 720 F.2d 578, 581 (9th Cir. 1983). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must assume the truth of all factual allegations and "construe them in the light most favorable to [the nonmoving party]." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002); *see also Walleri v. Fed. Home Loan Bank of Seattle*, 83 F.3d 1575, 1580 (9th Cir. 1996).

As the Supreme Court explained, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). Instead, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* A

complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir. 1984).

## IV.   Discussion

Defendant seeks dismissal of the case on the following grounds: (1) Plaintiff's request for injunctive and declaratory relief are moot under the law of the case; (2) Plaintiff lacks standing to assert a cause of action on behalf of its members; (3) the Ordinance did not violate the Contracts Clause of the U.S. Constitution; (4) the Ordinance did not violate the Takings Clause of the U.S. Constitution; and (5) the Ordinance did not violate the California Constitution. (Mot. at 5-21).

### 1.  Law of the Case

"Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012). However, the Ninth Circuit has explained that generally its "decisions at the preliminary injunction phase do not constitute the law of the case" because "decisions on preliminary injunctions ... must often be made hastily and on less than a full record." *Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013). To the extent an appellate court makes determinations on an issue of law in a preliminary injunction appeal, those decisions become "the law of the case for further proceedings in the trial court." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dept. of Ag.,* 499 F.3d 1108, 1114 (9th Cir. 2007)(internal citations omitted).

Defendant argues that Plaintiff is not entitled to an injunction under the law-of-the-case based on the appellate court's determination that the request for an

7

injunction was moot. (Mot. at 5). Defendant claims that there is no reasonable expectation that the government will take similar action again. (*Id*.)

Plaintiff counters that the Ninth Circuit panel's decision regarding the preliminary injunction is not law-of-the-case on any relevant matter because they are not relitigating the preliminary injunction question, and therefore it does not require dismissal of the case. (Oppo. at 13). Instead, Plaintiffs argue that the request for declaratory relief and a permanent injunction are live under the "capable of repetition yet evading review" exception. (*Id*. at 17). They claim that there is a reasonable expectation that the controversy presented in this case will recur because the County has not renounced its legal authority to reimpose the same or similar moratorium in the future. (*Id*. at 18).

The Court finds that Plaintiff has not plausibly alleged that the County will reimpose the offending Ordinance. In the Ninth Circuit's decision, the request for injunctive relief was held to be moot because there was "nothing to enjoin" and the Court determined that the Ordinance was not the type of matter that was "capable of repetition yet evading review." *SoCal Rental Housing Association v County of San Diego*, 21-55798 at *3 (9th Cir. 2022)(unpublished memorandum).  In making this determination, the appellate court looked to the decision in *Brach v. Newsom*, 38 F.4th 6 (9th Cir. 2022)(en banc) where the court held that a "[i]t will always be true in contexts beyond the present case, that unexpected events may prompt the government to adopt extraordinary measures" however these concerns are too "remote and speculative" to serve as a firm foundation for our jurisdiction." *Brach*, 38 F.4th at 14.

Plaintiff claims that it "strains credulity to assert that COVID-19 or a similar public-health emergency will never again strike the County" but Plaintiff has not pled sufficient facts to demonstrate that it is more than a mere possibility that the Ordinance is "capable of repetition," despite the fact that the County has not

disavowed its authority to enact such legislation in the future, because the threat is too "remote and speculative." For these reasons, Plaintiff has not sufficiently pled a cause of action for injunctive or declaratory relief and Defendant's Motion to Dismiss is **GRANTED** as to these requests.

### 2. Standing

Article III of the Constitution limits the jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2. "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (internal quotation marks and citation omitted). To establish standing:

> a plaintiff must show (1) [they have] suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. Inc.,* 528 U.S. 167, 180-81 (2000).

An organization such as Plaintiff SCRHA has standing to sue on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Defendant argues that Plaintiff lacks standing because it is a trade association seeking damages and compensation on the first and second causes of action for its third-party members which would require individualized participation of each member, thereby failing the third prong of the *Hunt* test. (Mot. at 6).

1
2
3
4
5
6

  Plaintiff counters that it has associational standing because it has requested nominal damages and an individualized determination is therefore not necessary. (Oppo. at 16). Plaintiff contends that the claim meets the third prong of the associational standing test because they raise only legal questions as to the Ordinance's lawfulness and this prudential prong focuses on matters of administrative convenience and not elements of a case or controversy. (*Id*. at 15).

7
8
9
10
11
12
13

  The parties do not dispute that SCRHA meets the first two prongs of the associational standing test and the Court agrees. With regard to the third prong, "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

14
15
16
17
18
19

  The Complaint states:

> Plaintiff Southern California Rental Housing Association is an association of rental housing owners, many of whom own units in the County and are subject to, and injured by, the Ordinance's eviction moratorium. The Ordinance violates their federal constitutional rights, as described herein. For those members with rental housing units in cities within the County, the Ordinance unconstitutionally purports to apply to those properties, as well. Plaintiff brings this challenge to the Ordinance on behalf of itself and its members to vindicate their civil rights under 42 U.S.C. § 1983, and seeks equitable relief and damages.

20
21

(Compl. at ¶ 5).

22
23
24
25
26
27
28

  Although the Court finds that determination of nominal damages on behalf of SCRHA's individual members would likely require the participation of each member to demonstrate entitlement to, and the amount of, damages particularly because not all of Plaintiff's members own rental property in San Diego County, "the third prong of the associational standing test is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food and Commercial Workers*

*Union Local 751 v. Brown Group. Inc.*, 517 U.S. 544, 559 (1996).  Plaintiff meets the first two Constitutionally compelled components of the *Hunt* test, indicating that there is a "case or controversy" under Article III. The Court construes the allegations in the light most favorable to the nonmoving party and finds that Plaintiff has asserted a plausible associational standing claim. *Iqbal*, 556 U.S. at 678. Accordingly, Defendant's Motion to Dismiss is **DENIED** on this ground.

### 3.  Contracts Clause

Article I, Section 10 of the U.S. Constitution prohibits the States from passing any law "impairing the Obligation of Contracts." U.S. Const. Art. I § 10, cl. 1. While the wording suggests that it "is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people. *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 410 (1983).  To determine whether a restriction violates the Contracts Clause, the Court must analyze whether (1) the law "operate[s] as a substantial impairment of a contractual relationship," (2) whether there is "a significant or legitimate public purpose" in establishing the moratorium, and (3) whether the adjustment to the rights of the contracting parties is "based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislations adoption." *Energy Reserves*, 459 U.S. at 411-12.

### a.  Substantial Impairment

To determine whether a state law substantially impairs the Contract Clause, the Court considers "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S.Ct 1815, 1822 (2018). Pertinent to this inquiry is whether the parties were operating in a regulated industry. *Energy Reserves,* 459 U.S. at 411. "If the industry has been heavily regulated, then

11

the impairment is less severe." *Campanelli v. Allstate Life Ins. Co.,* 322 F.3d 1086, 1098 (9th Cir. 2003). "If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation." *Sveen,* 138 S.Ct. at 1822.

Defendant contends that nothing in the Ordinance substantially impairs the fundamental nature of landlord-tenant contracts, which is the payment of rent in return for housing. (Mot. at 11).  Defendant further argues that landlords retain their non-contractual remedies because the Ordinance allows landlords to sue for damages to rental property and seek restraining orders against tenants who threaten violence. (*Id*.) Moreover, Defendant claims that the landlord-tenant relationship is subject to considerable regulation, therefore, it was not unforeseeable that additional regulation in response to the unprecedented COVID-19 pandemic would be enacted.  (*Id*.) With regard to Plaintiff's facial challenge of the Ordinance, Defendant claims that Plaintiff has not alleged that all applications of the Ordinance unconstitutionally impair existing contractual rights, and any agreements signed after May 4, 2020, were entered into subject to the Ordinance. (*Id*. at 12).

SCRHA argues that the Ordinance substantially impairs contracts by suspending various contract rights including owners' rights to manage, repossess, and protect the integrity of their properties during its term.  (Oppo. at 19). Although the Ordinance purportedly allows eviction of a tenant who poses a "hazard to the health and safety of other tenants or occupants" Plaintiff argues that the term "hazard" was ill-defined, making it uncertain how landlords could permissibly proceed, if at all, to evict a tenant. (*Id*.) Plaintiff further contends that tenants were protected from eviction if the eviction would risk the spread of COVID-19 yet landlords were not in a position to make that medical determination. (*Id*.) In addition, Plaintiff argues that the Ordinance interferes with the rental housing owners' reasonable expectations, contending that no owners could have foreseen that such a restriction would be enacted 15 months into the pandemic as it was winding down.  (*Id*. at 21). Finally,

Plaintiff claims that the policy cannot be carried out in a constitutional manner in all relevant applications, therefore, they have sufficiently pled a facial challenge to the Ordinance. (*Id*. at 22-23).

The Court finds that the Ordinance impairs the landlord-tenant relationship by broadly forbidding the lawful termination of a tenancy without "just cause." Here, the Ordinance states that "just cause" is required for a landlord to evict a tenant and defines "just cause" to require a showing that the Tenant is an imminent health or safety threat, as defined in Section 2. Ordinance, § 3(b). In turn, Section 2 of the Ordinance defines "imminent health or safety threat" as "a hazard to the health or safety of other tenants or occupants of the same property" but does not define the term "hazard." Ordinance, §§ 2, 3(c). By failing to define this term, the Ordinance leaves landlords in a precarious position when determining if conduct satisfies the standard, thereby diminishing the substantial contractual right to terminate a residency. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 431 (1934)("The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them" and impairment exists even when a law does not destroy a contractual agreement but diminishes substantial contractual rights.)

The Complaint further outlines that landlords are prevented from removing tenants despite tenants

> a. harassing, threatening, or endangering the health or safety of the rental housing owner; her employees and agents; invited guests of other tenants; and third parties authorized to conduct business on the property (e.g., repair persons, utility service providers, delivery persons, etc.);
>
> b. damaging or destroying the rental unit or common areas of the rental housing premises;
>
> c. creating a disturbance or nuisance inside a rental unit or in common areas, including in a way that affects others' peace, comfort, and quiet enjoyment of property through the generation of noise, odors, and other offensive conduct;
>
> d. using the rental unit for unlawful purposes in a manner that may not clearly rise to the level of constituting a "hazard to the health or safety of other tenants or occupants of the same property" (e.g., housing occupants not

listed in the rental agreement; keeping unauthorized pets, whose nature or number risks property damage and destruction; illegal drug cultivation, dealing, or use; prostitution; etc.);

e. failure to pay rent;

f. refusal to vacate unit, following otherwise-lawful notice, to allow the rental housing owner and/or her family to move into said unit, out of financial necessity or other extenuating circumstance.

(Compl. ¶ 32).

The Ordinance may even prevent a rental owner from evicting a "hazardous" tenant in light of "the risk of potential spread of coronavirus."  (Compl. ¶ 31). These allegations are sufficient for the Court to draw the reasonable inference that the Ordinance impairs the rights of Plaintiff's members from pursuing their contractual right to remove tenants who breach those agreements or violate the law. *Iqbal*, 556 U.S. at 678.

In addition, Plaintiff sufficiently asserts a plausible claim that the Ordinance impairs contractual rights to rent despite the Ordinance terms which state that owners have the right to collect rent from tenants during its term and seek back rents once the Ordinance expired. The allegation states that:

under the Ordinance, nonpayment of rent is not "just cause" for eviction, so a rental housing owner may not evict a tenant for failure to pay rent. The natural consequence is that, as long as the Ordinance is in effect, tenants are excused from paying rent because owners are without legal remedy. Thus, the Ordinance has the legal and practical effect of relieving tenants of their obligation to pay rent and blocks rental housing owners' ability to recover rent due.

(Compl. ¶ 23). Plaintiff has also sufficiently pled that the Ordinance impairs contractual rights by creating a new cause of action against owners who repossessed property. The Complaint alleges that: "[t]he Ordinance ensures that the 'just cause' exception to the eviction moratorium will rarely (if ever) be invoked by rental housing owners. That is because invoking the exception—even successfully—exposes an owner to the risk of costly and time-consuming litigation by the tenant because "a tenant who receives a notice to terminate based on an

owner's good-faith belief that he presents an 'imminent health or safety threat' can sue the owner over whether the (vaguely defined) 'imminent health and safety' criterion was satisfied. Few, if any, owners will want to invite that kind of litigation risk." (Compl. at ¶ 22). Indeed, if an owner "attempts to recover possession or recovers possession of a residential real property in violation of this ordinance," the "aggrieved Tenant may institute a civil proceeding for injunctive relief, money damages (including for mental or emotional distress . . . ), and all other relief the court deems appropriate." Ordinance, § 7(c).

With regard to landlord's reasonable expectations, the Parties do not dispute that San Diego County landlords operate in a highly regulated industry, with state and federal law governing multiple aspects of the landlord-tenant relationship, Plaintiff alleges:

> the Ordinance significantly interferes with rental housing owners' reasonable expectations. No rental housing owner, including Plaintiff's members, could ever have foreseen or expected the COVID-19 pandemic (the County's purported justification for the Ordinance) and or the extent to which governments (like the County) would use those extraordinary circumstances to justify crippling restrictions on their livelihoods as owners, and violations of their rights under existing rental agreements and the United States Constitution.

(Compl. at ¶ 34). Other district courts have determined that "the scope and nature of the COVID-19 pandemic, and of the public health measures necessary to combat it, have no precedent in the modern era, and that no amount of prior regulation could have led landlords to expect anything like the blanket Moratorium." *Apartment Association of Los Angeles Co. v City of Los Angeles*, 500 F.Supp.3d 1088, 1096 (C.D. Cal. 2020). Taking Plaintiff's allegations as true for purposes of this motion to dismiss, the enactment of the Ordinance was arguably unforeseeable despite the highly regulated landlord-tenant field.

For the foregoing reasons, the Court finds that Plaintiff has plausibly alleged that the Ordinance substantially impairs property owners' contractual rights for

purposes of this motion to dismiss. *See generally Sveen v. Melin,* 138 S. Ct. 1815, 1822 (2018); *Blaisdell*, 290 U.S. 431.

b) Public Purpose

In light of the Court's finding that Plaintiff has alleged a plausible claim that the Ordinance substantially impairs contractual rights, the Court must next determine whether the County had a significant and legitimate public purpose in enacting the Ordinance. *Energy Reserves*, 459 U.S. at 411-12. A legitimate public purpose is one whose goal is to alleviate important general social or economic problems, as opposed to providing a benefit to a specific individual or group. *Id.*

The Ordinance provides background describing the global COVID-19 pandemic threat and emphasizes the importance of keeping San Diego County residents in their homes to limit and stop the spread of this highly contagious disease. Ordinance § 1(a)-(gg). The stated purpose of the Ordinance is clear:

> (r) Because experiencing homelessness can exacerbate vulnerability to COVID-19, it is necessary to take measures to preserve and increase housing security for San Diego County residents; and to protect public health and prevent transmission of COVID-19, it is essential to avoid unnecessary displacement and homelessness.

> (s) An urgency ordinance that requires just case for termination of a residential tenancy during the COVID-19 crises would help ensure that residents stay safely housed during the pandemic and would therefore reduce opportunities for transmission of the virus.

Ordinance §1 (r)-(s).

In light of targeted efforts to keep individuals at home to protect their health and the health of others in the community, the Ordinance's provisions were clearly enacted to address a "broad and general social or economic problem" and Plaintiff has not sufficiently alleged otherwise. *Iqbal*, 556 U.S. at 678.

//

//

16

c) Reasonable and Appropriate

Finally, the Court must determine whether the Ordinance is reasonable and appropriate to the public purpose that justifies its enactment.  See *Energy Reserves*, 459 U.S. at 412; *Apartment Association of Los Angeles Co. v. City of Los Angeles*, 10 F.4th 905, 912 (9th Cir. 2021)(internal quotations omitted). "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Id*.

Defendant argues that the purpose of the Ordinance was to provide housing security to all tenants, not just those experiencing financial hardship or those at risk from the pandemic, to ensure that no tenant would be evicted and forced to interact with others in order to secure new housing while all individuals were ordered to stay at home. (Mot. at 14-15; Reply at 7).

Plaintiff counters that the Ordinance is not drawn in a reasonable and appropriate manner because it "indiscriminately requires owners to house all tenants for an indefinite period of time, regardless of whether such tenants are suffering a financial hardship, are at risk of homelessness, or are vaccinated or otherwise vulnerable to COVID transmission." (Oppo. at 25).  Plaintiff argues that the County could have served its alleged purpose equally well by providing rental assistance for economically vulnerable tenants requiring new housing following otherwise lawful evictions, or at a minimum suspend evictions only for economically vulnerable tenants who can establish financial hardship. (Reply at 13).

The Ordinance is reasonable and appropriate to the public purpose underlying its enactment and Plaintiff has not sufficiently alleged a plausible claim to the contrary. As a primary matter, this Court defers to the conclusions made by the County's Board of Supervisors when enacting the Ordinance finding that those

decisions constituted "the most appropriate way of dealing with the problems identified." *See Apt. Ass'n of L.A. County,* 10 F.4th at 914.

Next, the Ordinance does not limit its scope to economically disadvantaged residents. Ordinance §1 (z)- (cc). The stated purpose is to "serve justice and promote racial equity for renters in the County of San Diego and serve[] to preserve the public health and safety which is threatened by COVID-19 and to keep the residents of the County of San Diego housed." Ordinance § 1(ff). The terms of the Ordinance do not reference "economically vulnerable" tenants, but instead state that those infected with COVID-19 may be unable to work due to illness and may face "potential loss of income, health care and medical coverage, and ability to pay for housing and basic needs." Ordinance §1 (l)-(n). Because the economic impacts of the COVID-19 pandemic are far ranging, the Ordinance aims to ensure County of San Diego residents, whatever their socio-economic status, remain housed for their own safety and the safety of the community at large. Moreover, the Ordinance does not require landlords to house tenants for an "indefinite period of time" but was set to expire, and did expire, after a mere 68 days.

Finally, Plaintiff has not sufficiently pled a plausible claim that the Ordinance was special interest legislation designed to benefit tenants, a discrete class of persons, by adjusting the rights and responsibilities of the contracting parties. As noted above, the aim of the Ordinance was to address the global health crisis created by the COVID-19 virus by ensuring all tenants could remain housed to avoid interacting with the general public. Plaintiff has cited no binding authority for the proposition that such regulations are designed for and benefit only a select class of persons, i.e. tenants.

For the foregoing reasons, the Court finds that Plaintiff has not sufficiently pled a cause of action for violation of the Contracts Clause, and Defendant's Motion to Dismiss is GRANTED.

### 4. Takings Clause

The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the government from taking private property unless it is for a "public use" and "just compensation" is paid to the owner.  U.S. Const. amend. V, XIV (applying Takings Clause to state and local governments).  Two categories of takings exist: physical takings and regulatory takings. *Yee v. City of Escondido, Cal.,* 503 U.S. 519 (1992).  In a physical taking, the government "authorizes a physical occupation of property" and is required to afford just compensation to the property owner.  *Id*. at 522.

A regulatory taking may be either categorical, where "no productive or economically beneficial use of land is permitted," or non-categorical, which is "[a]nything less than a complete elimination of value, or a total loss." *Tahoe Sierra Pres. Council Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 330-31 (2002).  In analyzing a regulatory taking, a court considers the three *Penn Central* factors: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with investment-backed expectations; and (3) the character of the governmental taking. *Penn. Central*, 438 U.S. at 124 (internal citations omitted).  In a non-categorical taking, the government regulates the use of the property, and compensation is only required where "the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee,* 503 U.S. at 523 (citing *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 123-125 (1978).

19

1
2
3
4

Defendant argues that Plaintiff's Takings Clause cause of action must be dismissed because Plaintiff has not sufficiently pled that the Ordinance was enacted for a private, rather than a public use and Plaintiff fails to plead a plausible claim that the Ordinance was a *per se* or regulatory taking. (Mot. at 16-17; Reply at 8-9).

5
6
7
8
9
10
11
12
13
14
15
16
17
18

Plaintiff counters that the Ordinance constitutes an unconstitutional taking for a private use because it was designed "to benefit a particular class of identifiable individuals" (tenants), citing *Kelo v. City of New London*, 545 U.S. 469, 477 (2005). (Oppo. at 26).  Injunctive relief is warranted against the same or similar type of ordinance, according to Plaintiff, because the owners have suffered irreparable harm associated with the total loss, even temporarily, of their constitutional property right. (*Id*.)  Plaintiff claims that the Ordinance constitutes a *per se* taking under *Loretto v. Teleprompter Manhattan Catv Corp*., 458 U.S. 419, 426 (1982), because it requires an owner to suffer a "physical occupation" without his consent.  (*Id*. at 28).  Alternatively, the Ordinance effected a regulatory taking under *Lucas* or *Penn Central* because it deprived owners of all "economically beneficial" or "viable" use of their properties by stripping them of their right to evict, the only means of securing payment, according to Plaintiff. (*Id*.)

19
20
21
22
23
24
25
26
27
28

The Court finds that Plaintiff has failed to plead sufficient facts which, taken as true, support the Takings cause of action.  First, the Complaint does not sufficiently support Plaintiff's claim that the Ordinance was enacted for private use. The allegation states "the taking is not for a public use or purpose. The moratorium's express purpose and effect are to benefit 'a particular class of identifiable individuals—namely tenants" citing *Kelo*. (Compl. at ¶ 48). While *Kelo* recognized that a private taking is forbidden because it serves no legitimate governmental purpose, the Court stated that legislatures should be granted "broad latitude in determining what public needs justify the use of the takings power." *Kelo*, 545 U.S. at 483. The County set forth numerous findings in the Ordinance outlining the reasons

for its enactment as a tool to serve the greater public during a once in a lifetime pandemic indicating the Ordinance was not enacted to benefit a small class of individuals but was instead designed to further a compelling and legitimate government purpose.

Similarly, Plaintiff fails to plausibly plead that the Ordinance constitutes a *per se* physical taking. Generally, if "a regulation results in a physical appropriation of property, a *per se* taking has occurred." *Cedar Point Nursery v. Hassid*, ⸺ U.S. ⸺ ⸺, 141 S. Ct. 2063, 2072 (2021). In *Cedar Point*, the Supreme Court held that a California regulation that permitted access to union representatives for up to three hours a day for 120 days a year on to landowners property constituted a physical, or *per se* taking, because it was a physical appropriation of property and impaired the owners' right to exclude. *Id*. at 2080. In reaching this conclusion, the Court focused on "physical invasions" which constituted takings, even if only for a limited time pursuant to an access regulation. *Id*. at 2073.

*Cedar Point* is distinguishable from the facts before this Court. Unlike the landowners in *Cedar Point* who were forced to allow unionizing activity on their property for a specified amount of time, the landlords here have solicited tenants to rent their properties, and the Ordinance simply regulates landlords' relationship with tenants. *Yee v. City of Escondido*, 503 U.S. at 531 ("Because they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals.) Although renters cannot be evicted during the temporary duration of the Ordinance, landlords have not lost their right to exclude as did the owners in *Cedar Poin*t.

Similarly, Plaintiff's reliance on *Loretto* is unavailing, as the Supreme Court there reaffirmed that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when

interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Loretto*, 458 U.S. 419, 426 (1982). The Ordinance clearly has a public purpose and temporarily adjusts the benefits and burdens of the landlord tenant contractual relationship.

The Court finds that Plaintiff has not sufficiently pled that the Ordinance effected a regulatory taking under *Lucas* or *Penn Central*. The conclusory allegation states that "the Ordinance provides no mechanism for compensating owners for the loss of their property rights" and "eliminates housing owners' full rights to possess, use, and exclude, pursuant to their existing rental agreements and the Constitution." (Compl. at ¶ 49). In the Opposition, Plaintiff claims that:

> (1) the moratorium's "economic impact" on rental housing owners was substantial, given it eliminated owners' right to lawfully repossess property, even for nonpayment of rent or to move themselves and/or their families into their property;(2) the extent to which the Ordinance interfered with distinct investment-backed expectations, based on existing law and rental agreements, was significant; and (3) the character of the County's action- enactment of a law that conferred no reciprocity of advantage, but rather penalized owners to the exclusive benefit of tenants—weighs decisively in favor of a taking.

(Oppo. at 28-29). Plaintiff's allegations constitute little more than "a formulaic recitation of the elements of a cause of action" which is insufficient under *Twombly*. *Twombly*, 550 U.S. at 555.

In addition, it is not enough to succeed on a facial challenge to the Ordinance under the Takings Clause if only a few tenants are behind on their rent. (See Complaint; Declarations [ECF Nos. 7-2-7-5).]) "Many . . . ordinances place limits on the property owner's right to make profitable use of some segments of his property" but do not run afoul of the Takings Clause. *Keystone*, 480 U.S. at 498. Although the Ordinance restrains landlords' ability to evict tenants during its term, nothing in the Ordinance makes it "commercially impracticable" to continue to receive rents from other tenants or from the rental assistance fund. *See* County Emergency Rent & Utility Assistance, https://www.sandiegocounty.gov/content/dam/sdc/sdhcd/new-

22

docs/Landlord-Flyer.pdf. Landlords may also apply for rental assistance for their tenants in some instances. *See* Housing Stability Assistance Program, https://www.sdhc.org/housing-opportunities/help-with-your-rent/covid-19-rental-assistance/.

Accordingly, Plaintiff's reasonable investment-backed expectations must yield to a "public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124.

In the Complaint, Plaintiff makes the bare assertion that "Plaintiff and its members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless the County is immediately enjoined from implementing and enforcing the Ordinance." (Compl. at ¶ 50). Such "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the Ordinance results in takings, the remedy is money damages, not an injunction. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 741)(2010)(Kennedy, J., concurring)("It makes perfect sense that the remedy for a Takings Clause violation is only damages, as the Clause does not proscribe the taking of property; it proscribes taking without just compensation").

For the foregoing reasons, Plaintiff has failed to plead sufficient facts to support the Takings Clause claim, therefore, Defendant's Motion to Dismiss is **GRANTED.**

//

//

//

5.  California Constitution

23

1
2
3
4
5
6
7
8
9

Defendant argues that the third cause of action should be dismissed because the County had authority to enact the countywide Ordinance pursuant to California Emergency Services Act section 8634, which does not contain any geographical limitations.  (Mot. at 18).  In addition, Defendant contends that this cause of action should be dismissed because Plaintiff seeks only declaratory relief but there is no case or controversy due to the expiration of the Ordinance. (*Id*.)  Defendant further argues that the Ordinance is consistent with the California Constitution because Article XI, section 7 provides that a county may make and enforce ordinances within the unincorporated areas and cities within county limits. (*Id*. at 22).

10
11
12
13
14
15
16
17
18
19
20
21

Plaintiff argues that the Ordinance violates the California Constitution because it impermissibly extends its reach beyond the unincorporated areas of the County, and applies to cities within the County.  (Oppo. at 30.)  Plaintiff further argues that California Government Code section 8634 does not justify the Ordinance's extra-territorial application to cities because "the statute does not say that a county regulation required by a county-declared 'emergency' applies to cities within that county." (Compl. at ¶ 56). Plaintiff claims that even if a county "emergency" justified enactment of such legislation, "the Board voted to convert the Ordinance from an 'urgency' ordinance (which would take effect immediately upon enactment) into a *non-urgency* ordinance to take effect within 30 days of its enactment. (Compl. at ¶ 57)(emphasis in original).

22
23
24
25
26
27
28

The Court finds that Plaintiff has not pled sufficient factual support for the claim that the Ordinance violates the California Constitution. In the Complaint, Plaintiff alleges that "[a]s a constitutional matter, the Ordinance has no lawful application outside the unincorporated areas of the County" yet it purports to apply to cities within the County. (Compl. at ¶ 54). Plaintiff alleges that "[t]he statute does not say that a county regulation required by a county-declared 'emergency' applies to cities within that county. Nor is there case law to support that interpretation of the statute."

(Compl. at ¶ 56). The cause of action further claims that "even if section 8634 subjected cities to a county's 'emergency' regulations, the County could not invoke that statute to apply its Ordinance outside unincorporated areas. That is because the Ordinance is not premised upon an urgent need to protect life and property." (Compl. at ¶ 57).

As a primary matter, the language of the statute does not support Plaintiff's assertions in the Complaint.  Section 8634 states in pertinent part: "[d]uring a local emergency the governing body of a political subdivision, or officials designated thereby, may promulgate orders and regulations necessary to provide for the protection of life and property."  Cal. Gov. Code. § 8634.  No delineation about the boundaries of the regulations reaching only unincorporated areas of a county is included. This comports with the California Constitution which states that: "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."  Cal. Const., art. XI, § 7.

The Ordinance states that "the regulations in this ordinance shall apply to cities within the County of San Diego" except where "the governing body of a city has enacted an ordinance that has stronger protections for Tenants during the COVID-19 emergency."  Ordinance § 8 (a)-(b). Support for the interpretation that the Ordinance permissibly applies to cities within the County comes from a California Attorney General opinion issued in response to a request from the Director of the Office of Emergency Services to clarify whether cities within a county were bound by rules and regulations adopted by the county pursuant to section 8634. The Attorney General concluded that "[c]ities within a county are bound by county rules and regulations adopted by the county pursuant to section 8634 of the Government Code during a county proclaimed emergency" irrespective of whether the cities have also declared an emergency.  62 Ops. Cal.Att'y Gen. 701 (Cal. A.G. 1979).

While not binding on this Court, the Opinion of the Attorney General is entitled to "great weight." *California Bldg. Indus. Ass'n v. State Water Res. Control Bd.*, 4 Cal. 5th 1032, 1042 (2018).  The Opinion stated that the Legislature intended to provide that a county's authority to address local emergencies such as "fire, flood, epidemic, or air pollution" was not limited by "corporate boundaries" and that it would "defy common sense" to conclude otherwise.  A.G. Opinion at *134. The Court agrees. The COVID-19 virus does not distinguish between city and county borders. Instead, it spreads through the air. It would "defy common sense" for the Court to hold that the County was not authorized under section 8364 to enact an Ordinance that included cities within the County when the stated aim and purpose to limit the spread of COVID-19 by prohibiting evictions for the duration of the declared emergency.

Plaintiff cites *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264 (1993), and *County Sanitation Dist. Nos.2 v. County of Kern*, 127Cal.App. 4th 1544 (2005), for the proposition that the California Constitution limits authorization of a county to exercise its police power within the unincorporated areas of the county. (Reply at 19).  However, the California Emergency Services Act was not an issue in either of these cases. Instead, they involved matters of purely local concern, in which the county regulations did not apply within incorporated cities. In *Kern*, the case involved disposal of "sewage sludge" under CEQA.  127 Cal. App. 4th at 1557.  The issue of landfill surcharges and garbage incineration bans were at issue in *Dublin*.  14 Cal. App. 4th at 270.  Neither of these issues concerned the health and safety of residents throughout the county including all of its cities.

Plaintiff makes much of the fact that the Ordinance was not passed as an "urgency" motion pursuant to Government Code § 25123(d), and therefore it was not premised upon an urgent need to protect life and property, but section 8634 permits a county to enact regulations when there is "a local emergency" and here it is undisputed that

a national, statewide, and local emergency was declared.  For the foregoing reasons, the Court finds that Plaintiff has failed to state a plausible claim for relief that the Ordinance violates the California Constitution by applying to areas outside the unincorporated areas of the County, including cities within the County. *Iqbal*, 556 U.S. at 678.  Accordingly, Defendant's Motion to Dismiss is GRANTED on this ground.

## V.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is **DENIED** as to Plaintiff's standing, and **GRANTED** as to all other claims without prejudice and with leave to amend.

**IT IS SO ORDERED.**

Dated:  September 27, 2023

Hon. M. James Lorenz
United States District Judge